**Patrick B. Hughes (Bar No. 16648)**
phughes@adamsjones.com
**ADAMS JONES LAW FIRM, P.A.**
1635 N. Waterfront Parkway, Suite 200
Wichita, KS 67206
Telephone: (316) 265-8591
Facsimile: (316) 265-9719

Brett L. Foster (*pro hac vice* applicant)
foster.brett@dorsey.com
Tamara L. Kapaloski (*pro hac vice* applicant)
kapaloski.tammy@dorsey.com
**DORSEY & WHITNEY LLP**
111 South Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile: (801) 933-7373

*Attorneys for Plaintiffs Parah, LLC and Ozonics, LLC*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **PARAH, LLC**, a Texas limited liability company, **OZONICS, LLC**, a Texas limited liability company, | **PLAINTIFFS' REDACTED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| Plaintiffs, | Civil Case No. 6:18-cv-1208 |
| vs. | |
| **MOJACK DISTRIBUTORS, LLC**, a Kansas limited liability company, d/b/a **SCENT CRUSHER**, | **HEARING REQUESTED** |
| Defendant. | |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP"), Plaintiffs Parah,

LLC and Ozonics, LLC ("Ozonics") hereby move to preliminarily enjoin Defendant MoJack

Distributors, LLC, d/b/a Scent Crusher ("Scent Crusher") from patent infringement.

# I.   <u>**INTRODUCTION**</u>

This is a critical time for Ozonics, a small innovator faced with the imminent threat of being squeezed out of its only business by an aggressive rival who is blatantly and intentionally infringing Ozonics' patents.  In 2013, the United States Patent and Trademark Office granted two patents to Ozonics covering methods for descenting a hunter in the field.  The commercial embodiments of Ozonics' patents are portable ozone generators designed for use by hunters in the field.  Ozonics' ozone generators are the lifeblood of the company.  This innovation literally created a new product category in the hunting industry and Ozonics has diligently and successfully enforced its patents and has refused to license or sell this proprietary and patented technology.

By contrast, rather than blazing its own trail of innovation and securing patent rights to protect that innovation, Scent Crusher's imminent emergence into the market is based on a concerted and deliberate decision to unlawfully take what it failed to obtain through proper means.  Scent Crusher's first play at Ozonics' technology occurred over three years ago when it offered an infringing product to the hunting industry.  After receiving a cease and desist letter from Ozonics threatening immediate legal action if Scent Crusher did not cease its infringing conduct in 2015, Scent Crusher withdrew from the in-the-field ozone generator market.  In mid-2017, Scent Crusher offered to buy Ozonics for ten million dollars.  After Ozonics declined this offer, Scent Crusher asked to license the patented scent elimination technology or join forces with Ozonics to sell the technology.  Again, Ozonics declined Scent Crusher's overtures.

After its lawful efforts to obtain Ozonics' patented technology failed, Scent Crusher decided to simply take it, despite full knowledge of Ozonics' patent protection, and to aggressively push copy-cat products out to the market.  No doubt believing its sales of the

infringing products would sustain litigation and justify any eventual damages payment to Ozonics, Scent Crusher chose to brazenly flout the United States Patent Laws. As the Federal Circuit warned, "a calculating infringer may . . . decide to risk a delayed payment [to a patentee] to obtain use of valuable property without prior negotiation or the owner's permission." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362-63 (Fed. Cir. 2012). This is precisely what Scent Crusher is attempting here.

Scent Crusher's deliberate, wholesale, and systematic campaign to rip-off Ozonics' technology must be stopped. Such illegal conduct makes investments in innovative technologies costly and pointless, and will serve to encourage others to knowingly violate hard earned intellectual property rights when they feel the monetary upside justifies it. Time is of the essence here. Although Scent Crusher is currently advertising its infringing technology, as are numerous of its retailers including Cabela's, Lancaster Archery Supply, and Simmons' Sporting Goods, the products are not slated to be available for actual purchase until early August. As shown below, preliminary injunctive relief is warranted here to prevent the irreparable harm that will inevitably befall Ozonics if it is forced to compete with Scent Crusher against its own patented technologies.

## II.   FACTUAL BACKGROUND

### A.   Ozonics obtains patents on its scent elimination technology.

Ozonics owns[1] valid and enforceable United States patents at issue here. *See* Declaration of Scott Elrod ("Elrod Decl.") at ¶¶ 2-3. On March 26, 2013, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 8,404,180 (the "'180 Patent"), entitled

---

[1] Plaintiff Parah, LLC owns the Ozonics Patents (defined below), and exclusively licenses them to Ozonics, LLC. Both companies are commonly owned. *See* Elrod Decl ¶¶ 2-3.

"Method of Descending Hunter's Clothing." *Id*. at ¶ 2; Exh. A.[2]  On October 15, 2013, the USPTO issued U.S. Patent No. 8,557,177 (the "'177 Patent"), entitled "Method of Descending Hunter's Clothing." *Id*. at ¶ 3; Exh. B.  The '177 Patent and the '180 Patent are collectively referred to herein as the "Ozonics Patents" or as "Ozonics' Patents."

The Ozonics Patents cover methods of deodorizing a hunter, hunter clothing, and hunting equipment through a portable oxidizing gas generator that is used in the field for discharging a stream of ozone.  Elrod Decl. at ¶ 4.  The technology works by transforming oxygen molecules into ozone molecules, which then bond with the scent molecules being constantly produced by a hunter and his or her equipment.  In other words, the technology essentially alters a hunter's scent molecules and renders them unrecognizable by deer and other wild game.  *Id*.

**B.     Ozonics created a new market for in-the-field scent elimination for hunters.**

Ozonics brought the first portable in-the-field ozone generator to the market in the fall of 2007.  Elrod Decl. at ¶ 7.  Since that time, Ozonics has successfully developed and iterated five different models of its ozone generators with numerous support accessories.  *Id*.[3]  Through Ozonics' research and development, it continues to develop new, cutting edge, and innovative platforms to increase hunters' success.  *Id*. at ¶ 8.  Ozonics' current in-the-field ozone generators, the HR300 and HR230 are shown below:

---

[2] References to "Exh. __" are to the exhibits attached to the Elrod Decl.  The patent applications for both patents at issue were filed in 2004.  Elrod Decl. at ¶ 5.

[3] These models are the HR100 (2007-2010), HR150 (2010-2013), HR200 (2010-2017), HR230 (2018-present), and HR300 (2016-present).  *Id*.



Ozonics' ozone generators are designed to be used by hunters in the field—*i.e.*, in tree stands or in blinds, as shown by the following pictures available on Ozonics' Facebook page:



*Id*. at ¶ 9. Ozonics has invested heavily in marketing this use to its customers and instructing them on how to use the products in tree stands and in blinds. *Id*. at ¶ 10.

