# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PARAH, LLC, and OZONICS, LLC,

       *Plaintiffs,*

  vs.

Case No. 18-1208-EFM-TJJ

MOJACK DISTRIBUTORS, LLC, d/b/a/
Scent Crusher

       *Defendant.*

## MEMORANDUM AND ORDER

This is a patent infringement case involving hunting products. Plaintiffs Parah, LLC, and Ozonics, LLC, (collectively "Ozonics") own three U.S. patents that cover methods for descenting hunters and their equipment in the field using a portable ozone generator. Ozonics alleges that Defendant Mojack Distributors, LLC, d/b/a Scent Crusher ("Scent Crusher") is infringing its patents through the manufacture and sale of Scent Crusher's own portable ozone generators for use by hunters in the field. This matter comes before the Court on Ozonics' Motion for Preliminary Injunction (Doc. 6). After considering the four factors relevant to granting preliminary injunctive relief, the Court grants Ozonics motion.

# I.     Factual and Procedural Background

## A.     Ozonics' Patents

As a practicing dentist, Scott Elrod became familiar with the scent-destroying power of ozone and realized that it could be used in the hunting industry to eliminate a hunter's odor. He invested significant resources and years of research to develop a scent elimination technology for hunters to use while hunting in the field. Elrod filed several patent applications for his technology, and the United States Patent and Trademark Office ("USPTO") ultimately issued three patents: U.S. Patent No. 7,939,015 (the "'015 Patent"); U.S. Patent No. 8,557,177 (the "'177 Patent"); and U.S. Patent No. 8,404,180 (the "'180 Patent"), all of which are entitled "Method of Descenting Hunter's Clothing."[1] The patents are owned by Defendant Parah, LLC, which exclusively licenses them to Defendant Ozonics, LLC.[2]

The patents cover methods of deodorizing or removing human scent or other foreign scent from the clothing or equipment of a hunter through a portable oxidizing gas generator that discharges a stream of ozone. At issue in this motion is claim 1 of each of the three patents.

'015 Patent:

1. A method of eliminating scent from a hunter's body, clothes worn by the hunter, and equipment used by the hunter, comprising:

providing a portable ozone generator for discharging a stream of ozone;

transporting the portable ozone generator by the hunter into the field;

hanging the portable ozone generator in an open atmosphere in which the hunter and game animals are present and applying the stream of ozone directly on the hunter, clothing worn by the hunter, and equipment used by the hunter;

---

[1] The '015 Patent application was filed with the USPTO in 2004. The '177 and '180 Patents derive from continuations of the '015 Patent application.

[2] Both companies are commonly owned.

wherein applying the stream of ozone directly on the hunter, clothing worn by the hunter, and equipment used by the hunter occurs in the open atmosphere to deodorize the hunter, clothing worn by the hunter, and equipment used by the hunter to eliminate human scent and other scent foreign to the open atmosphere such that deodorized air travels downwind of the hunter.

'177 Patent:

1. A method of deodorizing a hunter, hunter clothing, and a hunting equipment while hunting, comprising:

providing a portable oxidizing gas generator that has been transported to a field for discharging a stream of an oxidizing gas;

positioning the portable oxidizing gas generator for use in the field where the hunter, the hunting clothing, the hunting equipment and game animals are present;

applying the stream of oxidizing gas directly onto the hunter, the hunting clothing, and the hunting equipment in the field to deodorize the hunting clothing and the hunting equipment.

'180 Patent

1. A method of eliminating scents, the method comprising:

providing a gas generator configured for transport into a field, configured for mounting in the field, and configured for discharging a stream of oxidizing gas into the field to eliminate scents associated with a hunter in air traveling downwind of the hunter toward game animals in the field.

The commercial embodiment of Elrod's invention consists of a portable gas generator taken into the field that is attached to a tree stand or a blind. The generator releases a stream of ozone gas that transforms oxygen molecules present in the air into ozone molecules. The ozone molecules then bond with the scent molecules being produced by a hunter and his equipment. In other words, the technology deodorizes a hunter, his clothing, and his equipment so that human-related odor and scents are not detectable by deer and other wild game.

**B.      Ozonics Sells its Portable In-the-Field Ozone Generators**

Elrod formed Ozonics, LLC, in 2007 to market the commercial embodiment of his inventions.  In the fall of 2007, Ozonics brought the first portable in-the-field ozone generator to the market.  Since that time, Ozonics has developed five different models of ozone generators along with support accessories.  Ozonics' current, in-the-field ozone generators are the HR300 and HR230 models.  Like the previous models, these ozone generators are designed to be used by hunters in the field, attached to tree stands or in blinds.

Since 2007, Ozonics has spent more than seven million dollars marketing its ozone generators and educating consumers about its products.  Ozonics promotes its products through television, print, and online advertisements; through website and social media accounts; and at trade shows.  It has also created numerous instructional videos to promote its products that are available on its website.  Through its investment, Ozonics created a new market category in the hunting industry.