Since its founding, Ozonics has spent more than ███████████████████ marketing its patented in-field generators and educating customers about its products. *Id*. at ¶ 12. Ozonics promotes its products through television, print and online advertisements, its website and social media accounts, and at trade shows. *Id*. at ¶ 11. Over the years, Ozonics has ███

████████████████████████████████████████████████████

██████ *Id*.  Ozonics currently has 28,000 Facebook followers, over 4,000 Twitter followers, and approximately 6,800 Instagram followers.  *Id*.  Ozonics has also created numerous instructional videos, which are available on Ozonics' website, to promote its products.  *Id*.  Through its substantial investment, Ozonics literally created a market category that did not previously exist.  *Id*. at ¶ 12.  As Ozonics states on its website, the introduction of Ozonics' technology "was the start of a new era of scent management, and it remains the only active in-the-field scent elimination device."  *Id*. at ¶ 18.[4]

This investment has paid off.  ██████████████████████████████ ██████████████████████████████. *Id*. at ¶ 13.  Ozonics' patented scent elimination technology is the lifeblood of its business, and, although Ozonics also sells related accessories, its portable ozone generators are its flagship products.  *Id*. at ¶ 14; Declaration of Charles "Buddy" Piland ("Piland Decl.") at ¶ 2.

### C.    Ozonics diligently protects its patent rights and maintains exclusivity in the market.

Ozonics has diligently enforced its patent rights.  Elrod Decl. at ¶ 15.  In addition to widely advertising its patent-protected status, Ozonics has sent cease-and-desist letters and brought legal action against would-be infringers.  *Id*.  Moreover, Ozonics has never licensed its patented technology and has refused to sell it.  *Id*. at ¶ 16.  Although Ozonics has previously sold its ozone generating units through retailers such as Cabela's and Bass Pro Shop, Ozonics currently sells its products only directly to its customers at trade shows or online through its website at www.ozonicshunting.com.  *Id*. at ¶ 17.  This recent marketing change has had no impact on the identity of the end users of Ozonics' products.  *Id*.  Ozonics continues to sell its

---

[4]  Ozonics' reputation as an innovator has been widely recognized by the industry and Ozonics has worked hard to maintain this reputation.  *Id*. at ¶¶ 19-20.

products to the identical customer base (hunters) that it has always had. *Id*.

Prior to Scent Crusher's recent announcement of its imminent emergence into the market, Ozonics had no competitors in the marketplace for portable ozone generator devices for use by hunters in the field. *Id*. at ¶ 21. Rather, Ozonics has enjoyed and enforced its right to exclude others as provided by the Ozonics Patents. *Id*.

### D.    Scent Crusher enters the market with infringing in-field ozone generators.

Scent Crusher manufactures and sells products to hunters designed to eliminate odors through ozone technology. *Id*. at ¶ 22. Scent Crusher maintains a website at www.scentcrusher.com where it promotes its products to the very same customers as does Ozonics. *Id*. at ¶¶ 23-24. Scent Crusher also advertises its products to its potential customers (which are also Ozonics' potential customers) on its social media sites, including Facebook, where it has almost 115,000 followers, and Twitter, where it has over 3,300 followers. *Id*. at ¶ 23. With one temporary exception noted below, until very recently, Scent Crusher has not sold or offered to sell portable ozone generating units. *Id*. at ¶ 22. Instead, its product line consisted of gear bags, packs, totes, closets, soap, laundry detergent, sprays, and other products that steered clear of Ozonics' Patents. *Id*.

Scent Crusher has made several attempts in the past to use or obtain Ozonics' patented technology. In early 2015, Ozonics discovered that Scent Crusher was making and selling portable ozone generators and advertising that they were to be taken to the field and used for hunting. *Id*. at ¶ 25. Ozonics immediately sent Scent Crusher a cease-and-desist letter advising Scent Crusher of the Ozonics Patents and demanding that Scent Crusher stop its infringing conduct. *Id*. Ozonics included copies of the Ozonics Patents in its letter. *Id*. Following receipt of Ozonics' 2015 cease-and-desist letter, Scent Crusher withdrew its portable ozone generators

from the market and Ozonics hoped and believed that there would be no further attempts by Scent Crusher to infringe the Ozonics Patents. *Id*. at ¶ 26.

In approximately April of 2017, Dan Drake, the CEO of Scent Crusher approached Ozonics and offered to buy the company for $10,000,000. *Id*. at ¶ 27. Ozonics respectfully declined Scent Crusher's offer. In approximately November of 2017, Scent Crusher again approached Ozonics and requested permission to license the technology from Ozonics or to enter into a joint venture type arrangement to sell Ozonics' technology. *Id*. at ¶ 28. Once again, Ozonics respectfully declined these offers. *Id*.

To Ozonics' great shock and disappointment, in June of 2018, Ozonics discovered that Scent Crusher had announced its plans to begin making and selling a "Field Unit." *Id*. at ¶ 29. Scent Crusher announced as "New for 2018!" portable ozone generator devices called the "Field Pro" and "Field Lite":

 

*Id.;* Exh. E. Scent Crusher announced that the Field Pro and Field Lite will be available to ship the week of August 6, 2018. *See id*. As shown in the charts below, it is clear and beyond rational dispute that the Scent Crusher products practice the inventions claimed in the Ozonics Patents.

## U.S. Patent No. 8,557,177

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| A method of deodorizing a hunter, hunter clothing, and a hunting equipment while hunting, comprising: | Scent Crusher's promotional materials[5] instruct its customers to use the Scent Crusher ozone generators to perform a method of deodorizing a hunter, hunter clothing, and hunting equipment while hunting.<br><br>For example, the Field Lite is described as providing "ample ozone output for most hunting situations", and for creating a "circle of protection" for "the hunter to use [] in a tree stand, ground blind, or for spot and stalk hunts." The Field Pro is described as providing a "scent control blanket", and as having a battery allowing for "longer hunts on a single charge."<br><br>**Field Lite**　　　　　**Field Pro**<br> |
| providing a portable oxidizing gas generator that has been transported to a field for discharging a stream of oxidizing gas; | The Scent Crusher Products are portable oxidizing gas generators configured for transport into the field by a hunter for the purpose of discharging a stream of oxidizing gas.  The Scent Crusher promotional materials instruct users to transport the Field Lite and Field Pro to a field for discharging a stream of oxidizing gas.<br><br>The Field Lite product is described as "[c]ompact and lightweight" allowing for easy portability to the field. The Field Lite also has "ample ozone output for most hunting situations" and "allows the hunter to use [the Field Lite] in a tree stand, ground blind, or for spot |