Ozonics has manufactured and sold over 85,000 ozone generators since 2010.  The manufacture and sale of Ozonics' ozone generators are the essence of its business, and although it sells related accessories, the ozone generators are its flagship products.  Ozonics previously sold its ozone generators through big-box retailers such as Cabela's and Bass Pro Shops.  But in 2016, Ozonics decided to only sell its products directly to customers at trade shows or online through its website.  Ozone currently offers its HR300 for $449 and its HR230 for $349.

**C.      Scent Crusher Enters the Market with Its Own Ozone Generator**

In 2014, Scent Crusher began developing and distributing products utilizing ozone to deodorize athletic equipment.  In 2015, Scent Crusher began developing and distributing a line of products utilizing ozone for the archery and hunting market.  Since that time, Scent Crusher has

offered gear bags, packs, totes, soap, laundry detergent, sprays, and other products for in-field use by hunters.

In early 2015, Ozonics discovered that Scent Crusher was making and selling a portable ozone generator and advertising that it was to be taken into the field to be used for hunting. Ozonics sent Scent Crusher a cease and desist letter advising Scent Crusher of its patents and demanding that Scent Crusher stop its allegedly infringing conduct. After receiving this letter, Scent Crusher withdrew its portable ozone generator from the market.

In August of 2016, Daniel Drake, Chief Executive Officer of Scent Crusher, sent a letter to Scott Elrod, telling him that he respected Elrod's work in "pioneering ozone in the hunting industry." Drake further stated that he would like to sit down with Elrod to discuss their businesses. He believed that the combination of Ozonics and Scent Crushers would be an "unstoppable force." Drake then stated that he wanted to talk about a strategic partnership or buying Elrod's company for $10 million. Ozonics declined Drake's offer. In December 2017, Drake and Elrod met for dinner, during which Elrod told Drake that he was not interested in licensing Ozonics' patents.

In June 2018, Ozonics discovered that Scent Crusher had announced plans to begin making and selling its own portable ozone generator for hunters to use in the field. Scent Crusher had announced as "New for 2018" portable ozone generator devices called the "Field Pro" and "Field Lite." The advertisements for these devices depicted the ozone generator mounted to a tree above a hunter in the field. Shortly after seeing these announcements, Ozonics discovered that one of its retailers, Lancaster Archery Supply, was offering Scent Crusher's Field Pro and Field Lite units for sale on its website. The product description for the Field Pro on Lancaster's website claims that it provides "60% more ozone output than any comparable field product" and that the "New

Scent Crusher Field Pro is your scent control blanket for the tree stand and ground blind." By July 9, 2018, additional retailers were marketing and offering to sell the Scent Crusher ozone generators. Scent Crusher began shipping the Field Pro and Field Lite to its retailers on August 6, 2018. Retailers are selling the Field Pro for $399 and the Field Lite for $299.

## D.   Ozonics Files Suit

On July 19, 2018, Ozonics filed suit against Scent Crusher, alleging that Scent Crusher directly infringes, indirectly infringes, and induces infringement of at least claim 1 of the '015 Patent, claim 1 of the '180 Patent, and claim 1 of the '177 Patent. In addition to damages, Ozonics seeks a preliminary and permanent injunction enjoining Scent Crusher from selling or offering for sale the Field Pro and Field Lite. The same day that Ozonics filed its Complaint, it filed a Motion for Preliminary Injunction. Scent Crusher responded to the motion and filed an Answer and Counterclaim, asserting claims for non-infringement and invalidity of the '015, '180, and '177 Patents. The Court held a hearing on Ozonics' preliminary injunction motion on August 15 and August 16, during which the parties presented testimony from Drake, Elrod, and James Knight, Scent Crusher's Chief Financial Officer. In addition, the parties presented expert testimony from Dr. Elizabeth Friis, Scent Crusher's expert on noninfringement and invalidity, and Scott Cragun, Ozonics' expert on irreparable harm.

## II.   Legal Standard

The decision to grant or deny injunctive relief is an act of equitable discretion by the district court.[3] The Patent Act provides that injunctions "may" issue "in accordance with the principles of

---

[3] *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

equity."[4]  A preliminary injunction is "a drastic and extraordinary remedy that is not to be routinely granted."[5]  As the party moving for injunctive relief, Ozonics must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.[6]  "[A] movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm."[7]

### III.    Analysis

### A.    Substantial Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, Ozonics must show "that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent."[8]  Scent Crusher denies infringement and in the alternative asserts that Ozonics' patents are invalid.