---

[5] Available at https://scentcrusher.com/field-pro/ and https://scentcrusher.com/field-lite/, respectively; certain materials cited herein may also be found at http://www.lancasterarchery.com/scent-crusher-field-lite.html and http://www.lancasterarchery.com/scent-crusher-field-pro.html.  Undoubtedly, the materials (e.g., images and product descriptions) on the Lancaster Archery websites were provided by Scent Crusher.  *See* Elrod Decl. at ¶ 40.

ix

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| | and stalk hunts." The Field Lite has a series of slits or vents on the front of the product allowing for discharge of a stream of ozone.<br><br><br><br>The Field Pro has "[v]ent ports on the front and side for an industry leading 270° of coverage and 60% more ozone output than any comparable field product . . . with high quality fan for quiet operation". The Field Pro is battery operated, allowing for use in the field in the manner depicted in promotional images. "Directional vent ports" on the front and sides of the Field Pro allow for discharge of one or more streams of oxidizing gas. *See* http://www.theoutdoorwire.com/story/1ea5aa38-2863-4bfc-a779-8540624e352d.<br><br>  |
| positioning the portable oxidizing gas generator for use in the field where the hunter, the hunting clothing, the hunting equipment and game animals are present; | The Scent Crusher Products are used, pursuant to Scent Crusher's promotional materials, by positioning the portable oxidizing gas generator in the field where the hunter, the hunting clothing, the hunting equipment and game animals are present. |

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| |  |
| applying the stream of oxidizing gas directly onto the hunter, the hunting clothing, and the hunting equipment in the field to deodorize the hunting clothing and the hunting equipment. | The Scent Crusher products are used, pursuant to Scent Crusher's promotional materials, to apply a stream of oxidizing gas directly onto the hunter, the hunting clothing, and the hunting equipment in the field to deodorize the hunting clothing and the hunting equipment.

Scent Crusher uses the marketing term "Scent off. Game on." to inform consumers that the intended use of the Field Lite and Field Pro products is to eliminate scents associated with the hunter while in the field.

The Field Lite is described as providing "ample ozone output for most hunting situations", and for creating a "circle of protection" for "the hunter to use [] in a tree stand, ground blind, or for spot and stalk hunts." See also http://www.theoutdoorwire.com/story/1ea5aa38-2863-4bfc-a779-8540624e352d ("[T]he Field Lite will have you covered and scent free.")

The Field Pro is described as providing a "scent control blanket for the tree stand and ground blind", through "an industry leading 270° of coverage and 60% more ozone output than any comparable field product." See also http://www.theoutdoorwire.com/story/1ea5aa38- |

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
|  | 2863-4bfc-a779-8540624e352d (describing the Field Pro as providing "a wider blanket and added ozone output, the Field Pro has you covered, and you have the advantage."). |

**U.S. Patent No. 8,404,180**

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| A method of eliminating scents, the method comprising: | Scent Crusher's promotional materials instruct its customers to use the Scent Crusher ozone generator products to perform a method of eliminating scents.<br><br>For example, the Field Lite is described as providing "ample ozone output for most hunting situations", and for creating a "circle of protection" for "the hunter to use [] in a tree stand, ground blind, or for spot and stalk hunts." The Field Pro is described as providing a "scent control blanket", and as having a battery allowing for "longer hunts on a single charge."<br><br>**Field Lite**  **Field Pro**<br> |

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| providing a gas generator configured for transport into a field, | The Scent Crusher products comprise ozone gas generators configured for transport into a field.<br><br>**Field Lite**      **Field Pro**<br> |
| configured for mounting in the field, | The Scent Crusher Products are configured for mounting in the field.<br><br>**Field Lite**      **Field Pro**<br> |
| and configured for discharging a stream of oxidizing gas into the field to eliminate scents associated with a hunter in the air traveling downwind of the hunter toward game animals in the field. | The Scent Crusher Products are configured for discharging a stream of oxidizing gas into the field to eliminate scents associated with a hunter in the air traveling downwind of the hunter toward game animals in the field.<br><br>Scent Crusher uses the marketing term "Scent off. Game on." to inform consumers that the intended use of the Field Lite and Field Pro products is to eliminate scents associated with the hunter while in the field.<br><br>The Field Lite is described as providing "ample ozone output for most hunting situations", and for creating a "circle of protection" for "the hunter to use [] in a tree stand, ground blind, or for spot and stalk hunts." *See also* http://www.theoutdoorwire.com/story/1ea5aa38-2863-4bfc-a779-8540624e352d ("[T]he Field Lite will have you covered and scent free.") |

| Claim 1 | Scent Crusher Field Lite & Field Pro |
|---|---|
| | The Field Pro is described as providing a "scent control blanket for the tree stand and ground blind", through "an industry leading 270° of coverage and 60% more ozone output than any comparable field product." See also http://www.theoutdoorwire.com/story/1ea5aa38-2863-4bfc-a779-8540624e352d (describing the Field Pro as providing "a wider blanket and added ozone output, the Field Pro has you covered, and you have the advantage."). |

Detailed claim charts further illustrating Scent Crusher's infringement are provided in Exhibits

1-2 to the Declaration of Brett Foster ("Foster Decl.").

Scent Crusher has forecasted very healthy profit margins that it expects its retailers to

receive on its infringing Field Lite and Field Pro products and related accessories:



*See* Elrod Decl. at ¶ 30; Exh. E.

Shortly after discovering Scent Crusher's initial marketing plans, Ozonics discovered that

some of Scent Crusher's retailers, including Lancaster Archery Supply, were offering the Field

Pro and Field Lite units for sale on their websites:



Elrod Decl. at ¶ 31.  The "product description" for the Scent Crusher Field Pro claims that it provides "60% more ozone output than any comparable field product" and that the "New Scent Crusher Field Pro is your scent control blanket for the tree stand and ground blind."  *Id*. at ¶ 32.

Lancaster Archery Supply also offers the Scent Crusher Field Lite for sale on its website:



*Id.* at ¶ 33.  The product description for the Scent Crusher Field Lite states that the "new Scent Crusher Field Lite is compact and lightweight with great features in a small design" and that its

"design allows the hunter to use it in a tree stand, ground blind, or for spot and stalk hunts." *Id.* at ¶ 34.

In its listings for both the Scent Crusher Field Pro and Field Lite, Lancaster Archery Supply includes pictures of a hunter using Scent Crusher's ozone generators in the field:



*Id*. at ¶ 35.