#### 1.    *Invalidity*

The Court first examines Scent Crusher's argument that Ozonics' patents are invalid.  A patent is entitled to a presumption of validity at all stages of litigation, including during preliminary injunction proceedings.[9]  If the non-moving party challenges the validity of the patent and comes

---

[4] 35 U.S.C. § 283.

[5] *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993); *see also Abbott Labs v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006).

[6] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018).

[7] *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted).

[8] *Tinnus Enters. v. Telebrands Corp.*, 846 F.3d 1190, 1202 (Fed. Cir. 2017) (quotation omitted).

[9] *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009) (citing *Canon Comput. Sys., Inc. v. Nu–Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed.Cir.1998)).

forth with evidence that "raises a substantial question" as to the patent's validity then the burden of proving a substantial likelihood of success on the merits shifts back to the moving-party.[10] At that point, the moving party must prove that the non-moving party's invalidity defense "lacks substantial merit."[11] "[T]he trial court, after considering all the evidence available at this early stage of the litigation, must determine whether it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid."[12]

Scent Crusher argues that the patents' claims are obvious in view of three prior art references: U.S. Patent No. 7,222,634 (the "Hess Patent"), U.S. Patent No. 5,914,119 (the "Dawson Patent"), and U.S. Patent Application Publication No. 2007/0166186 (the "Stec Application"). Both the Hess Patent and the Stec Application were disclosed to the USPTO during examination of Ozonics' patent applications. In fact, Ozonics overcame the examiner's rejection of its claims in view of the Hess Patent in five different office actions. "[T]he presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the [Patent] Examiner did his duty and knew what claims he was allowing."[13] "When the examiner considered the asserted prior art and basis for the validity challenge during patent prosecution, that burden becomes particularly heavy."[14] Scent Crusher points out that the Dawson Patent was not before the examiner during the prosecution of Ozonics' patent applications. But the technology disclosed in the Dawson Patent is least like Ozonics' claimed inventions. Regardless, the Court concludes that Scent

---

[10] *Id*. at 1377-78.

[11] *Id*. at 1378-79.

[12] *Id*. at 1379.

[13] *Al-Site Corp. v. VSI Int'l, Inc*., 174 F.3d 1308, 1323 (Fed. Cir. 2008) (internal quotation omitted).

[14] *Impax Labs., Inc. v. Aventis Pharm. Inc*., 545 F.3d 1312, 1314 (Fed. Cir. 2008).

Crusher has not come forward with credible evidence of invalidity. The only evidence Scent Crusher has offered is the opinion of Dr. Friis, who is not an expert on patent validity.[15] Accordingly, the Court concludes that Scent Crusher has not raised a substantial question of invalidity.

### 2.    *Infringement*

Only one instance of infringement of one claim is necessary to grant an injunction.[16] Among other things, Ozonics asserts that Scent Crusher infringes claim 1 of the '177 Patent, claim 1 of the '180 Patent, and claim 1 of the '015 Patent. For the purpose of this motion, the parties agreed at the hearing that Ozonics' infringement allegations come down to two issues: (1) whether the Field Lite and Field Pro release a "stream of ozone" or "stream of oxidizing gas" that covers the hunter, the hunter's clothing, and the hunting equipment and (2) whether the Field Lite and Field Pro "deodorize" or "eliminate" the hunter's scent. The resolution of these issues turns on the Court's construction of the terms "stream," "eliminate," and "deodorize" within the patents' claims.

Claim construction begins by "considering the language of the claims themselves."[17] "The words of a claim should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention."[18] "Importantly, the person of

---

[15] The Court also notes that although Dr. Friis is an accomplished mechanical engineering professor in ozone use, she is not an expert in the sport of hunting.

[16] *Abbott Labs v. Andrx Pharms., Inc.*, 473 F.3d 1196, 1201 (Fed. Cir. 2007) (citation omitted).

[17] *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)).

[18] *Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns LLC*, 2014 WL 5089402, *1 (D. Kan. Oct. 9, 2014) (citing *Phillips*, 415 F.3d at 1312-1313 (Fed. Cir. 2005)).

ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[19]

The specification is the best guide to determining the meaning of a disputed term.[20]  In addition, the Court should consider the patent's prosecution history if it is in evidence.[21]  This history consists of the complete record of the proceeding before the USPTO and all prior art cited during the prosecution of the patent and is called "intrinsic evidence."[22]  It may provide information as to how the inventor and the USPTO examiner understood the patent.[23]  But, because the prosecution history is an ongoing negotiation, it may lack clarity provided by the patent's specification.[24]

Finally, the Court may consider "extrinsic evidence" such as expert and inventor testimony, dictionaries, and treatises.[25]  Conclusory or unsupported assertions by an expert are not useful, and a court should discount expert testimony that is contradicted by claim language or the intrinsic

---

[19] *Phillips*, 415 F.3d at 1313.

[20] *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1315 (specification is primary basis for construing claims).