Around the same time, Ozonics discovered that a Scent Crusher representative had stated that Scent Crusher could sell the Field Pro and Field Lite because Scent Crusher had found "loopholes" around the Ozonics' Patents. Elrod Decl. at ¶ 36. No such loopholes exist.

On June 26, 2018, Scent Crusher issued a press release publicly "[i]ntroducing the all new Field Lite and Field Pro in the field ozone generators." *Id.* at ¶ 37; Exh. F. In its press

release, Scent Crusher also claimed that it is "the leading manufacturer of ozone technology in the hunting industry" and "has set the standard once again." *Id.* In addition, among other things, Scent Crusher described its Field Lite ozone generator as "[d]esigned for the hunter that doesn't want to take up added space in his pack," and its Field Pro as providing "a wider blanket and added ozone output." *Id.*

By July 9, 2018, numerous Scent Crusher retailers were marketing and offering to sell the Scent Crusher ozone generators as the following screen shots show:







Elrod Decl. at ¶ 38.

On or about July 10, 2018, Scent Crusher added its Field Pro and Field Lite devices to the list of products it advertises on its website:



*Id*. at ¶ 39. Clicking on the pictures above leads consumers to product pages for Scent Crusher's Field Pro and Field Lite respectively. *Id*.; Exhs. G-H. Scent Crusher's Field Pro and Field Lite pages on its website include the same pictures that are available on the websites of Scent Crusher's retailers:






*Id.* at ¶ 40. Scent Crusher describes the Field Pro and Field Lite in identical language as do its

retailers. Scent Crusher spoon fed these photographs and product descriptions to its retailers. *Id.*

   **E.     Scent Crusher's in-field ozone units compete directly with Ozonics' patented technology.**

   By making and offering to sell portable ozone generating devices and advertising them as

designed and intended for use in the field by hunters, Scent Crusher is using the technology

covered by Ozonics' Patents to compete directly with Ozonics for the exact same customers. *Id.*

at ¶ 41. The names of Scent Crusher's ozone generators (*i.e.*, the <u>Field</u> Pro and the <u>Field</u> Lite),

and its own press release announcing "the all new Field Lite and Field Pro <u>in the field</u> ozone

generators" leave no doubt as to their intended use in the field. *Id.*; Exh. F (emphasis added).

Even more disappointing, and highly telling of Scent Crusher's intent, Scent Crusher has not stopped at patent infringement. Scent Crusher is also brazenly copying Ozonics' marketing and product configuration. Elrod Decl. at ¶ 42. For example, as with Ozonics, Scent Crusher is offering two in-field ozone generators—its Field Lite and its more robust Field Pro. *Id*. at ¶ 43. This is similar to Ozonics' two in-field ozone generators—its HR230 and its more robust HR300. *Id*. Scent Crusher's field ozone generators are similar to Ozonics' generators in size, shape, and design, and Scent Crusher is promoting the Field Pro and Field Lite to be used in the exact same way as Ozonics' units, as shown by the following pictures, taken from the respective Facebook pages of Scent Crusher and Ozonics, of hunters using the Field Pro and Ozonics' HR 300 in a tree stand:

 

*Id*. at ¶ 44. The similarity in design has not been lost on Ozonics' potential customers, as one Facebook user recently posted side-by-side pictures of Scent Crusher's Field Pro and Ozonics' HR300:



*Id*. at ¶ 45.

In addition to copying the overall design and look of Ozonics' products, Scent Crusher also copied Ozonics' marketing slogans. Ozonics has long used the concept of an ozone "blanket" in describing and marketing its products. *Id*. at ¶ 46. Ozonics widely advertises that "[a]s the industry leader in scent control, Ozonics is the first and only in-the-field ozone generator that has been designed to blanket human scent with scent-destroying ozone." *Id*. at ¶ 48. Ozonics' product manual promises that "[e]ach Unit actively blankets your scent with odor-destroying ozone." *Id*. at ¶ 46. Scent Crusher has copied this. In its advertisements, Scent Crusher describes its field units as a hunter's "ozone blanket":



*Id.* at ¶ 50. Moreover, in its June 26, 2018, press release introducing the Field Pro and Field Lite, Scent Crusher described its Field Pro as providing "a <u>wider blanket</u> and added ozone output." *Id.* at ¶ 51; Exh. F (emphasis added).

Scent Crusher is also directly targeting Ozonics in advertisements. Scent Crusher and/or its retailers are telling potential customers that its in-field ozone generators are "comparable to Ozonics." Elrod Decl. at ¶ 54; Piland Decl. at ¶ 4. Scent Crusher's advertisements state that it has an "industry leading 270° of coverage and 60% more ozone output than any comparable field product." Elrod Decl. at ¶ 54. Scent Crusher also claims on its website that "[t]he Scent Crusher Field Pro" has "better coverage than any other product on the market." *Id.* There is no question that potential customers will understand the reference to the "comparable field product" and the "other product on the market" to be Ozonics. *Id.* Not only is Scent Crusher telling the industry that its field units are "comparable to Ozonics," there are no other competing products on the market. *Id.* Finally, to add insult to injury, Scent Crusher is also wrongly claiming that it is the "originator[] and innovator[] of Ozone scent elimination." *Id.* at ¶ 52.

III.    **ARGUMENT**

The Patent Act provides a patentee with the "right to exclude others from making, using, offering for sale, or selling the [patented] invention."  35 U.S.C. § 154(a)(1).  To protect this right, courts "may grant injunctions in accordance with the principals of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  To obtain a preliminary injunction, a patentee must show (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction would be in the public interest."  *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1363 (Fed. Cir. 2017). In addition, the Federal Circuit has recently made clear that the district court must consider "the fundamental nature of patents as property rights granting the owner the ***right to exclude***." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011) (emphasis added). As set forth below, Ozonics can make the required showing here and the Court should enter a preliminary injunction to preserve Ozonics' patent rights.

A.    **Ozonics Is Highly Likely To Succeed On The Merits.**

To demonstrate a likelihood of success on the merits, Ozonics must show "that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent."  *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017). Ozonics is not required to prove that it is certain to win.  It is enough to show that "success is more likely than not."  *Revision Military, Inc. v. Balboa Mfg., Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012).  As demonstrated below, Ozonics exceeds this requirement.

1.    **The Field Pro and Field Lite Infringe the Asserted Claims.**

"An infringement analysis proceeds first to claim construction to determine the scope and

meaning of the asserted claims, and second to a comparison of the properly construed claims with the allegedly infringing product to determine whether the product embodies every limitation of the claims." *Biagro W. Sales, Inc. v. Grow More, Inc*., 423 F.3d 1296, 1301 (Fed. Cir. 2005).