[21] *Phillips*, 415 F.3d at 1317.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 1318.

evidence.[26]  Although extrinsic evidence may be useful to the Court, it is not likely to render a reliable interpretation of the patent's terms unless considered in the context of intrinsic evidence.[27]

       a.     "Stream"

Ozonics proposes that the term "stream" should be construed according to its ordinary and customary meaning.  Ozonics has defined the term based on its dictionary definition as "any body of flowing" gas or "an unbroken flow" of gas.  Ozonics argues that under this interpretation, the Field Lite and Field Pro practice this limitation of its claims because the products discharge a flow of ozone that covers the hunter, his clothing, and his equipment.

Scent Crusher has proposed two differing constructions of the term "stream."  First, in its response brief, Scent Crusher argues that the term should be narrowly defined because Ozonics surrendered the scope of the claimed invention during prosecution of the '015 Patent.  Scent Crusher cites the opinion of its expert on noninfringement and invalidity, Elizabeth Friis, in support of this argument.  Friis opined that when Ozonics removed the term "a volume of ozone gas" from claim 1 of the '015 Patent application and replaced it with the narrower term, "gaseous stream," Ozonics narrowed the scope of its claimed invention.  According to Friis, Scent Crusher's products do not infringe Ozonics' patents because they release a "volume of gas" that creates a blanket of ozone as opposed to the narrow "stream of gas" required by Ozonics' patents.

The Court is not persuaded by this argument.  There is a "heavy presumption" that claim terms carry their ordinary and customary meaning unless the patentee demonstrated an intent to depart from that meaning by redefining that term or recharacterizing it in the intrinsic evidence

---

[26] *Id*. at 1318.

[27] *Id*. at 1319.

through "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."[28]   In other words, while the prosecution history may result in disavowal or disclaimer of the scope of a claim, courts must decline "to apply the doctrine of prosecution [history] disclaimer where the alleged disavowal of claim scope is ambiguous."[29]   A disclaimer or disavowal only occurs where "the alleged disavowing actions or statements made during prosecution [are] both clear and unmistakable."[30]

In this case, the file history does not show a clear and unmistakable surrender of claim scope relating to the term "volume."  Claim 1 of the '015 patent application initially claimed that the ozone generator would produce "a volume of ozone gas or a gaseous stream of hydroxyl and hydroperoxide ions." The USPTO examiner initially rejected all of the initial claims in the '015 patent application on the basis that the prior art taught a "volume of ozone gas" and a "gaseous stream."  The examiner did not distinguish between the "volume" and "stream" elements, but instead broadly applied to the prior art to reject the claims.  In response, Ozonics cancelled its original 11 claims and filed a new claim 12, consisting of "a gaseous stream of descenting material."  Nowhere in Ozonics' response to the office action is there any discussion regarding the character or measurement of the ozone output or more particularly the difference between a "volume of ozone gas" and a "gaseous stream."  Accordingly, the Court concludes that Ozonics did not surrender the scope of its invention during the prosecution history of its patents.

---

[28] *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

[29] *Omega Eng'g, Inc. v. Ray Tech Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

[30] *Id.* at 1326.

During the preliminary injunction hearing, Scent Crusher offered an alternative interpretation for the term "stream."  Friis testified that the term should be construed according to its plain and ordinary meaning, and that as understood by a person of ordinary skill in the art, a stream is a forced flow of gas.  In other words, a stream must be driven by mechanical power. Friis testified, and Scent Crusher argues, that under this interpretation Scent Crusher's products do not infringe Ozonics' patents because although the Field Lite and Field Pro initially discharge a stream of ozone, the ozone disperses into a volumetric mass as it flows in the air and thus ceases to be a stream when it covers the hunter, his clothing, and his equipment.

Ozonics opposes this construction on two grounds. First, Ozonics argues that Friis has incorrectly identified the level of ordinary skill in the art.  Friis has defined a person of ordinary skill in the art as one who has "familiarity with the literature surrounding bacteria and/or scent elimination products as of 2004, and (1) a Bachelor's degree in Mechanical Engineering or a related discipline along with 1-2 years of related industry experience, or (2) the technical equivalent."  According to Ozonics, such person is overqualified.  Ozonics proposes that a person of ordinary skill in the art is a person with at least two or three years of experience in hunting and using scent elimination products during hunting.  It claims that this definition is supported by the field of invention and prosecution history.  The patents explain the field of invention as:

> The invention relates to a method of de-scenting the clothes and apparatus of sportsmen, both professional, non-professional, bikers, campers, and the like.  More particularly, there is provided a method of removing human scent and any other scent that is not advantageous in that environment from clothing and equipment of hunters and fish odors from fisherman utilizing an oxidizing agent which is ozone or a combination of hydroxyl and hydroperoxide ions.

In addition, during the prosecution history of the patents the USPTO examiner described the relevant art as "the art of hunting and scent elimination during hunting."