<u>*Claim Construction*</u>

Claim construction begins with the words of the claims, which "are generally given their ordinary and customary meaning." *Phillips v. AWH Corp*., 415 F.3d 1303, 1312-14 (Fed. Cir. 2015). Indeed, there is "a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002). "[T]he ordinary and customary meaning of a claim is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

Here, none of the asserted claims contain any language that requires special construction. The ordinary meaning of each claim term is "readily apparent," and thus claim construction in this matter "involves little more than the application of the widely accepted meaning of commonly understood words." *Id*. at 1314. As such, a claim construction hearing is not necessary to decide this motion and Scent Crusher's infringement of the asserted claims is clear.

<u>*Infringement Analysis*</u>

A method claim is directly infringed when someone practices every step of the patented method. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 576 F.3d 1348, 1359 (Fed. Cir. 2009); 35 U.S.C. §271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."). When a party performs, or induces another party to perform, every single step in the method, that party is liable for

induced infringement. *See* 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1219 (Fed. Cir. 2014). Inducement requires that the alleged infringer "knowingly induced infringement and possessed specific intent to encourage another's infringement." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). The Federal Circuit has held that "[i]nducement can be found where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'" *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015). The circumstantial evidence found in marketing materials instructing consumers how to use a product in an infringing manner constitutes evidence of an affirmative intent to induce infringement of the patent. *See Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018).

Scent Crusher's promotional images reveal that direct infringement of Ozonics' patent methods has occurred by Scent Crusher itself.

 

In addition, Scent Crusher's promotional materials and specifications for the forthcoming Field Pro and Field Lite products clearly show that Scent Crusher is intentionally inducing its

customers to use the products in a manner that directly and literally infringes the method claims in the Ozonics Patents. The claim charts set forth above and submitted with this Motion establish in detail Scent Crusher's infringement liability of at least claims 1-2 and 4 of Ozonic's '177 Patent and claims 1, 3, 7, and 11 of the '180 Patent. *See* Foster Decl., Exhibits 1-2.[6] Accordingly, Ozonics is almost certain to prevail in proving Scent Crusher has directly infringed and actively induces other to infringe one or more claims in the Ozonics Patents.

### 2. Ozonics' Patents Are Presumptively Valid.

Under 35 U.S.C. § 282, Ozonics' Patents are "presumed valid . . . at every stage of the litigation." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc*., 134 F.3d 1085, 1088 (Fed. Cir. 1998). As the Federal Circuit has made clear:

> "[A] patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation. Thus, if a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue."

*Titan Tire, Corp. v. Case New Holland, Inc*., 566 F.3d 1372, 1377 (Fed. Cir. 2009) (internal citation omitted).

Scent Crusher has the burden "to come forward with evidence of invalidity." *Id*. at 1377. The USPTO had ample opportunity to reject the asserted claims during the years the Ozonics' Patents were pending, and it concluded the claims were patentable. Elrod Decl. at ¶ __. For nearly a decade, the USPTO analyzed Ozonics patent applications in the context of 150 prior art

---

[6] Only one instance of infringement of one claim is needed to grant an injunction. *See Abbott Labs. v. Andrx Pharms., Inc*., 473 F.3d 1196, 1201 (Fed. Cir. 2007). Because the Field Pro and Field Lite are not yet available, Ozonics has compared the claim limitations to Scent Crusher's own materials explaining and promoting the accused products. *See Tinnus Enters*., 846 F.3d at 1204-05 (holding that a "patentee is entitled to rely on circumstantial evidence to establish direct infringement").

4

references, including prior U.S. patents, foreign patents, and non-patent publications, and concluded that the inventions claimed in the Ozonics Patents were novel and patentable. *See* Exhs. A-B. Given how much prior art was already considered by the USPTO during the prosecutions, it is highly unlikely that Scent Crusher will discover prior art references that are more relevant than those already considered and rejected by the USPTO. *See Purdu Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001) ("If [the accused infringer] fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies [the patentee's] burden on validity.").

**B.**   **Ozonics Will Suffer Irreparable Harm If Scent Crusher's Infringement Is Not Enjoined.**

To show irreparable harm, Ozonics must show that absent an injunction, it will suffer irreparable harm and that a causal nexus between the harm and infringement exists. *See Metalcraft*, 848 F.3d at 1368. "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable." *Id.* In the context of patent infringement, "[p]rice erosion, loss of good will, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis in Vitro, Inc., v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Here, Ozonics will be irreparably harmed for at least six reasons as set forth below.

**1.**   **Irreparable And Irretrievable Loss of Market Position, Sales, and Business Opportunities Due To Scent Crusher's Entry As A Head-To-Head Competitor.**

Direct competition with an infringing product is "one factor suggesting strongly the potential for irreparable harm." *Apple Inc. v. Samsung Elecs. Co*., 809 F.3d 633, 653-54 (Fed. Cir. 2015) (Reyna, J., concurring) (citation omitted). *See also Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1345 (Fed. Cir. 2013) (harm suffered "where two companies are in

competition against one another" is "often irreparable"); *Presidio Components*, 702 F.3d at 1363 (same). Here, Scent Crusher and Ozonics compete directly for the same customers. Elrod Decl. at ¶ 24. In fact, there is no question that Scent Crusher's ozone generators were <u>designed and intended to compete directly with Ozonics</u>. Scent Crusher began its infringing activities only <u>after</u> its attempts to lawfully acquire Ozonics' technology failed. *See id*. at ¶¶ 25-29. Further, Scent Crusher has stated that its in-field ozone generators are "comparable to Ozonics" (*id*. at ¶ 54), and that it can sell the Field Pro and Field Lite because it has found supposed "loopholes" around Ozonics' Patents, when no such loopholes exist (*id*. at ¶ 36).[7] As a result, Ozonics will suffer irreparable harm by "being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345.[8]

These harmful effects are greatly amplified here as Scent Crusher's entrance into the market will create a two-player market. Elrod Decl. at ¶ 21. A "two-player market may well serve as a substantial ground for *granting* an injunction . . . because it creates an inference that an infringing sale amounts to a lost sale for the patentee." *Robert Bosch*, 659 F.3d at 1151 (emphasis in original). In this situation, "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer." *Celsis in Vitro*,

---

[7] Scent Crusher offered millions of dollars to buy or license Ozonics' patent rights, and clearly communicated in making these offers that the Ozonics Patents were strong and valuable. Elrod Decl. at ¶¶ 27, 53.