The Court agrees with Ozonics that Friis' definition of a person of ordinary skill in the art is overqualified. Friis has offered no reason as to why such person must have a bachelor's degree in mechanical engineering or the equivalent. Ozonics' proposed definition comports with the patents' language and its prosecution history. Therefore, the Court concludes that a person of ordinary skill in the art should be a person with at least 2 or 3 years of experience in hunting and using scent elimination products during hunting.

Second, Ozonics argues that the Court should reject Scent Crusher's interpretation because it would exclude any embodiment from the scope of its patents' claims. According to Ozonics, if the Court accepts Scent Crusher's definition, no embodiments of the claimed invention would practice the '015, '177, and '180 Patents. Claims are not normally construed in a way that excludes disclosed examples in the specification.[31] As the Federal Circuit stated, "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism." Here, claim 1 of the '177 Patent and claim 1 of the '015 Patent require a "stream" of ozone or oxidizing gas to be applied directly to the hunter. The '177 and '015 Patents describe one embodiment of the invention as applying a low volume stream of oxidizing gas on the hunter while he is wearing a hunting outfit. The gaseous stream may be applied by an ozone generator. Another embodiment is that the generator can be carried with the hunter or hung upwind of the body so it descents the human scent traveling downwind. Under Friis' interpretation, these embodiments would never practice the '177 Patent and '015 Patent claims because although the ozone gas would be a

---

[31] *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007); *see also MBO Labs, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (quotation omitted).

"stream" when it left the generator, the gas molecules would subsequently disperse into the air and cease being a stream when they reach the hunter.[32]

The Court rejects Scent Crusher's construction of the term "stream." Friis has not cited any evidence supporting her definition and such a construction essentially renders the claimed methods impossible. The Court agrees with the parties that the term should be construed in accordance with its plain and ordinary meaning.[33] Ozonics' definition accomplishes this, and therefore the Court construes the term "stream" as "any body of flowing fluid (such as water or gas)."[34] Based on this construction and the evidence presented by Ozonics, Scent Crusher's products practice the limitation of applying the stream of ozone or oxidizing gas directly on the hunter, clothing worn by the hunter, and equipment used by the hunter in claim 1 of the '015 Patent and the '177 Patent and the limitation of discharging a stream of oxidizing gas in the '180 Patent.

b. "Eliminate" and "Deodorize"

Claim 1 of the '015 Patent and the '180 Patent require that the stream of oxidizing gas or ozone "eliminate the scent" of the hunter and his equipment. Claim 1 of the '177 Patent requires that the stream of oxidizing gas "deodorize" the hunter and his equipment. Scent Crusher argues that these terms are absolutes, and therefore the Court should construe them to mean that 100 percent of all odor-causing bacteria must be removed. Scent Crusher contends that under this

---

[32] Even if the Court accepted Scent Crusher's interpretation, the Field Lite and Field Pro would still practice this limitation of the '180 Patent. Claim 1 of the '180 Patent only requires that the generator be "configured for discharging a stream of oxidizing gas into the field," and Friis admitted during her testimony that the Field Pro and Field Lite generators emit an initial stream of gas.

[33] *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (citation omitted).

[34] Stream, MERRIAM-WEBSTER, *available at* http://www.merriam-dictionary.com/dictionary/stream (last visited Aug. 19, 2018).

construction, its products are not infringing because there is no evidence of absolute elimination and deodorization of the scent of the hunter, the hunter's clothing, and the hunter's equipment. But Scent Crusher offers no intrinsic or extrinsic evidence in support of this position. Furthermore, as Friis recognized during her testimony, such construction would exclude every preferred embodiment from the scope of the claim because it is practically impossible to achieve 100 percent elimination unless the hunter, his clothing, and his equipment are in a controlled environment.[35]

Ozonics proposes that the court adopt a definition of the term "elimination" from the specification of the "Hess Patent," which as noted above was cited as prior art during the prosecution of Ozonics' patents. In its specification, the Hess Patent states: "[F]or hunting applications, 'scent-elimination' means reducing scent to a low-enough level in the ambient air that they do not alarm wild animals and cause them to flee the hunting area." The Court declines to adopt this precise definition simply because the Hess Patent appears in the file history of Ozonics' patents. The Hess Patent is, however, indicative of how a person of ordinary skill in the art would view the term. Based on this definition and a common-sense interpretation of the term, the Court concludes that the terms "eliminate" and "deodorize" are not absolutes.

Ozonics has persuaded the Court to construe the terms "eliminate" and "deodorize" according to its proposed interpretation. Based on the evidence presented by Ozonics, including Elrod's declaration and Drake's testimony, the Scent Crusher products practice the limitation of deodorizing the hunter, his clothing, and his equipment, and eliminating the scents, human or otherwise, associated with the hunter as required by claim 1 of Ozonics' patents.