[8] Not only is Scent Crusher forcing Ozonics to directly compete with an infringer, it is doing so with Ozonics' "flagship products." Piland Decl. at ¶ 2; Elrod Decl. at ¶ 14. This further amplifies Ozonics' harm. *See Celsis in Vitro*, 664 F.3d at 930 (finding irreparable harm where an infringed patent was the basis for the holder's "flagship products"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, No. 04-5312, 2008 U.S. Dist. LEXIS 86953, at *8 (N.D. Ill. May 22, 2008) ("where a patentee has built a successful business around core patented technology, an infringing competitor in the same marketplace causes irreparable harm to the patentee"), *aff'd* 595 F.3d 1340 (Fed. Cir. 2010).

664 F.3d at 930 (citation omitted). Thus, because Ozonics is being forced into toe-to-toe competition with an infringer, "the infringement causes a direct, measurable loss of market share, customers, and access to potential customers, and causes irreversible price erosion" such that money damages are insufficient. *Hydrodynamic Indus. Co. v. Green Max Distribs., Inc.*, No. 12-cv-05058-ODW, 2014 U.S. Dist. LEXIS, at *8 (C.D. Cal. Jun. 16, 2014).[9]

This is precisely the case here. Not only will every Scent Crusher sale be a lost sale for Ozonics, it will also result in Ozonics losing several other types of opportunities and sales. Elrod Decl. at ¶ 56. First, Ozonics will lose out on accessory sales as Field Pro and Field Lite buyers are also likely to buy Scent Crusher accessories. *Id*. at ¶ 56(b). Second, there may be a downstream effect from repeat customers buying replacement units or newer models from Scent Crusher. *Id*. at ¶ 56(c). Third, Ozonics' sales often result from recommendations or word-of-mouth from other hunters. *See id*. at ¶ 56(d). Scent Crusher sales mean that Ozonics will lose out on the value of this informal advertising network. *Id*. Ozonics will also lose any actual sales that result from hunters recommending the Field Pro or Field Lite. *Id*. Fourth, Ozonics offers a fee-based recertification program in which customers can ship their units back to Ozonics for cleaning, inspection, and part replacement. *See id*. at ¶ 56(e). Every sale lost to Scent Crusher means that Ozonics will lose the opportunity to capture recertification revenues. *Id*. Thus, Scent Crusher sales will have a far-reaching and unquantifiable impact on Ozonics.

Courts have found these types of losses to be irreparable:

---

[9] A finding of irreparable harm is particularly appropriate where, as here, "the patentee has sought to enforce its rights against other infringers in the market" and has "diligently pursued infringers." *Robert Bosch*, 659 F.3d at 1151 (where patentee sought to enforce its patent rights "the court erred in concluding that the absence of a two-player market effectively prohibits a finding of irreparable harm"). Here, Ozonics has at all times diligently sought to enforce its patent rights, including against Scent Crusher, and a two-player market exists. Elrod Decl. at ¶¶ 16, 21, 28.

> "Sales lost by Apple to Samsung are difficult to quantify due to the 'ecosystem effect'— that is the effect the sale of a single product can have on downstream sales of accessories, computers, software applications, and future smartphones and tablets. In addition to the downstream sales to the individual customer, . . . individual customers have a 'network effect,' by which they advertise Apple's product to their friends, family, and colleagues. Thus, the loss by Apple of a single smartphone or tablet customer may have a far-reaching impact on Apple's future revenues. Because of its variable and uncertain nature, this loss is very difficult to calculate." *Appl*e, 809 F.3d at 645.

*See also Metalcraft*, 848 F.3d at 1368 ("[T]he loss by Scag of customers may have far-reaching, long-term impact on its future revenues, and the sales lost by Scag are difficult to quantify due to ecosystem effects, where one company's customers will continue to buy that company's products and recommend them to others.") (finding irreparable harm) (citation and internal quotation marks omitted). For these reasons, based on this factor alone, Ozonics has shown irreparable harm.

### 2. Irreparable Harm Due To Lost Reputation As An Innovator.

Damage to reputation may also constitute irreparable harm. *See Douglas Dynamics*, 717 F.3d at 1344 (irreparable injury encompasses "erosion in reputation and brand distinction"). As the Federal Circuit has stated, a company's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]." *Douglas Dynamics*, 717 F.3d at 1344-45. Moreover, where, as here, "the patentee and the infringer are toe-to-toe competitors in a two-competitor marketplace, the loss of reputation caused by infringement marks a gain of reputation of the infringer as an innovator." *Apple*, 809 F.3d at 653. Thus, courts have found irreparable injury where "infringing products in the marketplace would damage" a patentee's "reputation as an innovator and diminish the appearance of viability to its customers." *Trade Techs*., 2008 U.S. Dist. LEXIS 86953, at *9.

Ozonics has a strong reputation as an innovator, and widely touts this status to the public.

Elrod Decl. ¶¶ 18-19.  Ozonics' website proudly proclaims that its patented technology "was the start of a new era of scent management, and it remains the only active in-the-field scent elimination device." *Id*. at ¶ 18.  Third parties and customers also recognize Ozonics' status as an innovator.  *Id*. at ¶ 19 (recognizing Ozonics as "the lone company . . . promoting the use of ozone generators while actually hunting"); *id*. ("Ozonics . . . has changed the game by making an ozone device portable"); *id*. ("thanks for changing the game").  This reputation will be tarnished if Scent Crusher is allowed to sell copycat products that mimic Ozonics' innovation.

In a June 26, 2018, press release announcing the Field Pro and Field Lite, Scent Crusher claims that as "the leading manufacturer of ozone technology in the hunting industry," it "has set the standard once again."  *Id*. at ¶ 37; Exh. F.  In another advertisement for the Field Pro, Scent Crusher claims to be the "originator[] and innovator[] of Ozone scent elimination."  Elrod Decl. at ¶ 52.  Thus, Scent Crusher is directly challenging Ozonic's reputation as the revolutionizing innovator of in-field scent elimination and Ozonics' hard earned reputation will be forever harmed if Scent Crusher is allowed to offer Ozonics' innovation to customers.  *Id*. at ¶ 57.  There is no way to measure the damage to Ozonics if customers no longer believe its claim that it is the "world's first and only in-the-field ozone generator."  *Id*.  As one court stated, it is difficult to quantify "the effect on reputation and business due to [a patentee] being precluded from marketing to potential and existing customers that it is the exclusive market leader."  *Celsis in Vitro*, 664 F.3d at 930 (finding irreparable harm).  Absent an injunction, Ozonics will be irreparably harmed for this reason as well.

### 3. Irreparable Harm Due To Perception That Ozonics' Patents Are Not Enforceable Or That Ozonics Will Not Enforce Its Patents.