---

[35] *See MBO Labs*, 474 F.3d at 1333 ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.") (quotation omitted).

In sum, Ozonics has shown that the Scent Crusher products (1) release a stream of oxidizing or ozone gas that covers the hunter, his clothing, and his equipment and (2) deodorize the hunter and eliminate human and foreign scent. The parties do not dispute at this time that Scent Crusher's products, when used as designed and instructed by Scent Crusher, practice the remaining limitations of claim 1 of Ozonics' patents. Therefore, the Court concludes that Ozonics has shown a substantial likelihood that it will establish that Scent Crusher is infringing the '177, '180, and '015 Patents.

## B.    Irreparable Harm

"A party seeking a preliminary injunction must establish that it is likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm."[36] "Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable."[37] In patent infringement cases, "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."[38]

Ozonics contends that it will suffer irreparable harm if Scent Crusher is not preliminarily enjoined because it will suffer lost market share, lost sales and business opportunities, price erosion, and loss of consumer goodwill and reputation. Ozonics further contends that these losses will be amplified by Scent Crusher's entry into the market as its direct competitor. In response, Scent Crusher argues that Ozonics' alleged harms are financial and can adequately be compensated

---

[36] *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir 2017) (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013)).

[37] *Id.*

[38] *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citation omitted).

with money damages.  It also asserts that Ozonics has not met its burden to show irreparable harm because it relies on Elrod's conclusory declaration and not independent evidence.

As an initial matter, the Court rejects Scent Crusher's argument that Elrod's declaration is not competent evidence of irreparable harm.  Contrary to Scent Crusher's assertion, there is no authority that requires Ozonics to come forward with independent evidence or expert testimony regarding "regulations and contractual arrangements" to support a claim of irreparable harm. Furthermore, the case law Scent Crusher relies on to discredit Elrod's declaration is not persuasive. Scent Crusher compares Elrod's declaration to that of the corporate executive in *Voilé Manufacturing Corp. v. Dandurand*.[39]  In that case, the plaintiff provided an affidavit of its president in support of its claim of irreparable harm.[40]  The district court found the affidavit to be "conclusory" and insufficient because it was comprised of "unsupported factual conclusions."[41] Specifically, the affidavit did not explain how the plaintiff was being devalued by the sale of the infringing product, did not point to any potential lost licensees, and did not show any evidence of lost sales to determine to what extent the plaintiff's market share had been eroded.[42]  Here, Ozonics has presented two declarations from Elrod that cite supporting evidence and contain detailed explanations.  Furthermore, Ozonics has offered the opinion of its expert, Scott Cragun, on irreparable harm.  Scent Crusher cannot rebut Ozonics' entire irreparable harm argument on the basis that it is only supported by a "conclusory" declaration.

---

[39] 551 F. Supp. 2d 1301 (D. Utah 2008).

[40] *Id*. at 1307.

[41] *Id*.

[42] *Id*.

Turning to Ozonics' claims of lost market share, price erosion, and loss of reputation and goodwill, the Court must first examine the relationship between the parties because this relationship frames the irreparable harm analysis. As Ozonics asserts, courts are more likely to find irreparable harm when the plaintiff and defendant are direct competitors in the market.[43] The Federal Circuit has stated that "the existence of a two-player market may well serve as a substantial ground for granting an injunction—e.g., because it creates an inference that an infringing sale amounts to a lost sale for the patentee."[44] Here, the evidence shows that Scent Crusher and Ozonics directly compete for the same customers. Although Scent Crusher has identified four companies that purportedly sell in-the-field portable ozone generators, three of these companies instruct users that the products are designed for enclosed spaces. And the fourth company is precluded from selling its product by a settlement agreement it entered with Ozonics. Thus, because Ozonics is competing head-to-head with Scent Crusher, every sale by Scent Crusher of its Field Pro and Field Lite products likely will be a lost sale for Ozonics.

As to economic harm, Ozonics has presented evidence that it lost customers and potential sales to Scent Crusher. When Scent Crusher advertised its new products, many customers responded to those advertisements stating that they intend to buy the Field Pro and Field Lite or that they have already preordered one. This loss has immeasurable effects. For example, Elrod stated in his declaration that Ozonics' customers are repeat purchasers who purchase new models of its product. Ozonics will lose out on these repeat purchases if Scent Crusher continues to sell its products. In addition, Ozonics' sales often come from hunters who heard about the product

---

[43] *See Robert Bosch, LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153 (Fed. Cir. 2011).