Ozonics repeatedly advertises its products as containing Ozonics' "patented scent elimination technology."  Elrod Decl. at ¶ 58.  If Scent Crusher is permitted to sell the Field Lite

and Field Pro, potential customers, other competitors, and retailers may not believe that Ozonics actually has or will enforce its patent rights. This harm is magnified here where Scent Crusher has falsely claimed to those in the industry that it has found "loopholes" around Ozonics' Patents. *Id*. This also harms Ozonics' reputation and will result in a loss of goodwill with its customers and in the marketplace. There is no way for Ozonics to measure this harm. *Id*. This too constitutes irreparable harm. *See Douglas Dynamics*, 717 F.3d at 1345 ("Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights.").

### 4. Scent Crusher's Inferior Products Will Result In Lost Goodwill.

Scent Crusher's products appear to be of inferior quality compared to Ozonics' products. Elrod Decl. at ¶ 59. For instance, Scent Crusher's products shut off automatically at select intervals (6 hours, 4 hours, 1 hour, 30 minutes). *Id*. at ¶ 59(a). This indicates that Scent Crusher's products derive from "off the shelf" ozone generators used to treat indoor odors in enclosed spaces like hotel rooms and vehicles, unlike Ozonics products that are designed and manufactured for in-the-field hunting application. *Id*. Additionally, many hunters have displayed skepticism toward the in-field ozone technology, which Ozonics has worked hard to overcome. *Id*. at ¶ 60. Scent Crusher's introduction of inferior products into the market may have an irreparable deleterious effect on customer's goodwill towards in-field ozone generators in general. *Id*. Thus, this loss of marketplace goodwill may result in irreparable and unquantifiable harm to Ozonics. *See, e.g., Quantronix, Inc. v. Data Trak Techs., Inc*., 536 F. Supp. 2d 1039, 1049-50 (D. Minn. 2008) (finding irreparable harm, in part, because inferior infringing systems "may likely cause customers to be disinclined to buy any [similar] systems in the future"); *Penmac Corp. v. Falcon Pencil Corp*., 28 F. Supp. 639 (N.D.N.Y. 1938) (granting

preliminary injunction in part because "inferior" infringing products may create "unfavorable

public opinion of" the products "in general").

### 5.    Ozonics Will Be Irreparably Harmed By Price Erosion.

If not enjoined, Scent Crusher's sales of the Field Pro and Field Lite will result in

irreparable price erosion of Ozonics' patented technology.  Elrod Decl. at ¶ 61.  Ozonics

currently sells the HR300 for $449.99 and the HR230 for $349.99.  *Id*.  By contrast, Scent

Crusher is offering the Field Pro for $399 and the Field Lite for $299, and is advertising its

products as "the most efficient ozone portable unit on the market by far" at the "best price point."

*Id*.  Not only will this price undercutting result in Ozonics losing sales and market share to Scent

Crusher, it will also force Ozonics to lower its prices to compete with the Field Pro and Field

Lite.  *Id*.  Thus, Scent Crusher's infringement will undermine Ozonics' ability to earn a return on

the technology in which it has invested so significantly.  *Id*.

In the absence of a preliminary injunction, price erosion is very likely to occur, and

Ozonics will be unable to recover the loss in price level following final resolution of this action

without losing customers.  *Id*.  As one court recognized, "price erosion, in particular, may be

irreversible regardless of an ultimately favorable outcome for Dyson—creating a significant

uncertainty as to amount of damages."  *Cornucopia Prods., LLC v. Dyson, Inc*. No. 12-cv-234,

2012 U.S. Dist. LEXIS 104750, at *28 (D. Ariz. Jul. 27, 2012).  *See also Bushnell, Inc. v.

Brunton Co.,* 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) (customers' questions regarding "when

[patentee] will sell a low price unit to match the price of [infringer's product] and why [the

patented products] cost so much more than [infringing product]" damage patentee's reputation)

(finding irreparable harm); *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir.

2008) (price erosion and loss of market position are evidence of irreparable harm).

### 6. Irreparable Harm To Ozonics' Right To Exclude Direct Competitors.

A patent confers the "right to exclude others from making, using, offering for sale, or selling the invention." 35 U.S.C. § 154(a)(1). Ozonics' "right to maintain exclusivity" and to prevent Scent Crusher from offering a copycat product, is "a hallmark and crucial guarantee of patent rights deriving from the Constitution itself." *Apple*, 809 F.3d at 642. "Exclusivity . . . is an intangible asset that is part of a company's reputation." *Douglas Dynamics*, 717 F.3d at 1345. "[T]he need to protect this exclusivity would certainly be highest when," as here, "the infringer is one's fiercest competitor." *Apple*, 809 F.3d at 642. Although Ozonics' right to exclude "alone cannot justify an injunction, it should not be ignored either." *Robert Bosch*, 659 F.3d at 1149. Indeed, "[b]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Tuf-Tite, Inc. v. Fed. Package Networks, Inc*., No. 14-cv-2060, 2014 U.S. Dist. LEXIS 163352, at *23 (N.D. Ill. Nov. 21, 2014) (citation omitted).

Ozonics has intentionally chosen not to license its ozone generator technology to maintain market exclusivity. Elrod Decl. at ¶ 16. In fact, Ozonics recently refused to license the technology to Scent Crusher. *See id*. at ¶ 28. If an injunction is not issued here, Ozonics "will be forced into a compulsory licensing agreement" with Scent Crusher, "one that does not contain the myriad protections that a licensing agreement would normally possess." *Trading Techs*., 2008 U.S. Dist. LEXIS 86953, at *12 (irreparable harm existed). Thus, absent an injunction, Ozonics' rights will be eviscerated. *See, e.g., MGM Well Servs. v. Mega Lift Sys*., LLC, 505 F. Supp. 2d 359, 379 (S.D. Tex. 2007) (irreparable harm established where "MGM has proven an existing policy not to license its patented technology[,]" but has not "been able to enjoy this benefit because of persistent infringement by Mega Lift, its direct competitor.").

Similarly, there is a substantial risk that Scent Crusher's continued infringement suggests to others that the market is open to new entrants, even those that may be infringing. *See Upjohn Co. v. Medtron Labs., Inc.*, 751 F. Supp. 416, 430 (S.D.N.Y. 1990) (Medtron's "continued infringement, left unchecked, could conceivably encourage many others to infringe"), *aff'd without op.*, 937 F.2d 622 (Fed. Cir. 1991).[10] Thus, "courts have found irreparable harm if infringement indirectly encourages others to infringe the patent." *Bushnell*, 673 F. Supp. 2d at 1263 (D. Kan. 2009). This immeasurable harm to Ozonics is amplified here due to Scent Crusher's false statements to the market that "loopholes" allow new market entrants. Elrod Decl. at ¶ 62. Accordingly, Ozonics respectfully asks the Court to enforce its right to exclude and enjoin its "fiercest competitor" from inflicting any further damage.