[44] *Id*. at 1151.

based on other hunters' recommendations.  If Scent Crusher continues to sell its products, Ozonics will lose out on the value of this informal advertising network.  Courts have found these types of harm to be irreparable.[45]

Ozonics has also demonstrated that because it competes head-to-head with Scent Crusher, it may suffer immeasurable losses from price erosion.  "[P]rice erosion may be difficult to quantify and thus constitute irreparable harm."[46]  Ozonics sells the HR300 for $449 and the HR230 for $349.  Scent Crusher is offering its products for approximately $50 cheaper.  It sells the Field Pro for $399 and the Field Lite for $299.  Scent Crusher also advertises its products as "the most efficient ozone portable unit on the market by far" at the "best price point."  According to Ozonics' expert, whose declaration Scent Crusher did not rebut, if Scent Crusher is allowed to enter the market, Scent Crusher's ozone generators will lower price expectations for consumers in the market.  If Ozonics keeps its current prices, it will lose more customers and market share.  This type of harm is difficult to calculate, thus supporting Ozonics' claim that it will suffer irreparable harm.

As for reputational harm, Ozonics has demonstrated that it has a strong reputation as an innovator.  Ozonics touts its status as an innovator on its website, stating that its technology "was the start of a new era of scent management, and it remains the only active in-the-field scent

---

[45] *Metalcraft*, 848 F.3d at 1368 ("[T]he loss by Scag of customers may have far-reaching, long-term impact on its future revenues, and the sales lost by Scag are difficult to quantify due to ecosystem effects, where one company's customers will continue to buy that company's products and recommend them to others.") (internal quotation omitted); *Celsis In Vitro*, 664 F.3d at 930 ("[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer.").

[46] *Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1262 (D. Kan. 2009) (citation omitted); *see also Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1361-62 (Fed. Cir. 2008).

elimination device."[47]  But, Scent Crusher also touts itself as an innovator.  Its advertisements claim that it is the "leading manufacturer of ozone technology in the hunting industry" and that it is the "originator[] and innovator[] of Ozone scent elimination."  Ozonics argues that as a result of this challenge, Ozonics' reputation will be forever harmed if Scent Crusher continues to sell its products.  The Court agrees.  As the Federal Circuit has stated, "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]."[48]  Thus, courts have found irreparable injury where the sale of the infringing product would damage the patentee's reputation as an innovator.[49]

Ozonics also asserts that it will suffer irreparable harm due to the perception that its patents are not enforceable or that Ozonics does not enforce its patent rights.  The evidence shows that Ozonics advertises its products as containing patented technology and that it strictly enforces its patent rights.  Ozonics believes the harm is magnified here because Scent Crusher has told potential customers that it found a "loophole" around Ozonics' patents.  As previously stated, courts have found irreparable harm based on loss of goodwill and reputation.[50]  In addition, courts have found irreparable harm if infringement indirectly encourages others to infringe the patent.[51]  Thus, Ozonics' claim of loss of goodwill and reputational harm due to its inability to enforce its patents supports a finding of irreparable harm.

---

[47] Ozonics has introduced evidence that Scent Crusher also recognized Ozonics' status as an innovator.  In his letter to Elrod, Scent Crusher's CEO described Elrod as a "pioneer" in the ozone scent elimination industry.

[48] *Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1344-45 (Fed. Cir. 2013).

[49] *Id*.; *Celsis in Vitro*, 664 F.3d at 931.

[50] *Douglas Dynamics*, 717 F.3d at 1345 ("Douglas's reputation would be damaged if its dealers and distributors believed it did not enforce its intellectual property rights.").

[51] *Bushnell*, 673 F. Supp. 2d at 1263 (citation omitted).

Finally, Ozonics must show that there is a causal nexus between Scent Crusher's infringement and the cause of Ozonics' harm. To show a causal nexus, a patentee must demonstrate "that the patented features impact consumers' decisions to purchase the accused devices."[52] The "causal nexus requirement is simply a way of distinguishing between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition—e.g., sales that would be lost even if the offending feature were absent from the accused product."[53] This requirement is easily met. The infringing features of Scent Crusher's products (the portable ozone generator used to eliminate a hunter's scent in the field) creates the demand for the products. Scent Crusher advertises the Field Lite and Field Pro by these very terms. Its press release announced "the all new Field Lite and Field Pro in the field ozone generators." Accordingly, Ozonics has demonstrated that it will suffer irreparable harm if Scent Crusher is not preliminarily enjoined from manufacturing and distributing its products. This factor supports granting a preliminary injunction.

## C.    Balance of Equities

"The district court must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted."[54] In patent cases, "[t]he magnitude of the threatened injury to the patent owner is weighed, in the light of the strength of the showing of likelihood of success on the merits, against the injury to the accused infringer if the

---

[52] *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 642 (Fed. Cir. 2015).

[53] *Apple*, 735 F.3d at 1361 (internal quotation omitted).