### 7.     Scent Crusher's Infringement is the Cause of Ozonics' Harm.

To show a causal nexus, Ozonics must "show that the patented features impact consumers' decisions to purchase the accused devices." *Apple*, 809 F.3d at 642. The "causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—*e.g*., sales that would be lost even if the offending feature were absent from the accused product." *Apple, Inc. v. Samsung Elecs. Co*., 735 F.3d 1352, 1361 (Fed. Cir. 2013). Thus, Ozonics "must show some connection between the patented feature and demand for [Scent Crusher's] products." *Id*. at 1364. Here, there is no doubt that the infringing features (portable ozone generating device to

---

[10] As Scent Crusher is fully aware of Ozonics' Patents and has tried to license them, it is taking a deliberate and calculated risk in infringing them now. Scent Crusher likely believes that it will enjoy very healthy profit margins on these products. Elrod Decl. at ¶ 30; Exh. E. Thus, it appears that Scent Crusher has determined that the profitability of infringement is worth taking the risks. Others should not be encouraged to make this same gamble.

eliminate hunters' scent <u>in the field</u>) drives consumer demand. Indeed, Scent Crusher defines its products in these very terms. Elrod Decl. at ¶ 41 (introducing "the all new <u>Field</u> Lite and <u>Field</u> Pro <u>in the field</u> ozone generators"). This is not a case where a causal nexus is a close call.[11]

Moreover, Ozonics invented the market for in-field ozone generators. Elrod Decl. at ¶¶ 12, 63-64. But for Scent Crusher's infringement, Ozonics' patented products would be the only such product offering on the market. Thus, all of Ozonics' irreparable harm is directly attributable to Scent Crusher's infringement and the causal relationship is direct and clear. *See Hydrodynamic Indus.*, 2014 U.S. Dist. LEXIS 80336, at *5 (the "causal-nexus evidence is a matter of merely connecting the dots," one of which is that "Green Max is Hydrodynamic's *sole* competitor") (emphasis in original).

### C. The Balance of Equities Favors Entry of a Preliminary Injunction.

In balancing the parties' harms, courts "assess[] the relative effect of granting or denying an injunction on the parties." *Hydrodynamic*, 2014 U.S. Dist. LEXIS 80336, at *12-13. The balancing of the hardships here favors entry of a preliminary injunction. The irreparable harm shown above places a substantial hardship on Ozonics. Without an injunction, Ozonics will face "substantial hardship in being forced to compete against its own patented invention." *Metalcraft*, 848 F.3d at 1369 (internal quotations omitted). *See also Apple*, 809 F.3d at 646 (substantial hardship caused by "lost market share and lost downstream sales and . . . forcing Apple to compete against its own patented invention") (balance of harms favored granting injunction).

By contrast, Scent Crusher will suffer little to no hardship if the Court issues an

---

[11] In cases, such as this one, involving "relatively simple products—at least in the sense that they had a small number of features . . . the impact that the infringing features had on demand may never have been in doubt." *Apple*, 735 F.3d at 1362. Thus, the causal nexus requirement "may be more easily satisfied (indeed, perhaps even conceded) for relatively 'simple' products." *Id*.

injunction. After its attempts to license and purchase the patented technology failed, Scent

Crusher took a calculated risk with the Field Pro and Field Lite despite Ozonics' Patents. Elrod

Decl. at ¶¶ 25-29. As a result, any harm an injunction would cause Scent Crusher would be "the

result of its own calculated risk in selling a product with knowledge of [Ozonics'] patent."

*Celsis*, 664 F.3d at 931. "[C]ourts are not sympathetic to the hardship a party brings upon itself

by undertaking knowing infringement." *Hydrodynamic*, 2014 U.S. Dist. LEXIS 80336, at *13.

*See also Mylan Inst., LLC v. Aurobindo Pharma Ltd.,* 2016 U.S. Dist. LEXIS 180551, at *74

(E.D. Tex. Nov. 21, 2016) ("One who elects to build a business on a product found to infringe

cannot be heard to complain if an injunction against continuing infringement destroys the

business so elected.") (citation omitted).

Moreover, the Field Pro and Field Lite are not yet available, so any harm to Scent

Crusher from the issuance of an injunction will be minimal. *See Tuf-Tite*, 2014 U.S. Dist.

LEXIS 163352, at *26 (balance of harms favor patentee where infringer "has only recently

entered the market" with infringing product). Scent Crusher has been in business for years and

sells a number of flagship products that do not infringe Ozonics' Patents. An injunction would

not put Scent Crusher out of business; it would merely prevent it from engaging in unlawful acts

of willful infringement.

     **D.**     **The Public Interest Favors Entry of a Preliminary Injunction.**

Here, an injunction would be in the public interest. If an injunction is granted, the

technology at issue will still be available to the public from Ozonics, its rightful owner. The

Federal Circuit has indicated that courts should be more likely to grant an injunction "in

traditional cases, such as this, where the patentee and adjudged infringer both practice the

patented technology." *Robert Bosch*, 659 F.3d at 1150. Further, there is a strong public interest

in enforcing patent rights, particularly when the infringing product directly competes with the patentee's product. *See Impax Labs., Inc. v. Aventis Pharm., Inc.*, 235 F. Supp. 2d 390, 397 (D. Del. 2002) (there is a "strong public interest in protecting valid patents by preventing the premature entry of [infringing products] into the marketplace"). Thus, although "the public often benefits from healthy competition . . . the public generally does not benefit when that competition comes at the expense of a patentee's investment-backed property right." *Apple*, 809 F.3d at 647. This favor also weighs in favor of granting a preliminary injunction.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Ozonics has made the required showing for issuance of preliminary injunctive relief. Ozonics respectfully requests that the Court issue a preliminary injunction to enjoin Scent Crusher from infringing the Ozonics' Patents and from making, using, advertising, selling, or offering to sell the Field Pro and Field Lite.

Dated this 19th day of July, 2018.

**ADAMS JONES LAW FIRM, P.A.**

*/s/ Patrick B. Hughes*
Patrick B. Hughes
1635 N. Waterfront Parkway, Suite 200
Wichita, KS 67206
Telephone: (316) 265-8591
Facsimile: (316) 265-9719
phughes@adamsjones.com

Brett L. Foster (*pro hac vice* applicant)
Tamara L. Kapaloski (*pro hac vice* applicant)
**DORSEY & WHITNEY LLP**
111 South Main Street, Suite 2100
Salt Lake City, UT 84111
Telephone: (801) 933-7360
Facsimile: (801) 933-7373

*Attorneys for Plaintiffs*