[54] *Metalcraft of Mayville*, 848 F.3d at 1369 (citing *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988)).

preliminary decision is in error."[55]  Both Ozonics and Scent Crusher assert that they will suffer substantial harm if the Court does not find in their favor.  Ozonics contends that if Scent Crusher is allowed to sell its products Scent Crusher could completely displace Ozonics' sales and drive it out of the market entirely.  Scent Crusher asserts that if the Court issues an injunction, Scent Crusher would breach the contractual agreements it entered into with its retail partners and breach the covenants on the line of credit it took out to bring its products to market.

After comparing these asserted harms, the Court concludes that this factor weighs in favor of granting a preliminary injunction.  Based on the testimony presented at the hearing, while Scent Crusher may breach its contractual agreements if the Court issues an injunction, Scent Crusher will still have additional product lines available for retail sale.  Ozonics, on the other hand, may suffer the more devastating effect of being completely driven out of the market by Scent Crusher's products.  Indeed, without an injunction, Ozonics will face "substantial hardship in being forced to compete against its own patented invention."[56]  Therefore, the balance of equities weighs in favor of granting a preliminary injunction.

## D.  Public Interest

The final factor for the Court to consider is the impact of the injunction on the public interest.  "Entry of a preliminary injunction will discourage competition.  The public benefits from lower prices spurred by free market competition."[57]  But, the public also has an interest in the enforcement of patents.  The Federal Circuit has "long acknowledged the importance of the patent

---

[55] *H.H. Roberston Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987), abrogated in part on other grounds by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 1019 (Fed. Cir. 1995).

[56] *MetalCraft*, 848 F.3d at 1369 (internal quotations omitted).

[57] *Bushnell, Inc. v.  Brunton Co.*, 673 F. Supp. 2d 1241, 1265 (D. Kan. 2009).

system in encouraging innovation."[58]   The "encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude."[59]  Generally, the public interest prong favors the party that will likely prevail on the patent infringement claim.[60] Because the Court has concluded that Ozonics has shown a likelihood of success on the merits, the factor weighs in favor of granting a preliminary injunction.

## IV.    Conclusion

Ozonics has demonstrated that it is likely to succeed on the merits of proving infringement, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that the public interest favors the issuance of a preliminary injunction. The Court therefore grants Ozonics' Motion for a Preliminary Injunction.

Federal Rule of Civil Procedure 65(c) requires the Court to set a bond amount that is proper to pay the costs and damages sustained by Scent Crusher if it is found to have been wrongfully enjoined or restrained.[61]   The parties did not brief this issue.   At the hearing, however, Scent Crusher argued that the bond amount should be the total amount of its "current orders and/or commitments to place orders from its retail partners" and its projected orders for the remainder of 2018.[62]  This proposed amount is based on vague language in Drake's declaration and not well-

---

[58] *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).

[59] *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed.Cir.1985).

[60] *See Abbott Labs.*, 452 F.3d at 1348 ("Although the public interest inquiry is not necessarily or always bound to the likelihood of success of the merits, in this case absent any other relevant concerns, we agree with the district court that the public is best served by enforcing patents that are likely valid and infringed.").

[61] Fed. R. Civ. P. 65(c) ("Security.  The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

[62] The Court declines to discuss the exact figures because they were filed under seal.

supported. Testimony from the hearing indicates that, at the high end, Scent Crusher has already shipped 600 units of the Field Pro product and 600 units of the Field Lite product and that it has additional inventory in its warehouses (although Scent Crusher did not indicate how much). The Court assumes that Scent Crusher will be shipping a roughly comparable amount of product to its retailers in the near future. Taking this into account along with the price of the Field Pro and Field Lite products, the Court sets the bond amount at $750,000.

**IT IS THEREFORE ORDERED** that Ozonics' Motion for Preliminary Injunction (Doc. 6) is **GRANTED**.

**IT IS FURTHER ORDERED** that during the pendency of this action and until final judgment herein, Scent Crusher, and its agents, officers, servants, employees, and all other persons acting on its behalf, is hereby enjoined and restrained from making, using, advertising, selling or offering to sell the Field Pro and Field Lite products at issue in this Order and any other products that infringe the '015 Patent, the '177 Patent, and the '180 Patent.

**IT IS FURTHER ORDERED** that within 10 days of the injunction issuing, Scent Crusher must provide written notice of this Order to all retail outlets selling or offering for sale through any physical stores or online any product that infringes the '180 Patent, '177 Patent, and the '015 Patent, including the Field Pro and Field Lite products, and a directive to cease all sales of those products.

**IT IS FURTHER ORDERED** that pursuant to Federal Rule of Civil Procedure 65(c), Ozonics must post a preliminary injunction bond with the Clerk of the Court in the amount of $750,000.00.

**IT IS FURTHER ORDERED** that this preliminary injunction will issue and become effective without further order of the Court upon the posting of the bond.

**IT IS SO ORDERED**.

Dated this 22nd day of August, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE