IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

PARAH, LLC, and OZONICS, LLC,    )
                                 )
                 Plaintiffs,     )
v.                               )   District Court
                                 )   Case No.
MOJACK DISTRIBUTORS, LLC,        )   18-1208
  d/b/a SCENT CRUSHER,           )
                                 )
                 Defendant.      )


TRANSCRIPT OF PROCEEDINGS

     On the 15th day of August, 2018, came on to be
heard proceedings in the above-entitled and numbered
cause before the HONORABLE ERIC F. MELGREN, Judge of the
United States District Court for the District of Kansas,
sitting in Wichita, commencing at 12:58 P.M. Proceedings
recorded by machine shorthand.  Transcript produced by
computer-aided transcription.

APPEARANCES:

The plaintiffs appeared by and through:
          Mr. Patrick B. Hughes
          Adams Jones Law Firm, P.A.
          1635 N. Waterfront Parkway
          Suite 200
          Wichita, Kansas  67206

          Mr. Brett L. Foster
          Mr. Mark A. Miller
          Dorsey & Whitney LLP
          111 South Main Street
          Suite 2100
          Salt Lake City, Utah 84111

The defendant appeared by and through:
          Mr. Douglas M. Weems
          Mr. Kyle L. Elliott
          Mr. Kevin Tuttle
          Mr. Brian Peterson
          Spencer Fane Britt & Browne, LLP
          1000 Walnut Street
          Suite 1400
          Kansas City, Missouri  64106-2140

Also present:
        Mr. Jim Knight, corporate representative for
MoJack Distributors

I N D E X

PAGE


WITNESSES
    For the Plaintiff
    DANIEL VERNON DRAKE
      Direct Examination By Mr. Foster     10
      Cross-Examination By Mr. Elliott    40
      Redirect Examination By Mr. Foster   50
    DR. LISA FRIIS
      Direct Examination By Mr. Miller    52
      Cross-Examination By Mr. Tuttle    91
      Redirect Examination By Mr. Miller  122
      Recross-Examination By Mr. Tuttle  124


    For the Defendant
    JIM KNIGHT
      Direct Examination By Mr. Weems    129
      Cross-Examination By Mr. Miller    135
    SCOTT ELROD
      Direct Examination By Mr. Peterson  137
      Cross-Examination By Mr. Foster   145
    SCOTT CRAGUN
      Direct Examination By Mr. Peterson  148

EXHIBITS                    ADMD

For the Defendant:
No. 413    Examples of portable and   134
          plug-in ozone products
No. 414    Webpage showing ozone     134
          purifier product
No. 415    Webpage showing ozone     134
          purifier product
No. 416    Webpage showing ozone     134
          purifier product
No. 417    Webpage showing ozone     134
          purifier product
No. 418    Webpage showing ozone     134
          purifier product


REPORTER'S CERTIFICATE          154

| | | |
|---|---|---|
| 12:58:45 | 1 | CLERK BODECKER:  All rise. |
| 12:58:46 | 2 | United States District Court for the District of |
| 12:58:48 | 3 | Kansas is now in session, the Honorable Eric F. Melgren |
| 12:58:51 | 4 | presiding. |
| 12:58:51 | 5 | THE COURT:  Good afternoon.  You may be seated. |
| 12:58:54 | 6 | The Court calls the case -- is it -- how's the |
| 12:59:07 | 7 | plaintiff pronounced, Parah [pronouncing]? |
| 12:59:09 | 8 | MR. FOSTER:  Yes, Your Honor. |
| 12:59:10 | 9 | THE COURT:  Parah. |
| 12:59:10 | 10 | MR. FOSTER:  Parah and Ozonics. |
| 12:59:12 | 11 | THE COURT:  Okay.  I could have probably gotten |
| 12:59:14 | 12 | the Ozonics but I was a little confused with the Parah. |
| 12:59:18 | 13 | Thank you.  Parah, LLC, versus MoJack Distributors, Case |
| 12:59:22 | 14 | No. 18-1208. |
| 12:59:24 | 15 | Let's start with appearances for the parties, |
| 12:59:26 | 16 | please. |
| 12:59:27 | 17 | MR. FOSTER:  Brett Foster representing the |
| 12:59:30 | 18 | plaintiffs, Your Honor. |
| 12:59:31 | 19 | MR. MILLER:  Mark Miller on behalf of the |
| 12:59:33 | 20 | plaintiffs. |
| 12:59:33 | 21 | MR. HUGHES:  Patrick Hughes on behalf of the |
| 12:59:35 | 22 | plaintiffs. |
| 12:59:35 | 23 | THE COURT:  Thank you. |
| 12:59:36 | 24 | MR. WEEMS:  Your Honor, Doug Weems of the Spencer |
| 12:59:40 | 25 | Fane firm on behalf of MoJack Distributors.  With me at |

| | | |
|---|---|---|
| 12:59:42 | 1 | counsel table I have Kyle Elliott and Brian Peterson. |
| 12:59:45 | 2 | Also with us is Kevin Tuttle.  In addition, on behalf of |
| 12:59:49 | 3 | the MoJack Distributors, Mr. Jim Knight. |
| 12:59:53 | 4 | THE COURT:  All right.  Thank you. |
| 12:59:54 | 5 | Mr. Weems, you'll be taking the lead for |
| 12:59:57 | 6 | defendants; is that correct? |
| 12:59:58 | 7 | MR. WEEMS:  We all have responsibilities, but to |
| 13:00:00 | 8 | the extent there's a lead, it will be me, yes. |
| 13:00:02 | 9 | THE COURT:  All right.  Very well. |
| 13:00:04 | 10 | Well, plaintiff Parah has filed a motion for a |
| 13:00:10 | 11 | preliminary injunction.  I'll note, first of all, that |
| 13:00:16 | 12 | it's not a motion for temporary restraining order.  And |
| 13:00:19 | 13 | in practice, in federal court at least, because we seldom |
| 13:00:22 | 14 | have ex parte hearings on these, I generally treat these |
| 13:00:26 | 15 | as preliminary injunctions anyway.  And I assume that the |
| 13:00:29 | 16 | parties, based on the nature of how these have been |
| 13:00:30 | 17 | filed, assume this is not for just a temporary order but |
| 13:00:32 | 18 | we're going to proceed to have an actual preliminary |
| 13:00:36 | 19 | hearing at this point. |
| 13:00:36 | 20 | Secondly, Mr. Weems, you've filed a motion to |
| 13:00:40 | 21 | disqualify Mr. Foster, which I guess we should take up |
| 13:00:46 | 22 | first. |
| 13:00:46 | 23 | MR. WEEMS:  Yes, sir, Your Honor.  But I'm not |
| 13:00:48 | 24 | sure how much of an issue it is for today.  Mr. Foster, |
| 13:00:52 | 25 | Mr. Hughes, and myself discussed this issue yesterday |

13:00:55  1  before we filed the motion.  The evidence, the

13:00:59  2  declaration, and the attached exhibit to the declaration,

13:01:01  3  Mr. Foster and Mr. Hughes indicated yesterday that they

13:01:04  4  may not offer that exhibit at all today.  If they don't

13:01:07  5  offer it, I don't know that we need to take up the motion

13:01:09  6  to disqualify.

13:01:10  7       THE COURT:  Well, I interpret your argument as

13:01:12  8  accusing Mr. Foster of making legal arguments, which is

13:01:14  9  what I think counsel does.  Even with respect to his

13:01:17  10  claim construction, I think that's what counsel does.  I

13:01:19  11  don't see anything in your motion that suggests that

13:01:23  12  Mr. Foster's actually going to be a fact witness, which

13:01:25  13  is what these matters are addressed to and I'm going to

13:01:28  14  deny your motion.

13:01:28  15       MR. WEEMS:  Well, Your Honor -- I'm sorry, Your

13:01:31  16  Honor.  If you're prepared to rule, then I will -- I will

13:01:34  17  not say anything further, but I did want to make one

13:01:37  18  point.

13:01:37  19       THE COURT:  Go ahead.

13:01:38  20       MR. WEEMS:  The attachment to Mr. Foster's

13:01:41  21  declaration actually has a legal component to it, yes,

13:01:44  22  but it also has factual components.  Apparently

13:01:46  23  Mr. Foster has done some factual investigation.  There

13:01:49  24  are factual statements and representations in that

13:01:52  25  document.

| | | |
|---|---|---|
| 13:01:53 | 1 | THE COURT:  And there are factual statement in |
| 13:01:54 | 2 | every filing that you've made in this court.  That's a |
| 13:01:57 | 3 | part of what attorneys make.  But is he really purporting |
| 13:02:00 | 4 | to be a fact witness that would testify? |
| 13:02:03 | 5 | MR. WEEMS:  If he intends to offer the exhibit |
| 13:02:05 | 6 | that is prepared and attached to his declaration, I think |
| 13:02:08 | 7 | he could be.  Whether it's offered or not, I don't know. |
| 13:02:10 | 8 | THE COURT:  I find you accusing Mr. Foster of |
| 13:02:12 | 9 | practicing law, and that's what attorneys do.  I'm |
| 13:02:15 | 10 | denying your motion. |
| 13:02:16 | 11 | Let's take up then the underlying motion for |
| 13:02:22 | 12 | preliminary injunction.  I know when this was initially |
| 13:02:24 | 13 | filed -- I'm sorry, Mr. Weems, did you have something? |
| 13:02:27 | 14 | MR. WEEMS:  I was going to invoke the rule of |
| 13:02:30 | 15 | sequestration. |
| 13:02:30 | 16 | THE COURT:  All right.  So we have witnesses that |
| 13:02:32 | 17 | will be called? |
| 13:02:32 | 18 | MR. WEEMS:  Yes. |
| 13:02:32 | 19 | THE COURT:  Certainly there's a rule of evidence |
| 13:02:34 | 20 | that allows sequestration to be invoked by either party. |
| 13:02:37 | 21 | I'm going to require that any witness who anticipate |
| 13:02:39 | 22 | they'll be called to offer factual testimony in this case |
| 13:02:42 | 23 | excuse themself from the courtroom until after such time |
| 13:02:45 | 24 | as you've testified.  And, furthermore, no one, either |
| 13:02:50 | 25 | witnesses or attorneys, can communicate to those |

| | | |
|---|---|---|
| 13:02:53 | 1 | witnesses any prior factual testimony that was received |
| 13:02:55 | 2 | in this courtroom.  So whoever plaintiffs intend to call |
| 13:03:01 | 3 | as their first witness can remain, but the other |
| 13:03:04 | 4 | witnesses should excuse themselves from the courtroom |
| 13:03:07 | 5 | until such time as they're called to testify pursuant to |
| 13:03:10 | 6 | the rule. |
| 13:03:11 | 7 | MR. FOSTER:  Very well.  Our fact witnesses, we |
| 13:03:14 | 8 | expect to call Mr. Elrod.  We don't expect to call |
| 13:03:19 | 9 | Mr. Piland as a witness.  He submitted a declaration, |
| 13:03:22 | 10 | attached one text to it.  We're not expecting to call him |
| 13:03:25 | 11 | today, but we can take him out, too. |
| 13:03:27 | 12 | THE COURT:  Who you call is up to you, but |
| 13:03:28 | 13 | obviously, if they -- if they stay in the courtroom -- |
| 13:03:33 | 14 | MR. FOSTER:  They can't testify. |
| 13:03:34 | 15 | THE COURT:  All right.  Right. |
| 13:03:35 | 16 | MR. FOSTER:  Okay.  Sounds good.  So you will need |
| 13:03:38 | 17 | to leave. |
| 13:03:44 | 18 | MR. WEEMS:  Mr. Knight is our corporate |
| 13:03:47 | 19 | representative but you had subpoenaed Mr. Drake.  If he |
| 13:03:50 | 20 | is your first witness, I think he can probably stay, but |
| 13:03:52 | 21 | if he is not your first witness -- |
| 13:03:54 | 22 | MR. FOSTER:  He'll be our first witness.  And as |
| 13:03:56 | 23 | long as he has no intention of testifying, we're fine if |
| 13:03:58 | 24 | he stays. |
| 13:03:59 | 25 | MR. WEEMS:  He's the corporate representative.  I |

13:04:01   1   think he's entitled to stay whether he's going to testify

13:04:04   2   or not.  He is the corporate representative.

13:04:04   3          THE COURT:  The corporate representative is

13:04:06   4   entitled to stay, notwithstanding the rule.

13:04:09   5          MR. FOSTER:  Okay.  Then we'll have Scott stay,

13:04:11   6   Dr. Elrod.  I mean, we want him to testify, but you're

13:04:14   7   saying that a corporate representative --

13:04:16   8          THE COURT:  That's correct.  Corporate

13:04:17   9   representative is allowed to stay, notwithstanding the

13:04:19   10  rule.

13:04:20   11         MR. FOSTER:  You can stay.  And experts can stay?

13:04:22   12         THE COURT:  No.

13:04:23   13         MR. FOSTER:  No.  Experts out.

13:04:32   14         Thank you, Your Honor.

13:04:33   15         THE COURT:  Plaintiffs have filed a motion for

13:04:35   16  preliminary injunction.  I noted at the time it was

13:04:36   17  initially filed, almost a month ago, that there was

13:04:43   18  concern that the allegedly infringing product might be

13:04:48   19  offered for sale beginning in early August.  I don't

13:04:52   20  recall now what that date was but I did note that,

13:04:55   21  whatever that date was, the date is now passed, and

13:04:58   22  moreover, I now have reason to believe that sales of the

13:05:02   23  alleging infringing product have occurred.  I don't know

13:05:04   24  how that's going to modify the relief that you're

13:05:09   25  requesting, but we'll have to take that up as we proceed

| | | |
|---|---|---|
| 13:05:11 | 1 | through. |
| 13:05:11 | 2 | I will tell you that I've looked through your |
| 13:05:13 | 3 | filings in this case.  If we're going to have fact |
| 13:05:18 | 4 | testimony, that's probably where we should start.  Unless |
| 13:05:21 | 5 | there's anything else that either of you think we need to |
| 13:05:24 | 6 | do preliminarily, we'll proceed to receive evidence. |
| 13:05:27 | 7 | MR. FOSTER:  We would call Mr. Dan Drake to the |
| 13:05:32 | 8 | stand as our first witness. |
| 13:05:46 | 9 | THE COURT:  It's a beautiful courtroom but not |
| 13:05:48 | 10 | very conveniently designed to get people from where you |
| 13:05:51 | 11 | are to where we are, so I apologize for that.  But if |
| 13:05:54 | 12 | you'll come stand in front of my courtroom deputy, she |
| 13:05:56 | 13 | will swear you in and then you may have a seat in the |
| 13:05:58 | 14 | witness box. |
| 13:05:58 | 15 | DANIEL VERNON DRAKE, |
| 13:05:58 | 16 | having been first duly sworn to testify the truth, the |
| 13:05:58 | 17 | whole truth, and nothing but the truth, testified as |
| 13:06:18 | 18 | follows: |
| 13:06:19 | 19 | DIRECT EXAMINATION |
| 13:06:19 | 20 | BY MR. FOSTER: |
| 13:06:33 | 21 | Q.    Would you state your name for the record. |
| 13:06:35 | 22 | **A.    Sure.  Daniel Vernon Drake.** |
| 13:06:41 | 23 | Q.    And what is your position with the defendant |
| 13:06:47 | 24 | MoJack Distributors d/b/a Scent Crusher? |
| 13:06:50 | 25 | **A.    I'm the CEO.** |

| 13:06:51 | 1 | Q. | And are you the sole owner as well? |

13:06:51  1  Q.    And are you the sole owner as well?

13:06:53  2  **A.    No, I'm not.**

13:06:54  3  Q.    Okay.  What percentage ownership do you have?

13:06:57  4  **A.    Somewhere in the 90 percent range.**

13:07:00  5  Q.    Okay.  All right.  If I -- all of our papers refer

13:07:05  6  to Scent Crusher.  If I refer to Scent Crusher will you

13:07:07  7  understand that I'm referring to MoJack, the entity

13:07:09  8  itself?

13:07:10  9  **A.    Yes.**

13:07:15  10  Q.    All right.  You've provided a declaration and have

13:07:19  11  provided a little bit of background.  I want to kind of

13:07:21  12  set the stage for a couple of issues.

13:07:23  13       First of all, your first involvement with

13:07:28  14  ozone-related products was in 2013, correct, water-based?

13:07:33  15  **A.    I think we'd done some research maybe in 2012 on**

13:07:36  16  **it.**

13:07:36  17  Q.    In terms of marketing itself, that happened late

13:07:40  18  2013?

13:07:41  19  **A.    I believe so.**

13:07:43  20  Q.    Okay.  And that didn't involve hunting but really

13:07:48  21  the products; correct?

13:07:49  22  **A.    It did not.**

13:07:49  23  Q.    And you then came out with Odor Crusher products

13:07:52  24  in 2014; correct?

13:07:56  25  **A.    I believe the Odor Crusher stuff was later than**

| 13:07:59 | 1 | **that.** |

13:07:59   2   Q.     Later than that.  Okay.  All right.  And the Odor

13:08:04   3   Crusher, later than 2014, was designed to treat or

13:08:09   4   deodorize athletic equipment; correct?

13:08:12   5   **A.     Primarily.**

13:08:13   6   Q.     Primarily putting ozone generators in -- and

13:08:17   7   putting them in gear bags?

13:08:19   8   **A.     That's one of our products.**

13:08:21   9   Q.     And closets that would zip closed with the ozone

13:08:24   10   put in there to clean up those sort of products; correct?

13:08:27   11   **A.     That's one of our products.**

13:08:28   12   Q.     Okay.  You had Ozone to Go, which was a cart, a

13:08:33   13   product that you'd plug into a cigarette lighter and it

13:08:36   14   would create ozone in a closed space of the car?

13:08:39   15   **A.     Yes.**

13:08:42   16   Q.     And in connection with your Odor Crusher, you

13:08:48   17   claimed when you offered those -- first of all, those

13:08:51   18   were not hunting-related products; correct?

13:08:53   19   **A.     They're not.**

13:08:54   20   Q.     Okay.  But your claim was that they effectively

13:08:59   21   eliminate all odors on your gear?  Those are the claims

13:09:02   22   you made in connection with selling those products;

13:09:04   23   correct?

13:09:08   24   **A.     It reduces the bacteria which causes smell, yes.**

13:09:11   25   Q.     Okay.  And don't you claim it eliminates the odors

| | | |
|---|---|---|
| 13:09:17 | 1 | associated with those products? |
| 13:09:21 | 2 | **A.      I don't have the marketing stuff right in front of** |
| 13:09:24 | 3 | **me, but I would assume that's part of our marketing** |
| 13:09:26 | 4 | **message, yes.** |
| 13:09:27 | 5 | Q.      Okay.  Just to be clear -- |
| 13:09:29 | 6 | MR. FOSTER:   Sherri, can we go to the about |
| 13:09:36 | 7 | OdorCrusher.com ozone page, page 6.  Okay. |
| 13:09:52 | 8 | Is that coming into focus for everyone?  Okay. |
| 13:09:59 | 9 | Can you go to the very bottom sentence. |
| 13:09:59 | 10 | BY MR. FOSTER: |
| 13:10:01 | 11 | Q.      Well, first of all, this is your Odor Crusher |
| 13:10:05 | 12 | website page; correct? |
| 13:10:07 | 13 | **A.      It looks like it, yes.** |
| 13:10:08 | 14 | MR. FOSTER:   Go to the very bottom of it. |
| 13:10:08 | 15 | BY MR. FOSTER: |
| 13:10:12 | 16 | Q.      It says here "The ozone attacks and kills all |
| 13:10:16 | 17 | odors and bacteria through oxidization and then converts |
| 13:10:20 | 18 | safely back into standard oxygen, leaving your gear |
| 13:10:23 | 19 | scent-free."   Correct? |
| 13:10:24 | 20 | **A.      Yes, that's what it says.** |
| 13:10:27 | 21 | Q.      And, in fact, you marketed those products to |
| 13:10:32 | 22 | specifically deodorize athletic equipment; correct? |
| 13:10:35 | 23 | **A.      Yes, we do.** |
| 13:10:36 | 24 | Q.      Okay.  Now, the first entry into the |
| 13:10:40 | 25 | hunting-related market was with similar technology, |

13:10:44   1   correct, similar to your Odor Crusher; right?

13:10:47   2   **A.      It's similar, yes.**

13:10:48   3   Q.      And the fundamental ozone generator, is it roughly

13:10:53   4   the same for the products that you sell under the Scent

13:10:58   5   Crusher brand?

13:10:59   6   **A.      They're similar, yes.**

13:11:01   7   Q.      Are the ones that you put in enclosed spaces using

13:11:05   8   the same technology and device as those that were used in

13:11:10   9   the Odor Crusher product lines?

13:11:14   10   **A.      I'm sorry, could you repeat that?  Which company?**

13:11:18   11   **I'm confused.**

13:11:19   12   Q.      I'm sorry --

13:11:20   13        MR. ELLIOTT:  Objection, Your Honor.  I think the

13:11:21   14   question calls for speculation from the witness as to

13:11:24   15   what the products are.  He's testified he's the CEO, so

13:11:26   16   I'm not sure that -- maybe we could rephrase, but --

13:11:29   17        THE COURT:  I'm assuming he's competent to answer

13:11:32   18   these questions as CEO and owner of the company.  And if

13:11:35   19   he's not competent to answer the questions, I'm assuming

13:11:38   20   he'll let us know, so I'm going to overrule the

13:11:41   21   objection.

13:11:42   22   BY MR. FOSTER:

13:11:42   23   Q.      So my question was bad.  Thank you for clarifying.

13:11:46   24        You have products such as Tote and the Hunter's

13:11:53   25   Closet, similar to the Ozone Closet and the Tote you have

13:11:59  1  in Odor Crusher when you created Scent Crusher.  Were

13:12:02  2  those products, ozone products, essentially the same?

13:12:06  3  **A.      Essentially.**

13:12:13  4  Q.      Okay.  Now, in connection with creating -- in 2015

13:12:16  5  you brought the Scent Crusher products to market;

13:12:19  6  correct?

13:12:20  7  **A.      That's correct.**

13:12:21  8  Q.      And that was using ozone technology for the first

13:12:24  9  time in your history relating to hunting products; is

13:12:29  10 that right?

13:12:29  11 **A.      Related to hunting, yes.**

13:12:31  12 Q.      Okay.  All right.  And you characterized the

13:12:35  13 products of Scent Crusher as odor-elimination products;

13:12:39  14 correct?

13:12:42  15 **A.      Yes.**

13:12:48  16 Q.      And just like you've got the identical marketing

13:12:52  17 language in your Scent Crusher website that you have in

13:12:55  18 your Odor Crusher about killing bacteria and being scent

13:13:00  19 free, eliminating scent, when you're dealing with Scent

13:13:03  20 Crusher products; correct?

13:13:08  21 **A.      Yes, but I'm -- I mean, you know, we're killing**

13:13:12  22 **the bacteria that's there.  To the extent that you can**

13:13:15  23 **kill the bacteria, then that removes the scent.**

13:13:19  24 Q.      Okay.

13:13:19  25 **A.      I don't --**

| | | |
|---|---|---|
| 13:13:20 | 1 | Q.      My question is basically what you're claiming, |
| 13:13:23 | 2 | that you kill bacteria and that eliminates all odors and |
| 13:13:26 | 3 | you go scent-free.  That's what you advertise for your |
| 13:13:30 | 4 | Scent Crusher products; correct? |
| 13:13:31 | 5 | A.      **Correct.** |
| 13:13:32 | 6 | Q.      And that's what they do?  You're advertising |
| 13:13:35 | 7 | truthful; correct? |
| 13:13:36 | 8 | A.      **That's what they're designed to do, yes.** |
| 13:13:52 | 9 | Q.      Answering the Judge -- the Court's question, isn't |
| 13:13:58 | 10 | it true that as of last week products started being |
| 13:14:04 | 11 | distributed in the market? |
| 13:14:05 | 12 | A.      **Yes, we started to ship them last week.** |
| 13:14:07 | 13 | Q.      And, specifically, the Field Pro and the Field |
| 13:14:10 | 14 | Lite started shipping last week for the first time; |
| 13:14:12 | 15 | correct? |
| 13:14:12 | 16 | A.      **Yes, it did.** |
| 13:14:15 | 17 | Q.      Do you know roughly how many products, units, have |
| 13:14:19 | 18 | shipped to this point? |
| 13:14:23 | 19 | A.      **I don't off the top of my head.** |
| 13:14:24 | 20 | Q.      Do you have a ballpark figure? |
| 13:14:27 | 21 | A.      **I don't.  I was on vacation all last week with my** |
| 13:14:30 | 22 | **family and I'm not sure exactly what shipped.** |
| 13:14:33 | 23 | Q.      If you don't know, you don't know.  Do you know |
| 13:14:36 | 24 | how much, in terms of the sales, have actually turned |
| 13:14:44 | 25 | into orders and commitments that have turned into actual |

| | | |
|---|---|---|
| 13:14:46 | 1 | sales to date? |
| 13:14:48 | 2 | **A.      I don't.** |
| 13:14:48 | 3 | Q.      So what you testified to in your declaration is |
| 13:14:52 | 4 | currently that -- it's the same, the orders and |
| 13:14:55 | 5 | commitments is the same number in your declaration that |
| 13:15:00 | 6 | it is today; is that right? |
| 13:15:01 | 7 | MR. ELLIOTT:  Objection, Your Honor.  We did file |
| 13:15:03 | 8 | his declaration under seal, and so if we're going to get |
| 13:15:06 | 9 | into specific numbers, if we can have the corporate |
| 13:15:09 | 10 | representative step out because we would consider those |
| 13:15:12 | 11 | for-attorneys'-eyes-only information, if we get to |
| 13:15:16 | 12 | specific numbers. |
| 13:15:16 | 13 | THE COURT:  Do we need to get into these specific |
| 13:15:19 | 14 | numbers, Mr. Foster? |
| 13:15:20 | 15 | MR. FOSTER:  I think if the Court is aware of it, |
| 13:15:22 | 16 | I think we can probably -- I was trying to be vague for |
| 13:15:24 | 17 | that very reason.  And if -- we will have testimony later |
| 13:15:28 | 18 | that will get into some specifics, but I think for now I |
| 13:15:33 | 19 | think we can try to -- |
| 13:15:34 | 20 | THE COURT:  Well, and regarding this "later," you |
| 13:15:38 | 21 | know the court closes at 5:00. |
| 13:15:40 | 22 | MR. FOSTER:  Okay. |
| 13:15:41 | 23 | THE COURT:  The courthouse closes.  I mean, I |
| 13:15:43 | 24 | assume that you all assumed that.  So I'm assuming that |
| 13:15:47 | 25 | we're going to get through this hearing in four hours, |

| 13:15:49 | 1 | and I just want to make sure that you schedule your |
| 13:15:52 | 2 | presentation accordingly. |
| 13:15:54 | 3 | MR. FOSTER: Fair enough. We're not -- I have an |
| 13:15:58 | 4 | expert witness here who submitted a declaration and will |
| 13:16:01 | 5 | testify on irreparable harm relating in part to the |
| 13:16:06 | 6 | magnitude of the sales of Scent Crusher versus Ozonics |
| 13:16:11 | 7 | Scent Crusher. |
| 13:16:11 | 8 | THE COURT: Yeah, I don't think the volume of the |
| 13:16:13 | 9 | sales is that critical to the claims you're making. |
| 13:16:16 | 10 | Whether they're X or Y doesn't change the nature of your |
| 13:16:19 | 11 | legal claims with respect to irreparable harm. |
| 13:16:20 | 12 | MR. FOSTER: Okay. Anyway, that's what we have, |
| 13:16:22 | 13 | and we will be very brief with that, and we'll try to |
| 13:16:25 | 14 | move on here. |
| 13:16:27 | 15 | BY MR. FOSTER: |
| 13:16:27 | 16 | Q. Okay. I want to focus on some of the infringement |
| 13:16:31 | 17 | issues in the case. So I'm looking at the -- have you |
| 13:16:45 | 18 | looked at the patents that are at issue in this case? |
| 13:16:48 | 19 | **A.     Not recently.** |
| 13:16:49 | 20 | Q. Okay. All right. |
| 13:16:50 | 21 | **A.     I haven't.** |
| 13:16:50 | 22 | Q. And I don't want you to -- I don't need you to |
| 13:16:53 | 23 | become an expert in the patent area, but one of the |
| 13:16:55 | 24 | issues we need to talk about is eliminating -- |
| 13:16:59 | 25 | eliminating scent, and I think we've covered that. Your |

| | | |
|---|---|---|
| 13:17:04 | 1 | products are designed to and do eliminate scent for Scent |
| 13:17:10 | 2 | Crusher; correct? |
| 13:17:11 | 3 | MR. ELLIOTT:  Objection.  Mischaracterizes his |
| 13:17:15 | 4 | previous testimony.  They were qualified answers. |
| 13:17:19 | 5 | THE COURT:  Counsel, we don't have a jury here -- |
| 13:17:24 | 6 | MR. ELLIOTT:  Okay. |
| 13:17:25 | 7 | THE COURT:  -- so I think we can sort of flow. |
| 13:17:27 | 8 | Let's not worry about some of those hypertechnical. |
| 13:17:31 | 9 | MR. ELLIOTT:  Yes, Your Honor. |
| 13:17:33 | 10 | THE COURT:  Why don't you reask the question. |
| 13:17:35 | 11 | MR. FOSTER:  Okay. |
| 13:17:36 | 12 | BY MR. FOSTER: |
| 13:17:37 | 13 | Q.    I think we covered this but I do want to get into |
| 13:17:40 | 14 | some specific evidence relating to it. |
| 13:17:42 | 15 | You sell your products as representing they |
| 13:17:46 | 16 | eliminate odors.  You call them odor-elimination |
| 13:17:51 | 17 | products; correct? |
| 13:17:54 | 18 | **A.    Yeah, ozone kills the bacteria that causes smell.** |
| 13:17:57 | 19 | Q.    Causes body odor; right? |
| 13:18:00 | 20 | **A.    And others, yes.** |
| 13:18:01 | 21 | Q.    Perfect.  Okay. |
| 13:18:05 | 22 | MR. FOSTER:  Let's go to, Ms. Stucki, Exhibit S, |
| 13:18:12 | 23 | page 169.  This is Elrod Exhibit S.  When I'm referring |
| 13:18:17 | 24 | to the numbers -- or the lettered exhibits, they're all |
| 13:18:20 | 25 | attached in sequence, for the Court's knowledge, to |

13:18:23   1   Elrod's declaration, so I'll be referring to those.

13:18:26   2          Did you give the Court a binder?  Would you like a

13:18:30   3   binder that has those exhibits and page references?

13:18:34   4          THE COURT:  Sure.

13:18:35   5          MR. WEEMS:  I'd like one, too, if you've got an

13:18:38   6   extra.

13:18:38   7          MR. FOSTER:  Do we have an extra one?  I don't

13:18:40   8   have an extra one.  So if you've got the exhibit, I'll

13:18:43   9   tell you the page of the exhibit.  And the reason I have

13:18:48   10  a page is so that my paralegal can get us right to the

13:18:52   11  page.  Okay.

13:18:56   12         All right.  If you could, Ms. Stucki, blow up the

13:19:00   13  middle part of it with those -- keep all the way to the

13:19:03   14  bottom.  There you go.

13:19:08   15  BY MR. FOSTER:

13:19:08   16  Q.     This is -- this comes from your manual for your

13:19:16   17  Field Pro product; correct?

13:19:21   18  **A.     I haven't reviewed that recently.  I've seen this**

13:19:26   19  **in our marketing materials, but I couldn't tell you if**

13:19:28   20  **it's from the manual or not.**

13:19:29   21  Q.     Okay.  Let's go to Elrod S and let's go to

13:19:39   22  first -- there we go.

13:19:40   23         Does that look like the instruction manual for

13:19:43   24  your Field Pro product?

13:19:44   25  **A.     It does.**

13:19:45  1  Q.    Okay.  Now, let's go to page 169.  And you can

13:19:51  2  blow up that section again.  And this is the explanation

13:20:00  3  of your technology again, in the middle section.  "Ozone

13:20:04  4  attacks bacteria on a molecular level and eliminates it."

13:20:08  5  Do you see that?

13:20:11  6  A.    Yes.

13:20:11  7  Q.    And that's correct, that's the way you advertise

13:20:13  8  your products and that's what you think they do; correct?

13:20:20  9  A.    Yes.

13:20:20  10  Q.    And then the next one, "You stay scent-free while

13:20:25  11  in the field."  Do you see that?

13:20:26  12  A.    Yes.

13:20:27  13  Q.    And that's a truthful statement, too, and that's

13:20:29  14  what your products do; correct?

13:20:33  15  A.    That's what you're aiming to do.  There's lots of

13:20:36  16  variables there, obviously, so . . .

13:20:38  17  Q.    Okay.  So the statement is unequivocal:  you stay

13:20:41  18  scent-free while in the field?  That's what you advertise

13:20:44  19  and you believe you produce -- you deliver on that claim;

13:20:47  20  correct?

13:20:47  21  A.    There are lots of variables that affect that, from

13:20:53  22  wind to how much you sweat to how hot it is out in the

13:20:57  23  day to -- but --

13:20:59  24  Q.    But that's what you believe your product is doing;

13:21:02  25  correct?

| | | |
|---|---|---|
| 13:21:04 | 1 | A.      That's what you're trying to do. |
| 13:21:06 | 2 | Q.    And that's what they're buying for $300 or more; |
| 13:21:10 | 3 | correct? |
| 13:21:12 | 4 | A.      I don't know why -- I mean, you're asking me to |
| 13:21:20 | 5 | ask why they buy it.  I can't tell you why.  You know |
| 13:21:24 | 6 | what I mean? |
| 13:21:25 | 7 | Q.    But that's how you sell it in order for someone to |
| 13:21:29 | 8 | buy it? |
| 13:21:29 | 9 | A.      It's our marketing stuff, yes. |
| 13:21:31 | 10 | Q.    Okay.  And let's go to -- let me ask a background |
| 13:21:51 | 11 | question.  Recently you sent displays to various |
| 13:21:56 | 12 | retailers for your products; correct? |
| 13:21:57 | 13 | A.      I believe we have, yes. |
| 13:21:59 | 14 | Q.    And Scheels is one of those, it's one of your |
| 13:22:02 | 15 | retailers; correct? |
| 13:22:03 | 16 | A.      They are. |
| 13:22:04 | 17 | Q.    And you sent advertising displays to them to put |
| 13:22:07 | 18 | up in connection with your products; correct? |
| 13:22:09 | 19 | A.      Yes. |
| 13:22:10 | 20 |       MR. FOSTER:  Sherri, would you pull up H5. |
| 13:22:14 | 21 | BY MR. FOSTER: |
| 13:22:14 | 22 | Q.    And this is one of the displays in -- this one is |
| 13:22:19 | 23 | the Scheels display; correct? |
| 13:22:22 | 24 | A.      Yes. |
| 13:22:22 | 25 | Q.    Okay.  And the top of the banner it says, "Scent |

8-15-18   PARAH v. MOJACK   No. 18-1208

23

| | | |
|---|---|---|
| 13:22:26 | 1 | elimination for the field."  See that? |
| 13:22:28 | 2 | A.      Yes. |
| 13:22:28 | 3 | Q.      And so the concept is you call 'em Field Lite and |
| 13:22:33 | 4 | Field Pro, they're designed to be taken into the field |
| 13:22:36 | 5 | and used in the field for hunting; correct? |
| 13:22:39 | 6 | A.      Yes. |
| 13:22:55 | 7 | Q.      While we have that up, explain to me the |
| 13:22:59 | 8 | mechanisms in your first units that you put into the |
| 13:23:07 | 9 | Hunter's Closet and the similar closet for Odor Crusher. |
| 13:23:10 | 10 | How does it produce ozone?  How do your products produce |
| 13:23:15 | 11 | ozone? |
| 13:23:16 | 12 | A.      I can't tell you the exact engineering of it. |
| 13:23:19 | 13 | We've got NASA scientists and engineers that do that, but |
| 13:23:23 | 14 | they produce ozone with a powered environment, with a |
| 13:23:30 | 15 | cord, where these are battery-powered. |
| 13:23:32 | 16 | Q.      Okay.  Fair enough.  And do you know, your |
| 13:23:35 | 17 | products, these products, the Field Lite and Field Pro, |
| 13:23:38 | 18 | have fans in them, correct, battery-powered? |
| 13:23:42 | 19 | A.      Yes. |
| 13:23:42 | 20 | Q.      And they have -- is it a corona-type |
| 13:23:46 | 21 | ozone-creating device? |
| 13:23:47 | 22 | A.      I'm not sure. |
| 13:23:48 | 23 | Q.      You're not sure? |
| 13:23:49 | 24 | A.      No. |
| 13:23:49 | 25 | Q.      But you do know there is some mechanism for |

| | | |
|---|---|---|
| 13:23:53 | 1 | generating ozone, the fan blows it; correct? |
| 13:23:58 | 2 | **A.     Yes.** |
| 13:23:58 | 3 | Q.     And then the fan blows it out of the unit and it |
| 13:24:03 | 4 | flows into the environment when you're hunting; correct? |
| 13:24:06 | 5 | **A.     Disperses it, yes.** |
| 13:24:12 | 6 | MR. FOSTER:  And, Sherri, if you could kind of |
| 13:24:14 | 7 | focus, maybe blow up that part right here. |
| 13:24:29 | 8 | BY MR. FOSTER: |
| 13:24:29 | 9 | Q.     I want to -- so you've got a fan in there, and the |
| 13:24:32 | 10 | fan, there's some element that you don't know the details |
| 13:24:35 | 11 | of pushing -- that creates the ozone as the fan runs; |
| 13:24:39 | 12 | correct? |
| 13:24:39 | 13 | **A.     Correct.** |
| 13:24:39 | 14 | Q.     And then it comes out of these holes; right? |
| 13:24:42 | 15 | **A.     Correct.** |
| 13:24:42 | 16 | Q.     Every one of those holes has a flow of ozone |
| 13:24:45 | 17 | coming out; right? |
| 13:24:50 | 18 | **A.     It disperses it out three sides.** |
| 13:24:53 | 19 | Q.     Okay.  But each one of those holes, there is flow |
| 13:24:56 | 20 | of ozone coming out of it; correct? |
| 13:25:00 | 21 | **A.     Yeah.  They all act in concert together to create** |
| 13:25:08 | 22 | **the dispersement.** |
| 13:25:11 | 23 | Q.     With respect to each individual hole, there's |
| 13:25:13 | 24 | something coming out, flowing out of each hole, by virtue |
| 13:25:16 | 25 | of the fan pushing it out? |

| | | |
|---|---|---|
| 13:25:17 | 1 | **A.      Right.   There's not an individual tube to each** |
| 13:25:20 | 2 | **hole.** |
| 13:25:20 | 3 | Q.      And that's the same as Ozonics' products; correct? |
| 13:25:24 | 4 | They have a fan, some mechanism for producing ozone, and |
| 13:25:27 | 5 | it comes out except for -- just comes out in 180 degrees |
| 13:25:30 | 6 | one way and you've got 270 degrees here, right, for this |
| 13:25:34 | 7 | product? |
| 13:25:34 | 8 | **A.      Is one way 90?** |
| 13:25:37 | 9 | Q.      Pardon me? |
| 13:25:37 | 10 | **A.      Is one way 90 degrees?** |
| 13:25:39 | 11 | Q.      I don't know.  What's your field like?  It comes |
| 13:25:41 | 12 | out one side, is that 90 degrees or 180 degrees? |
| 13:25:49 | 13 | **A.      That is 90 degrees.** |
| 13:25:51 | 14 | Q.      Okay.  So, regardless, you have ozone -- |
| 13:25:55 | 15 | MR. FOSTER:  Let's go -- let's go to the other |
| 13:25:57 | 16 | side, Sherri, and let's pull up the Field Lite. |
| 13:25:57 | 17 | BY MR. FOSTER: |
| 13:26:01 | 18 | Q.      Now, is this the -- do you know if this is where |
| 13:26:03 | 19 | the air comes in to the unit or goes out, these slots? |
| 13:26:09 | 20 | **A.      There are slots on both sides.  I -- I don't** |
| 13:26:13 | 21 | **recall if that's the intake or the -- without having it** |
| 13:26:18 | 22 | **right here in front of me.** |
| 13:26:19 | 23 | Q.      One's intake, though, one's output? |
| 13:26:21 | 24 | **A.      Correct.** |
| 13:26:21 | 25 | Q.      And there are slots on just one side that's |

| | | |
|---|---|---|
| 13:26:24 | 1 | output; right? |
| 13:26:25 | 2 | **A.       Correct.** |
| 13:26:27 | 3 | Q.     Okay.  And when you say, "270 degrees is 55 |
| 13:26:31 | 4 | percent greater than the competition," who are you |
| 13:26:35 | 5 | referring to? |
| 13:26:37 | 6 | **A.       Anything that's been on the market before.** |
| 13:26:39 | 7 | Q.     Okay.  Including Ozonics? |
| 13:26:42 | 8 | **A.       Ozonics and, yeah, the other people that sell** |
| 13:26:49 | 9 | **those devices.** |
| 13:26:58 | 10 | Q.     In terms of the function of the unit, let's go to |
| 13:27:03 | 11 | Exhibit S again, the instruction manual.  And let's go to |
| 13:27:12 | 12 | page 6, 172, page 6 of the manual, 172 for the binder. |
| 13:27:20 | 13 |       MR. FOSTER:  And then if you could blow up the |
| 13:27:22 | 14 | steps there of using the Scent Crusher Field Pro. |
| 13:27:22 | 15 | BY MR. FOSTER: |
| 13:27:27 | 16 | Q.     Okay.  Here we have the way you operate the Field |
| 13:27:32 | 17 | Pro; right? |
| 13:27:33 | 18 | **A.       Yes.** |
| 13:27:34 | 19 | Q.     Okay.  Insert the battery, turn it on, and then |
| 13:27:38 | 20 | you pick how long it's going to run; right? |
| 13:27:40 | 21 | **A.       Correct.** |
| 13:27:41 | 22 | Q.     It's got options for this product:  six hours, |
| 13:27:44 | 23 | four hours, one hours and 30 minutes.  And for the Field |
| 13:27:52 | 24 | Lite, you have shorter time intervals; correct? |
| 13:27:55 | 25 | **A.       Yes.** |

| 13:27:55 | 1 | Q.     Two hours, hour and a half, hour, and 30 minutes; |
| 13:28:01 | 2 | right? |
| 13:28:01 | 3 | **A.     I believe so.  I don't have it right in front of** |
| 13:28:03 | 4 | **me.** |
| 13:28:03 | 5 | Q.    Okay.  Then you select usual -- and when you turn |
| 13:28:06 | 6 | that button on and pick that hour, that hour interval, it |
| 13:28:14 | 7 | will stop -- it will continuously run and flow the ozone |
| 13:28:17 | 8 | out the unit until six hours, one hour, or 30 minutes, |
| 13:28:22 | 9 | whatever time interval you picked; correct? |
| 13:28:24 | 10 | **A.     Correct.** |
| 13:28:27 | 11 | Q.    And then you have a desired mode:  low, medium, |
| 13:28:31 | 12 | high.  And that simply regulates the amount of the flow |
| 13:28:34 | 13 | out of the ozone generator; correct? |
| 13:28:40 | 14 | **A.     It does.  I don't know if it's a combination of** |
| 13:28:43 | 15 | **fan speed and concentration, I believe.** |
| 13:28:45 | 16 | Q.    Okay.  Fair enough.  So the fan speed on low is |
| 13:28:49 | 17 | lower and there's less flow, for high the fan speed's |
| 13:28:52 | 18 | higher and there's more flow; correct? |
| 13:28:54 | 19 | **A.     Yeah, and I think maybe the concentration loads** |
| 13:28:57 | 20 | **get kicked up also.** |
| 13:28:58 | 21 | Q.    Okay.  All right.  Now, to be sure, you have |
| 13:29:02 | 22 | described the output of the unit as producing flow; |
| 13:29:10 | 23 | correct? |
| 13:29:11 | 24 | **A.     Correct.** |
| 13:29:13 | 25 | Q.    And, in fact, in your -- we've cited to it in our |

| | | |
|---|---|---|
| 13:29:16 | 1 | papers -- in your working class podcast, that's exactly |
| 13:29:20 | 2 | how you described the output, is a flow of ozone out of |
| 13:29:23 | 3 | the unit; correct? |
| 13:29:25 | 4 | **A.    I don't remember the podcast.  It was several** |
| 13:29:29 | 5 | **weeks ago.** |
| 13:29:30 | 6 | Q.    But you wouldn't -- we've cited it to the Court |
| 13:29:33 | 7 | and you wouldn't dispute that you'd refer to the flow out |
| 13:29:36 | 8 | of your Field Pro and Field Lite as a flow of ozone; |
| 13:29:40 | 9 | correct? |
| 13:29:40 | 10 | **A.       Correct.** |
| 13:29:50 | 11 | Q.    One of the elements is an ozone generator. |
| 13:29:54 | 12 | MR. FOSTER:  Could you go to page 1 of S.  That's |
| 13:29:56 | 13 | 167. |
| 13:29:56 | 14 | BY MR. FOSTER: |
| 13:29:59 | 15 | Q.    It says right here "ozone generator"; correct. |
| 13:30:02 | 16 | **A.       Correct.** |
| 13:30:02 | 17 | Q.    And ozone generator generates ozone and flows out |
| 13:30:06 | 18 | of the unit; correct? |
| 13:30:08 | 19 | **A.       Disperses, yes.** |
| 13:30:10 | 20 | Q.    Okay. |
| 13:30:11 | 21 | MR. FOSTER:  Let's go to Exhibit T, page 176, |
| 13:30:15 | 22 | first page. |
| 13:30:15 | 23 | BY MR. FOSTER: |
| 13:30:16 | 24 | Q.    Same thing on this instruction manual, it says |
| 13:30:18 | 25 | "ozone generator"; correct? |

| | | |
|---|---|---|
| 13:30:19 | 1 | A.      Correct. |
| 13:30:23 | 2 | Q.      Okay.  And these are -- we've covered this.  They |
| 13:30:30 | 3 | are designed to be used in the field.  That's another |
| 13:30:33 | 4 | element in the patent.  These are to go out in the field |
| 13:30:36 | 5 | and used for hunting by a hunter; correct? |
| 13:30:39 | 6 | A.      Correct. |
| 13:30:46 | 7 | Q.      Okay.  Another claimed element is mounting in some |
| 13:30:52 | 8 | of the claims. |
| 13:30:52 | 9 |      MR. FOSTER:  And I'd like to go to Exhibit S and |
| 13:30:59 | 10 | page 7, and page 173 for you, Sherri.  If you could blow |
| 13:31:05 | 11 | up tree stand use. |
| 13:31:05 | 12 | BY MR. FOSTER: |
| 13:31:10 | 13 | Q.      This describes exactly how you need to mount the |
| 13:31:17 | 14 | unit and use it in the field for hunting; correct? |
| 13:31:20 | 15 | A.      Correct. |
| 13:31:20 | 16 | Q.      And you have the same type of description, a |
| 13:31:25 | 17 | little different description, for ground blind? |
| 13:31:29 | 18 | A.      For what? |
| 13:31:29 | 19 | Q.      Mounting the unit in the ground blind for hunting. |
| 13:31:33 | 20 | A.      Yes. |
| 13:31:42 | 21 | Q.      Okay.  One of the elements of the patent is |
| 13:31:45 | 22 | downwind.  And I want to stay where you are here.  And |
| 13:31:50 | 23 | this is again referring to Exhibit S, page 7. |
| 13:31:54 | 24 |      MR. FOSTER:  And we have the right page up, |
| 13:31:55 | 25 | Sherri.  You don't need to do anything. |

| | | |
|---|---|---|
| 13:31:55 | 1 | BY MR. FOSTER: |
| 13:31:57 | 2 | Q.     The bottom sentence on tree stand use, "Determine |
| 13:32:01 | 3 | wind direction and correctly position the unit facing the |
| 13:32:04 | 4 | downwind direction."   Do you see that? |
| 13:32:07 | 5 | A.     Yes. |
| 13:32:11 | 6 | Q.     Okay.  One of the issues is -- that was raised in |
| 13:32:18 | 7 | the brief is whether any animals were present.  And the |
| 13:32:22 | 8 | whole point of this is to fool the deer, the nose of the |
| 13:32:26 | 9 | deer, and that's why you're selling it to hunters so that |
| 13:32:29 | 10 | they will not recognize human scent and give the archer |
| 13:32:33 | 11 | or hunter a clean shot at the animal; is that correct? |
| 13:32:36 | 12 | A.     For all type of deer, animals people hunt. |
| 13:32:40 | 13 | Q.     Deer, elk, any animal; right? |
| 13:32:44 | 14 | A.     Right. |
| 13:32:44 | 15 | Q.     And have you used the product in actual hunting, |
| 13:32:47 | 16 | either the Field Pro or the Field Lite? |
| 13:32:52 | 17 | A.     I have, yes. |
| 13:32:53 | 18 | Q.     And you used it successfully when animals were |
| 13:32:55 | 19 | present and harvested an animal; correct? |
| 13:33:00 | 20 | A.     I have not with the production units. |
| 13:33:04 | 21 | Q.     Okay.  Have you with even a prototype unit? |
| 13:33:09 | 22 | A.     Not to this exact extent, no. |
| 13:33:11 | 23 | Q.     Okay.  But you were part of a hunt; correct?  And |
| 13:33:17 | 24 | you were there promoting your Field Pro unit on an Axis |
| 13:33:23 | 25 | deer hunt in Texas when an animal was taken with that |

| | | |
|---|---|---|
| 13:33:25 | 1 | unit and it was the first kill for that unit; correct? |
| 13:33:28 | 2 | **A.      No.** |
| 13:33:28 | 3 | Q.      Okay. |
| 13:33:29 | 4 |       MR. FOSTER:  Let's go to the Facebook.  Let's |
| 13:33:45 | 5 | start with Facebook 2.  Okay?  Can we get the sound? |
| 13:33:52 | 6 | This is a video from Scent Crusher's Facebook page. |
| 13:33:56 | 7 |       (Viewing video.) |
| 13:34:15 | 8 | Q.      So isn't that you in the video; correct? |
| 13:34:17 | 9 | **A.      Yeah, I wasn't in the blind with him.** |
| 13:34:19 | 10 | Q.      Okay.  All right.  But that was your Field Pro |
| 13:34:22 | 11 | unit in the back of the pickup? |
| 13:34:24 | 12 | **A.      Uh-huh.** |
| 13:34:25 | 13 | Q.      And you're the one who said it was the first kill |
| 13:34:27 | 14 | with that unit; correct? |
| 13:34:28 | 15 | **A.      Right, I just wasn't --** |
| 13:34:29 | 16 | Q.      And an Axis deer was present while you were |
| 13:34:33 | 17 | hunting, while he was hunting, and while you were there |
| 13:34:35 | 18 | on scene; correct? |
| 13:34:37 | 19 | **A.      Yes.  And now I'm trying to remember if I killed** |
| 13:34:39 | 20 | **it with a rifle or a bow, but I don't know if that** |
| 13:34:42 | 21 | **matters.** |
| 13:35:00 | 22 | Q.      And you don't dispute that ozone is a stream of |
| 13:35:03 | 23 | oxidizing gas; right?  You believe that's correct? |
| 13:35:07 | 24 | **A.      Well, I think it can come in a lot of different** |
| 13:35:11 | 25 | **volumes and dispersements.** |

| | | |
|---|---|---|
| 13:35:13 | 1 | Q.      But you would agree that ozone is an oxidizing |
| 13:35:16 | 2 | gas? |
| 13:35:18 | 3 | **A.      The chemistry of it, yes.** |
| 13:35:21 | 4 | Q.      Okay.  I think I've got the patent infringement |
| 13:35:24 | 5 | stuff done that I need to.  Okay.  Let's go back a little |
| 13:35:46 | 6 | bit in time.  In 2015, in addition to selling products |
| 13:35:50 | 7 | similar to Odor Crusher, you came out with a unit that |
| 13:35:55 | 8 | was going to be used in the field; correct? |
| 13:35:56 | 9 | **A.      I don't think we'd started Odor Crusher before our** |
| 13:35:59 | 10 | **hunting stuff.** |
| 13:36:00 | 11 | Q.      You don't think you started Odor Crusher before |
| 13:36:03 | 12 | hunting? |
| 13:36:03 | 13 | **A.      Huh-uh.** |
| 13:36:04 | 14 | MR. FOSTER:  Let's go to -- pull up the Drake |
| 13:36:07 | 15 | declaration and let's blow up both paragraphs 5 and 6, to |
| 13:36:14 | 16 | refresh your recollection. |
| 13:36:14 | 17 | BY MR. FOSTER: |
| 13:36:19 | 18 | Q.      This was your declaration that you signed on |
| 13:36:21 | 19 | August 8th, just a few days ago; right? |
| 13:36:24 | 20 | **A.      Yes.** |
| 13:36:24 | 21 | Q.      And it says in 2014 you developed Odor -- ozone to |
| 13:36:32 | 22 | deodorize athletic equipment, the Odor Crusher line, and |
| 13:36:36 | 23 | then in 2015 the Scent Crusher line.  Does that refresh |
| 13:36:39 | 24 | your -- |
| 13:36:40 | 25 | **A.      Odor Crusher was really kind of clean $O_3$, plus** |

| | | |
|---|---|---|
| 13:36:48 | 1 | Odor Crusher's really water-based stuff not air-based |
| 13:36:52 | 2 | stuff in 2014. |
| 13:36:53 | 3 | Q.     Okay.  Fair enough.  So in any event, when you |
| 13:36:56 | 4 | came up with your Scent Crusher products sometime in |
| 13:37:01 | 5 | 2015, you created an in-the-field ozone unit; correct? |
| 13:37:20 | 6 | A.     Now the stuff, for the most part, was -- I mean, |
| 13:37:24 | 7 | we had discussed it but all the stuff that we came out |
| 13:37:27 | 8 | with was not field stuff. |
| 13:37:29 | 9 | Q.     Okay.  You do recall getting a cease and desist |
| 13:37:33 | 10 | letter from Ozonics relating to a claim of patent |
| 13:37:35 | 11 | infringement in 2015; correct? |
| 13:37:37 | 12 | A.     I do. |
| 13:37:37 | 13 | Q.     Okay. |
| 13:37:40 | 14 | A.     I do. |
| 13:37:41 | 15 | Q.     And that attached Ozonics' patents; correct? |
| 13:37:45 | 16 | A.     Pardon me? |
| 13:37:46 | 17 | Q.     That cease and desist letter attached Ozonics' |
| 13:37:50 | 18 | patents and provided you a copy of them; correct? |
| 13:37:53 | 19 | A.     For the attorneys, yes. |
| 13:41:29 | 20 |        (Off the record discussion.) |
| 13:41:29 | 21 |        THE COURT:  Go ahead, Counsel. |
| 13:41:30 | 22 |        MR. FOSTER:  Are we ready?  Okay.  Thank you. |
| 13:41:32 | 23 | BY MR. FOSTER: |
| 13:41:39 | 24 | Q.     All right.  You also were using the trademark Game |
| 13:41:49 | 25 | Changer in 2015 relating to your hunting products; |

| 13:41:52 | 1 | correct? |
| 13:41:53 | 2 | **A.      No, I think it was a terminology that we had just** |
| 13:41:58 | 3 | **said in one of our presentations.** |
| 13:42:01 | 4 | Q.      Okay. |
| 13:42:02 | 5 | **A.      We weren't marketing it that way.** |
| 13:42:04 | 6 | Q.      I apologize.  I didn't mean to cut you off.  You |
| 13:42:09 | 7 | know -- you were advised also in the cease and desist |
| 13:42:11 | 8 | letter, which is Elrod Exhibit D, that Ozonics had |
| 13:42:17 | 9 | trademark registration for Game Changer; correct? |
| 13:42:19 | 10 | **A.      Yes.** |
| 13:42:20 | 11 | Q.      And you stopped using the Game Changer trademark; |
| 13:42:23 | 12 | correct? |
| 13:42:23 | 13 | **A.      We had just had it in one presentation.  We didn't** |
| 13:42:25 | 14 | **use it anywhere else after that, that's correct.** |
| 13:42:27 | 15 | Q.      And after this time and until your recent |
| 13:42:30 | 16 | introduction, you did not have an ozone in the field for |
| 13:42:34 | 17 | hunting; correct? |
| 13:42:35 | 18 | **A.      That's correct.** |
| 13:42:43 | 19 | Q.      Now, you did offer to do -- to have business |
| 13:42:47 | 20 | opportunities.  You talked about business opportunities |
| 13:42:49 | 21 | with Ozonics; correct? |
| 13:42:52 | 22 | **A.      What?** |
| 13:42:55 | 23 | Q.      Isn't it true that you offered to buy Ozonics? |
| 13:42:58 | 24 | **A.      No.** |
| 13:42:59 | 25 | Q.      Okay. |

| 13:43:00 | 1 | A.      I -- I was trying to sit down and have a |
| 13:43:05 | 2 | conversation with Ozonics to discuss what their sales |
| 13:43:09 | 3 | were, where stuff was, some strategic alliances. |
| 13:43:14 | 4 | Q.     All right.  Let's pull up and I want to walk you |
| 13:43:17 | 5 | through a letter that you sent to Mr. Elrod.  It's |
| 13:43:21 | 6 | Exhibit O.  150 is the number.  And I just want to walk |
| 13:43:27 | 7 | through this.  First of all, take the first chunk with |
| 13:43:31 | 8 | the first paragraph, and it's dated August 24, 2016. |
| 13:43:36 | 9 | A.      Right. |
| 13:43:37 | 10 | Q.     So this was a year or so after the letter you got |
| 13:43:40 | 11 | from their attorneys; correct? |
| 13:43:43 | 12 | A.      I don't remember when I received the letter from |
| 13:43:46 | 13 | the attorneys. |
| 13:43:47 | 14 | Q.     Okay.  All right. |
| 13:43:49 | 15 |        MR. FOSTER:  Just so the Court's record is -- |
| 13:43:51 | 16 | Court understands that March 4, 2015, Exhibit D is the |
| 13:43:55 | 17 | date of the cease and desist letter. |
| 13:43:55 | 18 | BY MR. FOSTER: |
| 13:44:00 | 19 | Q.     Here this is your letter to Scott Elrod, who's |
| 13:44:03 | 20 | the -- you understood to be the president of Ozonics; |
| 13:44:07 | 21 | correct? |
| 13:44:07 | 22 | A.      Correct. |
| 13:44:07 | 23 | Q.     And you'd seen him at trade shows; correct? |
| 13:44:10 | 24 | A.      Yes. |
| 13:44:12 | 25 | Q.     And you said, "I clearly have great respect for |

13:44:15   1   what you have done in pioneering ozone in the hunting

13:44:17   2   industry."   See that?

13:44:19   3   A.      Yes.

13:44:19   4   Q.      And he had been in the hunting industry with ozone

13:44:22   5   products for years prior to your market entry; correct?

13:44:26   6   A.      I assume, yes.

13:44:27   7   Q.      Okay.  "You've done an unbelievable job of

13:44:31   8   creating products and educating the world about the

13:44:34   9   hunting products and benefits of ozone for the hunter."

13:44:36   10  Do you see that?

13:44:37   11  A.      Yes.

13:44:37   12  Q.      And that was a truthful statement that you

13:44:40   13  expressed to him in that letter, too; correct?

13:44:43   14  A.      Yes.

13:44:43   15  Q.      And education on ozone is up -- early on that's a

13:44:50   16  difficult process, isn't it?

13:44:51   17  A.      We've done a tremendous amount of it with our

13:44:54   18  products.

13:44:54   19  Q.      And has Ozonics; correct?

13:44:56   20  A.      Yes.

13:44:56   21  Q.      And did you know they started the commercial

13:44:59   22  embodiments for their products in 2007?

13:45:04   23  A.      No.

13:45:04   24          MR. FOSTER:  Let's go to the second paragraph,

13:45:06   25  Sherri.

| 13:45:06 | 1 | BY MR. FOSTER: |
|---|---|---|
| 13:45:12 | 2 | Q.      Second sentence, "I understand your passion for |
| 13:45:14 | 3 | the product and your time and energy building the |
| 13:45:19 | 4 | marketplace."   Do you see that? |
| 13:45:20 | 5 | A.      Yes. |
| 13:45:20 | 6 | Q.      And that's something that you'd watched Ozonics |
| 13:45:25 | 7 | and understood that they had worked hard to build up the |
| 13:45:28 | 8 | marketplace for ozone in hunting; correct? |
| 13:45:32 | 9 | A.      Yes. |
| 13:45:32 | 10 | Q.      And here you talk about doing the same thing on |
| 13:45:35 | 11 | the lawn mower side on the MoJack side of business; |
| 13:45:38 | 12 | right? |
| 13:45:38 | 13 | A.      Correct. |
| 13:45:39 | 14 | Q.      Let's go to the final paragraph. |
| 13:45:43 | 15 |        It says, "I would enjoy an opportunity to sit down |
| 13:45:47 | 16 | and discuss our businesses.   I believe the combination of |
| 13:45:51 | 17 | our products, marketing, ozone expertise, and sales team |
| 13:45:55 | 18 | would be an unstoppable force."   Do you see that? |
| 13:45:58 | 19 | A.      Yes. |
| 13:46:00 | 20 | Q.      "I have watched your business and believe it would |
| 13:46:04 | 21 | be a great fit with our company."   And "With that in |
| 13:46:11 | 22 | mind, I would like to talk about a strategic partnership |
| 13:46:13 | 23 | of buying your company for $10 million."   Do you see |
| 13:46:16 | 24 | that? |
| 13:46:17 | 25 | A.      Yes. |

| 13:46:17 | 1 | Q.    Now, you say down here there are a lot of |
| 13:46:19 | 2 | variables but you put a $10 million number on the table; |
| 13:46:22 | 3 | correct? |
| 13:46:23 | 4 | **A.    I had left several messages for Mr. Elrod and had** |
| 13:46:27 | 5 | **talked with his consultants, and I was trying to get his** |
| 13:46:32 | 6 | **attention to sit down and talk about, you know, how we** |
| 13:46:35 | 7 | **could work together to better educate the world about** |
| 13:46:38 | 8 | **ozone.  And there are a lot of smaller players in the** |
| 13:46:41 | 9 | **market.  I wanted him to know that I was serious.  I** |
| 13:46:44 | 10 | **thought we could educate the world about ozone.** |
| 13:46:46 | 11 | Q.    Okay.  And Mr. Elrod testified that you talked |
| 13:46:53 | 12 | about a joint venture-type arrangement and you took issue |
| 13:46:57 | 13 | with that.  You didn't -- you said you didn't offer him a |
| 13:47:00 | 14 | joint venture.  Correct? |
| 13:47:02 | 15 | **A.    No, I don't believe I did.** |
| 13:47:04 | 16 | Q.    Okay.  Let's go to Drake declaration, page 1, |
| 13:47:11 | 17 | paragraph 7. |
| 13:47:15 | 18 |     Is that your testimony, "MoJack never offered to |
| 13:47:18 | 19 | go into a joint venture with plaintiffs." |
| 13:47:21 | 20 | **A.    Yes.** |
| 13:47:21 | 21 | Q.    Now, let's go back to the letter, which is 150, |
| 13:47:28 | 22 | last paragraph.  You're talking about combining products, |
| 13:47:34 | 23 | marketing ozone expertise, and sales teams; right? |
| 13:47:39 | 24 | **A.    Yes.** |
| 13:47:39 | 25 | Q.    And a strategic partnership, isn't that a little |

| | | |
|---|---|---|
| 13:47:45 | 1 | bit of some kind of a joint venture-type arrangement? |
| 13:47:48 | 2 | Are you splitting hairs?  I want to understand the point. |
| 13:47:51 | 3 | MR. ELLIOTT:  Objection.  I think that calls for a |
| 13:47:53 | 4 | legal conclusion about terms of what they would mean in |
| 13:47:55 | 5 | the corporate world.  I don't know if the witness is |
| 13:47:57 | 6 | qualified to testify. |
| 13:47:59 | 7 | THE COURT:  Overruled. |
| 13:48:01 | 8 | **A.      I mean, a strategic partnership can be anything** |
| 13:48:03 | 9 | **from us going to trade shows together and sharing a booth** |
| 13:48:06 | 10 | **to marketing materials, to, you know, cross-marketing** |
| 13:48:13 | 11 | **products, all those kinds of things.  Joint venture, I** |
| 13:48:17 | 12 | **think, is more of a -- something else, so . . .** |
| 13:48:21 | 13 | THE COURT:  Mr. Foster, how many witnesses do you |
| 13:48:23 | 14 | have? |
| 13:48:24 | 15 | MR. FOSTER:  Pardon me? |
| 13:48:25 | 16 | THE COURT:  How many witnesses do you have? |
| 13:48:27 | 17 | MR. FOSTER:  I have Mr. Drake, Mr. Elrod, and |
| 13:48:34 | 18 | Dr. Friis, and, if necessary, I don't plan on calling |
| 13:48:37 | 19 | Scott Cragun, but if they want to cross-examine him I'll |
| 13:48:40 | 20 | redirect him. |
| 13:48:40 | 21 | THE COURT:  Well, we've been here 45 minutes and |
| 13:48:42 | 22 | we've hardly talked about the partnership -- I mean, the |
| 13:48:45 | 23 | patent at all, and I harbor serious reservations that |
| 13:48:48 | 24 | you're on track to get finished with this hearing in the |
| 13:48:51 | 25 | time allotted, so I'm expressing that concern to you. |

| | | |
|---|---|---|
| 13:48:54 | 1 | But, of course, you do have the burden -- |
| 13:48:56 | 2 | MR. FOSTER:  Yes. |
| 13:48:56 | 3 | THE COURT:  -- and you're going to have to satisfy |
| 13:48:58 | 4 | that burden in the time allotted, and so far it seems to |
| 13:49:01 | 5 | me we've talked about lots of things but not really your |
| 13:49:05 | 6 | patent or how MoJack has maybe violated it.  And the |
| 13:49:08 | 7 | clock's ticking. |
| 13:49:09 | 8 | MR. FOSTER:  Fair enough, Your Honor. |
| 13:49:10 | 9 | THE COURT:  I suggest that you expedite your main |
| 13:49:14 | 10 | story here. |
| 13:49:14 | 11 | MR. FOSTER:  I appreciate the heads up.  I did go |
| 13:49:17 | 12 | through all of the elements in the claims earlier, the |
| 13:49:21 | 13 | generator, in the field, mounted stream, so I will move |
| 13:49:25 | 14 | forward.  Okay.  A moment. |
| 13:49:53 | 15 | (Brief pause.) |
| 13:49:53 | 16 | MR. FOSTER:  Your Honor, I think I'm good.  We'll |
| 13:49:56 | 17 | turn the witness over to Mr. Weems. |
| 13:49:58 | 18 | THE COURT:  All right.  Cross-examination. |
| 13:50:07 | 19 | CROSS-EXAMINATION |
| 13:50:07 | 20 | BY MR. ELLIOTT: |
| 13:50:47 | 21 | Q.    Let's go just to the last testimony that was just |
| 13:50:51 | 22 | elicited.  The letter that you sent to Mr. Elrod was |
| 13:50:56 | 23 | complimentary to him; correct? |
| 13:50:58 | 24 | **A.    Yes.** |
| 13:50:59 | 25 | Q.    And the reason it was complimentary is you were |

| | | |
|---|---|---|
| 13:51:02 | 1 | trying to gain his interest in a potential discussion |
| 13:51:05 | 2 | regarding what? |
| 13:51:08 | 3 | A.     Regarding how we can better educate the world |
| 13:51:11 | 4 | about ozone and maybe whatever came out of the meeting. |
| 13:51:15 | 5 | But we had never had a meeting before and I was trying to |
| 13:51:17 | 6 | sit down with him. |
| 13:51:19 | 7 | Q.     And what was the -- what was the 10 million -- the |
| 13:51:23 | 8 | intent of the $10 million number that you put in that |
| 13:51:25 | 9 | letter? |
| 13:51:26 | 10 | A.     Just there are so many small employers in the |
| 13:51:28 | 11 | industry, I wanted him to know, one, I had built a |
| 13:51:31 | 12 | business, MoJack, I wasn't just out of the middle of |
| 13:51:33 | 13 | nowhere; and, two, that we are a real player with our |
| 13:51:38 | 14 | resources and the stuff we can do, so, you know, I was |
| 13:51:41 | 15 | serious. |
| 13:51:41 | 16 | Q.     And so if he had written back just simply, "I |
| 13:51:47 | 17 | accept," would there have been a deal in place to acquire |
| 13:51:50 | 18 | the company? |
| 13:51:51 | 19 | A.     No.  Clearly you've got to exchange financials |
| 13:51:56 | 20 | and, you know, all that -- there's a whole bunch of |
| 13:51:58 | 21 | analysis that would be required.  And I never actually |
| 13:52:00 | 22 | spoke to Mr. Elrod until almost a year and a half later. |
| 13:52:04 | 23 | Q.     Okay.  And during that conversation did you guys |
| 13:52:07 | 24 | discuss a term sheet or any other document that would |
| 13:52:10 | 25 | start to outline those financials that you referenced? |

| | | |
|---|---|---|
| 13:52:13 | 1 | **A.       No.** |
| 13:52:13 | 2 | Q.     Have you ever seen financials from Ozonics or the |
| 13:52:18 | 3 | other plaintiff? |
| 13:52:19 | 4 | **A.       I have not.** |
| 13:52:24 | 5 | Q.     Let's continue to track backwards.  You recall |
| 13:52:28 | 6 | getting the cease and desist letter from counsel, |
| 13:52:31 | 7 | opposing counsel, here in 2015, sometime then? |
| 13:52:34 | 8 | **A.       Yes, yes.** |
| 13:52:36 | 9 | Q.     Generally what did you do with that cease and |
| 13:52:40 | 10 | desist letter? |
| 13:52:41 | 11 | **A.       We asked our attorney to review all of our** |
| 13:52:44 | 12 | **products, and we didn't -- the opinion of counsel at the** |
| 13:52:50 | 13 | **time was that we didn't violate --** |
| 13:52:52 | 14 | MR. FOSTER:  I'm going to object unless they're |
| 13:52:54 | 15 | producing the opinion of counsel.  And we haven't seen |
| 13:52:56 | 16 | it.  They didn't produce it, and it's hearsay on behalf |
| 13:52:59 | 17 | of this witness for him to testify what -- |
| 13:53:00 | 18 | THE COURT:  Well, he's not offering his opinion as |
| 13:53:02 | 19 | to what counsel gave him the truth of the matter |
| 13:53:05 | 20 | asserted.  I assume he's offering it with respect to how |
| 13:53:08 | 21 | it informed what course of conduct he took, so I'm going |
| 13:53:11 | 22 | to overrule your hearsay objection. |
| 13:53:12 | 23 | You may proceed. |
| 13:53:14 | 24 | MR. ELLIOTT:  Yeah, and the -- exactly what we're |
| 13:53:17 | 25 | trying to do is establish what steps he took after that, |

| | | |
|---|---|---|
| 13:53:20 | 1 | not the actual nature of the opinion. |
| 13:53:22 | 2 | THE COURT:  I've already sustained your |
| 13:53:24 | 3 | objection -- or ruled in your favor on the objection, so |
| 13:53:27 | 4 | you can proceed. |
| 13:53:29 | 5 | MR. ELLIOTT:  Apologize, Your Honor. |
| 13:53:29 | 6 | BY MR. ELLIOTT: |
| 13:53:30 | 7 | Q.     So go ahead and continue your answer. |
| 13:53:31 | 8 | A.     So, you know, we asked counsel to review to make |
| 13:53:34 | 9 | sure that we didn't violate any of their patents, and we |
| 13:53:37 | 10 | moved forward exactly as we'd done in the past. |
| 13:53:40 | 11 | Q.     Is there any other time when you also went to seek |
| 13:53:44 | 12 | advice of counsel? |
| 13:53:46 | 13 | A.     Yes.  So when we decided to produce field units, |
| 13:53:50 | 14 | we went and got a lengthy and expensive opinion from |
| 13:53:54 | 15 | counsel about the patents. |
| 13:53:57 | 16 | Q.     And then, without divulging what was actually in |
| 13:54:00 | 17 | the opinion -- though we may do that later on -- did you |
| 13:54:03 | 18 | then proceed with the field units after you received |
| 13:54:06 | 19 | that -- |
| 13:54:06 | 20 | A.     Yes.  So after we had opinion of counsel, we felt |
| 13:54:10 | 21 | like we wouldn't violate it and we moved forward with the |
| 13:54:14 | 22 | production and engineering of the units. |
| 13:54:16 | 23 | Q.     Okay.  Describe for me, when you say you "moved |
| 13:54:19 | 24 | forward with the production and the engineering," what |
| 13:54:20 | 25 | were the steps you took doing that? |

| | | |
|---|---|---|
| 13:54:23 | 1 | A.      So we, you know, we went and we interviewed a |
| 13:54:28 | 2 | bunch of teams who had used in-field ozone.  We discussed |
| 13:54:32 | 3 | what they liked, what they didn't like.  We examined the |
| 13:54:36 | 4 | newest technology from both the ozone side and the |
| 13:54:39 | 5 | battery side and the fan side and how you can make the |
| 13:54:45 | 6 | units quieter, better, newer technology, lighter.  So |
| 13:54:50 | 7 | it's a combination of engineering, probably using our |
| 13:54:54 | 8 | NASA guys with some concentration stuff, in combination |
| 13:54:58 | 9 | with our factories and their sourcing abilities, as well |
| 13:55:02 | 10 | as designers, kinda.  You know, it's a lengthy process, |
| 13:55:07 | 11 | but we were doing it all. |
| 13:55:08 | 12 | Q.     Okay.  And in the context of the designing of |
| 13:55:15 | 13 | that, your unit, did you use any parts that are in common |
| 13:55:19 | 14 | with the Ozonics unit? |
| 13:55:22 | 15 | A.      No. |
| 13:55:22 | 16 | Q.     So these are all individual parts that were |
| 13:55:25 | 17 | created for your product? |
| 13:55:26 | 18 | A.      All of the newest and best technology that we |
| 13:55:29 | 19 | could put together, yes. |
| 13:55:33 | 20 | Q.     Now, you're an owner of MoJack, as well as the |
| 13:55:39 | 21 | CEO; correct? |
| 13:55:39 | 22 | A.      Correct. |
| 13:55:40 | 23 | Q.     So when there's a potential dispute, is it common |
| 13:55:44 | 24 | for you to seek a business resolution before there's a |
| 13:55:48 | 25 | result to litigation? |

| | | |
|---|---|---|
| 13:55:49 | 1 | A.      Yes. |
| 13:55:50 | 2 | Q.      And so the -- at the time when you had sent the |
| 13:55:54 | 3 | letter to Mr. Elrod, is that you making some of those |
| 13:55:58 | 4 | business overtures toward them? |
| 13:56:00 | 5 | A.      Yeah, just, you know, they had a lot of |
| 13:56:03 | 6 | distribution on the dealer side of the business also and |
| 13:56:06 | 7 | we did not.  We had strong big-box relationships, and I |
| 13:56:10 | 8 | was interested in that piece of the business 'cause I |
| 13:56:13 | 9 | thought it would benefit our products. |
| 13:56:14 | 10 | Q.      Uh-huh.  So it was the distribution that was of |
| 13:56:18 | 11 | interest to you primarily? |
| 13:56:20 | 12 | A.      Also they had a little bit a brand name, although |
| 13:56:23 | 13 | we had been building a brand name at the same time, |
| 13:56:25 | 14 | so . . . |
| 13:56:31 | 15 | Q.      Do you know whether your products actually |
| 13:56:34 | 16 | eliminate odor? |
| 13:56:39 | 17 | A.      Do I know? |
| 13:56:39 | 18 | Q.      Yep. |
| 13:56:40 | 19 | A.      I believe they do. |
| 13:56:41 | 20 | Q.      You believe they do? |
| 13:56:43 | 21 | A.      Yes. |
| 13:56:43 | 22 | Q.      Have you had any studies done to see that they |
| 13:56:46 | 23 | actually eliminate odor? |
| 13:56:48 | 24 | A.      Yes. |
| 13:56:48 | 25 | Q.      Okay. |

| | | |
|---|---|---|
| 13:56:49 | 1 | A.     We've done a bunch of independent testing with |
| 13:56:52 | 2 | respect to bacteria and stuff, and as well as just |
| 13:56:56 | 3 | take -- you know, take stinky stuff and see how it works. |
| 13:57:00 | 4 | Q.     Sure.   And so the statements that were put before |
| 13:57:03 | 5 | you earlier by Mr. Foster, those are marketing |
| 13:57:06 | 6 | statements, though; correct? |
| 13:57:07 | 7 | A.     Yes. |
| 13:57:08 | 8 | Q.     And that's consistent generally with how ozone and |
| 13:57:11 | 9 | other descenting products have been marketed throughout |
| 13:57:15 | 10 | the industry? |
| 13:57:16 | 11 | A.     That's right.   It's the easiest way for consumers |
| 13:57:19 | 12 | to understand how it works. |
| 13:57:30 | 13 | Q.     Regarding the field unit, that's the more |
| 13:57:34 | 14 | expensive unit; is that correct? |
| 13:57:35 | 15 | A.     The Field Pro unit? |
| 13:57:37 | 16 | Q.     Field Pro unit. |
| 13:57:38 | 17 | A.     Yes. |
| 13:57:38 | 18 | Q.     And the other one's Field Lite; right? |
| 13:57:40 | 19 | A.     Right. |
| 13:57:41 | 20 | Q.     So the Field Pro unit, can you describe that |
| 13:57:45 | 21 | particular product for me as to where there are openings |
| 13:57:49 | 22 | that ozone might come out of. |
| 13:57:51 | 23 | A.     Sure.   So as we went through and talked with |
| 13:57:55 | 24 | hunters, they wanted a wider dispersal of the ozone to |
| 13:57:59 | 25 | give a blanket of coverage.   So we designed it so that it |

13:58:03  1  emits ozone from the front and the sides, to blanket the

13:58:07  2  area, as part of, you know, the design for that unit, to

13:58:11  3  make it more effective in the field.

13:58:13  4  Q.     And as far as the Field Lite, it only puts out, I

13:58:17  5  think your testimony was, 90 degrees; is that correct?

13:58:20  6  A.     That's right.

13:58:21  7  Q.     And do you ever show or would you ever demonstrate

13:58:26  8  to a hunter using two of those together perhaps in the

13:58:29  9  field to create that blanket?

13:58:31  10  A.     That's part of why it's a lower price point so

13:58:35  11  they've got ability to do that, to put one in front of

13:58:38  12  them or behind them or, you know, the wind's blowing and

13:58:41  13  it disperses it.

13:58:45  14  Q.     Okay.  And as far as the wind blowing, we talk

13:58:49  15  about the downstream a little bit.  What happens to the

13:58:51  16  ozone if there's a crosswind?

13:58:54  17  A.     Depending on how strong it is, it gets dispersed

13:58:58  18  quickly, yes.

13:59:13  19  Q.     One thing I missed, I'm sorry, referring back to

13:59:15  20  what would be the Exhibit O.  It's the letter that you

13:59:18  21  sent to Mr. Elrod.

13:59:20  22  A.     Yes.

13:59:20  23  Q.     It does use the phrase, if you remember, to "talk

13:59:25  24  about"; is that correct?

13:59:26  25  A.     Yes.

| | | |
|---|---|---|
| 13:59:26 | 1 | Q.      And that was your intent, was to talk about this? |
| 13:59:28 | 2 | A.      I just wanted to sit down and have a discussion |
| 13:59:31 | 3 | with him, yeah. |
| 13:59:45 | 4 | Q.      So going to your more -- what you referred to, I |
| 13:59:48 | 5 | believe, as your more recent incurrence into the field |
| 13:59:53 | 6 | product, how did -- what happened that caused you to try |
| 13:59:57 | 7 | and reenter or reenter this marketplace? |
| 14:00:01 | 8 | A.      On the field side? |
| 14:00:02 | 9 | Q.      Yes. |
| 14:00:03 | 10 | A.      So Ozonics last year pulled out of all retail and |
| 14:00:10 | 11 | went consumer-direct.  So we had had some interest from |
| 14:00:14 | 12 | retailers to discuss, you know, having a product that |
| 14:00:19 | 13 | would be in-field that could be there. |
| 14:00:21 | 14 |         I believe they also -- you know, they cut their |
| 14:00:25 | 15 | prices, why they did that, and I think the retailers |
| 14:00:27 | 16 | ended up with a whole bunch of inventory they couldn't |
| 14:00:30 | 17 | sell, too, as a part of it. |
| 14:00:32 | 18 | Q.      Okay.  And so you were approached by retailers to |
| 14:00:34 | 19 | help fill that void that they created? |
| 14:00:37 | 20 | A.      Yes. |
| 14:00:38 | 21 | Q.      And what is your sense of what that has done to |
| 14:00:43 | 22 | Ozonics' reputation amongst the retailers? |
| 14:00:45 | 23 | A.      They weren't happy that they were left with a |
| 14:00:47 | 24 | whole bunch of product in their hands as they cut prices |
| 14:00:51 | 25 | underneath them. |

14:01:03  1   Q.     So one of the things that is in your declarations

14:01:06  2   under seal -- so let's avoid specific numbers, I think we

14:01:09  3   can probably get it done with that -- what did you do as

14:01:13  4   far as finances in order to prepare for, you know,

14:01:18  5   introducing the Field Pro, Field Lite, into the market?

14:01:20  6   **A.     How did we finance the R & D and engineering and**

14:01:26  7   **all the rest of it?**

14:01:26  8   Q.     Sure.

14:01:27  9   **A.     We took out -- we extended our line of credit with**

14:01:30  10  **our bank from -- by probably --**

14:01:33  11  Q.     You don't need to go into numbers.

14:01:35  12  **A.     Yeah, 60 percent, a large number to finance what**

14:01:39  13  **we would need to do from an engineering, advertising and,**

14:01:44  14  **you know, inventory standpoint.**

14:01:45  15  Q.     And it's a seven-digit number; is that correct?

14:01:47  16  **A.     Uh-huh, yes.**

14:01:53  17  Q.     And are there terms in that line of credit that if

14:01:56  18  there's a preliminary injunction issued here that would

14:01:58  19  be breached?

14:01:59  20  **A.     I believe so, yes.**

14:02:04  21  Q.     Also if the preliminary injunction issues, is

14:02:10  22  there a product that you're going to be stuck holding

14:02:12  23  onto?

14:02:13  24  **A.     Yes.  We would have the product, yeah, in our**

14:02:16  25  **warehouse that we couldn't sell.**

| | | |
|---|---|---|
| 14:02:18 | 1 | Q.     Uh-huh.  And that's product you've already paid |
| 14:02:20 | 2 | for the production of? |
| 14:02:21 | 3 | **A.     Yes.** |
| 14:02:21 | 4 | Q.     And you've paid for it to come into your |
| 14:02:24 | 5 | warehouses? |
| 14:02:25 | 6 | **A.     Yes.** |
| 14:02:25 | 7 | Q.     Shipment, et cetera? |
| 14:02:26 | 8 | **A.     Correct.** |
| 14:02:27 | 9 | Q.     Okay.  And that number's also in your declaration. |
| 14:02:31 | 10 | I don't think we need to go there. |
| 14:03:12 | 11 | MR. ELLIOTT:  I've no further questions for the |
| 14:03:14 | 12 | witness, Your Honor. |
| 14:03:15 | 13 | Thank you, Mr. Drake. |
| 14:03:16 | 14 | THE COURT:  Thank you, Mr. Elliott.  You may |
| 14:03:17 | 15 | redirect, Mr. Foster. |
| 14:03:22 | 16 | MR. FOSTER:  Very briefly. |
| 14:03:23 | 17 | REDIRECT EXAMINATION |
| 14:03:23 | 18 | BY MR. FOSTER: |
| 14:03:29 | 19 | Q.     After the letter that you sent offering a |
| 14:03:32 | 20 | strategic partnership or to discuss it and discuss the |
| 14:03:35 | 21 | $10 million offer, isn't it true that after that you |
| 14:03:38 | 22 | continued to communicate with Mr. Elrod about business |
| 14:03:42 | 23 | opportunities together? |
| 14:03:43 | 24 | **A.     I met with him almost a year and a half later.  We** |
| 14:03:49 | 25 | **were -- we had dinner.** |

| | | |
|---|---|---|
| 14:03:49 | 1 | Q.     You had dinner in late 2017; correct? |
| 14:03:53 | 2 | A.     I believe it was December of 2017. |
| 14:03:55 | 3 | Q.     Okay.  And isn't it true that you still were |
| 14:03:58 | 4 | discussing the possibility of some strategic partnership? |
| 14:04:02 | 5 | A.     He told us at that dinner he didn't have any |
| 14:04:05 | 6 | interest, that he was going on his own.  We talked, you |
| 14:04:09 | 7 | know, kind of about business in general.  We were down |
| 14:04:11 | 8 | there to see Academy Sports anyway, so it was nice to be |
| 14:04:14 | 9 | able to shake hands. |
| 14:04:15 | 10 | Q.     And it was you reaching out to him; correct?  To |
| 14:04:19 | 11 | see if he wanted to do business together in some fashion; |
| 14:04:23 | 12 | correct? |
| 14:04:24 | 13 | A.     I called him and said, "I'm gonna be in Houston |
| 14:04:27 | 14 | meeting with Academy Sports.  Would you like to have |
| 14:04:31 | 15 | dinner?" "Yes." |
| 14:04:32 | 16 | Q.     And did you ask him if you could license his |
| 14:04:35 | 17 | patents as well? |
| 14:04:36 | 18 | A.     No, I believe I asked him if he would ever license |
| 14:04:42 | 19 | his patents.  I didn't ask to license his patents. |
| 14:04:45 | 20 | Q.     In regard to advertising and instructions, you |
| 14:04:48 | 21 | advertise how your product is to be used; correct? |
| 14:04:52 | 22 | A.     Which product? |
| 14:04:53 | 23 | Q.     Field Lite and Field Pro. |
| 14:04:54 | 24 | A.     Yes. |
| 14:04:54 | 25 | Q.     And you expect that they're going to use it for |

| | | |
|---|---|---|
| 14:04:59 | 1 | their intended purposes; correct? |
| 14:05:03 | 2 | **A.       Yes, and other purposes.   I've seen some crazy** |
| 14:05:06 | 3 | **things, but yes.** |
| 14:05:12 | 4 | MR. FOSTER:  Nothing further. |
| 14:05:14 | 5 | THE COURT:  Mr. Elliott? |
| 14:05:15 | 6 | MR. ELLIOTT:  No further questions, Your Honor. |
| 14:05:16 | 7 | THE COURT:  Thank you. |
| 14:05:17 | 8 | Mr. Drake, you may step down, sir.  Thank you. |
| 14:05:20 | 9 | THE WITNESS:  Thank you. |
| 14:05:21 | 10 | (Witness excused from the witness stand.) |
| 14:05:21 | 11 | THE COURT:  Mr. Foster, call your next witness, |
| 14:05:22 | 12 | please. |
| 14:05:23 | 13 | MR. FOSTER:  Mr. Miller will take the next one. |
| 14:05:25 | 14 | MR. MILLER:  We'll call Dr. Friis. |
| 14:06:30 | 15 | THE COURT:  Dr. Friis, if you would stand in front |
| 14:06:32 | 16 | of my courtroom deputy, she will swear you in, and then |
| 14:06:34 | 17 | you may have a seat in the witness box to our right. |
| 14:06:39 | 18 | THE CLERK:   Please raise your right hand. |
| 14:06:41 | 19 | DR. LISA FRIIS, |
| 14:06:41 | 20 | having been first duly sworn to testify the truth, the |
| 14:06:41 | 21 | whole truth, and nothing but the truth, testified as |
| 14:06:52 | 22 | follows: |
| 14:06:52 | 23 | DIRECT EXAMINATION |
| 14:06:58 | 24 | BY MR. MILLER: |
| 14:07:03 | 25 | Q.    Good afternoon, Dr. Friis. |

| | | |
|---|---|---|
| 14:07:04 | 1 | A.        Good afternoon. |
| 14:07:05 | 2 | Q.     Would you please state your name and occupation |
| 14:07:08 | 3 | for the record. |
| 14:07:08 | 4 | A.     My name is Elizabeth Anna Maria Friis.  I like to |
| 14:07:13 | 5 | go by Lisa and Dr. Friis, and I'm a professor in |
| 14:07:16 | 6 | mechanical engineering at the University of Kansas. |
| 14:07:18 | 7 | Q.     Okay.  And tell me what -- when was your last |
| 14:07:26 | 8 | hunting trip? |
| 14:07:26 | 9 | A.     Oh, goodness, last time I went on a hunting trip |
| 14:07:29 | 10 | was around '93, '94, '95, before I got pregnant. |
| 14:07:35 | 11 | Q.     Okay. |
| 14:07:35 | 12 | A.     At the Flint Oak hunting ranch in southwest |
| 14:07:39 | 13 | Kansas. |
| 14:07:39 | 14 | Q.     What were you hunting? |
| 14:07:41 | 15 | A.     Pheasant.  I didn't actually shoot anything.  I've |
| 14:07:46 | 16 | never been able to bring myself to pull the trigger and |
| 14:07:49 | 17 | shoot a live animal, but I went with my colleagues. |
| 14:07:52 | 18 | There was a conference there, and I spoke at the |
| 14:07:55 | 19 | conference and then there was hunting and such. |
| 14:07:57 | 20 | Q.     Okay.  Were you an avid hunter up until that time |
| 14:08:01 | 21 | in '93? |
| 14:08:03 | 22 | A.     No. |
| 14:08:04 | 23 | Q.     Okay.  So safe to say that you're not -- you don't |
| 14:08:08 | 24 | have a lot of experience in the hunting industry or in |
| 14:08:12 | 25 | the field of scent elimination during hunting? |

| | | |
|---|---|---|
| 14:08:14 | 1 | A.      I grew up on a farm in Iowa.  My father hunted for |
| 14:08:19 | 2 | sport and to provide food for our family on the table, |
| 14:08:24 | 3 | and I went with him on trips when I was a young girl. |
| 14:08:30 | 4 | Again, I've never killed anything.  I have fished and |
| 14:08:32 | 5 | such.  But I was around it my entire life when my brother |
| 14:08:39 | 6 | and my father hunted. |
| 14:08:40 | 7 | Q.     Okay.  But no hunting in the last 25 years? |
| 14:08:45 | 8 | A.      Approximately. |
| 14:08:46 | 9 | Q.     Okay. |
| 14:08:49 | 10 |       MR. MILLER:  Sherri, will you bring up Friis 4. |
| 14:08:53 | 11 | BY MR. MILLER: |
| 14:08:53 | 12 | Q.     You submitted a declaration in this case; correct? |
| 14:08:57 | 13 | A.      Correct. |
| 14:08:58 | 14 | Q.     And I'm not going to ask you to reiterate all the |
| 14:09:00 | 15 | details of that declaration.  But in part of it you |
| 14:09:04 | 16 | mention -- |
| 14:09:09 | 17 |       MR. MILLER:  Do you have page 4, Friis 4?  There |
| 14:09:14 | 18 | we go.  No, now you got 7. |
| 14:09:19 | 19 | BY MR. MILLER: |
| 14:09:24 | 20 | Q.     In your declaration you identified some employment |
| 14:09:27 | 21 | experience.  I just wanted to make sure we understand |
| 14:09:30 | 22 | that none of that employment experience was ever in the |
| 14:09:32 | 23 | hunting industry; correct? |
| 14:09:35 | 24 | A.      Correct, except for being at the conferences at |
| 14:09:38 | 25 | Flint Oak and going out and being with the surgeons there |

| | | |
|---|---|---|
| 14:09:46 | 1 | **in the field.** |
| 14:09:50 | 2 | MR. MILLER:  There we go.  If you could highlight |
| 14:09:56 | 3 | paragraph 4, Sherri. |
| 14:10:01 | 4 | BY MR. MILLER: |
| 14:10:02 | 5 | Q.    In this paragraph you talk about your research |
| 14:10:05 | 6 | activities since 1985, and you broadly mentioned a lot of |
| 14:10:09 | 7 | different things.  Did you -- you don't identify any |
| 14:10:17 | 8 | experience developing or designing ozone generators; |
| 14:10:20 | 9 | correct? |
| 14:10:20 | 10 | **A.    Not in my research, no.** |
| 14:10:32 | 11 | Q.    And if -- have you used, ever used, any ozone |
| 14:10:39 | 12 | products in the field in a hunting context? |
| 14:10:43 | 13 | **A.    No.** |
| 14:10:44 | 14 | Q.    Okay.  When you went hunting back in the '90s with |
| 14:10:52 | 15 | your grandfather or father -- father -- |
| 14:10:54 | 16 | **A.    No, it was my orthopedic surgeon colleagues in the** |
| 14:10:58 | 17 | **'90s.** |
| 14:10:58 | 18 | Q.    Okay.  Did they use ozone products in the hunting |
| 14:11:02 | 19 | field? |
| 14:11:03 | 20 | **A.    No.** |
| 14:11:07 | 21 | MR. MILLER:  Now, if you'd go to Friis 5. |
| 14:11:11 | 22 | BY MR. MILLER: |
| 14:11:12 | 23 | Q.    Here you put a chart that identified the materials |
| 14:11:15 | 24 | you reviewed; right? |
| 14:11:18 | 25 | **A.    Correct.** |

14:11:19   1   Q.      Did your client -- and these are basically the

14:11:23   2   filings with Ozonics' motion for preliminary injunction;

14:11:27   3   correct?

14:11:27   4   A.      That's one of the documents, yes.

14:11:29   5   Q.      Okay.  Did Scent Crusher give you any of their

14:11:34   6   product manuals to review?

14:11:36   7   A.      At the time of the written declaration, but on

14:11:40   8   Monday, August 13th, I did examine the Field Pro and the

14:11:44   9   Field Pro Lite.

14:11:45   10  Q.      You examined the products themselves?

14:11:47   11  A.      Correct.

14:11:47   12  Q.      And their user manuals?

14:11:50   13  A.      Correct.

14:11:57   14  Q.      When were you first retained?

14:11:59   15  A.      Approximately July 31st or August 1st.  This has

14:12:05   16  been a very quick turnaround.

14:12:08   17  Q.      Okay.  And did you review the entire file history

14:12:11   18  of the three patents listed here?

14:12:12   19  A.      Yes, as best as I could.

14:12:14   20  Q.      Okay.  So is this report a report you prepared

14:12:24   21  yourself?

14:12:24   22  A.      So it was such a limited time frame in which we

14:12:29   23  worked, so I didn't write the first draft.  But what I

14:12:32   24  did was I read everything as soon as I was retained and

14:12:37   25  read and read and read, and then the first draft came, I

| | | |
|---|---|---|
| 14:12:40 | 1 | edited it, I had many talks with counsel, and then |
| 14:12:47 | 2 | together we revised, and then all of the final report |
| 14:12:51 | 3 | reflects my feelings. |
| 14:12:53 | 4 | Q.    Okay. |
| 14:12:55 | 5 | A.    My opinions. |
| 14:12:56 | 6 |     MR. MILLER:  Sherri, if you could go to Friis -- |
| 14:13:00 | 7 | no, Elrod, page 41.  And highlight the field of the |
| 14:13:13 | 8 | invention paragraph. |
| 14:13:17 | 9 | BY MR. MILLER: |
| 14:13:17 | 10 | Q.    So this is a page from the '177 patent and you'll |
| 14:13:21 | 11 | see it identifies the field of the invention here? |
| 14:13:24 | 12 | A.    Uh-huh. |
| 14:13:25 | 13 | Q.    "Methods of descenting the clothes and apparatus |
| 14:13:29 | 14 | of sportsmen."  Do you see that? |
| 14:13:32 | 15 | A.    Correct. |
| 14:13:33 | 16 | Q.    And it talks about from fishermen, it talks about |
| 14:13:34 | 17 | the equipment of hunters; right? |
| 14:13:34 | 18 | A.    Correct. |
| 14:13:37 | 19 | Q.    And are you familiar with how the patent office, |
| 14:13:39 | 20 | when they examine these patents, defined the art when |
| 14:13:45 | 21 | talking about obviousness and the level of ordinary skill |
| 14:13:49 | 22 | in the art? |
| 14:13:49 | 23 | A.    Yes.  Obviously, though, I'm not a lawyer, but we |
| 14:13:53 | 24 | have three patents submitted, patent applications, in |
| 14:13:56 | 25 | process now, and I have testified at the International |

| | | |
|---|---|---|
| 14:14:01 | 1 | **Trade Commission, the ITC, in a previous case, so yes,** |
| 14:14:05 | 2 | **I'm familiar.** |
| 14:14:05 | 3 | Q.     That's helpful.  I probably phrased my question |
| 14:14:09 | 4 | wrong. |
| 14:14:09 | 5 |       Do you recall how the patent office, when |
| 14:14:14 | 6 | examining Ozonics' patent applications, referred to what |
| 14:14:16 | 7 | the art was, the relevant art? |
| 14:14:26 | 8 | **A.     I believe so.** |
| 14:14:26 | 9 | Q.     And how did the patent office describe the |
| 14:14:28 | 10 | relevant art in the obvious analysis? |
| 14:14:30 | 11 | **A.     Okay.  The relevant art, there were many patents,** |
| 14:14:33 | 12 | **particularly Stec -- if this is answering your question.** |
| 14:14:35 | 13 | Q.     Okay.  You're going to specific prior reference, |
| 14:14:38 | 14 | and I want to know -- I'm talking about defining what the |
| 14:14:42 | 15 | level of ordinary skill in the art is.  And that's the |
| 14:14:45 | 16 | perspective from which we have to analyze it. |
| 14:14:47 | 17 |       So how did the patent office describe the field of |
| 14:14:51 | 18 | art that is relevant when evaluating obviousness? |
| 14:14:56 | 19 | **A.     I think I understand.  I am 100 percent sure at** |
| 14:15:01 | 20 | **this time.** |
| 14:15:01 | 21 | Q.     Okay. |
| 14:15:02 | 22 |       MR. MILLER:  Sherri, will you bring up Miller 113. |
| 14:15:08 | 23 | BY MR. MILLER: |
| 14:15:09 | 24 | Q.     This is a page out of one of the office actions in |
| 14:15:13 | 25 | the file history. |

| 14:15:17 | 1 | MR. MILLER:  And if you would highlight about that |
| 14:15:19 | 2 | (indicating). |
| 14:15:19 | 3 | BY MR. MILLER: |
| 14:15:23 | 4 | Q.    And can you see that when the patent office was |
| 14:15:25 | 5 | evaluating the applications and talked about what was |
| 14:15:29 | 6 | well known in the art, it said "the art of hunting and |
| 14:15:35 | 7 | human scent elimination during hunting."  Correct? |
| 14:15:35 | 8 | A.    Correct. |
| 14:15:39 | 9 | Q.    Would you disagree that that is the relevant field |
| 14:15:42 | 10 | of art when evaluating obviousness in this case? |
| 14:15:47 | 11 | A.    I believe it's more complicated than that, because |
| 14:15:50 | 12 | just because you're a hunter doesn't mean that you know |
| 14:15:54 | 13 | how to control and eliminate human scent.  That's more of |
| 14:15:58 | 14 | a chemical reaction and a design process. |
| 14:16:02 | 15 | Q.    Okay.  So then you're saying you do disagree that |
| 14:16:06 | 16 | you shouldn't -- you think the patent office should not |
| 14:16:08 | 17 | have defined the art as hunting and human scent |
| 14:16:12 | 18 | elimination during hunting? |
| 14:16:13 | 19 | A.    That's not what I said. |
| 14:16:15 | 20 | Q.    Okay.  Well, then do you agree that, when defining |
| 14:16:18 | 21 | the relevant art in this obviousness context, the |
| 14:16:22 | 22 | relevant art field of the invention is "hunting and human |
| 14:16:26 | 23 | scent elimination during hunting"? |
| 14:16:29 | 24 | A.    Then I agree with that. |
| 14:16:31 | 25 | Q.    Okay.  And you don't have personal experience in |

14:16:36   1   that field of hunting and human scent elimination during

14:16:40   2   hunting?

14:16:40   3   **A.      I have personal experience in being in the field**

14:16:44   4   **while hunting, and I have experience in control of**

14:16:51   5   **bacteria through ozone application through my teaching.**

14:16:56   6   **So I reviewed a lot on this on the field of sterilization**

14:17:00   7   **of biomaterials.**

14:17:01   8   Q.      Okay.  So you understand how ozone eliminates

14:17:05   9   scent?

14:17:05   10  **A.      Basically, yes.**

14:17:06   11  Q.      Okay.  But you've never -- you don't have any

14:17:09   12  experience in trying to apply ozone in the field for

14:17:13   13  hunting purposes?

14:17:14   14  **A.      No, not in the field for hunting purposes.**

14:17:17   15  Q.      And you don't have any personal experience in

14:17:19   16  evaluating scent cover or scent-elimination products in

14:17:23   17  the field for hunting purposes?

14:17:25   18  **A.      Well, my father back in -- before '87 or '85,**

14:17:32   19  **would use scent coverage and blinds, and I would**

14:17:36   20  **accompany him occasionally.  So I do have some experience**

14:17:38   21  **in that and why he would do it.  Obviously, growing up on**

14:17:43   22  **a farm and in a hunting family, we would know.**

14:17:45   23  Q.      Okay.  But that would be the extent of your

14:17:47   24  experience, what you just described?

14:17:48   25  **A.      Correct.**

| | | |
|---|---|---|
| 14:17:49 | 1 | Q.      Okay. |
| 14:17:59 | 2 |         MR. MILLER:  Let's go to Friis 20, and paragraph |
| 14:18:08 | 3 | 65. |
| 14:18:08 | 4 | BY MR. MILLER: |
| 14:18:09 | 5 | Q.     In your report, Dr. Friis, you identified some |
| 14:18:13 | 6 | file history where the claims in the patent originally |
| 14:18:18 | 7 | said -- referred to a volume of ozone gas or a gaseous |
| 14:18:21 | 8 | stream of hydroxl and hydroperoxide ions; right? |
| 14:18:26 | 9 | **A.      Correct.** |
| 14:18:26 | 10 | Q.      And ozone is one type of deodorizer disinfectant? |
| 14:18:35 | 11 | **A.      Yes.** |
| 14:18:35 | 12 | Q.      And the hydroxl and hydroperoxide are another type |
| 14:18:39 | 13 | of disinfectant; right? |
| 14:18:42 | 14 | **A.      They're related, but yes.** |
| 14:18:43 | 15 | Q.      And at some point after this the patent |
| 14:18:49 | 16 | application -- or the patent attorney at the time |
| 14:18:51 | 17 | canceled all those claims and decided to rewrite the |
| 14:18:54 | 18 | claims; correct? |
| 14:18:55 | 19 | **A.      Yes.  I believe claims 1 through 11 or 1 through** |
| 14:18:59 | 20 | **12 were canceled or something like that, and then** |
| 14:19:02 | 21 | **rewritten.** |
| 14:19:02 | 22 | Q.      Okay.  And if you wanted to refer to both ozone |
| 14:19:06 | 23 | gas and the hydroxl and hydroperoxide ions with a more |
| 14:19:12 | 24 | general term, wouldn't it be appropriate to refer to a |
| 14:19:16 | 25 | stream of oxidizing gas? |

| | | |
|---|---|---|
| 14:19:22 | 1 | A.      Not a stream of oxidizing gas.  I believe the |
| 14:19:26 | 2 | oxidizing gas could cover both. |
| 14:19:33 | 3 | Q.      So if you wanted to cancel out those alternatives |
| 14:19:37 | 4 | and be more general, you could just be more general in -- |
| 14:19:42 | 5 | you can refer to just descenting material, that would |
| 14:19:47 | 6 | encompass both ozone gas and the hydroxl and the |
| 14:19:51 | 7 | hydroperoxide; right? |
| 14:19:52 | 8 | A.      Well, it depends on how it's applied.  But if it's |
| 14:19:55 | 9 | applied directly to the -- what you want to descent and |
| 14:20:02 | 10 | it stays there for long enough and a high-enough |
| 14:20:05 | 11 | concentration, then yes. |
| 14:20:06 | 12 | Q.      Okay.  And you took issue with the word "stream." |
| 14:20:13 | 13 | And from what I understand, your opinion is that a stream |
| 14:20:18 | 14 | does not have volume.  Is that your opinion? |
| 14:20:24 | 15 | A.      Not quite.  That's not what I said. |
| 14:20:25 | 16 | Q.      Do you know what the Ideal Gas Law is? |
| 14:20:28 | 17 | A.      Yes. |
| 14:20:28 | 18 | Q.      What is it? |
| 14:20:29 | 19 | A.      PV = nRT. |
| 14:20:29 | 20 | Q.      PV = nRT. |
| 14:20:32 | 21 | A.      Uh-huh. |
| 14:20:32 | 22 | Q.      And what's the purpose of the Ideal Gas Law? |
| 14:20:35 | 23 | A.      The Ideal Gas Law defines volume with respect to |
| 14:20:38 | 24 | pressure and temperature. |
| 14:20:39 | 25 | Q.      Okay.  The V in PV = nRT is volume? |

| 14:20:43 | 1 | A.      Correct. |
| 14:20:44 | 2 | Q.     Isn't it true that every gas, every amount of gas, |
| 14:20:47 | 3 | has a volume to it?  Isn't that a physical property? |
| 14:20:51 | 4 | A.      Okay, so that's the difference between a solid and |
| 14:20:54 | 5 | a gas, that the volume of a gas depends on how it's |
| 14:20:58 | 6 | contained and how diffusion take place over time. |
| 14:21:01 | 7 | Q.     So the area it encompasses is the volume of the |
| 14:21:04 | 8 | gas? |
| 14:21:04 | 9 | A.      The instantaneous three-dimensional volume that it |
| 14:21:10 | 10 | encompasses is the volume of the gas at that instant in |
| 14:21:15 | 11 | time as it diffuses out. |
| 14:21:17 | 12 | Q.     Okay.  So at any given time a stream of gas will |
| 14:21:20 | 13 | have a volume to it? |
| 14:21:22 | 14 | A.      A stream of forced flow could have a volume, yes. |
| 14:21:29 | 15 | Q.     In fact, it will have a volume; isn't that true? |
| 14:21:31 | 16 | A.      An instantaneous, instant, an initial volume, yes. |
| 14:21:34 | 17 | Q.     Right.  Because the laws of physics still apply in |
| 14:21:37 | 18 | the Scent Crusher products; correct? |
| 14:21:39 | 19 | A.      Of course. |
| 14:21:45 | 20 |         MR. MILLER:  Now, if we go to Friis 21 and |
| 14:21:56 | 21 | highlight paragraph 29. |
| 14:22:00 | 22 |         MS. STUCKI:  69? |
| 14:22:02 | 23 |         MR. MILLER:  Oh, 69. |
| 14:22:04 | 24 | BY MR. MILLER: |
| 14:22:04 | 25 | Q.     In your report you say that the term "a stream" is |

14:22:08  1   not given any special meaning by the inventor in the

14:22:10  2   description of the invention; correct?

14:22:12  3   **A.      That's correct.**

14:22:13  4   Q.      Okay.  So the plain and ordinary meaning of stream

14:22:18  5   is what should apply when you're reading these claims; is

14:22:21  6   that -- do you agree with that?

14:22:22  7   **A.      That's my understanding.**

14:22:23  8   Q.      Okay.  And you didn't provide with your report any

14:22:34  9   treatise or dictionary or other material that would

14:22:38  10  provide a plain and ordinary meaning of what stream is;

14:22:41  11  correct?

14:22:42  12  **A.      I did look up some websites to make sure I had a**

14:22:45  13  **common understanding.**

14:22:46  14  Q.      Okay.  But you didn't provide any of those or cite

14:22:49  15  to any in your declaration?

14:22:50  16  **A.      No.**

14:22:50  17  Q.      Okay.

14:23:03  18          MR. MILLER:  Let's go to Miller 412.  And let's

14:23:11  19  highlight this right here (indicating).

14:23:14  20  BY MR. MILLER:

14:23:14  21  Q.      Would you disagree with the Merriam-Webster

14:23:20  22  definition here that says a stream is "any body of

14:23:25  23  flowing fluid, such as water or gas."

14:23:29  24  **A.      So, no, as long as it's running, is forced from**

14:23:34  25  **the source, no, I would not.**

| | | |
|---|---|---|
| 14:23:35 | 1 | Q.     Okay.  So it just says "any body of flowing fluid, |
| 14:23:40 | 2 | such as water or gas." |
| 14:23:45 | 3 | **A.     Where the flow is forced flow.  Diffusion doesn't** |
| 14:23:49 | 4 | **count as a stream in my mind.** |
| 14:23:51 | 5 | Q.     Fusion? |
| 14:23:52 | 6 | **A.     Diffusion.** |
| 14:23:53 | 7 | Q.     Diffusion, okay.  So is it your understanding |
| 14:24:00 | 8 | that -- well, let me just ask you this.  In the Scent |
| 14:24:03 | 9 | Crusher products, the Field Pro and the Field Lite, does |
| 14:24:07 | 10 | ozone gas flow out of those holes? |
| 14:24:10 | 11 | **A.     There's initial flow of ozone gas out of those** |
| 14:24:13 | 12 | **holes, yes.** |
| 14:24:15 | 13 | Q.     Okay.  So those products cause ozone to flow? |
| 14:24:19 | 14 | **A.     Initially, yes.** |
| 14:24:20 | 15 | Q.     And under this definition, the word "any" means |
| 14:24:27 | 16 | any body of flowing fluid such as water or gas; right? |
| 14:24:31 | 17 | Which would encompass flow of ozone out the holes in the |
| 14:24:37 | 18 | Field Pro and the Field Lite; right? |
| 14:24:38 | 19 | **A.     The initial flow, yes.** |
| 14:24:40 | 20 | Q.     Okay.  And when you say "initial flow," are you |
| 14:24:54 | 21 | drawing -- I want to know what line you're trying to draw |
| 14:24:57 | 22 | here.  Are you trying to draw a line that it flows out |
| 14:25:00 | 23 | and once it's out it ceases to be a flow and takes on the |
| 14:25:04 | 24 | characteristic of what you want to call a dispersement? |
| 14:25:08 | 25 | **A.     So as any gas would do, ozone would come out in an** |

| | | |
|---|---|---|
| 14:25:15 | 1 | initial force flow from the fan.  And then as that force |
| 14:25:19 | 2 | of flow ceased, it would then be passive movements of air |
| 14:25:26 | 3 | that would take any of the molecules further and |
| 14:25:31 | 4 | diffusion that would disperse it evenly throughout the |
| 14:25:33 | 5 | space.  And that's not a flow; that's diffusion. |
| 14:25:37 | 6 | Q.    So you're saying when the wind blows, the air is |
| 14:25:42 | 7 | not flowing? |
| 14:25:42 | 8 | A.    But it's not forced from the device. |
| 14:25:45 | 9 | Q.    So you're putting a limitation that says, when you |
| 14:25:50 | 10 | talk about flow, it has to be a flow forced from a |
| 14:25:53 | 11 | device? |
| 14:25:53 | 12 | A.    The initial stream has to be from the device. |
| 14:25:56 | 13 | Q.    And can you point to anywhere in the file history |
| 14:25:59 | 14 | or the patents that says flow is to be understood as flow |
| 14:26:05 | 15 | created by, forced from, an electrical fan? |
| 14:26:09 | 16 | A.    Well, the common meaning of stream is forced from |
| 14:26:14 | 17 | some source, as you show here, and that's not up to me to |
| 14:26:17 | 18 | construe that. |
| 14:26:18 | 19 | Q.    Okay. |
| 14:26:19 | 20 | A.    It's the judge. |
| 14:26:20 | 21 | Q.    So I haven't seen a definition of stream that says |
| 14:26:22 | 22 | forced from some force.  You just agreed with me that |
| 14:26:25 | 23 | this is a plain and ordinary meaning of stream, "any body |
| 14:26:29 | 24 | of flowing fluids such as water or gas."  Right? |
| 14:26:31 | 25 | A.    But running water, if you're in a pond, is not |

14:26:36   1   flow.   Running water has some momentum associated with

14:26:40   2   it, just like the initial flow out of the machine has

14:26:44   3   momentum of the molecules coming out.   As soon as that

14:26:48   4   momentum is lost, there was no longer a stream.

14:26:51   5   Q.      Gravity is a force; right?

14:26:53   6   A.      Correct.

14:26:53   7   Q.      And gravity can cause momentum and flow on

14:26:58   8   particles; right?

14:26:58   9   A.      But that's not -- yes, right, but that's not

14:27:01  10   generated by the machine.

14:27:02  11   Q.      Okay.  But it's still a force causing the movement

14:27:06  12   of the ozone particles?

14:27:07  13   A.      That's correct.

14:27:07  14   Q.      Okay.  So the -- under your understanding, the

14:27:11  15   Scent Crusher products will force a flow, which is a

14:27:17  16   stream, of gas out of it, and after that stream is out,

14:27:24  17   by way of gravity or air, they continue to move around

14:27:27  18   after that; right?

14:27:29  19   A.      Correct.  But not by the force of the stream.

14:27:32  20   Q.      Okay.  And the Scent Crusher products have

14:27:36  21   directional vents on them; right?

14:27:38  22   A.      That's correct.

14:27:39  23   Q.      Those are to control the direction that it -- that

14:27:44  24   the stream of ozone flows out; right?

14:27:46  25   A.      The initial direction, yes.

| | | |
|---|---|---|
| 14:27:48 | 1 | Q.    Okay.  And the Field Pro has a high, medium, and |
| 14:27:57 | 2 | low; right? |
| 14:27:58 | 3 | **A.    That's what I saw.** |
| 14:27:58 | 4 | Q.    And are you aware, do you -- does that control the |
| 14:28:04 | 5 | rate of the volume of flow that comes out? |
| 14:28:08 | 6 | **A.    I don't remember from the manual that it was** |
| 14:28:11 | 7 | **there, but I would assume so.** |
| 14:28:16 | 8 | Q.    Okay. |
| 14:28:16 | 9 | MR. MILLER:  If we'd go to Friis 127 and |
| 14:28:23 | 10 | paragraph 154.  It's kind of big, so let me just see here |
| 14:28:28 | 11 | if we could -- let's -- let's do this part right there |
| 14:28:33 | 12 | (indicating). |
| 14:28:38 | 13 | BY MR. MILLER: |
| 14:28:39 | 14 | Q.    In your declaration you state that -- you said |
| 14:28:42 | 15 | there's "no direct evidence that Scent Crusher products |
| 14:28:45 | 16 | deodorize the hunter." |
| 14:28:47 | 17 | **A.    That's correct.** |
| 14:28:47 | 18 | Q.    Do you see that?  You -- you're aware that the |
| 14:28:52 | 19 | Scent Crusher products are advertised as |
| 14:28:56 | 20 | scent-elimination products; right? |
| 14:28:59 | 21 | **A.    It's marketing in an unregulated industry.** |
| 14:29:03 | 22 | Q.    Okay.  Does the application of ozone eliminate |
| 14:29:07 | 23 | scent? |
| 14:29:07 | 24 | **A.    It depends.** |
| 14:29:09 | 25 | Q.    But it can? |

JOHANNA L. WILKINSON, CSR, CRR, RMR
U.S. District Court, 401 N. Market, Wichita, KS 67202
(316) 315-4334

14:29:12   1   **A.      In a confined environment, at a high-enough**

14:29:16   2   **concentration for a long-enough period of time, yes, it**

14:29:21   3   **can potentially eliminate scent.**

14:29:21   4   Q.     Say that again.  In what type of environment?

14:29:24   5   **A.      In a confined environment, for a long-enough**

14:29:27   6   **period of time, at a high-enough concentration, yes,**

14:29:30   7   **ozone can potentially eliminate scent.**

14:29:32   8   Q.     So are you saying that you don't believe that it's

14:29:35   9   possible for an ozone generator, sitting above you out in

14:29:40   10  the open atmosphere, projecting ozone, to actually

14:29:44   11  eliminate any scent?

14:29:45   12  **A.      I haven't done the studies, but in my opinion it**

14:29:48   13  **is highly unlikely that it would completely eliminate**

14:29:52   14  **scent in an open atmosphere.**

14:29:55   15  Q.     Do the Scent Crusher products application of

14:29:59   16  ozone, do they eliminate some scent?

14:30:05   17  **A.      Yes, one molecule, yes, of course.**

14:30:07   18  Q.     Okay.

14:30:08   19         MR. MILLER:  And, in fact, Sherri if we go to

14:30:11   20  Elrod Exhibit S, and go to page 3.

14:30:17   21         In the Field Pro manual, will you highlight that

14:30:22   22  (indicating).

14:30:22   23  BY MR. MILLER:

14:30:26   24  Q.     Would you say that this is an accurate

14:30:28   25  representation of how ozone can eliminate some

14:30:33   1   odor-producing molecules?

14:30:36   2   **A.      Again, in a confined space at a concentration**

14:30:40   3   **that's high enough for a long enough period of time, then**

14:30:43   4   **yes.**

14:30:43   5   Q.      Okay.  But in the open atmosphere, I got ozone

14:30:46   6   coming down and landing on me, it will eliminate some of

14:30:51   7   the odor or bacteria on me and eliminate some of my

14:30:55   8   scent; correct?

14:30:56   9   **A.      Correct.  It's like the Lysol bottle eliminates**

14:31:00   10  **99.9 percent.  It will eliminate some.**

14:31:02   11  Q.      Okay.  So you're just saying you don't know if it

14:31:05   12  could eliminate 100 percent of all scent-producing

14:31:11   13  bacteria?

14:31:12   14  **A.      I have not done the studies nor have I found them,**

14:31:15   15  **but it is highly unlikely, in my opinion, that it could,**

14:31:18   16  **in the open atmosphere, eliminate all scent.**

14:31:21   17  Q.      So based on your experience, you find it -- you're

14:31:25   18  a bit skeptical that doing ozone in the open atmosphere

14:31:28   19  like that would really be effective?  You like the

14:31:33   20  confined, closed environments for ozone; is that right?

14:31:35   21  **A.      I didn't say that.**

14:31:35   22  Q.      Okay.

14:31:36   23  **A.      Depends on how you define "effective."  But**

14:31:39   24  **"eliminate" is a precise term.  It means eliminate, in my**

14:31:46   25  **reading, in the plain and common, ordinary meaning of**

14:31:49  1  "eliminate," and in that sense, then no.

14:32:03  2  Q.     When you -- do you believe a person of ordinary

14:32:06  3  skill in the art -- and we talked about the art being

14:32:09  4  hunting and, you know, odor elimination during hunting.

14:32:14  5  Do you believe a person of ordinary skill in the hunting

14:32:16  6  art would read the word "eliminate" in these claims and

14:32:19  7  believe that it required elimination of every

14:32:22  8  odor-producing bacteria molecule or it wouldn't be

14:32:27  9  satisfied?

14:32:27  10  A.     I'm not -- I have not seen any studies that

14:32:30  11  quantify that.  I can't comment on that.  But a person of

14:32:35  12  ordinary skill in the art would also have not seen any

14:32:40  13  studies that would actually quantify what you said.

14:32:42  14  Q.     But what I was asking, do you think that's how

14:32:44  15  somebody would read that word "eliminate," that this

14:32:48  16  word, talking about odor control in the hunting industry

14:32:52  17  and out in the field, is going to satisfy that claim,

14:32:57  18  what they're talking about is eliminating every single

14:33:01  19  odor-producing bacteria?

14:33:01  20  A.     Well, once again --

14:33:04  21  Q.     Would that be a reasonable reading of that claim?

14:33:08  22  A.     Once again, all the hunters have seen the Lysol

14:33:12  23  bottles where it says "eliminates 99.9 percent of odor

14:33:16  24  and bacteria," and so they would be familiar with that

14:33:21  25  type of language.  And eliminate is a very precise term,

| | | |
|---|---|---|
| 14:33:24 | 1 | so I would say eliminate is eliminate.  And even a |
| 14:33:29 | 2 | hunter, with no scientific background, absolutely would |
| 14:33:33 | 3 | understand it does not eliminate. |
| 14:33:36 | 4 | Q.    And Scent Crusher advertises their product by |
| 14:33:40 | 5 | saying, "Odor disappears.  You stay scent-free while in |
| 14:33:45 | 6 | the field."  Do you see that? |
| 14:33:46 | 7 | A.    I do. |
| 14:33:46 | 8 | Q.    Okay.  And that is what Scent Crusher believes |
| 14:33:50 | 9 | their product does; right? |
| 14:33:53 | 10 | A.    Marketing in an unregulated field is not my |
| 14:33:57 | 11 | judgment to make. |
| 14:33:57 | 12 | Q.    So are you saying that this is false? |
| 14:34:01 | 13 | A.    I haven't seen any studies to support or confirm |
| 14:34:07 | 14 | that statement. |
| 14:34:07 | 15 | Q.    So you have no opinion one way or the other? |
| 14:34:10 | 16 | A.    I do have an opinion.  I believe it's highly |
| 14:34:13 | 17 | unlikely, but I have not seen any studies to say that |
| 14:34:17 | 18 | complete elimination would be reasonable. |
| 14:34:21 | 19 | Q.    Okay.  Let's move on to invalidity. |
| 14:34:27 | 20 |     MR. MILLER:  Let's go to Friis 18, paragraph 59. |
| 14:34:44 | 21 | Oh, no, not that one.  Sorry.  Friis 55, paragraph 98. |
| 14:34:49 | 22 |     THE WITNESS:  May I get some water, please? |
| 14:34:52 | 23 |     MR. MILLER:  Oh, yes. |
| 14:34:55 | 24 |     THE WITNESS:  Thank you. |
| 14:34:55 | 25 |     MR. MILLER:  Friis 55, paragraph 98. |

```
14:35:02    1   BY MR. MILLER:

14:35:02    2   Q.      I want to make sure I understand the scope of your

14:35:06    3   obviousness opinion.  Based on my reading there, it seems

14:35:11    4   that your opinion of obviousness is that you start with

14:35:15    5   Dawson, and then you say it would be obvious for a person

14:35:19    6   of ordinary skill in the art to take the gas generators

14:35:24    7   in Stec or Hess out into the field and then to create a

14:35:29    8   stream of ozone-descenting-gas out in the field while

14:35:33    9   hunting.

14:35:34   10   A.        Correct.

14:35:34   11   Q.      Okay.  And that's the only opinion you have of

14:35:37   12   what would be obvious, based on these three patents;

14:35:40   13   right?

14:35:41   14   A.        That's what I reviewed to date to make my

14:35:46   15   opinions.  (Nods head.)

14:35:48   16   Q.      And that type -- the combination you teach here of

14:35:52   17   it's obvious to take the generators in Stec or Hess out

14:35:56   18   in the field and follow the approach of Dawson, that's

14:35:59   19   the type of obviousness that is the foundation of your

14:36:03   20   opinion?

14:36:03   21   A.        Well, that and my experiences of how hunting is

14:36:07   22   done, how my father would hunt, and driving the pickup to

14:36:13   23   the field with a suitcase from Stec plugged into the

14:36:16   24   cigarette lighter in the back of the pickup, and it seems

14:36:20   25   clear that it teaches it could be used in the field in
```

| 14:36:23 | 1 | the open atmosphere. |
| 14:36:23 | 2 | Q.     Okay.  I just wanted to make sure I understood |
| 14:36:26 | 3 | that you didn't have alternative ways of, well, what if |
| 14:36:30 | 4 | you start with Stec and then you bring Dawson into the |
| 14:36:33 | 5 | mix.  I want to make sure that this statement, which you |
| 14:36:35 | 6 | restate in paragraphs 122 and paragraph 146, that this is |
| 14:36:39 | 7 | your statement of your obviousness opinion.  Is that |
| 14:36:43 | 8 | accurate? |
| 14:36:45 | 9 | A.     Yes. |
| 14:36:46 | 10 | Q.     Okay.  Now, you don't allege that there's any |
| 14:36:50 | 11 | anticipation defense in this case; right? |
| 14:36:52 | 12 | A.     No. |
| 14:36:52 | 13 | Q.     Okay.  So you haven't seen any evidence that a |
| 14:36:57 | 14 | single prior art reference showed that somebody, prior to |
| 14:37:00 | 15 | December 2004, actually did use an ozone generator in the |
| 14:37:06 | 16 | open atmosphere while hunting; right? |
| 14:37:12 | 17 | A.     Stec comes close to doing that in the open field, |
| 14:37:17 | 18 | but no. |
| 14:37:17 | 19 | Q.     But it doesn't do it? |
| 14:37:19 | 20 | A.     Not -- |
| 14:37:24 | 21 | Q.     Let's go ahead and talk about Stec. |
| 14:37:25 | 22 | A.     Not in terms of a stream directly on the hunter, |
| 14:37:28 | 23 | unless you consider the hunter's hands inside the |
| 14:37:31 | 24 | suitcase. |
| 14:37:33 | 25 |        MR. MILLER:  Any chance you can put my PowerPoint |

| | | |
|---|---|---|
| 14:37:36 | 1 | slide 2 up? |
| 14:37:39 | 2 | BY MR. MILLER: |
| 14:37:39 | 3 | Q.     Let's talk about Stec then.  And just make sure we |
| 14:37:43 | 4 | understand what Stec discloses. |
| 14:37:44 | 5 | **A.     Uh-huh.** |
| 14:37:45 | 6 | Q.     Stec teaches kind of two different inventions, |
| 14:37:50 | 7 | both enclosures; right? |
| 14:37:53 | 8 | **A.     Initially enclosures, yes.** |
| 14:37:55 | 9 | Q.     Okay.  The first thing Stec says is you can get a |
| 14:37:58 | 10 | portable closet, and says you can also use a suitcase or |
| 14:38:03 | 11 | a big Tupperware bin; right?  And you use an ozone |
| 14:38:07 | 12 | generator inside of that zipper-sealed closet with your |
| 14:38:13 | 13 | clothes in it; right? |
| 14:38:14 | 14 | **A.     Correct, and your hunting equipment inside as** |
| 14:38:16 | 15 | **well.** |
| 14:38:16 | 16 | Q.     Okay.  And if you look on your screen, this is |
| 14:38:20 | 17 | kind of a mock-up of some stuff from Stec that I put |
| 14:38:22 | 18 | together.  And Stec teaches that this portable closet, |
| 14:38:27 | 19 | the intent of this is to take it with you and place it in |
| 14:38:30 | 20 | the lodge or the cabin that you're staying in; right? |
| 14:38:33 | 21 | **A.     For one of the embodiments, yes.** |
| 14:38:36 | 22 | Q.     Okay.  For -- that's the only thing it ever tells |
| 14:38:39 | 23 | you to do with the portable closet. |
| 14:38:43 | 24 | **A.     No.  Well, with the portable closet, yes.** |
| 14:38:45 | 25 | Q.     Yes.  And then it also says -- okay, well, we did |

| | | |
|---|---|---|
| 14:38:56 | 1 | that.  It teaches right there you place it in the hunting |
| 14:38:59 | 2 | lodge where you're staying; right?  And then you know |
| 14:39:02 | 3 | that Stec was considered by the patent office; right in? |
| 14:39:02 | 4 | A.      Correct. |
| 14:39:05 | 5 | Q.      And it was considered, if you look down here, one |
| 14:39:07 | 6 | two, three, four, five different office actions Stec was |
| 14:39:11 | 7 | analyzed by the patent office; right? |
| 14:39:14 | 8 | A.      Correct. |
| 14:39:14 | 9 | Q.      Okay. |
| 14:39:15 | 10 |         MR. MILLER:  And go to the next page, Sherri. |
| 14:39:15 | 11 | BY MR. MILLER: |
| 14:39:17 | 12 | Q.      So Stec also talks about this room; right?  A side |
| 14:39:22 | 13 | room that you build onto the hunting lodge that has some |
| 14:39:27 | 14 | ozone generators in it; right? |
| 14:39:28 | 15 | A.      Correct. |
| 14:39:29 | 16 | Q.      And the hunter goes in there and it can disinfect |
| 14:39:34 | 17 | the clothing there? |
| 14:39:35 | 18 | A.      It can apply a direct stream out of the generator |
| 14:39:41 | 19 | 52 to the hunter as he walks into or out of the |
| 14:39:46 | 20 | enclosure; correct. |
| 14:39:47 | 21 | Q.      Okay.  And when it talks about this room, it says, |
| 14:39:57 | 22 | right here in paragraph 25, the provision of the |
| 14:39:59 | 23 | stand-alone room, "one of the benefits of this |
| 14:40:03 | 24 | stand-alone room is it advantageously eliminates the need |
| 14:40:07 | 25 | for the hunter to carry the portable enclosure with him." |

| | | |
|---|---|---|
| 14:40:11 | 1 | Do you see that? |
| 14:40:11 | 2 | A.     I do. |
| 14:40:11 | 3 | Q.     So Stec teaches that it's an advantage to not have |
| 14:40:16 | 4 | to carry this portable closet or suitcase with you.  It |
| 14:40:21 | 5 | says one of the advantages of this room is you wouldn't |
| 14:40:23 | 6 | have to take this portable enclosure to the lodge with |
| 14:40:26 | 7 | you because the lodge has a built-in room.  That's what |
| 14:40:29 | 8 | Stec teaches; right? |
| 14:40:30 | 9 | A.     It also -- yes, it also teaches a different |
| 14:40:33 | 10 | embodiment, though. |
| 14:40:34 | 11 | Q.     It doesn't teach that you take it into the field |
| 14:40:37 | 12 | and open it in the field and leave it open while the |
| 14:40:39 | 13 | ozone runs, does it? |
| 14:40:41 | 14 | A.     It teaches that it can be portable and plugged |
| 14:40:44 | 15 | into a cigarette lighter.  And those are found in trucks |
| 14:40:48 | 16 | and pickups that you would take to the place of your |
| 14:40:52 | 17 | hunting and walk a short distance to the trees or the |
| 14:40:56 | 18 | blinds and -- |
| 14:40:57 | 19 | Q.     Well, you're assuming a lot there, because Stec |
| 14:41:00 | 20 | teaches that you take it to the lodge or cabin and you |
| 14:41:03 | 21 | can have it in your car, plugged in, while you take it to |
| 14:41:06 | 22 | the lodge or cabin; right? |
| 14:41:07 | 23 | A.     From my experience, from when I was a young lady, |
| 14:41:10 | 24 | that's what was done.  That's how I applied it. |
| 14:41:17 | 25 | Q.     And in the car is one thing, but Stec doesn't |

14:41:22  1  teach to take it out in the field with you, open it up

14:41:27  2  and run the ozone generator?

14:41:30  3  **A.      It teaches a suitcase, and a suitcase is for**

14:41:35  4  **transportation to the field.**

14:41:36  5  Q.      Right.  And like you said before, when you're

14:41:39  6  applying ozone, sometimes an enclosed space helps the

14:41:43  7  disinfectant properties work better; right?

14:41:46  8  **A.      It increases the concentration and controls the**

14:41:48  9  **time, so it can.**

14:41:49  10  Q.      Okay.  Let's talk about Hess in that context then.

14:41:54  11  Hess is another one you --

14:41:58  12       MR. MILLER:  My slide No. 1.

14:42:05  13  BY MR. MILLER:

14:42:05  14  Q.      Now, Hess talks about a hunter's blind, right,

14:42:09  15  that has a fan filter at the bottom?

14:42:13  16  **A.      Correct.**

14:42:13  17  Q.      And the filter fan pulls air in so that you've got

14:42:19  18  clean ambient air coming in from the top here, going

14:42:22  19  through the hunter, grabbing all the odor and bacteria

14:42:25  20  that settles at the bottom, filtering it out so that

14:42:29  21  filtered clean air goes out the bottom; right?

14:42:31  22  **A.      That's one embodiment, yeah.**

14:42:33  23  Q.      Okay.  And Hess teaches that this arrangement

14:42:37  24  generates a positive flow of clean air through the blind

14:42:40  25  to help keep the blind well ventilated and cool; right?

| | | |
|---|---|---|
| 14:42:45 | 1 | A.        Correct. |
| 14:42:45 | 2 | Q.        And Hess was considered one, two, three, four, |
| 14:42:49 | 3 | five different office actions; right? |
| 14:42:51 | 4 | A.        To the best of my knowledge, yes. |
| 14:42:52 | 5 | Q.        Okay.  And in your declaration you make a |
| 14:43:01 | 6 | statement where you say you could reverse the flow of |
| 14:43:05 | 7 | that filter so that it blew air back into the blind; |
| 14:43:09 | 8 | right? |
| 14:43:09 | 9 | A.        Correct. |
| 14:43:10 | 10 | Q.        You never say anywhere in your declaration that it |
| 14:43:14 | 11 | would be obvious to do that, and you never provide any |
| 14:43:16 | 12 | reason why somebody would actually do that; right? |
| 14:43:19 | 13 | A.        Well, in my declaration, no.  But it also says in |
| 14:43:27 | 14 | Hess that you can use the ozone generation, the |
| 14:43:32 | 15 | ultraviolet light, in combination with the carbon filter, |
| 14:43:36 | 16 | and I just don't understand how that would be |
| 14:43:38 | 17 | advantageous unless you were to reverse, either put the |
| 14:43:44 | 18 | ozone generation above and draw over the hunter and draw |
| 14:43:48 | 19 | through the carbon filter or somehow interact the ozone |
| 14:43:53 | 20 | with the hunter and the scent. |
| 14:43:56 | 21 | Q.        So Hess teaches that with the carbon filter you |
| 14:43:59 | 22 | can also add a UV lamp to add additional bacteria killing |
| 14:44:03 | 23 | in the filter; right? |
| 14:44:04 | 24 | A.        Correct. |
| 14:44:06 | 25 | Q.        Okay.  And there's no teaching to Hess -- you |

14:44:11   1   don't cite any information to suggest that if you had a

14:44:13   2   filter with a carbon filter and a UV lamp, that it's

14:44:16   3   going to generate a concentration of ozone that could

14:44:23   4   operate by descenting the hunter within the blind?

14:44:28   5   **A.      The details are not in Hess, but a person of**

14:44:31   6   **ordinary skill in the art would be able to divine how to**

14:44:35   7   **do that.**

14:44:36   8   Q.      And what's your basis for that, divine how to --

14:44:39   9   if you -- let's just talk about this.  If you reverse

14:44:43   10  that filter in Hess?

14:44:44   11  **A.      Uh-huh.**

14:44:44   12  Q.      And looking at my figure here, you're taking clean

14:44:47   13  air from the outside and you're putting clean air into

14:44:50   14  the filter.

14:44:52   15  **A.      Passing it through -- if it was the ozone**

14:44:54   16  **generation instead of necessarily the carbon filter, then**

14:44:58   17  **that would make sense.**

14:44:59   18  Q.      And then you're blowing it up from the bottom

14:45:02   19  through the settled bacteria stuff.  And if you did that,

14:45:06   20  you're not going to get the positive air tunnel effect

14:45:11   21  that Hess describes earlier to keep the blind well

14:45:15   22  ventilated and cool?

14:45:16   23  **A.      Not now, but it would be up through the top of the**

14:45:20   24  **blind that's often described as opened in Hess.**

14:45:22   25  Q.      Have you ever seen that done?

| | | |
|---|---|---|
| 14:45:24 | 1 | **A.      No.** |
| 14:45:24 | 2 | Q.     Have you ever seen anything like Hess ever built |
| 14:45:27 | 3 | and in practice? |
| 14:45:28 | 4 | **A.      Well, I've told you I've never seen ozone or use** |
| 14:45:32 | 5 | **in the field actually, so . . .** |
| 14:45:36 | 6 | Q.     And that's not how Hess is intended to be used? |
| 14:45:40 | 7 | **A.      That's one embodiment that is described.** |
| 14:45:42 | 8 | Q.     Okay.  It doesn't describe reversing the filter? |
| 14:45:47 | 9 | **A.      No, it does not, but it would be a reasonable way** |
| 14:45:51 | 10 | **to look at it.** |
| 14:45:52 | 11 | Q.     It would be, using Hess, contrary to the way it's |
| 14:45:56 | 12 | taught? |
| 14:45:58 | 13 | **A.      Supplementary to the way it's taught.  It would be** |
| 14:46:02 | 14 | **possible to just switch the positive and negative on the** |
| 14:46:05 | 15 | **electrical to the fan.** |
| 14:46:07 | 16 | Q.     Okay.  Let's go to the Hirvela slide. |
| 14:46:18 | 17 | MR. MILLER:  Your Honor, I'm going to try and |
| 14:46:19 | 18 | hurry through this, I promise. |
| 14:46:22 | 19 | BY MR. MILLER: |
| 14:46:22 | 20 | Q.     Have you -- are you familiar with the Hirvela |
| 14:46:26 | 21 | patent? |
| 14:46:26 | 22 | **A.      I have seen it in the patent prosecution history,** |
| 14:46:29 | 23 | **and I glanced over it.  I just learned about it on** |
| 14:46:33 | 24 | **Tuesday.** |
| 14:46:37 | 25 | MR. MILLER:  I think it's 4. |

| | | |
|---|---|---|
| 14:46:39 | 1 | BY MR. MILLER: |
| 14:46:40 | 2 | Q.    Okay.  And Hirvela teaches a little device that |
| 14:46:44 | 3 | projects an animal scent, and it's a cover scent and an |
| 14:46:50 | 4 | attractive scent; right? |
| 14:46:52 | 5 | A.    **Correct.** |
| 14:46:53 | 6 | Q.    Okay.  And that's used out in the field; right? |
| 14:46:55 | 7 | A.    **Correct.** |
| 14:46:56 | 8 | Q.    I think Hirvela says you can pin it to the hunter |
| 14:46:59 | 9 | himself or you can even attach it to a tree; right? |
| 14:47:02 | 10 | A.    **To the best of my memory.  I believe you.** |
| 14:47:05 | 11 | Q.    And the purpose of Hirvela is to create both a |
| 14:47:09 | 12 | cover -- now, a cover scent isn't a deodorizing scent; |
| 14:47:12 | 13 | right? |
| 14:47:14 | 14 | A.    **No.** |
| 14:47:15 | 15 | Q.    Okay.  So a masking scent masks the hunter's scent |
| 14:47:20 | 16 | from the game animal, and it also says you want to use as |
| 14:47:25 | 17 | a masking scent something that will attract the game; |
| 14:47:28 | 18 | right? |
| 14:47:28 | 19 | A.    **In this, yes.** |
| 14:47:30 | 20 | Q.    Okay. |
| 14:47:30 | 21 |     MR. MILLER:  If you'd go to the next slide, |
| 14:47:32 | 22 | Sherri. |
| 14:47:33 | 23 | BY MR. MILLER: |
| 14:47:33 | 24 | Q.    Porter, this was also a patent considered in the |
| 14:47:36 | 25 | patent office. |

| | | |
|---|---|---|
| 14:47:36 | 1 | A.      Uh-huh. |
| 14:47:37 | 2 | Q.      And Porter teaches that same concept, using |
| 14:47:40 | 3 | masking scents that attract animals; right? |
| 14:47:45 | 4 | A.      Correct. |
| 14:47:45 | 5 | Q.      And in Porter you're using a little box that sits |
| 14:47:47 | 6 | on the ground, it keeps it warm and then the scent comes |
| 14:47:50 | 7 | out? |
| 14:47:51 | 8 | A.      Correct. |
| 14:47:53 | 9 | Q.      Now, you can see Porter was cited by all those |
| 14:47:56 | 10 | office actions as well, and Hirvela was cited by a bunch, |
| 14:47:59 | 11 | too. |
| 14:47:59 | 12 | MR. MILLER:  Go to the next slide, Sherri. |
| 14:47:59 | 13 | BY MR. MILLER: |
| 14:48:02 | 14 | Q.      Now, you cite to Dawson, and you state in your |
| 14:48:04 | 15 | declaration, hey, Dawson's a new piece of prior art that |
| 14:48:09 | 16 | the patent office didn't consider; right? |
| 14:48:09 | 17 | A.      Correct. |
| 14:48:13 | 18 | Q.      And Dawson teaches the same principles taught in |
| 14:48:15 | 19 | Porter and Hirvela of using a masking scent that will |
| 14:48:18 | 20 | mask the hunter's scent and also attract game; right? |
| 14:48:22 | 21 | A.      Not quite.  Dawson teaches that it's downwind from |
| 14:48:26 | 22 | the hunter.  In my -- the best of my memory, the other |
| 14:48:30 | 23 | two did not teach that, so that's part of the elements of |
| 14:48:33 | 24 | understanding of how you could recreate -- or |
| 14:48:42 | 25 | understand -- |

| | | |
|---|---|---|
| 14:48:42 | 1 | Q.    Okay.  So the difference you find between Dawson |
| 14:48:45 | 2 | and Hirvela and Porter is Dawson says you take these |
| 14:48:48 | 3 | incense sticks -- |
| 14:48:49 | 4 | **A.    Uh-huh.** |
| 14:48:49 | 5 | Q.    -- and you stick 'em downwind? |
| 14:48:52 | 6 | **A.    Yes.** |
| 14:48:52 | 7 | Q.    Okay.  Okay.  But Dawson does teach the concept of |
| 14:48:58 | 8 | using a lure scent and a cover scent? |
| 14:49:00 | 9 | **A.    That's correct.** |
| 14:49:01 | 10 | Q.    Okay.  So the patent office wasn't in the dark on |
| 14:49:08 | 11 | the concept that hunters use cover scents and lure scents |
| 14:49:13 | 12 | in the field in various different mechanisms? |
| 14:49:17 | 13 | **A.    To the best of my knowledge, it would appear, no,** |
| 14:49:21 | 14 | **they were not in the dark.** |
| 14:49:25 | 15 | Q.    And the patent office granted these patents. |
| 14:49:28 | 16 | MR. MILLER:  If you'd go to the next slide, |
| 14:49:30 | 17 | Sherri. |
| 14:49:30 | 18 | BY MR. MILLER: |
| 14:49:31 | 19 | Q.    If you look at here, during the prosecution |
| 14:49:33 | 20 | history the patent office talked about -- in these two |
| 14:49:39 | 21 | office actions up here -- discussed Hess and Hirvela, in |
| 14:49:43 | 22 | these office actions talked about Stec and Porter, in |
| 14:49:46 | 23 | these two Hess, Stec, and Porter.  So the patent office |
| 14:49:49 | 24 | was talking about Hess and Stec in combination with cover |
| 14:49:54 | 25 | scents and attracting scent dispersers. |

| | | |
|---|---|---|
| 14:49:59 | 1 | MR. MILLER:  And next slide. |
| 14:49:59 | 2 | BY MR. MILLER: |
| 14:50:02 | 3 | Q.    You would agree with that that the patent office |
| 14:50:05 | 4 | evaluated various combinations of Hess and Stec with |
| 14:50:08 | 5 | other prior art? |
| 14:50:08 | 6 | A.    **From my read of the file history, yes.** |
| 14:50:12 | 7 | Q.    And Ozonics responded to all of these through |
| 14:50:16 | 8 | various responses; right? |
| 14:50:16 | 9 | A.    **Right.** |
| 14:50:17 | 10 | Q.    And at the end of the day -- if you go to the next |
| 14:50:20 | 11 | one -- the claims were allowed; right? |
| 14:50:24 | 12 | A.    **The revised claims were allowed.** |
| 14:50:26 | 13 | Q.    Yes.  And the patent office found that the |
| 14:50:29 | 14 | limitations about using ozone in an open atmosphere in |
| 14:50:32 | 15 | the field while hunting, that those were a novel, |
| 14:50:36 | 16 | nonobvious, not taught or suggested by the prior art; |
| 14:50:38 | 17 | right? |
| 14:50:38 | 18 | A.    **For the '015 patent.** |
| 14:50:41 | 19 | Q.    Okay. |
| 14:50:42 | 20 | MR. MILLER:  And if you go to the next one, |
| 14:50:43 | 21 | Sherri. |
| 14:50:43 | 22 | BY MR. MILLER: |
| 14:50:43 | 23 | Q.    And the in the '177 patent, specifically in the |
| 14:50:47 | 24 | notice of allowance, the examiner actually cited Hirvela, |
| 14:50:52 | 25 | which we just talked about.  Talked about that neither -- |

```
14:50:55   1  I can't even pronounce that one -- Grinarmi and Hirvela,

14:51:02   2  they don't teach portable ozone generation; right?

14:51:06   3        MR. MILLER:  If you'd go to the next slide.

14:51:06   4  BY MR. MILLER:

14:51:08   5  Q.    So the patent office expressly said Hirvela, which

14:51:13   6  is teaching lure scents and cover scents, that's not a

14:51:16   7  problem with these patents; right?

14:51:18   8  A.    No.

14:51:18   9  Q.    Okay.  And also specifically mentioned Stec right

14:51:22  10  here.  Do you see that?

14:51:23  11  A.    I do.

14:51:23  12  Q.    And specifically mentions Hess.  And the patent

14:51:28  13  office agreed that these claims are novel and nonobvious,

14:51:33  14  despite Stec, Hess, and Hirvela and the other prior art

14:51:38  15  that talks about masking and attracting scent; right?

14:51:43  16  A.    In my best of my memory, Stec was quite a problem

14:51:47  17  and required a lot of revision of the claims to be

14:51:50  18  allowed, particularly in the '177, where if I remember

14:51:54  19  right it required Stec taught that ozone was direct --

14:51:58  20  was applied to the hunter in the open atmosphere.  And if

14:52:03  21  I remember right again, it required the claims to be

14:52:07  22  revised to be in the field.

14:52:08  23  Q.    Right.

14:52:09  24  A.    Not in the open atmosphere.

14:52:10  25  Q.    And according to the patent office, Ozonics made
```

14:52:14   1   the sufficient revisions to the claims to where the

14:52:17   2   patent office concluded now they qualify and are

14:52:20   3   patentable and granted the claims; right?

14:52:22   4   **A.      That's what "allowance of the claims as revised"**

14:52:26   5   **would indicate.**

14:52:29   6         MR. MILLER:  Now, go to Friis 13.

14:52:29   7   BY MR. MILLER:

14:52:33   8   Q.    In your declaration you cite a bunch of statements

14:52:36   9   of how you understand the law.  Right?

14:52:38   10  **A.      Correct.**

14:52:39   11  Q.    And one of those -- did you write those or were

14:52:42   12  those provided to you by counsel?

14:52:43   13  **A.      They were initially written by counsel.  I did**

14:52:47   14  **offer suggestions, and I read them and studied them very**

14:52:50   15  **carefully.  And I had already written before, in a**

14:52:53   16  **previous case, similar type of statements.**

14:52:55   17  Q.    You identify -- in an obviousness analysis, you

14:53:00   18  say that "secondary considerations may also be

14:53:02   19  considered"; right?

14:53:03   20  **A.      Correct.**

14:53:03   21  Q.    And you used the word "may."

14:53:07   22        MR. MILLER:  If you highlight up here.

14:53:07   23  BY MR. MILLER:

14:53:11   24  Q.    Is it your understanding that the secondary

14:53:13   25  considerations of obviousness are optional?

14:53:19   1   A.      I'm not a lawyer.  I don't want to -- could you

14:53:29   2   repeat that, actually?

14:53:30   3   Q.      My question is, before -- to perform a proper

14:53:34   4   nonobviousness analysis in -- under the law, isn't it a

14:53:40   5   requirement that you consider any secondary

14:53:43   6   considerations of nonobviousness?

14:53:46   7   A.      Yes, it's my understanding.

14:53:47   8   Q.      Okay.  So it's a requirement?

14:53:51   9   A.      I believe so.

14:53:52   10   Q.      And you didn't provide any analysis in your

14:53:55   11   declaration of any secondary considerations or objective

14:53:59   12   evidence of nonobviousness?

14:54:04   13   A.      To the best of my knowledge, no, that wasn't what

14:54:08   14   I did.  I evaluated prior art and I evaluated whether or

14:54:13   15   not it infringed.

14:54:14   16   Q.      Okay.  You didn't discuss the commercial success

14:54:16   17   of Ozonics' patents?

14:54:19   18   A.      No.

14:54:19   19   Q.      They didn't provide you that.  Did they provide

14:54:21   20   you the sales or the success that Scent Crusher is having

14:54:24   21   in introducing their products?

14:54:26   22   A.      No.

14:54:26   23   Q.      Did you do any researching public record of how

14:54:31   24   the industry reacted to Ozonics products when they

14:54:35   25   entered the market?

| | | |
|---|---|---|
| 14:54:36 | 1 | A.      I actually did.  I went to some -- in terms of my |
| 14:54:41 | 2 | understanding of skill in hunting, I went to some forums |
| 14:54:46 | 3 | where it was discussed. |
| 14:54:48 | 4 | Q.      Did you -- you didn't discuss any of that in your |
| 14:54:51 | 5 | declaration, though? |
| 14:54:51 | 6 | A.      No. |
| 14:54:52 | 7 | Q.      Okay.  Did you -- were you provided the letter |
| 14:54:54 | 8 | from Mr. Drake to Mr. Elrod that referred to Mr. Elrod's |
| 14:55:00 | 9 | ozone technology as pioneering? |
| 14:55:03 | 10 | A.      I believe that was in a document that was not |
| 14:55:07 | 11 | allowed.  I'm not sure. |
| 14:55:08 | 12 | Q.      Okay.  Do you know that he referred to it as |
| 14:55:11 | 13 | pioneering? |
| 14:55:13 | 14 | A.      I did see that just yesterday. |
| 14:55:17 | 15 | Q.      And -- |
| 14:55:17 | 16 | A.      But again, I don't know that it was allowed in |
| 14:55:19 | 17 | court, so I don't know if it applies. |
| 14:55:22 | 18 | Q.      Isn't it, by definition -- if technology's |
| 14:55:26 | 19 | pioneering, by definition that's not obvious; right? |
| 14:55:28 | 20 | A.      Well, I do know that when you're trying to court |
| 14:55:31 | 21 | someone, that you say things to try and court them that |
| 14:55:35 | 22 | don't have necessarily legal meaning. |
| 14:55:38 | 23 | Q.      Okay.  But regardless, your declaration, your |
| 14:55:42 | 24 | opinion, is based on your analysis of -- but not any |
| 14:55:46 | 25 | secondary considerations analysis? |

14:55:48   1   **A.        No.**

14:55:48   2          MR. MILLER:  I have no further questions, Your

14:55:50   3   Honor.

14:55:50   4          THE COURT:  We've been here a couple hours.  We

14:55:52   5   need to take a break.  I'm very confused, Counsel, as to

14:55:56   6   where you think we're going.  You indicated you have five

14:56:00   7   witnesses to call.  We've gotten through one and a half.

14:56:06   8   I think it was obvious that when we set this hearing at

14:56:09   9   1:00 o'clock that you would have, at most, four hours to

14:56:11   10  do it, and it doesn't appear to me that anyone's taken

14:56:14   11  that into consideration.  So tell me where you think

14:56:16   12  we're going before we take this recess.

14:56:21   13         MR. FOSTER:  Well, I think we're obviously done

14:56:24   14  with Dr. Friis.

14:56:25   15         THE COURT:  Well, obviously.

14:56:26   16         MR. FOSTER:  They've got their cross.  And after

14:56:30   17  that we call Scott Elrod.  He will be brief.  He's been

14:56:35   18  very detailed in his declarations.  We'll rely on that,

14:56:39   19  touch on some areas, and --

14:56:43   20         THE COURT:  So you feel confident we'll finish in

14:56:46   21  the time allotted?

14:56:49   22         MR. FOSTER:  I hope.  I hope and expect we can,

14:56:52   23  Your Honor.

14:56:52   24         THE COURT:  Well, let's --

14:56:53   25         MR. FOSTER:  We'll do our best.

| | | |
|---|---|---|
| 14:56:55 | 1 | MR. HUGHES:  Your Honor, with respect to the |
| 14:56:58 | 2 | initial expectations, when we set the hearing, we |
| 14:57:01 | 3 | contacted chambers, and our understanding had been that, |
| 14:57:05 | 4 | given the scarcity of dates available, we could start at |
| 14:57:09 | 5 | 1:00 and we would continue however long until we got |
| 14:57:11 | 6 | finished. |
| 14:57:12 | 7 | THE COURT:  Well, certainly we can go a little |
| 14:57:15 | 8 | past 5:00, but we're not going to be here till 8:00 or |
| 14:57:20 | 9 | even, you know, 6:30.  So if that was your impression, I |
| 14:57:25 | 10 | apologize.  I don't think we meant that we were going to |
| 14:57:29 | 11 | plug through into the night if necessary.  So I'm just |
| 14:57:34 | 12 | concerned about the scheduling of testimony vis-à-vis the |
| 14:57:37 | 13 | time allotted.  But let's not further waste the time |
| 14:57:41 | 14 | allotted by this discussion. |
| 14:57:42 | 15 | Let's take a ten-minute recess for comfort and |
| 14:57:45 | 16 | we'll come back and do cross-examination. |
| 14:57:48 | 17 | MR. FOSTER:  Thank you, Your Honor. |
| 14:57:49 | 18 | THE CLERK:  All rise. |
| 14:57:51 | 19 | (A recess was taken from 2:57 to 3:09 P.M.) |
| 15:09:44 | 20 | THE CLERK:  All rise. |
| 15:09:45 | 21 | THE COURT:  You can be seated. |
| 15:09:47 | 22 | Cross-examination. |
| 15:09:51 | 23 | MR. TUTTLE:  Good afternoon. |
| 15:09:52 | 24 | CROSS-EXAMINATION |
| 15:09:52 | 25 | BY MR. TUTTLE: |

| | | |
|---|---|---|
| 15:09:53 | 1 | Q.      Good afternoon, Dr. Friis. |
| 15:09:54 | 2 | A.      **Good afternoon.** |
| 15:09:56 | 3 | Q.      First of all, why were you asked -- in what role |
| 15:10:00 | 4 | were you asked to participate in this hearing today? |
| 15:10:03 | 5 | A.      **I was asked to comment my findings of my analysis** |
| 15:10:08 | 6 | **on whether or not the patents-in-suit, the '015, the '177** |
| 15:10:14 | 7 | **and '180, infringe or would be held up as valid in** |
| 15:10:20 | 8 | **comparison to the prior art, and then to do an analysis** |
| 15:10:25 | 9 | **of the Scent Crusher products and if they infringed on** |
| 15:10:28 | 10 | **those patents-in-suit.** |
| 15:10:29 | 11 | Q.      So you were asked to analyze the certain patents, |
| 15:10:32 | 12 | analyze the accused products, and determine whether or |
| 15:10:35 | 13 | not there was infringement and you were also asked to |
| 15:10:37 | 14 | review the patent claims to determine whether they were |
| 15:10:40 | 15 | invalid or not; correct? |
| 15:10:42 | 16 | A.      **Correct.** |
| 15:10:42 | 17 | Q.      We've got a little bit of background information |
| 15:10:45 | 18 | from you during your direct examination.  I believe you |
| 15:10:48 | 19 | mentioned that you have some experience with ozone. |
| 15:10:50 | 20 | Would you like to explain that any further? |
| 15:10:53 | 21 | A.      **Sure.  So personally I had the Sharper Imagine** |
| 15:10:59 | 22 | **Ionic Breeze, which was interesting, and then I also** |
| 15:11:03 | 23 | **teach a class in which I teach the students about how** |
| 15:11:06 | 24 | **ozone could be used as a method of sterilizing very** |
| 15:11:10 | 25 | **delicate polymeric materials that are used in implants in** |

15:11:15   1   the body.  So it is not currently used in that but is a

15:11:19   2   really a viable product going forward in that space.

15:11:22   3   Q.     So you understand that ozone can be used or an

15:11:25   4   oxidizing gas can be used to treat odors, scents, or

15:11:29   5   foreign particles for any reason?

15:11:31   6   A.     Correct.

15:11:32   7   Q.     And you indicated that you have some experience

15:11:33   8   with hunting.  Is scent a factor in hunting?

15:11:36   9   A.     Absolutely.

15:11:36   10  Q.     So is the idea that if you could control scent or

15:11:40   11  eliminate scent, is that something that would be known to

15:11:43   12  a hunter?

15:11:44   13  A.     Yes.

15:11:44   14  Q.     So anyone that's familiar with hunting would also

15:11:46   15  be familiar with that concept?

15:11:48   16  A.     Correct.

15:11:50   17  Q.     And so you mentioned at one point during your

15:11:52   18  direct that you had some prior hearing testimony as an

15:11:55   19  expert; was that correct?

15:11:56   20  A.     That's correct.

15:11:57   21  Q.     And you had mentioned ITC.  Could you briefly

15:12:00   22  explain what that was.

15:12:02   23  A.     Sure.  It was a case at the International Trade

15:12:08   24  Commission two years ago now on a case that involved

15:12:11   25  invalidity of patents and infringement in the mattress

| | | |
|---|---|---|
| 15:12:14 | 1 | **industry.** |
| 15:12:15 | 2 | Q.     Thank you. |
| 15:12:20 | 3 | MR. TUTTLE:  Your Honor, may I approach the |
| 15:12:21 | 4 | witness and hand them a copy of the exhibit? |
| 15:12:23 | 5 | MR. ELLIOTT:  You may.  You don't need to ask |
| 15:12:25 | 6 | permission to approach the witness, but thank you, |
| 15:12:28 | 7 | Counsel. |
| 15:12:33 | 8 | THE WITNESS:  Thank you. |
| 15:12:46 | 9 | BY MR. TUTTLE: |
| 15:12:47 | 10 | Q.     So if you could refer -- look at Defendant's |
| 15:12:50 | 11 | Exhibit 403, please. |
| 15:12:53 | 12 | **A.     (The witness complies.)** |
| 15:12:57 | 13 | Q.     Behind that cover page, Doctor.  I'll let you get |
| 15:13:00 | 14 | that. |
| 15:13:08 | 15 | **A.     403?** |
| 15:13:09 | 16 | Q.     Yes.  Did you find tab 403 and there's an exhibit |
| 15:13:13 | 17 | right there. |
| 15:13:17 | 18 | **A.     I'm there.** |
| 15:13:18 | 19 | Q.     Great.  So after you flipped past your cover |
| 15:13:22 | 20 | sheet, this was an exhibit to your declaration; is that |
| 15:13:25 | 21 | correct? |
| 15:13:25 | 22 | **A.     I'm sorry?  I'm looking at the tab in the wrong** |
| 15:13:29 | 23 | **way.  I'm at the patents.  I'll go back to --** |
| 15:13:41 | 24 | Q.     Tab 403. |
| 15:13:43 | 25 | **A.     -- 403?** |

| | | |
|---|---|---|
| 15:13:44 | 1 | Q.      Four zero three, please. |
| 15:13:47 | 2 | **A.      It's the Friis declaration, and the patents are in** |
| 15:13:50 | 3 | **my -- it's '015 at 403 tab.** |
| 15:13:55 | 4 | Q.      Yep, the 403 tab.  So you're looking at patent |
| 15:13:58 | 5 | No. 7,939,015; is that correct? |
| 15:14:02 | 6 | A.      Correct. |
| 15:14:03 | 7 | Q.      Is that one of the asserted patents in this |
| 15:14:05 | 8 | litigation? |
| 15:14:06 | 9 | A.      Correct. |
| 15:14:06 | 10 | Q.      Are there -- are there more than one asserted |
| 15:14:09 | 11 | patents? |
| 15:14:09 | 12 | **A.      There are three.** |
| 15:14:10 | 13 | Q.      There are three asserted patents in this |
| 15:14:12 | 14 | litigation.  Is there more than one claim asserted in |
| 15:14:15 | 15 | this litigation? |
| 15:14:16 | 16 | A.      Correct. |
| 15:14:16 | 17 | Q.      So is there a claim asserted from each patent? |
| 15:14:20 | 18 | **A.      More than one claim is asserted for each patent.** |
| 15:14:23 | 19 | Q.      So, for example, claims 1 and 4 are being asserted |
| 15:14:29 | 20 | against MoJack Scent Crusher that they infringe from the |
| 15:14:34 | 21 | '015 patent; is that correct? |
| 15:14:34 | 22 | A.      Correct. |
| 15:14:41 | 23 | Q.      So if I refer to it as -- I referred to it already |
| 15:14:44 | 24 | as the '015 patent.  You understand what I mean when I |
| 15:14:47 | 25 | say the '015 patent? |

| | | |
|--|--|--|
| 15:14:49 | 1 | A.      Yes. |
| 15:14:50 | 2 | Q.      And, again, the plaintiffs have alleged that |
| 15:14:54 | 3 | MoJack d/b/a Scent Crusher allegedly infringes the '015 |
| 15:15:00 | 4 | patent? |
| 15:15:00 | 5 | A.      Correct. |
| 15:15:03 | 6 | Q.      Turning to Exhibit 404 in your binder, please. |
| 15:15:12 | 7 | After you flip past that cover page, can you tell me what |
| 15:15:14 | 8 | you're looking at? |
| 15:15:15 | 9 | A.      It's the '180 patent, one of the asserted patents. |
| 15:15:20 | 10 | Q.      So again Exhibit 404 is U.S. patent No. 8,404,180 |
| 15:15:26 | 11 | in? |
| 15:15:26 | 12 | A.      Correct. |
| 15:15:27 | 13 | Q.      Is that one of the asserted patents in this |
| 15:15:28 | 14 | litigation? |
| 15:15:29 | 15 | A.      It is. |
| 15:15:32 | 16 | Q.      Are claims 1, 3, 7, 11 of that patent being |
| 15:15:35 | 17 | asserted against MoJack d/b/a Scent Crusher? |
| 15:15:38 | 18 | A.      Correct. |
| 15:15:43 | 19 | Q.      With respect to the '015 patent, you reviewed that |
| 15:15:48 | 20 | in your analysis of whether or not that patent is |
| 15:15:51 | 21 | infringed and invalid? |
| 15:15:52 | 22 | A.      Correct. |
| 15:15:52 | 23 | Q.      And with respect to the '180 patent, you reviewed |
| 15:15:57 | 24 | that patent to determine whether or not it is infringed |
| 15:16:00 | 25 | by MoJack/Scent Crusher and whether or not it's invalid? |

| | | |
|---|---|---|
| 15:16:03 | 1 | A.    Correct. |
| 15:16:05 | 2 | Q.    Turning to tab 405, please.  Again, like we've |
| 15:16:16 | 3 | done twice before, what was the patent number of what you |
| 15:16:19 | 4 | see there? |
| 15:16:20 | 5 | A.    It's 8,557,177 that I referred to as the '177 |
| 15:16:27 | 6 | patent. |
| 15:16:27 | 7 | Q.    The '177 patent.  Is that a patent being asserted |
| 15:16:30 | 8 | by plaintiffs against MoJack d/b/a Scent Crusher? |
| 15:16:33 | 9 | A.    Correct. |
| 15:16:34 | 10 | Q.    And the asserted claims from the '177 patent are |
| 15:16:38 | 11 | 1, 2 and 4; is that correct? |
| 15:16:39 | 12 | A.    Correct. |
| 15:16:40 | 13 | Q.    And you reviewed the '177 patent for infringement |
| 15:16:44 | 14 | and invalidity; is that correct? |
| 15:16:46 | 15 | A.    Correct. |
| 15:16:53 | 16 | Q.    So if -- we have three different patents; correct? |
| 15:16:57 | 17 | And your understanding of patents, is it that they must |
| 15:17:02 | 18 | have different claims in them? |
| 15:17:04 | 19 | A.    Correct. |
| 15:17:05 | 20 | Q.    Is it your understanding that the asserted claims |
| 15:17:09 | 21 | are all different? |
| 15:17:11 | 22 | A.    Yes. |
| 15:17:15 | 23 | Q.    Do all of the asserted claims use the same words? |
| 15:17:20 | 24 | A.    Not exactly. |
| 15:17:23 | 25 | Q.    If you could turn to Exhibit 410, please, in your |

| | | |
|---|---|---|
| 15:17:26 | 1 | binder. |
| 15:17:27 | 2 | **A.        (The witness complies.)** |
| 15:17:35 | 3 | Q.        Do you recognize what is shown as Exhibit 410? |
| 15:17:38 | 4 | **A.        Yes.   It's the Field Lite.** |
| 15:17:41 | 5 | Q.        So you're saying that's the Scent Crusher Field |
| 15:17:44 | 6 | Lite? |
| 15:17:44 | 7 | **A.        I believe -- yes.** |
| 15:17:45 | 8 | Q.        And you indicated that you reviewed an actual |
| 15:17:49 | 9 | product, physical product, earlier this week; is that |
| 15:17:53 | 10 | correct? |
| 15:17:53 | 11 | **A.        I did.** |
| 15:17:53 | 12 | Q.        Is this an accurate representation of the product |
| 15:17:56 | 13 | you reviewed? |
| 15:17:57 | 14 | **A.        Yes.** |
| 15:17:59 | 15 | Q.        Turning to tab 411, please. |
| 15:18:03 | 16 | THE COURT:  Counsel, what are we doing?  I mean, |
| 15:18:07 | 17 | are you just laying evidentiary foundation for matters we |
| 15:18:09 | 18 | don't have a jury for?  I don't really understand what |
| 15:18:11 | 19 | we're doing here.  You're going through things that are |
| 15:18:13 | 20 | very obvious from the pleadings in the case.  What are we |
| 15:18:16 | 21 | actually establishing here that I don't already know? |
| 15:18:19 | 22 | MR. TUTTLE:  Understood, Your Honor.  I'll proceed |
| 15:18:21 | 23 | immediately to the patent claims and her assessment. |
| 15:18:23 | 24 | THE COURT:  Seeing as how I've already admonished |
| 15:18:26 | 25 | you that time it is of the essence, I would encourage you |

15:18:29   1   to make effective use of your time and not establish

15:18:32   2   things that are not really in dispute.

15:18:35   3   BY MR. TUTTLE:

15:18:35   4   Q.      Dr. Friis, if we could turn to the '015 patent,

15:18:39   5   please.  It's behind tab 403.

15:18:46   6   **A.      Okay.**

15:18:54   7   Q.      Turning your attention to claim 1, that's one of

15:18:57   8   the asserted claims; correct?

15:18:58   9   **A.      That's correct.**

15:18:59   10  Q.      In reviewing this claim, did you assess whether or

15:19:03   11  not all of the elements that are recited in this claim

15:19:05   12  are found in the Scent Crusher Field Lite and Field Pro

15:19:10   13  product?

15:19:10   14  **A.      In my opinion, the Scent Crusher products do not**

15:19:15   15  **meet the limitation, all the limitations, of this claim**

15:19:19   16  **1.**

15:19:20   17  Q.      So, for example, we've heard plenty of discussion

15:19:22   18  about the word a "stream."  Based on your analysis of

15:19:26   19  the physical products, do you believe that the accused

15:19:30   20  products generate a stream of ozone that is -- that is

15:19:36   21  being discharged from the ozone generator, as recited in

15:19:40   22  claim 1?

15:19:40   23  **A.      It could produce an initial stream of ozone.**

15:19:44   24  Q.      Further down in the claim it recites that "the

15:19:48   25  stream is being applied directly to the hunter."  Based

15:19:52   1   on your analysis of this product and the information

15:19:55   2   available in the pleadings, is it your belief that the

15:19:59   3   Scent Crusher product practices that limitation of the

15:20:02   4   claim?

15:20:03   5   **A.      No, it does not.**

15:20:05   6   Q.      That claim also recites the limitation

15:20:12   7   "eliminate."   It's at the top of column four.   Is it

15:20:14   8   your belief that that -- that the Scent Crusher products

15:20:18   9   practice that step of this claim, as recited in this

15:20:21   10   claim?

15:20:22   11   **A.      No, I don't believe it practices as recited in the**

15:20:25   12   **claim.**

15:20:26   13   Q.      Further, this claim states that "the ozone

15:20:30   14   eliminates human scent and other scent foreign to the

15:20:33   15   open atmosphere such that deodorizing air travels

15:20:37   16   downwind of the hunter."   Do you believe that all of

15:20:39   17   those steps are practiced by these accused products?

15:20:43   18   **A.      No, I do not.**

15:20:48   19   Q.      Claim 4 is one of the asserted claims in this

15:20:51   20   litigation.   Claim 4 is -- depends from claim 1; correct?

15:20:56   21   **A.      Correct.**

15:20:57   22   Q.      If you find that claim 1 is not infringed, would

15:21:00   23   you find that claim 4 is infringed?

15:21:02   24   **A.      No.**

15:21:05   25   Q.      There were no other asserted claims from the '015

| | | |
|---|---|---|
| 15:21:10 | 1 | patent; correct? |
| 15:21:10 | 2 | **A.      Correct.** |
| 15:21:14 | 3 | Q.      The '015 has two independent claims; correct? |
| 15:21:17 | 4 | **A.      Correct.** |
| 15:21:17 | 5 | Q.      One of them is claim 1 that's been asserted, the |
| 15:21:20 | 6 | other is claim 9 that has not been asserted? |
| 15:21:22 | 7 | **A.      Correct.** |
| 15:21:23 | 8 | Q.      We don't know if it's going to be asserted.  All |
| 15:21:25 | 9 | we have right now is it's at least. |
| 15:21:29 | 10 | Claim 9 has the limitation, portable oxidizing gas |
| 15:21:36 | 11 | generator generating oxidizing gas.  Do you believe that |
| 15:21:40 | 12 | the accused products generate oxidizing gas? |
| 15:21:43 | 13 | **A.      I do.** |
| 15:21:43 | 14 | Q.      Do you believe that they generate a stream of |
| 15:21:45 | 15 | oxidizing gas? |
| 15:21:46 | 16 | **A.      Initially, yes.** |
| 15:21:47 | 17 | Q.      Do you believe they generate a stream of oxidizing |
| 15:21:51 | 18 | gas that comes in direct contact with the hunter? |
| 15:21:54 | 19 | **A.      The stream does not come, in my opinion, in direct** |
| 15:21:57 | 20 | **contact with the hunter.** |
| 15:22:00 | 21 | Q.      The claim 9 also recites that the steps of this |
| 15:22:05 | 22 | method include that "the ozone eliminates human scent and |
| 15:22:08 | 23 | other scents foreign to the open atmosphere such that |
| 15:22:11 | 24 | deodorized air travels downwind of the hunter."  Do you |
| 15:22:15 | 25 | believe all of those limitations are met? |

| | | |
|---|---|---|
| 15:22:16 | 1 | **A.       It is highly unlikely that all of those** |
| 15:22:18 | 2 | **limitations are met.** |
| 15:22:23 | 3 | Q.       Turn your attention to the '180 patent.  I'm |
| 15:22:38 | 4 | sorry, let's look at '177 patent, please, that's behind |
| 15:22:41 | 5 | tab 405. |
| 15:23:00 | 6 |         Again, the asserted claims in the '177 patent to |
| 15:23:03 | 7 | date are claims 1, 2, 4; is that correct? |
| 15:23:07 | 8 | **A.       Correct.** |
| 15:23:08 | 9 | Q.       Looking at claim 1, do you believe the Scent |
| 15:23:11 | 10 | Crusher products meet all the limitations as recited in |
| 15:23:14 | 11 | that claim? |
| 15:23:14 | 12 | **A.       No, I do not.** |
| 15:23:15 | 13 | Q.       In particular, do you find that the -- do you find |
| 15:23:19 | 14 | that the Scent Crusher products have a portable oxidizing |
| 15:23:24 | 15 | gas generator that discharge a stream of oxidizing gas? |
| 15:23:28 | 16 | **A.       Initially, yes.** |
| 15:23:29 | 17 | Q.       Do you feel that the Scent Crusher products apply |
| 15:23:31 | 18 | this stream directly onto the hunter as recited by the |
| 15:23:36 | 19 | claim? |
| 15:23:36 | 20 | **A.       No, I do not.** |
| 15:23:37 | 21 | Q.       Do you feel that, as recited by the claim, the |
| 15:23:41 | 22 | Scent Crusher products also deodorize the hunter, the |
| 15:23:45 | 23 | hunting clothing, and the hunting equipment, as recited |
| 15:23:48 | 24 | by the claim? |
| 15:23:48 | 25 | **A.       It is highly unlikely that that is true.** |

| | | |
|---|---|---|
| 15:23:50 | 1 | Q.      Claim 2 is an independent claim; is that correct? |
| 15:23:55 | 2 | **A.      Independent?  Claim 2, no.** |
| 15:23:57 | 3 | Q.      Dependent claim, please. |
| 15:23:59 | 4 | **A.      It's dependent, yes.** |
| 15:24:00 | 5 | Q.      Claim 2 depends from claim one.  Because you don't |
| 15:24:04 | 6 | find claim 1 infringed do you find dependent claim 2 |
| 15:24:07 | 7 | infringed? |
| 15:24:07 | 8 | **A.      No.** |
| 15:24:08 | 9 | Q.      Turning to claim 4.  Claim 4 is a dependent claim; |
| 15:24:11 | 10 | is that correct? |
| 15:24:12 | 11 | **A.      I'm sorry, did you say "independent"?** |
| 15:24:14 | 12 | Q.      I'm sorry, claim 4 is a dependent claim; is that |
| 15:24:17 | 13 | correct? |
| 15:24:17 | 14 | **A.      That's correct.** |
| 15:24:17 | 15 | Q.      Claim 4 depends from claim 1; correct? |
| 15:24:19 | 16 | **A.      Correct.** |
| 15:24:20 | 17 | Q.      So since you don't find that claim 1 is infringed, |
| 15:24:22 | 18 | you don't find that claim 4 is infringed? |
| 15:24:25 | 19 | **A.      No.** |
| 15:24:26 | 20 | Q.      There are two other independent claims in the '177 |
| 15:24:28 | 21 | patent to date that have not been asserted.  That is |
| 15:24:31 | 22 | claim 7 and 12.  Looking at claim 7, do you feel that the |
| 15:24:35 | 23 | accused products, the Scent Crusher Field Lite and the |
| 15:24:39 | 24 | Field Pro, do you feel that they meet all the limitations |
| 15:24:42 | 25 | of that claim? |

| | | |
|---|---|---|
| 15:24:43 | 1 | **A.       No, in my opinion they do not.** |
| 15:24:45 | 2 | Q.      In particular, do you find that the accused |
| 15:24:51 | 3 | products discharge a stream of oxidizing gas? |
| 15:24:55 | 4 | **A.       Yes, they do, in my opinion.** |
| 15:24:56 | 5 | Q.      Do you find that the accused products when |
| 15:25:00 | 6 | operating in the field as recited by this claim deodorize |
| 15:25:03 | 7 | the objects? |
| 15:25:05 | 8 | **A.       I believe it's highly unlikely.** |
| 15:25:10 | 9 | Q.      Referring to claim 12, claim 12 is an independent |
| 15:25:13 | 10 | claim.  Claim 12 recites that a portable ozone generator |
| 15:25:24 | 11 | discharges a stream of ozone.  Do you believe the accused |
| 15:25:27 | 12 | products meet that limitation? |
| 15:25:29 | 13 | **A.       Yes.** |
| 15:25:31 | 14 | Q.      The claim also recites that to meet the method |
| 15:25:35 | 15 | steps that you have to apply the stream of ozone directly |
| 15:25:37 | 16 | onto the hunter and his equipment used by the hunter in |
| 15:25:40 | 17 | the field to eliminate human scent and other scents.  Do |
| 15:25:43 | 18 | you believe all those limitations are met by the accused |
| 15:25:46 | 19 | products? |
| 15:25:46 | 20 | **A.       No, I do not.** |
| 15:25:54 | 21 | Q.      Turning now to the '180 claim, please.  That was |
| 15:26:07 | 22 | tab 404.  To date the asserted claims of the '180 patent |
| 15:26:27 | 23 | are claims 1, 3, and 7; correct? |
| 15:26:31 | 24 | **A.       And 11.** |
| 15:26:32 | 25 | Q.      And 11, yes.  Claim 1 is an independent claim. |

| | | |
|---|---|---|
| 15:26:35 | 1 | Claim 1 recites and do you believe the Scent Crusher |
| 15:26:38 | 2 | products meet all the limitations of claim 1? |
| 15:26:40 | 3 | A.      No, I do not. |
| 15:26:42 | 4 | Q.      In particular, claim 1 recites "oxidizing gas into |
| 15:26:53 | 5 | the field to eliminate scents associated with the hunter |
| 15:26:57 | 6 | and air traveling downwind of the hunter toward game |
| 15:27:00 | 7 | animals in the field."  Do you believe the accused |
| 15:27:02 | 8 | products meet all of the limitations of that claim? |
| 15:27:04 | 9 | A.      No, it's highly unlikely. |
| 15:27:07 | 10 | Q.      Claim 3 depends from claim 1; correct? |
| 15:27:09 | 11 | A.      Correct. |
| 15:27:10 | 12 | Q.      Because you don't believe that claim 1 is |
| 15:27:12 | 13 | infringed, do you believe that claim 3 is infringed? |
| 15:27:14 | 14 | A.      No, I do not. |
| 15:27:15 | 15 | Q.      Claim 7 is an independent claim that recites "a |
| 15:27:21 | 16 | stream of oxidizing gas eliminates scents associated with |
| 15:27:25 | 17 | the hunter in air traveling downwind of the hunter."  Do |
| 15:27:28 | 18 | you believe the accused products meet all the limitations |
| 15:27:30 | 19 | of that claim? |
| 15:27:31 | 20 | A.      No, I do not. |
| 15:27:32 | 21 | Q.      Claim 1 is a dependent claim from claim 7; is that |
| 15:27:35 | 22 | correct? |
| 15:27:35 | 23 | A.      That's correct. |
| 15:27:38 | 24 | Q.      Because claim 11 -- because claim 7 is not |
| 15:27:42 | 25 | infringed, do you believe claim 11 is infringed? |

15:27:44  1  **A.       No, I do not.**

15:27:46  2  Q.    Claim 18 is the remaining independent claim in the

15:27:51  3  '180 patent.  Do you believe the accused products meet

15:27:53  4  all the limitations of that claim?

15:27:56  5  **A.       No, I do not.**

15:27:57  6  Q.    In particular, do you believe that the accused

15:28:01  7  products have oxidizing gas that generates its discharge

15:28:06  8  into the field and eliminates scents associated with the

15:28:09  9  hunter in traveling downwind of the hunter toward the

15:28:12  10  game animals?

15:28:12  11  **A.       I think it's highly unlikely.**

15:28:25  12  Q.    We just walked through at least the asserted

15:28:28  13  claims and the independent claims.  You analyzed the

15:28:34  14  accused products yourself; correct?

15:28:34  15  **A.       Correct.**

15:28:37  16  Q.    And based on your analysis of these products, you

15:28:40  17  don't believe that it's likely that they infringe the

15:28:44  18  asserted claims in this case?

15:28:47  19  **A.       No, I do not.**

15:29:03  20  Q.    When assessing infringement, we have to determine

15:29:06  21  whether or not claims are infringed directly and

15:29:09  22  indirectly; correct?

15:29:10  23  **A.       Correct.**

15:29:10  24  Q.    So based on your analysis of -- these accused

15:29:14  25  products don't directly infringe these claims?

| | | |
|---|---|---|
| 15:29:14 | 1 | **A.        Correct.** |
| 15:29:16 | 2 | Q.      And, therefore, they don't indirectly infringe |
| 15:29:19 | 3 | because they do not directly infringe? |
| 15:29:21 | 4 | **A.        Correct.** |
| 15:29:23 | 5 | Q.      Do you feel that there's anything that these -- |
| 15:29:26 | 6 | any features that the accused products possess that are |
| 15:29:31 | 7 | equivalent to any of the claimed features in the asserted |
| 15:29:34 | 8 | claims in this case? |
| 15:29:35 | 9 | **A.        No, not of the claimed features of the** |
| 15:29:39 | 10 | **patents-in-suit.** |
| 15:29:42 | 11 | Q.      Is there any particular -- other than there's a |
| 15:29:48 | 12 | multiple many features of the recited claims, is there |
| 15:29:52 | 13 | any other basis that you would give for believing that |
| 15:29:54 | 14 | the accused products do not infringe the claims? |
| 15:29:58 | 15 | **A.        Other than common sense?  No.** |
| 15:30:05 | 16 | Q.      Returning briefly to some of the words that we've |
| 15:30:08 | 17 | been dealing with or addressing today, one of the words |
| 15:30:11 | 18 | in the claim is "eliminate."   Is that word defined |
| 15:30:14 | 19 | anywhere in the patent? |
| 15:30:16 | 20 | **A.        It is not.** |
| 15:30:17 | 21 | Q.      So you determine what that word means based on |
| 15:30:21 | 22 | your common and ordinary understanding of the meaning of |
| 15:30:23 | 23 | that word? |
| 15:30:24 | 24 | **A.        That's correct.  And also looking at several of** |
| 15:30:27 | 25 | **the other prior art patents, they say "eliminate or** |

15:30:30   1   reduce," not just "eliminate."  And I could not find the

15:30:33   2   word "reduce" anywhere in the patents-in-suit.

15:30:37   3   Q.     Do you view the word "eliminate" as an absolute

15:30:39   4   term?

15:30:39   5   A.     Absolutely.

15:30:41   6   Q.     And you understand that when a patent applicant

15:30:45   7   drafts patent claims, they choose what words go into that

15:30:48   8   claim?

15:30:49   9   A.     I myself, going through three patents in the

15:30:52   10  process right now, it's very important to choose your

15:30:54   11  words wisely.

15:30:55   12  Q.     So do I take that to mean that every word has --

15:30:59   13  is very important and every word matters?

15:31:01   14  A.     Yes.

15:31:09   15  Q.     Some of the claims that we addressed deal with the

15:31:13   16  word "deodorize."  Is that word defined in the patent?

15:31:17   17  A.     No, to the best of my knowledge, it is not.

15:31:21   18  Q.     Is "deodorize" an absolute term?

15:31:27   19  A.     Yes.

15:31:28   20  Q.     Is "deodorize" different than "scent reduction"?

15:31:31   21  A.     Yes.

15:31:33   22  Q.     So all the patent -- all the asserted claims in

15:31:37   23  this case have words that the patentee chose to put in

15:31:42   24  the claim and have specific understood meaning and are

15:31:45   25  not otherwise defined?

| | | |
|---|---|---|
| 15:31:46 | 1 | A.      Yes. |
| 15:32:01 | 2 | Q.      So we briefly touched on the index or the exhibit |
| 15:32:05 | 3 | list to your declaration for -- that's Exhibit 400, |
| 15:32:14 | 4 | page 3 of 138.  So, again, you reviewed all of those |
| 15:32:20 | 5 | items on that list, correct, including the prosecution |
| 15:32:24 | 6 | history for the '015 patent? |
| 15:32:26 | 7 | A.      Correct. |
| 15:32:33 | 8 | Q.      From your review of that prosecution history, did |
| 15:32:35 | 9 | they remove any limitations associated with the notion of |
| 15:32:38 | 10 | volume from the originally filed claims? |
| 15:32:41 | 11 | A.      That is correct. |
| 15:32:45 | 12 | Q.      As we just walked through these claims in part, |
| 15:32:49 | 13 | but from your review of these claims, has the word |
| 15:32:51 | 14 | "volume" reappeared in any of these independent claims? |
| 15:32:55 | 15 | A.      No, not to the best of my knowledge. |
| 15:32:57 | 16 | Q.      So not -- the word "volume" does not appear |
| 15:33:00 | 17 | anywhere in the claims of the '015 patent; correct? |
| 15:33:04 | 18 | A.      To the best of my knowledge, no. |
| 15:33:06 | 19 | Q.      Or the '180 patent? |
| 15:33:08 | 20 | A.      Correct. |
| 15:33:08 | 21 | Q.      Or the '177 patent? |
| 15:33:10 | 22 | A.      Correct. |
| 15:33:15 | 23 | Q.      And in your view, do the accused products, the |
| 15:33:20 | 24 | Scent Crusher Field Lite and Field Pro, do they generate |
| 15:33:22 | 25 | a volume of ozone? |

| | | |
|---|---|---|
| 15:33:25 | 1 | A.      Well, volume is relative to how ozone is diffused |
| 15:33:32 | 2 | through the open atmosphere, so the volume is |
| 15:33:37 | 3 | instantaneous, constantly changing. |
| 15:33:43 | 4 | Q.    So in view of that, the accused products do |
| 15:33:47 | 5 | generate a volume, is that the same as what's a stream |
| 15:33:50 | 6 | that's recited by the asserted claims? |
| 15:33:52 | 7 | A.      You can look at it from an initial point of view. |
| 15:33:55 | 8 | There is a stream coming out associated with an initial |
| 15:33:58 | 9 | volume, but those both -- the stream is eliminated over |
| 15:34:02 | 10 | time as the force doesn't move the molecules anymore. |
| 15:34:06 | 11 | But the volume expands over time; it changes. |
| 15:34:14 | 12 | Q.    For example, some of the claims recite applying a |
| 15:34:17 | 13 | stream of volume directly onto the hunter. |
| 15:34:19 | 14 | A.      Uh-huh. |
| 15:34:19 | 15 | Q.    Do you believe, in using the accused products in |
| 15:34:24 | 16 | the field as they are intended, would they, in fact, |
| 15:34:29 | 17 | apply a stream of oxidizing gas or ozone directly on the |
| 15:34:38 | 18 | hunter? |
| 15:34:39 | 19 | A.      From what I examined of the Scent Crusher |
| 15:34:43 | 20 | products, the force at which a stream is initially |
| 15:34:46 | 21 | created would not be enough to actually reach the hunter |
| 15:34:50 | 22 | directly.  It would be through diffusion and then the air |
| 15:34:54 | 23 | carrying whatever was present.  And air, as you know, |
| 15:34:59 | 24 | especially in Kansas, is constantly changing with the |
| 15:35:03 | 25 | wind, so the stream does not directly apply to the |

15:35:06   1   hunter.

15:35:12   2   Q.    So you indicated that the accused products may

15:35:14   3   generate a stream.  It sounds like it is not during the

15:35:21   4   entire operation of the device; is that correct?

15:35:23   5   A.    **It would be -- in the initial operation there**

15:35:27   6   **would be forced air coming out that would also have an**

15:35:32   7   **initial volume.  But, again, that volume is what's really**

15:35:35   8   **important, is how it goes out and then changes.**

15:35:39   9   Q.    So you indicated that the products, when they

15:35:41   10  generate ozone or oxidizing gas, it diffuses; correct?

15:35:46   11  A.    **Correct.**

15:35:47   12  Q.    At what point do you feel that it diffuses?  Is it

15:35:50   13  diffused when it's within the device or when it's outside

15:35:54   14  the device?

15:35:54   15  A.    **Diffusion would start instantaneously as it exited**

15:35:59   16  **the device.**

15:36:19   17  Q.    We had some examination with respect to the

15:36:23   18  prosecution history of one of the asserted patents.  That

15:36:27   19  prosecution history was highlighted because what it did

15:36:31   20  is it attempted to frame what would be considered someone

15:36:35   21  of ordinary skill in the art in this technology area; is

15:36:38   22  that correct?

15:36:38   23  A.    **Correct.**

15:36:40   24  Q.    Did that language in the prosecution history say

15:36:45   25  that is what a person of the ordinary skill in the art in

| | | |
|---|---|---|
| 15:36:47 | 1 | this technology area is? |
| 15:36:49 | 2 | **A.     Could you repeat that, please?** |
| 15:36:52 | 3 | Q.     The language in the prosecution history which |
| 15:36:56 | 4 | identifies the field of understanding of these |
| 15:37:02 | 5 | inventions, did it specifically say that that described a |
| 15:37:06 | 6 | person of ordinary skill in the art of this technology? |
| 15:37:10 | 7 | **A.     Not -- it described people who used the** |
| 15:37:13 | 8 | **technology.** |
| 15:37:14 | 9 | Q.     So it's more, in your interpretation, a |
| 15:37:17 | 10 | description of the type of people that would use the |
| 15:37:20 | 11 | technology or be familiar with the technology? |
| 15:37:22 | 12 | **A.     Correct.  Engineers or people with technical** |
| 15:37:25 | 13 | **background would be the ones to develop and apply the** |
| 15:37:28 | 14 | **technology.** |
| 15:37:28 | 15 | Q.     I believe, in your declaration, when you addressed |
| 15:37:33 | 16 | the level of ordinary skill in the art, you indicated |
| 15:37:36 | 17 | that it was not high; is that correct? |
| 15:37:38 | 18 | **A.     Correct.** |
| 15:37:39 | 19 | Q.     And you indicated that you're familiar with |
| 15:37:42 | 20 | hunting, you're familiar with ozone; correct? |
| 15:37:44 | 21 | **A.     Correct.** |
| 15:37:44 | 22 | Q.     And so do you feel that you're a person of |
| 15:37:47 | 23 | ordinary skill in the art in this technology area? |
| 15:37:50 | 24 | **A.     Yes.** |
| 15:37:54 | 25 | Q.     Even though the prosecution history identified |

| | | |
|---|---|---|
| 15:37:56 | 1 | sort of the subject matter, the area that these patents |
| 15:37:59 | 2 | are in, is that the only way to describe how -- what type |
| 15:38:05 | 3 | of person or what their characteristics would be in order |
| 15:38:08 | 4 | for them to understand the subject matter of the patents? |
| 15:38:13 | 5 | **A.    Could you repeat that, please?** |
| 15:38:17 | 6 | Q.    The phrase in the prosecution history indicated |
| 15:38:22 | 7 | that the area of the technology was hunters and people |
| 15:38:26 | 8 | who go hunting and use hunting equipment and use |
| 15:38:29 | 9 | scent-elimination equipment, I believe.  Is this -- is it |
| 15:38:33 | 10 | your belief that that's the only types of people that |
| 15:38:36 | 11 | could have an understanding of this technology? |
| 15:38:37 | 12 | **A.    Absolutely not.  Common understanding of the** |
| 15:38:41 | 13 | **practice would be sufficient.** |
| 15:38:51 | 14 | Q.    At one -- so we had -- it's been established that |
| 15:38:54 | 15 | both plaintiffs and defendants don't view that any of the |
| 15:39:00 | 16 | words have any special meaning or need to be construed at |
| 15:39:03 | 17 | this point; correct? |
| 15:39:04 | 18 | **A.    That's my understanding.** |
| 15:39:05 | 19 | Q.    And so you analyze certain words based on the |
| 15:39:09 | 20 | context in which they reside, and that is the claim and |
| 15:39:13 | 21 | the patent; correct? |
| 15:39:13 | 22 | **A.    Correct.** |
| 15:39:14 | 23 | Q.    And that's called "intrinsic evidence"; correct? |
| 15:39:18 | 24 | **A.    Correct.** |
| 15:39:19 | 25 | Q.    And so when it's not understood, to a person of |

| | | |
|---|---|---|
| 15:39:21 | 1 | ordinary skill in the art, what a word might mean from |
| 15:39:24 | 2 | the context of the patent, et cetera, is it appropriate |
| 15:39:28 | 3 | to go look at other references to determine what the word |
| 15:39:30 | 4 | means? |
| 15:39:31 | 5 | A.    My understanding is that it's up to the judge to |
| 15:39:33 | 6 | construe what the meaning is ultimately. |
| 15:39:39 | 7 | Q.    You represented the meaning of the word "stream" |
| 15:39:42 | 8 | that came from the dictionary, you indicated that volume |
| 15:39:49 | 9 | might be at play in interpreting these claims.  Do you |
| 15:39:53 | 10 | have a different interpretation of the word "stream" than |
| 15:39:56 | 11 | what was reflected in the Webster's Dictionary |
| 15:39:59 | 12 | definition? |
| 15:39:59 | 13 | A.    The dictionary definition does fit what I believe |
| 15:40:03 | 14 | to be a stream.  But it's a forced flow in the direction |
| 15:40:08 | 15 | of the force of the gas or the water.  So -- and it has |
| 15:40:14 | 16 | limited capacity to flow according to that force that's |
| 15:40:17 | 17 | provided. |
| 15:40:26 | 18 | You could think of it as water coming out of a |
| 15:40:28 | 19 | water hose.  The stream only lasts for so long and then |
| 15:40:32 | 20 | it's a puddle. |
| 15:40:35 | 21 | Q.    So, again, just to summarize, you've analyzed the |
| 15:40:38 | 22 | accused products, the asserted claims, and your |
| 15:40:41 | 23 | conclusions with respect to infringement of the asserted |
| 15:40:44 | 24 | claims is that the accused products don't meet all the |
| 15:40:46 | 25 | limitations of the asserted claims; is that correct? |

| | | |
|---|---|---|
| 15:40:49 | 1 | A.      That's correct. |
| 15:40:54 | 2 | Q.      You also indicated that you were asked to make a |
| 15:40:58 | 3 | determination on whether or not these patents were valid; |
| 15:41:01 | 4 | correct? |
| 15:41:01 | 5 | A.      Correct. |
| 15:41:01 | 6 | Q.      So you saw during direct examination we |
| 15:41:05 | 7 | highlighted some of the references you referred to; |
| 15:41:07 | 8 | right?  One of those was by the inventor named Stec? |
| 15:41:11 | 9 | A.      That's correct. |
| 15:41:11 | 10 | Q.      One was the inventor named Hess, one was by an |
| 15:41:15 | 11 | inventor named Dawson; correct? |
| 15:41:15 | 12 | A.      Correct. |
| 15:41:18 | 13 | Q.      And of those three references, only Dawson was not |
| 15:41:21 | 14 | before the patent examiner -- |
| 15:41:22 | 15 | A.      Correct. |
| 15:41:23 | 16 | Q.      -- when they examined these claims? |
| 15:41:27 | 17 | A.      (Nods head.) |
| 15:41:36 | 18 | Q.      So let's walk through briefly your understanding |
| 15:41:39 | 19 | of the reference to Stec. |
| 15:41:41 | 20 | A.      So Stec teaches about use of ozone in several |
| 15:41:50 | 21 | different embodiments.  The first was in a closet where |
| 15:41:53 | 22 | there's directed flow at clothes hanging in the closet, |
| 15:41:57 | 23 | so hunter's clothes, hunters' equipment, and such that |
| 15:42:02 | 24 | could be transported anywhere. |
| 15:42:04 | 25 |         Stec also teaches an embodiment where there's a |

15:42:08  1  room that the hunter can walk through where there's ozone

15:42:11  2  directly flowing from the generator onto the hunter as he

15:42:17  3  passes into that room, or as he goes out of that room, so

15:42:20  4  the door would be open to the atmosphere.

15:42:23  5      Stec then also goes on to teach a very interesting

15:42:26  6  embodiment.  It's a suitcase where the hunter would put

15:42:30  7  the hunter's clothes and equipment and plug it into a

15:42:34  8  cigarette lighter, which obviously would imply

15:42:36  9  transportation in a pickup, and then transport it to the

15:42:40  10  field.  And there as, again, it would be as a suitcase is

15:42:47  11  opened, it would be open to the atmosphere and the rush

15:42:50  12  of ozone would flow directly onto the hunter in the

15:42:54  13  field.

15:42:56  14  Q.    So you were shown figure 1 of Stec; correct?

15:43:01  15  A.    Correct.

15:43:01  16  Q.    And so that was just an embodiment of what the

15:43:06  17  technology is and how it can be used disclosed by Stec;

15:43:09  18  correct?

15:43:09  19  A.    Correct.

15:43:12  20      MR. TUTTLE:  May I have the ELMO on, please.

15:43:17  21  BY MR. TUTTLE:

15:43:18  22  Q.    Referring to Exhibit 408, what I'm showing here is

15:43:25  23  fig. 3 from Stec.

15:43:29  24      Is this the part -- some of the information you

15:43:32  25  considered when you were reviewing and interpreting Stec?

| | | |
|---|---|---|
| 15:43:35 | 1 | A.      Yes. |
| 15:43:37 | 2 | Q.      And so when you interpreted Stec to have an ozone |
| 15:43:40 | 3 | generator, do you see that in this imagine? |
| 15:43:43 | 4 | A.      Yes. |
| 15:43:43 | 5 | Q.      When you interpreted Stec to disclose that |
| 15:43:47 | 6 | items -- hunting items in a room could be -- interact |
| 15:43:53 | 7 | with ozone, do you see those in this image? |
| 15:43:56 | 8 | A.      Yes.   Item 70 is an example. |
| 15:43:58 | 9 | Q.      Item 70 would be an example of clothing.  And then |
| 15:44:02 | 10 | Stec discloses that you can open a door; right?  Is that |
| 15:44:05 | 11 | what is referred to by your reference No. 54? |
| 15:44:09 | 12 | A.      Yes. |
| 15:44:11 | 13 | Q.      And so throughout the rest of Stec there's some |
| 15:44:15 | 14 | words that you read and those are the ones that give you |
| 15:44:19 | 15 | an understanding of what you just previously summarized? |
| 15:44:22 | 16 | A.      That's correct. |
| 15:44:36 | 17 | Q.      So you also reviewed the reference Hess; correct? |
| 15:44:38 | 18 | A.      Correct. |
| 15:44:39 | 19 | Q.      Could you give us a summary of your understanding |
| 15:44:41 | 20 | of what you learned from Hess. |
| 15:44:43 | 21 | A.      So Hess, again, had several embodiments.  The |
| 15:44:46 | 22 | first embodiment shown was a hunter in a blind that could |
| 15:44:51 | 23 | be enclosed or it can have the top and bottom open, as |
| 15:44:56 | 24 | one of the variations of that embodiment.  And it had a |
| 15:44:59 | 25 | carbon filter with a fan at the bottom that drew air from |

15:45:01  1  the top down over the hunter and then through the carbon

15:45:04  2  filter, to pass it out as cleaned air.

15:45:07  3       Hess also had a statement in there of a different

15:45:11  4  embodiment, that it could be used with ozone gas

15:45:15  5  generated from ultraviolet light.  And it specifically

15:45:19  6  says that it could be used in addition to or replace the

15:45:24  7  carbon filter.  And one of the other embodiments was to

15:45:29  8  leave the top and the bottom of the blind open, and the

15:45:32  9  filter could be on the side.  The filter and the fan

15:45:35  10 could be on the side of the blind as well.

15:45:38  11 Q.    And we agree that Stec and Hess were already

15:45:44  12 before the patent office when they went through an

15:45:47  13 examination of these asserted patents; correct?

15:45:49  14 A.    Correct.

15:45:49  15 Q.    And they went through a lengthy analysis and

15:45:52  16 examination of the claims in Stec and Hess; correct?

15:45:57  17 A.    Patent histories are a lot to read.

15:45:59  18 Q.    Right.  So these references disclose what they

15:46:03  19 disclose; correct?

15:46:04  20 A.    Correct.

15:46:07  21 Q.    And then in our limited time, we were -- we

15:46:11  22 identified and you analyzed and you selected Dawson as a

15:46:17  23 third reference in your analysis of obviousness; correct?

15:46:22  24 A.    Correct.

15:46:23  25 Q.    Could you give us a summary of what you learned

15:46:26   1   from Dawson.

15:46:27   2   **A.       Dawson shows a very nice picture of a hunter and**

15:46:32   3   **the game, and in between is -- in the picture is an**

15:46:35   4   **incense stick that's burning.   So it teaches that you can**

15:46:40   5   **have the masking agent go downwind from the hunter, that**

15:46:46   6   **the game won't then smell the hunter's odor because it's**

15:46:50   7   **being masked.**

15:46:52   8   Q.       So referring briefly to Exhibit 406, that is the

15:47:00   9   Dawson reference.   And if you turn to sheet 1 of 2 of the

15:47:32   10   patent, is that the figure that you were talking about,

15:47:34   11   the figure 1?

15:47:35   12   **A.       Yes.**

15:47:35   13   Q.       And you indicated that figure 1 shows a field;

15:47:40   14   correct?

15:47:41   15   **A.       Correct.**

15:47:41   16   Q.       And what else did figure 1 show?

15:47:43   17   **A.       Figure 1 shows the hunter and the game, so 60 and**

15:47:50   18   **12 in the figure.   And then it shows the scent, as**

15:47:56   19   **represented by squiggly lines going out from the incense**

15:48:00   20   **downwind to the game.**

15:48:03   21   Q.       So in your review of Dawson, what did it teach

15:48:08   22   you, if you haven't already summarized?

15:48:10   23   **A.       It taught that human scent could be masked**

15:48:13   24   **downwind from the hunter to the game, and that's the key**

15:48:16   25   **element there.**

15:48:20   1   Q.      So with respect to these three references, why did

15:48:24   2   you feel like someone of ordinary skill in the art could

15:48:28   3   look at these references and arrive at the claimed

15:48:34   4   inventions in this case?

15:48:35   5   A.      So it's common sense that if you can mask odors,

15:48:38   6   then you can control them as well, and you can control

15:48:41   7   them downwind of the hunter.  So, for example, in Stec it

15:48:46   8   would be happening in the field, particularly in the case

15:48:49   9   with the suitcase in the back of the pickup, that a

15:48:53   10  hunter would be there.  I know my father talked about

15:48:56   11  being out in the field in our river bottom lands and

15:48:59   12  seeing deer as he got out, get his rifle.  So that would

15:49:03   13  be in the field, during the act of hunting, that the

15:49:07   14  clothes would be descented and the hunter would be

15:49:11   15  exposed.

15:49:11   16          Hess, it's an open atmosphere.  It's not totally

15:49:15   17  enclosed in any of it.  And it does teach of bringing

15:49:21   18  cleaned air or deodorized air away.  So in combination

15:49:26   19  then with Dawson of downwind from the hunter, it would be

15:49:30   20  common sense to use those three.

15:49:33   21  Q.      So although there weren't any expressed teachings

15:49:37   22  as addressed on direct that you would take the prior --

15:49:43   23  already examined by the patent office and do what the

15:49:50   24  invention claims, in your view of the prior art that you

15:49:53   25  addressed in the short amount of time, you feel that it's

| 15:49:58 | 1 | likely that these claims are invalid? |
| 15:50:00 | 2 | A.      That is my opinion, yes. |
| 15:50:10 | 3 | Q.      And, briefly, you indicated that you're in the |
| 15:50:12 | 4 | process of obtaining your own patents; is that correct? |
| 15:50:14 | 5 | A.      That's correct. |
| 15:50:14 | 6 | Q.      Approximately how many issued patents does that |
| 15:50:18 | 7 | involve? |
| 15:50:18 | 8 | A.      I think three issued patents and then a |
| 15:50:23 | 9 | provisional in process and then two others in different |
| 15:50:27 | 10 | stages. |
| 15:50:27 | 11 | Q.      So in this patent examination process, do you have |
| 15:50:31 | 12 | a lot of contact -- do you have any contact with the |
| 15:50:33 | 13 | patent examiner?  I'm sorry, with the patent counsel? |
| 15:50:37 | 14 | A.      Yes, we do.  In fact, I just got a final motion |
| 15:50:41 | 15 | the other day I need to read. |
| 15:51:07 | 16 | Q.      So, again, to summarize, what is your opinion with |
| 15:51:10 | 17 | respect to the validity, the validity of the |
| 15:51:15 | 18 | patents-in-suit? |
| 15:51:16 | 19 | A.      From my analysis, I don't believe -- I think the |
| 15:51:22 | 20 | prior art shows that the patents-in-suit would be found |
| 15:51:27 | 21 | invalid eventually. |
| 15:51:29 | 22 | Q.      Is that based on at least the prior art you've had |
| 15:51:34 | 23 | time to review to date? |
| 15:51:35 | 24 | A.      That's correct. |
| 15:51:37 | 25 |         MR. TUTTLE:  No further questions, Your Honor. |

| | | |
|---|---|---|
| 15:51:39 | 1 | THE COURT:  Redirect? |
| 15:51:59 | 2 | REDIRECT EXAMINATION |
| 15:51:59 | 3 | BY MR. MILLER: |
| 15:52:00 | 4 | Q.    Dr. Friis, two quick points.  I'm kind of |
| 15:52:05 | 5 | confused.  So if we can get to Friis 127, paragraph 154. |
| 15:52:12 | 6 | MR. MILLER:  Let's highlight this right here |
| 15:52:14 | 7 | (indicating). |
| 15:52:14 | 8 | BY MR. MILLER: |
| 15:52:17 | 9 | Q.    In your declaration you state right here that |
| 15:52:21 | 10 | there's no evidence that the Scent Crusher products |
| 15:52:23 | 11 | deodorize the hunter -- |
| 15:52:28 | 12 | MR. MILLER:  No, up here, sorry. |
| 15:52:28 | 13 | BY MR. MILER: |
| 15:52:30 | 14 | Q.    You say, "There is no information indicating the |
| 15:52:34 | 15 | Scent Crusher products also discharge a stream of ozone." |
| 15:52:38 | 16 | Do you see that? |
| 15:52:39 | 17 | **A.    I do.** |
| 15:52:40 | 18 | Q.    Okay.  And so today I think your opinion has |
| 15:52:43 | 19 | changed because you've admitted they discharge a stream, |
| 15:52:46 | 20 | and now your position is, after the stream is discharged, |
| 15:52:52 | 21 | at some point between there and when it falls -- when the |
| 15:52:54 | 22 | ozone falls onto the hunter, it changes into something |
| 15:52:57 | 23 | that's not a stream; right? |
| 15:53:01 | 24 | **A.    It is an initial stream.  And that I -- a mistake.** |
| 15:53:06 | 25 | **I should have put "an initial stream of ozone," along** |

15:53:08    1   with the "initial volume of ozone" that's in the next

15:53:11    2   line down.

15:53:11    3   Q.      Okay.  So you never described in your declaration

15:53:16    4   the concept of how it's initially discharged as a stream

15:53:21    5   and then somehow it changes and it's no longer a stream

15:53:24    6   when it's applied to the hunter?  You didn't describe

15:53:26    7   that in your declaration; right?

15:53:30    8   A.      I am not sure at this point.  We did things in

15:53:33    9   such a hurry that that was initial -- obviously my

15:53:38   10   intent.  I'm not sure it made it all into this

15:53:40   11   declaration.

15:53:40   12   Q.      Okay.  Now, you said a couple times that when you

15:53:47   13   were asked about the claim limitations about deodorizing

15:53:50   14   or eliminating scent, you said it's highly unlikely that

15:53:53   15   they practiced that.  Is that your testimony?

15:53:55   16   A.      To eliminate.

15:53:56   17   Q.      Okay.  So based on your testimony earlier about

15:54:01   18   how unlikely it is to actually achieve 100 percent odor

15:54:07   19   elimination, that means, in your opinion, it's highly

15:54:11   20   unlikely that anybody could ever practice these claims?

15:54:16   21   A.      Correct.

15:54:16   22   Q.      Okay.  So it's highly unlikely that Ozonics'

15:54:20   23   products practice these claims?

15:54:22   24   A.      Correct.

15:54:22   25   Q.      And it's highly unlikely that the embodiments

15:54:25   1   described in the specification actually practice the

15:54:28   2   claims?

15:54:29   3   **A.       That's what happens when you have patent issues.**

15:54:35   4   **I am experiencing that right now with one of my current**

15:54:39   5   **patents in our final office return.   Correct.**

15:54:44   6   Q.      Okay.

15:54:44   7           MR. MILLER:   No further questions, Your Honor.

15:54:47   8           THE COURT:   Any follow-up?

15:54:53   9                       RECROSS-EXAMINATION

15:54:53   10   BY MR. TUTTLE:

15:54:58   11   Q.      Again, with respect to the recited element, a

15:55:02   12   stream, you indicated when you clarified your testimony

15:55:07   13   today that it will be a stream until it exits the accused

15:55:12   14   products; is that correct?

15:55:12   15   **A.       It'll be a stream as it exits, then immediately**

15:55:16   16   **diffusion will start.   The stream will then dissipate,**

15:55:20   17   **and it will become a volume as it goes out.**

15:55:22   18   Q.      So this, therefore -- this stream, therefore,

15:55:27   19   cannot end up coming into contact directly with the

15:55:32   20   hunter?

15:55:33   21   **A.       100 percent the volume of the stream cannot be in**

15:55:37   22   **direct -- be directly applied onto the hunter.**

15:55:41   23   Q.      And, again, in your analysis and the evaluation of

15:55:46   24   the accused products and reviewing the claims as recited,

15:55:49   25   they recite that the ozone or oxidizing gas comes in

15:55:54  1  contact with the hunter, the clothing, and the equipment.

15:56:00  2  Is it your belief or understanding that all those

15:56:03  3  limitations would be met by the accused products?

15:56:06  4  **A.      Well, unless they have, for a 6-foot hunter, a**

15:56:11  5  **6-foot exit portal, a stream, and the hunter standing**

15:56:15  6  **with a high-volume flow, high rate of flow out, on a**

15:56:24  7  **360-degree aspect of the hunter and his equipment, no.**

15:56:29  8  **And also, to completely eliminate scent from a human**

15:56:34  9  **being by just passing ozone would be very -- it would not**

15:56:40  10  **be reasonable.**

15:56:42  11  Q.     And, again, we touched on infringement of a claim

15:56:45  12  and that in order to infringe that claim every element of

15:56:48  13  that claim must be met by the accused product or the

15:56:51  14  accused process; is that correct?

15:56:52  15  **A.      Correct.**

15:56:55  16  Q.     We've discussed a little bit about the word

15:56:57  17  "eliminate" again and "deodorize."  Those are absolute

15:57:01  18  terms; correct?

15:57:02  19  **A.      Yes.**

15:57:02  20  Q.     So all those are absolute terms in the context of

15:57:05  21  this patent claim.  Is it your belief that the accused

15:57:08  22  products don't accomplish that step in the recited

15:57:15  23  claims?

15:57:15  24  **A.      It is my belief.**

15:57:16  25          MR. TUTTLE:  No further questions, Your Honor.

| | | |
|---|---|---|
| 15:57:17 | 1 | THE COURT:  May this witness be excused? |
| 15:57:21 | 2 | MR. MILLER:  Yes, Your Honor. |
| 15:57:22 | 3 | THE COURT:  You're free to go. |
| 15:57:23 | 4 | THE WITNESS:  Thank you. |
| 15:57:24 | 5 | THE COURT:  Thank you. |
| 15:57:25 | 6 | (Witness excused from the witness stand.) |
| 15:57:25 | 7 | THE COURT:  You may call your next witness. |
| 15:57:27 | 8 | MR. FOSTER:  In view of the Court's instructions, |
| 15:57:30 | 9 | we are going to rest, rely on the declarations that have |
| 15:57:34 | 10 | been presented to the Court.  We have no new ground to |
| 15:57:38 | 11 | cover, and we'll turn it over to -- |
| 15:57:42 | 12 | THE COURT:  All right.  Mr. Weems, anything from |
| 15:57:44 | 13 | defense? |
| 15:57:44 | 14 | MR. WEEMS:  Your Honor, the declarations were not |
| 15:57:46 | 15 | actually admitted into evidence today, and in my view |
| 15:57:48 | 16 | there are various portions of them that are subject to |
| 15:57:51 | 17 | various evidentiary issues.  For example, they may |
| 15:57:56 | 18 | contain hearsay, they may contain speculation, they may |
| 15:57:59 | 19 | contain a whole host of information that is not -- I |
| 15:58:01 | 20 | mean, so my belief is that they're not in evidence and |
| 15:58:04 | 21 | it's not appropriate for the plaintiff just wholesale to |
| 15:58:06 | 22 | say, "We're relying on these declarations." |
| 15:58:08 | 23 | THE COURT:  Are these evidentiary concerns |
| 15:58:10 | 24 | pertinent with respect to the injunction hearing, which |
| 15:58:13 | 25 | is all we're really here for? |

15:58:16   1        MR. WEEMS:  Well, for example, one of the -- one

15:58:18   2   of the declarations that was provided is Charles Piland.

15:58:23   3   His -- the sole value of the declaration that I can see

15:58:28   4   is hearsay and speculation.  There is an embedded text

15:58:32   5   message which the declarant and somebody else who works

15:58:35   6   for a retailer and there's a little text message.  That

15:58:39   7   text message was supported or provided by the plaintiff

15:58:41   8   in support of their motion for preliminary injunction.

15:58:44   9   That text message, I think, is hearsay and speculation by

15:58:47  10   the person who is texting back and forth with Mr. Piland.

15:58:51  11   He's actually identified, but there are other text

15:58:54  12   messages in other declarations where sometimes you don't

15:58:56  13   even know who is sending the text back and forth.

15:58:59  14        So for the plaintiff simply to say, "We're relying

15:59:02  15   on everything in every declaration," without identifying

15:59:05  16   what they're relying upon to support the motion, I think,

15:59:09  17   then does not give us the opportunity to lodge whatever

15:59:12  18   objections we have to the parts that are inappropriate.

15:59:15  19        THE COURT:  Well, again, though, Mr. Weems, my

15:59:17  20   question was to what extent strict compliance with the

15:59:20  21   rules of evidence comes into play at a hearing such as

15:59:26  22   this, which is a motion for a preliminary injunction.

15:59:30  23        MR. WEEMS:  I do believe there is authority that

15:59:32  24   suggests that the rules can be relaxed.  I do not believe

15:59:35  25   there's authority that suggests that they are

| | | |
|---|---|---|
| 15:59:37 | 1 | completely -- that the rules of evidence are completely |
| 15:59:40 | 2 | thrown out the window. |
| 15:59:40 | 3 | THE COURT:  And that's all I'm inquiring, is to |
| 15:59:44 | 4 | whether they're relaxed for more than they would be in a |
| 15:59:47 | 5 | trial hearing. |
| 15:59:47 | 6 | If you're afraid to walk in front of us, ma'am, |
| 15:59:52 | 7 | please, I appreciate your deference -- |
| 15:59:55 | 8 | THE WITNESS:  Thank you. |
| 15:59:56 | 9 | THE COURT:  -- but you're free to go.  Thank you. |
| 16:00:00 | 10 | THE WITNESS:  Thanks. |
| 16:00:01 | 11 | THE COURT:  What do you want me to do with your |
| 16:00:02 | 12 | concern, Mr. Weems? |
| 16:00:03 | 13 | MR. WEEMS:  Well, the plaintiff just said they're |
| 16:00:05 | 14 | relying upon their declarations.  I think it's incumbent |
| 16:00:08 | 15 | upon the plaintiff, who, as you've already noted, has the |
| 16:00:11 | 16 | burden of proof today to identify what exactly they're |
| 16:00:14 | 17 | relying upon so that then we can, to the extent we |
| 16:00:18 | 18 | believe we have objections, object to it. |
| 16:00:20 | 19 | I don't think it's appropriate for the plaintiff |
| 16:00:22 | 20 | just to say, "We're relying upon everything that's been |
| 16:00:24 | 21 | filed in the case."  We don't have the opportunity to |
| 16:00:27 | 22 | express any concerns we have.  I think it's the |
| 16:00:29 | 23 | plaintiff's burden to identify what it is precisely |
| 16:00:32 | 24 | they're relying upon so then we can address it. |
| 16:00:34 | 25 | THE COURT:  Well, we're not going to do that level |

| | | |
|---|---|---|
| 16:00:36 | 1 | of dissection. |
| 16:00:37 | 2 | Do you have evidence that you want to put on in |
| 16:00:40 | 3 | behalf of the defense? |
| 16:00:41 | 4 | MR. WEEMS:  We do. |
| 16:00:42 | 5 | THE COURT:  All right.  Why don't we proceed. |
| 16:00:43 | 6 | MR. WEEMS:  Jim Knight is our first witness, Your |
| 16:00:47 | 7 | Honor. |
| 16:00:47 | 8 | THE COURT:  Mr. Knight, if you would stand in |
| 16:00:49 | 9 | front of my courtroom deputy, she will swear you in. |
| 16:01:01 | 10 | JIM KNIGHT, |
| 16:01:01 | 11 | having been first duly sworn to testify the truth, the |
| 16:01:01 | 12 | whole truth, and nothing but the truth, testified as |
| 16:01:01 | 13 | follows: |
| 16:01:13 | 14 | DIRECT EXAMINATION |
| 16:01:13 | 15 | BY MR. WEEMS: |
| 16:01:15 | 16 | Q.    Mr. Knight, there are a few exhibits that we'll |
| 16:01:17 | 17 | refer to in the exhibit book. |
| 16:01:18 | 18 | Mr. Knight, would you state your full name for the |
| 16:01:21 | 19 | record, please. |
| 16:01:22 | 20 | **A.    James Douglas Knight.** |
| 16:01:23 | 21 | Q.    And what is your employment? |
| 16:01:25 | 22 | **A.    I'm the chief financial officer and chief** |
| 16:01:28 | 23 | **operating officer at MoJack Distributors.** |
| 16:01:29 | 24 | Q.    And how long have you had that position? |
| 16:01:31 | 25 | **A.    Since April of 2015.** |

16:01:35  1  Q.     All right.  There are two general subjects that I

16:01:38  2  want to cover with your testimony today, sir.  One is the

16:01:40  3  development of the product, the Scent Crusher products,

16:01:42  4  the Field Pro and the Field Lite.  And then I want to

16:01:46  5  talk about some of the exhibits in the book.  When did --

16:01:52  6  or tell me about MoJack's involvement in Ozonics, very

16:01:55  7  briefly.

16:01:55  8  **A.     Okay.  Involvement in what?**

16:01:57  9  Q.     Scent Crusher's involvement with ozone products.

16:02:01  10 **A.     Ozone in general?**

16:02:03  11 Q.     Yes.

16:02:03  12 **A.     So it goes back to the genesis is the water-based**

16:02:05  13 **ozone we did to treat athletic fields and things like**

16:02:09  14 **that.  We learned a lot about ozone.  And then we adapted**

16:02:12  15 **that, and prior to my arrival there in 2015, for the**

16:02:15  16 **hunting technology.**

16:02:18  17 Q.     And what did Scent Crusher do to develop its

16:02:20  18 products, its Field Pro and its Field Lite products?

16:02:24  19 **A.     So in January of this year, when we were**

16:02:28  20 **approached by some retailers with an interest in**

16:02:31  21 **potentially producing this product, we started a couple**

16:02:34  22 **of paths.  One was the engineering required, the**

16:02:37  23 **development required, to produce a product, and the other**

16:02:40  24 **was the legal process of making sure that we had a clear**

16:02:43  25 **path to operate in using those products.**

| | | |
|---|---|---|
| 16:02:46 | 1 | So we gained -- we did two things:  we had mostly |
| 16:02:50 | 2 | our sales folks and a couple of guys on staff who are |
| 16:02:55 | 3 | pretty avid hunters worked with some of our field teams |
| 16:02:59 | 4 | that we sponsor to look at what we liked about the unit, |
| 16:03:02 | 5 | what we wanted to put together in a unit, what might |
| 16:03:05 | 6 | be -- features that that we want to do if we want to |
| 16:03:09 | 7 | develop a new product in that space. |
| 16:03:11 | 8 | I was involved with that to a degree at the |
| 16:03:15 | 9 | beginning but I also spent a fair amount of time with our |
| 16:03:17 | 10 | patent counsel on examining the known Ozonics patents and |
| 16:03:24 | 11 | what operational room there might be with those patents. |
| 16:03:27 | 12 | Q.    And after doing that analysis or getting that |
| 16:03:30 | 13 | analysis from patent counsel, you then elected to go |
| 16:03:33 | 14 | forward with the two products we're talking about here? |
| 16:03:35 | 15 | A.    That's correct. |
| 16:03:36 | 16 | Q.    All right.  So once you had made the decision, |
| 16:03:40 | 17 | once you'd done that legal review, once you gathered that |
| 16:03:43 | 18 | groundwork, what hunters liked and disliked, what was the |
| 16:03:47 | 19 | next step in the process? |
| 16:03:47 | 20 | A.    We had our supply-chain director, Scott Smith, go |
| 16:03:51 | 21 | to China, to where we manufactured the products.  And he |
| 16:03:53 | 22 | started working with our local engineering teams there. |
| 16:03:56 | 23 | We also spoke with our -- a guy we use who has worked |
| 16:04:01 | 24 | with NASA in the past, who's got a pretty good, solid |
| 16:04:03 | 25 | understanding of ozone, to provide some direction to the |

| | | |
|---|---|---|
| 16:04:07 | 1 | Chinese factories.  Then we went through a series of |
| 16:04:10 | 2 | back-and-forths of "How about this?  How about that? |
| 16:04:15 | 3 | What about this?  Can you do it this way?" and such.  So |
| 16:04:17 | 4 | it was a fairly long process of product development. |
| 16:04:19 | 5 | Scott probably made, I think, five trips to China |
| 16:04:22 | 6 | during that window of time before we finally brought the |
| 16:04:26 | 7 | product into the states. |
| 16:04:27 | 8 | Q.   All right.  And have you actually shipped product |
| 16:04:29 | 9 | now? |
| 16:04:30 | 10 | A.    We have. |
| 16:04:30 | 11 | Q.   And is the product that you have, you have some |
| 16:04:34 | 12 | product in inventory? |
| 16:04:35 | 13 | A.    We do. |
| 16:04:36 | 14 | Q.   And how much product, just generally, do you have |
| 16:04:38 | 15 | in inventory? |
| 16:04:38 | 16 | A.    It's all -- all the parts that we purchased is in |
| 16:04:42 | 17 | inventory now, either in our warehouse or on the way to |
| 16:04:45 | 18 | our warehouse.  It's ours once it goes into transit, |
| 16:04:48 | 19 | so . . . |
| 16:04:48 | 20 | Q.   All right.  And how much product have you actually |
| 16:04:50 | 21 | shipped out to retailers? |
| 16:04:51 | 22 | A.    Do you want me to tell you the exact number? |
| 16:04:53 | 23 | Q.   Not the exact number.  Just generally. |
| 16:04:55 | 24 | A.    Oh, how many units we shipped out? |
| 16:04:57 | 25 | Q.   Right. |

| | | |
|---|---|---|
| 16:04:58 | 1 | A.       It's probably -- it might be 400 units, 4- or 500 |
| 16:05:02 | 2 | units apiece. |
| 16:05:03 | 3 | Q.       400 of the Field Pro? |
| 16:05:04 | 4 | A.       Of each, of each piece. |
| 16:05:05 | 5 | Q.       Of each unit? |
| 16:05:06 | 6 | A.       Maybe 600 by now.  I don't know.  It's in that |
| 16:05:09 | 7 | range. |
| 16:05:09 | 8 | Q.       All right.  And if the preliminary injunction that |
| 16:05:12 | 9 | the plaintiffs are requesting in this case is granted, |
| 16:05:14 | 10 | what happens to MoJack's investment in developing these |
| 16:05:17 | 11 | products? |
| 16:05:18 | 12 | A.       In theory it would be stranded. |
| 16:05:21 | 13 | Q.       I'm sorry? |
| 16:05:21 | 14 | A.       It would be stranded.  Our inventory cost would be |
| 16:05:24 | 15 | stranded and all of our costs of development would be |
| 16:05:26 | 16 | stranded. |
| 16:05:27 | 17 | Q.       Let me now talk a little bit, you mentioned going |
| 16:05:30 | 18 | to hunters, finding out what they liked and didn't like, |
| 16:05:33 | 19 | so forth.  Can you look at Exhibits 413 through 418 in |
| 16:05:36 | 20 | the exhibit book. |
| 16:05:49 | 21 | A.       (The witness complies.)  Okay. |
| 16:05:51 | 22 | Q.       And describe generally what those exhibits are. |
| 16:05:55 | 23 | A.       This is the page vault thing or is that the cover? |
| 16:05:57 | 24 | Q.       Well, the page vault thing is the cover.  Then |
| 16:06:00 | 25 | what do we have? |

| | | |
|---|---|---|
| 16:06:00 | 1 | A.      These are other products that have come into the |
| 16:06:05 | 2 | market over the past period of time that are either |
| 16:06:07 | 3 | portable or field-type units for using ozone in a |
| 16:06:12 | 4 | nonstationary environment. |
| 16:06:15 | 5 | Q.     And each of those examples, 413 through 418, are |
| 16:06:18 | 6 | examples of portable ozone products? |
| 16:06:24 | 7 | A.      There are portable ones in here.  Some of them are |
| 16:06:27 | 8 | not portable.  Some of them are plug-in units.  But yeah, |
| 16:06:29 | 9 | there's portable units among all these pages. |
| 16:06:31 | 10 | Q.     Some are portable and some are plug-in? |
| 16:06:34 | 11 | A.      Correct, yeah. |
| 16:06:35 | 12 | Q.     And you're familiar with the other products that |
| 16:06:37 | 13 | are available on the market? |
| 16:06:38 | 14 | A.      Yes, we are. |
| 16:06:39 | 15 | Q.     Was that part of your competitive assessment? |
| 16:06:41 | 16 | A.      Yes, it was. |
| 16:06:42 | 17 | MR. WEEMS:  I would offer Exhibits 413 through |
| 16:06:45 | 18 | 418, Your Honor. |
| 16:06:48 | 19 | THE COURT:  This is the first time after we've |
| 16:06:50 | 20 | referred to a hundred exhibits that someone's offered |
| 16:06:53 | 21 | them, but we have an offer.  Is there any objection to |
| 16:06:55 | 22 | admission? |
| 16:06:57 | 23 | MR. MILLER:  No objection, Your Honor. |
| 16:06:58 | 24 | THE COURT:  Then I'll admit them. |
| 16:07:00 | 25 | MR. WEEMS:  Thank you.  No further questions, Your |

16:07:04   1    Honor.

16:07:04   2          THE COURT:  Cross-examination?

16:07:06   3                 CROSS-EXAMINATION

16:07:07   4    BY MR. MILLER:

16:07:15   5    Q.    Mr. Knight, all of the investment that MoJack

16:07:21   6    undertook for the Field Pro and the Field Lite was taken

16:07:25   7    after you had knowledge of Ozonics' patent rights;

16:07:29   8    correct?

16:07:30   9    **A.    Well, I had knowledge of Ozonics' patents as they**

16:07:34   10   **exist from the time I started work there.  The letter**

16:07:37   11   **that was sent in March of 2015 just barely predated my**

16:07:42   12   **employment there.  Our response in 2015 was right before**

16:07:44   13   **my employment there, so I was very aware of the fact that**

16:07:48   14   **Ozonics had patents and that they had asserted those in**

16:07:52   15   **the past.**

16:07:52   16   Q.    Great.  And what was your counsel's opinion when

16:07:56   17   you sat down with him?  Was it noninfringement or was it

16:07:59   18   invalidity?

16:08:00   19   **A.    Both.**

16:08:00   20   Q.    Both.  Was the invalidity opinion from your

16:08:04   21   counsel based on the same prior art that Dr. Friis talked

16:08:08   22   about?

16:08:08   23   **A.    I believe so, yes.**

16:08:09   24   Q.    Was it more than Dr. Friis?

16:08:12   25   **A.    I don't recall all the references that were in his**

16:08:15   1   opinions.

16:08:15   2   Q.     And was the basis of noninfringement the same

16:08:17   3   basis that Dr. Friis has proposed in her declarations?

16:08:22   4   A.     I don't recall exactly the language on the

16:08:24   5   noninfringement piece.   In both of them there were

16:08:28   6   probably some similar, but I don't recall exactly all the

16:08:30   7   details in the original opinion letter and now the

16:08:33   8   information that's since come out of this proceeding.

16:08:35   9   Q.     Was it based on you don't have a stream?  Was that

16:08:37   10  the one that was missing?

16:08:40   11  A.     I'm not familiar with that being in the first

16:08:42   12  patent or the second.   I mean, that's in the second --

16:08:44   13  sorry, the second testimony today.   I'm not familiar with

16:08:47   14  it being in the first one.   It may be but I don't recall.

16:08:49   15  Q.     Okay.   Was it a written opinion?

16:08:51   16  A.     Yes.

16:08:51   17  Q.     Okay.   Did it talk about eliminate or deodorize as

16:08:55   18  being not met?

16:08:56   19  A.     I don't recall.

16:08:56   20  Q.     You don't recall that?  But you have a copy of

16:08:58   21  that?

16:08:59   22  A.     Yes.

16:09:00   23  Q.     And we could request that?

16:09:01   24  A.     Presumably, yes.

16:09:03   25  Q.     Okay.

| | | |
|---|---|---|
| 16:09:04 | 1 | MR. MILLER:  No further questions. |
| 16:09:06 | 2 | MR. WEEMS:  Nothing further. |
| 16:09:08 | 3 | THE COURT:  Mr. Knight, you may step down. |
| 16:09:12 | 4 | (Witness excused from the witness stand.) |
| 16:09:12 | 5 | THE COURT:  Any other witnesses from the |
| 16:09:13 | 6 | defendants? |
| 16:09:18 | 7 | MR. PETERSON:  We'd like to call Scott Elrod, |
| 16:09:23 | 8 | please. |
| 16:09:31 | 9 | THE COURT:  Do you want that notebook left up |
| 16:09:32 | 10 | there? |
| 16:09:34 | 11 | MR. PETERSON:  No, that won't be necessary. |
| 16:09:36 | 12 | THE COURT:  All right, Mr. Elrod if you would be |
| 16:09:38 | 13 | sworn, you can have a seat. |
| 16:09:42 | 14 | SCOTT ELROD, |
| 16:09:42 | 15 | having been first duly sworn to testify the truth, the |
| 16:09:42 | 16 | whole truth, and nothing but the truth, testified as |
| 16:09:53 | 17 | follows: |
| 16:09:54 | 18 | DIRECT EXAMINATION |
| 16:09:54 | 19 | BY MR. PETERSON: |
| 16:10:07 | 20 | Q.    Mr. Elrod, so it's correct that you're the CEO and |
| 16:10:10 | 21 | owner of both Parah, LLC, and Ozonics, LLC? |
| 16:10:15 | 22 | **A.    Yes, I am the CEO.  I am sole owner of Parah** |
| 16:10:19 | 23 | **intellectual property and I'm the majority shareholder of** |
| 16:10:22 | 24 | **Ozonics, that's correct.** |
| 16:10:22 | 25 | Q.    And isn't it true that you are not an attorney, |

| | | |
|--|--|--|
| 16:10:26 | 1 | sir? |
| 16:10:26 | 2 | **A.      I am not an attorney, no.** |
| 16:10:28 | 3 | Q.      Isn't it true that irreparable harm or whether |
| 16:10:31 | 4 | something constitutes irreparable harm is a legal |
| 16:10:37 | 5 | question? |
| 16:10:39 | 6 | **A.      I don't know.** |
| 16:10:41 | 7 | Q.      Fair enough.  But you're here today to testify |
| 16:10:44 | 8 | about facts, not legal opinions, is my point. |
| 16:10:48 | 9 | **A.      Yes, I'm here to testify about facts.** |
| 16:10:51 | 10 | Q.      Have you ever physically handled, yourself, in |
| 16:10:54 | 11 | your hands, a Field Lite or a Field Pro? |
| 16:10:57 | 12 | **A.      No, I have not.** |
| 16:10:59 | 13 | Q.      Have you ever directly witnessed the Field Lite or |
| 16:11:01 | 14 | the Field Pro in use by a hunter in the field? |
| 16:11:05 | 15 | **A.      No, I have not.** |
| 16:11:07 | 16 | Q.      In fact, it's true that all of your experience |
| 16:11:09 | 17 | with the product is based on marketing materials, |
| 16:11:12 | 18 | websites, and videos? |
| 16:11:14 | 19 | **A.      That's correct.** |
| 16:11:18 | 20 | Q.      And as you've heard, since you're the corporate |
| 16:11:20 | 21 | representative, through the prior testimony, isn't it |
| 16:11:22 | 22 | true that the Field Lite and Field Pro aren't even |
| 16:11:25 | 23 | available for sale to the public yet? |
| 16:11:27 | 24 | **A.      No, they're for sale.  I believe we've already** |
| 16:11:30 | 25 | **purchased one.** |

| | | |
|---|---|---|
| 16:11:31 | 1 | Q.    Isn't it true that they were not for sale at the |
| 16:11:34 | 2 | time you issued your initial affidavit, your first |
| 16:11:37 | 3 | affidavit? |
| 16:11:38 | 4 | A.    I believe they were purchased from Lancaster prior |
| 16:11:43 | 5 | to it happening. |
| 16:11:43 | 6 | Q.    Prior to your initial affidavit? |
| 16:11:46 | 7 | A.    I believe so.  I'm sorry, my voice is wiped out. |
| 16:11:52 | 8 | I apologize. |
| 16:11:53 | 9 | Q.    No, it's fine.  So do you believe that in your |
| 16:11:57 | 10 | initial affidavit you made allegations that you |
| 16:12:00 | 11 | physically handled the product or directly experienced |
| 16:12:02 | 12 | it? |
| 16:12:03 | 13 | A.    No, I never said I had directly handled or held |
| 16:12:07 | 14 | it. |
| 16:12:08 | 15 | Q.    Okay.  Isn't it true that Ozonics voluntarily |
| 16:12:14 | 16 | stopped selling its products through retailers? |
| 16:12:20 | 17 | A.    It's a very loaded question.  Am I supposed to |
| 16:12:27 | 18 | give the answer?  I mean, the answer is, 2016, we had one |
| 16:12:35 | 19 | of the fastest-growing entities in the hunting industry, |
| 16:12:37 | 20 | and basically all retail said that.  And we had a hard |
| 16:12:40 | 21 | time meeting demand, but we did.  '17 came and they said |
| 16:12:45 | 22 | they needed X amount of product, and so we hustled and we |
| 16:12:49 | 23 | built and we manufactured in Mason City, Iowa, and then |
| 16:12:53 | 24 | the merger between Bass Pro and Cabela's happened, and in |
| 16:12:57 | 25 | September all those orders got canceled at the heat of |

16:13:01  1  the merger.  And so we were stuck with all this

16:13:04  2  inventory, and it wasn't a partnership.  And so that's

16:13:07  3  when the decision was made that we were going to sell

16:13:10  4  direct.  And so voluntarily did we leave?  The answer is

16:13:14  5  we would have loved to stay with them, but we can't do

16:13:17  6  business like that as a small business and have them say

16:13:21  7  "We want this" and then not take it.

16:13:23  8  Q.     But keying on what was said, so like you made a

16:13:27  9  business judgment, a business decision, to stop selling?

16:13:30  10  A.     Yes, that is correct, we did.

16:13:34  11  Q.     And isn't it true that Ozonics continues to sell

16:13:36  12  products through its website and at trade shows?

16:13:40  13  A.     Yes, sir, that is correct.

16:13:41  14  Q.     And isn't it true that you will be able to

16:13:43  15  continue selling your products through your website and

16:13:46  16  at trade shows regardless of whether Scent Crusher is

16:13:51  17  enjoined as a result of this hearing?

16:13:53  18  A.     Not necessarily.

16:13:55  19  Q.     So let me ask a follow-up question.  Explain to me

16:14:00  20  why a failure to issue an injunction would prevent you

16:14:04  21  from selling through your website or at trade shows.

16:14:08  22  A.     What's happened, Your Honor, is this:  Long story

16:14:12  23  short, I created this company in 2004 when no one

16:14:16  24  believed in us, and we went ahead and we -- from 2004 to

16:14:20  25  2017, we broke our back.  And I'm going to answer your

16:14:24   1   question.  I'm going to answer your question.  And then

16:14:28   2   we went ahead and went through that whole process.  And

16:14:30   3   finally coming up to 2014, '15, we were able to breathe

16:14:36   4   and it started to take off.  Right?  And so when people

16:14:39   5   would go into a Cabela's or a Bass Pro to buy one of our

16:14:43   6   products, they went there to buy the products because our

16:14:47   7   marketing directed them there.  They didn't just

16:14:52   8   spontaneously decide to buy a $500 piece of equipment.

16:14:53   9          So when they decided to leave and then they, Scent

16:14:55   10  Crusher, jumps into the store and violate all of these

16:14:57   11  patents that we worked so hard to develop for so many

16:15:00   12  years, it's an utter slap in our face because any time

16:15:06   13  somebody wants to re-buy, they go there for an Ozonics

16:15:09   14  product, they buy one of theirs.  Anything they do there,

16:15:12   15  it guts us.  That's what it does.  We're fighting against

16:15:16   16  ourselves.

16:15:18   17  Q.    Mr. Elrod, I do not believe that answered the

16:15:20   18  question.  What would prevent you from selling -- there's

16:15:24   19  nothing -- there's nothing that would prevent you from

16:15:26   20  selling through your website?

16:15:28   21  A.     Except for the consumer base is not there.  The

16:15:31   22  same as they are going into a Cabela's or Bass Pro to buy

16:15:36   23  our technology.  You know, we were the ones that

16:15:38   24  developed it.  So if they go into it because they've been

16:15:41   25  trained for -- how many years have we been in there,

16:15:44   1   **2007, '8, '9? -- right around '8 or '9 we've been there,**

16:15:48   2   **so for five years they've been buying there.**

16:15:50   3   Q.      All right.  I'll move on.  You haven't answered

16:15:52   4   the question.

16:15:53   5          Okay.  So then going on to the question of the

16:15:55   6   number of competitors actually.  So you've previously

16:15:58   7   testified through affidavits that this is a

16:16:00   8   two-competitor market; correct?

16:16:02   9   A.      **Say it one more time.  My hearings's bad.**

16:16:05   10  Q.      You have previously testified through your

16:16:07   11  affidavits that you believe that the market for

16:16:11   12  in-the-field ozone generators is a two-competitor or

16:16:14   13  two-supplier market; correct?

16:16:16   14  A.      **For in the field, if Drake is allowed to do this,**

16:16:21   15  **the answer is yes.**

16:16:24   16  Q.      So you agree that you have previously said this is

16:16:27   17  a two-competitor market?

16:16:30   18  A.      **Yeah.**

16:16:30   19  Q.      So if something's a two-competitor market, that

16:16:33   20  means that if any sale occurs in the market, it goes to

16:16:36   21  either company one or company two; correct?

16:16:39   22  A.      **The sale you're saying?**

16:16:41   23  Q.      Yeah.  If there's two companies that sell a

16:16:44   24  product in a market, it's a two-competitor market, a sale

16:16:49   25  occurs in that market, that means conclusively that the

| | | |
|---|---|---|
| 16:16:53 | 1 | sale either went to company one or company two; correct? |
| 16:16:57 | 2 | A.    I'd say that's correct. |
| 16:16:58 | 3 | Q.    Okay.  So in a two-competitor market, isn't it |
| 16:17:05 | 4 | also true that lost sales could be determined by |
| 16:17:10 | 5 | evaluating and reviewing the accounting information and |
| 16:17:13 | 6 | sales records of company one?  If company one got the |
| 16:17:18 | 7 | sale, company two didn't; correct? |
| 16:17:25 | 8 | A.    You're making it very simple, but yes. |
| 16:17:28 | 9 | Q.    Because it is simple. |
| 16:17:29 | 10 | A.    No, it is not simple. |
| 16:17:32 | 11 | Q.    Now, you agree that, by looking at -- so you -- to |
| 16:17:37 | 12 | clarify -- |
| 16:17:38 | 13 | A.    Can I tell you why it's not simple?  Because I |
| 16:17:40 | 14 | have one platform that I'm selling through the most part |
| 16:17:43 | 15 | our website or we're going to shows.  When we left, |
| 16:17:45 | 16 | because we are IP protected, we lost hundreds of |
| 16:17:49 | 17 | retailers that -- where we had our product in front of. |
| 16:17:53 | 18 | And so we left that because of the value of the IP and |
| 16:17:57 | 19 | the strength of it to be able to go do this. |
| 16:17:59 | 20 | Q.    Okay.  Mr. Elrod, in light of that point, isn't it |
| 16:18:06 | 21 | true that your annual sales from 2010 through 2017 -- and |
| 16:18:11 | 22 | I don't want to get into specific numbers if you don't |
| 16:18:13 | 23 | need to.  We may need to clear the courtroom for that. |
| 16:18:16 | 24 | But isn't it true that years 2010 through 2017 Ozonics' |
| 16:18:23 | 25 | revenue has increased every single year? |

| | | |
|---|---|---|
| 16:18:27 | 1 | **A.        Basically, yes.** |
| 16:18:29 | 2 | Q.     Thank you.  Okay.  And then, finally, in your |
| 16:18:37 | 3 | second -- |
| 16:18:38 | 4 | **A.        Shouldn't you ask why?** |
| 16:18:41 | 5 | Q.     I'm conducting this cross-examination. |
| 16:18:43 | 6 | THE COURT:  It's his examination. |
| 16:18:45 | 7 | THE WITNESS:  I'm sorry, Judge, but you got to |
| 16:18:47 | 8 | hear the truth on this. |
| 16:18:48 | 9 | THE COURT:  Well, your attorney will have a chance |
| 16:18:49 | 10 | to ask you questions, but this is Mr. Peterson's |
| 16:18:52 | 11 | examination. |
| 16:18:55 | 12 | BY MR. PETERSON: |
| 16:18:55 | 13 | Q.     Okay.  So is Ozonics subject to any contractual |
| 16:18:59 | 14 | agreements that would require it to lower its prices or |
| 16:19:02 | 15 | provide customers with rebates if they did not purchase |
| 16:19:05 | 16 | at the lowest possible price? |
| 16:19:07 | 17 | **A.        I'm -- I don't mean to be difficult, but I heard** |
| 16:19:09 | 18 | **part.  I didn't hear it all.  Say it one more time.  I'm** |
| 16:19:12 | 19 | **sorry.** |
| 16:19:12 | 20 | Q.     Is Ozonics subject to any contracts that would |
| 16:19:16 | 21 | require it to provide rebates to its customers if they |
| 16:19:23 | 22 | purchase an Ozonics product and later discovered that |
| 16:19:27 | 23 | they did not buy it at the lowest possible price |
| 16:19:31 | 24 | available relative to comparable products? |
| 16:19:37 | 25 | **A.        No, not that I know.** |

| | | |
|---|---|---|
| 16:19:39 | 1 | Q.     Okay.  Is Ozonics subject to any regulations that |
| 16:19:43 | 2 | would require it to sell its products to customers at the |
| 16:19:48 | 3 | lowest possible price available in the market for the |
| 16:19:52 | 4 | relevant product? |
| 16:19:54 | 5 | **A.     Is it required to?  Is that what you --** |
| 16:19:57 | 6 | Q.     Is there -- is there a law, is there a law or |
| 16:19:59 | 7 | regulation that would require Ozonics to sell its |
| 16:20:05 | 8 | products at the lowest possible price in the available |
| 16:20:09 | 9 | market? |
| 16:20:10 | 10 | **A.     No, I don't believe so.** |
| 16:20:12 | 11 | Q.     Okay. |
| 16:20:14 | 12 |      MR. PETERSON:  No further questions, Your Honor. |
| 16:20:16 | 13 |      THE COURT:  Thank you, counsel. |
| 16:20:18 | 14 | Cross-examination. |
| 16:20:20 | 15 |                CROSS-EXAMINATION |
| 16:20:21 | 16 | BY MR. FOSTER: |
| 16:20:30 | 17 | Q.     Mr. Elrod, when you said sales increased every |
| 16:20:34 | 18 | year through 2017, in your judgment, were you the only |
| 16:20:41 | 19 | company in that time frame selling ozone units for use in |
| 16:20:45 | 20 | the field with hunters? |
| 16:20:46 | 21 | **A.     Yes.** |
| 16:20:47 | 22 | Q.     Was Scent Crusher in the market during those years |
| 16:20:50 | 23 | when you increased every year selling a unit for ozone in |
| 16:20:55 | 24 | the hunters -- for the hunters in the field? |
| 16:20:57 | 25 | **A.     No.** |

16:21:01    1    Q.      What is your view -- what will happen, in your

16:21:04    2    view, based upon your experience, if Scent Crusher covers

16:21:08    3    the retail market that you just exited from with their

16:21:12    4    Field Lite and Field Pro products?

16:21:15    5    A.      At the end of the day it's going to -- basically

16:21:18    6    it's going to be the death of our company.  We have

16:21:22    7    conditioned consumers to go to Cabela's, Bass Pro, all

16:21:26    8    the major retailers across the United States and through

16:21:29    9    Canada, to buy these oxidation-based products.  So if

16:21:35   10    somebody wants to go there, they want to just get a new

16:21:38   11    unit for the year, we're not going to be there.  They're

16:21:41   12    going to be one of his.  They want to buy the

16:21:43   13    accessories, they won't be there either.  So, you know,

16:21:45   14    it just goes on and on, you know, about with our company.

16:21:50   15    It's just -- yeah, it'll kill us.

16:21:52   16    Q.      One quick question, Mr. Elrod, to finish up.  You

16:21:57   17    were asked about pricing.  If they are not enjoined their

16:22:03   18    50 to a hundred dollars lower price than you, what are

16:22:05   19    you going to have to do to compete in the marketplace and

16:22:07   20    what will that do to your business?

16:22:10   21    A.      Definitely it's going to hurt us dramatically.

16:22:13   22    And yes, we will have to lower our price to be

16:22:15   23    competitive.  Not a doubt on that.  And so it's basically

16:22:19   24    the one thing -- I know I'm not supposed to talk -- give

16:22:23   25    me a second.  When we get the intellectual property, the

| | | |
|---|---|---|
| 16:22:28 | 1 | first three to four years of our company we didn't do |
| 16:22:31 | 2 | dirt.  We just kept on putting in millions of dollars, |
| 16:22:35 | 3 | literally millions of dollars.  And people laughed at us. |
| 16:22:38 | 4 | They laughed.  We would go -- we would go to shows across |
| 16:22:47 | 5 | the United States, not one store would put us in 'em. |
| 16:22:51 | 6 | Not one.  And finally I had to beg somebody from Scheels |
| 16:22:55 | 7 | to let us into that.  We finally got into one.  And it |
| 16:22:59 | 8 | wasn't until 2010 happened and all of a sudden somebody |
| 16:23:03 | 9 | helped us out and we finally got in Cabela's and we |
| 16:23:06 | 10 | started to be able to breathe.  But it was like then it |
| 16:23:09 | 11 | was more opposition, you know. |
| 16:23:11 | 12 | Until '15 came around, our company was struggling |
| 16:23:15 | 13 | to just breathe.  And we were fighting and fighting.  And |
| 16:23:21 | 14 | '15 and '16 happened and we started to become more and |
| 16:23:23 | 15 | more profitable, but it wasn't by massive amounts.  And |
| 16:23:26 | 16 | right now it's like we were getting ready to turn the |
| 16:23:29 | 17 | corner, well, all this happened.  And I didn't want to |
| 16:23:33 | 18 | leave Cabela's and Bass Pro.  I didn't want to.  We were |
| 16:23:37 | 19 | going to do fine there, but it was just we can't, as a |
| 16:23:41 | 20 | small company, work like that. |
| 16:23:43 | 21 | MR. FOSTER:  Thank you, Mr. Elrod. |
| 16:23:45 | 22 | THE WITNESS:  Sorry? |
| 16:23:46 | 23 | MR. FOSTER:  Nothing further. |
| 16:23:46 | 24 | THE COURT:  Any redirect, Mr. Peterson? |
| 16:23:49 | 25 | MR. PETERSON:  No, Your Honor. |

| | | |
|---|---|---|
| 16:23:51 | 1 | THE COURT:  Mr. Elrod, you may step down, sir. |
| 16:23:53 | 2 | Thank you. |
| 16:23:55 | 3 | (Witness excused from the witness stand.) |
| 16:23:55 | 4 | MR. WEEMS:  No other witnesses from us, Your |
| 16:23:58 | 5 | Honor.  Oh, I'm sorry. |
| 16:23:59 | 6 | MR. ELLIOTT:  I didn't understand your question. |
| 16:24:01 | 7 | We'll call the other expert. |
| 16:24:03 | 8 | MR. WEEMS:  Oh, okay.  All right.  I'm sorry. |
| 16:24:09 | 9 | Mr. Cragun. |
| 16:24:10 | 10 | MR. PETERSON:  We'd like to call Mr. Cragun, |
| 16:24:12 | 11 | please. |
| 16:24:13 | 12 | THE COURT:  All right. |
| 16:25:13 | 13 | If you would stand in front of my courtroom |
| 16:25:15 | 14 | deputy, she will swear you in and then you may have a |
| 16:25:18 | 15 | seat in the witness box. |
| 16:25:19 | 16 | THE CLERK:  Please raise your right hand. |
| 16:25:21 | 17 | SCOTT CRAGUN, |
| 16:25:21 | 18 | having been first duly sworn to testify the truth, the |
| 16:25:21 | 19 | whole truth, and nothing but the truth, testified as |
| 16:25:36 | 20 | follows: |
| 16:25:37 | 21 | DIRECT EXAMINATION |
| 16:25:37 | 22 | BY MR. PETERSON: |
| 16:25:54 | 23 | Q.    Mr. Cragun, are you ready to proceed? |
| 16:25:57 | 24 | **A.    Yes.** |
| 16:25:58 | 25 | Q.    Mr. Cragun, you would agree that you testify |

16:26:00    1    multiple times in your affidavit or, excuse me,

16:26:04    2    declaration that was filed with the Court that you

16:26:07    3    consider this to be a two-competitor market; correct?

16:26:10    4    **A.       That is correct.   That is my opinion from the**

16:26:13    5    **information I have reviewed.**

16:26:16    6    Q.    And you also testify multiple times that several

16:26:21    7    categories of damages would be difficult or impossible to

16:26:24    8    calculate; correct?

16:26:27    9    **A.       In my declaration I point to damages that would be**

16:26:32   10    **difficult or impossible to calculate in this case,**

16:26:35   11    **correct.**

16:26:35   12    Q.    And just to be clear for the Court, you used the

16:26:38   13    word "impossible to calculate"; correct?

16:26:42   14    **A.       Yes.**

16:26:43   15    Q.    So you've testified in other patent litigation as

16:26:45   16    a damages expert; correct?

16:26:47   17    **A.       That is correct, yes.**

16:26:50   18    Q.    And isn't it also true that in your resume,

16:26:55   19    attached to your prior declaration, there are multiple

16:27:00   20    references to instances where you did, in fact, calculate

16:27:02   21    some of the types of damages that you claim are

16:27:05   22    impossible to calculate?

16:27:07   23    **A.       Well, I don't tie the two together.   I've**

16:27:10   24    **calculated damages before for other clients, yes.**

16:27:15   25          MR. PETERSON:   Your Honor, may -- I have a sealed

| | | |
|---|---|---|
| 16:27:18 | 1 | document.  It's his affidavit.  I would like to show it |
| 16:27:21 | 2 | to him.  I'm not sure if we need to close the courtroom |
| 16:27:24 | 3 | really or have some witnesses excluded. |
| 16:27:26 | 4 | THE COURT:  It's his affidavit?  Are you showing |
| 16:27:28 | 5 | it to him to refresh his recollection? |
| 16:27:30 | 6 | MR. PETERSON:  Yes. |
| 16:27:30 | 7 | THE COURT:  And are you then going to ask him to |
| 16:27:32 | 8 | testify as to confidential, proprietary information? |
| 16:27:36 | 9 | MR. PETERSON:  No, Your Honor. |
| 16:27:37 | 10 | THE COURT:  Well, then I don't think we need to |
| 16:27:39 | 11 | close the courtroom.  You may hand him his affidavit, |
| 16:27:41 | 12 | though, to refresh his recollection. |
| 16:27:43 | 13 | MR. PETERSON:  Okay. |
| 16:27:47 | 14 | THE WITNESS:  Thank you. |
| 16:27:49 | 15 | BY MR. PETERSON: |
| 16:27:54 | 16 | Q.    Okay.  Could you please turn to paragraph 10 of |
| 16:27:57 | 17 | your affidavit, sir. |
| 16:27:59 | 18 | **A.    (The witness complies.)  Paragraph 10?** |
| 16:28:12 | 19 | Q.    Yes, paragraph 10.  And then if you go -- if you |
| 16:28:17 | 20 | see where -- if you see where footnote 42 is, do you see |
| 16:28:20 | 21 | about three-fourths of the way down where there's a |
| 16:28:23 | 22 | footnote for paragraph 42, and the start of the sentence |
| 16:28:27 | 23 | "it is not possible"? |
| 16:28:36 | 24 | **A.    Yes.** |
| 16:28:36 | 25 | Q.    Okay.  So reading from there, you would agree that |

| | | |
|---|---|---|
| 16:28:39 | 1 | that says, "It is not possible to know which customers |
| 16:28:42 | 2 | will purchase accessories, what accessories they will |
| 16:28:44 | 3 | purchase or when they will purchase the accessories.  As |
| 16:28:46 | 4 | a result, the harm to Ozonics from these downstream sales |
| 16:28:50 | 5 | is impossible to quantify."  You would agree that that's |
| 16:28:53 | 6 | what's stated there, sir? |
| 16:28:54 | 7 | A.      That is what I said, correct. |
| 16:28:56 | 8 | Q.      Okay, would you please flip to paragraph 16, |
| 16:29:25 | 9 | please. |
| 16:29:25 | 10 | A.      (The witness complies.)  I am there. |
| 16:29:37 | 11 | Q.      Okay.  Actually, strike that.  If you could just |
| 16:29:53 | 12 | please -- actually, if you could just please flip to your |
| 16:30:02 | 13 | resume, so that would be page 18 of your resume.  Excuse |
| 16:30:11 | 14 | me, I actually think it's page 18 as designated in the |
| 16:30:15 | 15 | filing, bullet point 2.  So, yeah, page 18 of 24. |
| 16:30:24 | 16 | A.      (The witness complies.) |
| 16:30:29 | 17 | Q.      Sir, are you on page 18? |
| 16:30:31 | 18 | A.      Yes, I am. |
| 16:30:31 | 19 | Q.      So on page 18, the second bullet point on that |
| 16:30:35 | 20 | page, if you go to the final sentence of bullet point 2, |
| 16:30:39 | 21 | "Work involved detailed analysis of multiple sales |
| 16:30:42 | 22 | databases and detailed review of client financial |
| 16:30:46 | 23 | reporting systems, including costs and profits." [As |
| 16:30:50 | 24 | read.] |
| 16:30:50 | 25 | A.      And sales. |

| | | |
|---|---|---|
| 16:30:51 | 1 | Q.     And it also says, "Assisted in the calculation of |
| 16:30:53 | 2 | lost profits, price erosion, and reasonable royalty |
| 16:30:56 | 3 | damages related to high purity chemicals." |
| 16:30:59 | 4 |      You would also agree it says that? |
| 16:31:02 | 5 | **A.     That, correct.** |
| 16:31:02 | 6 | Q.     And you would also be retained in previous |
| 16:31:05 | 7 | litigation specifically as a damages expert? |
| 16:31:08 | 8 | **A.     Yes.** |
| 16:31:10 | 9 | Q.     So you would agree you've previously done lost |
| 16:31:13 | 10 | sales, price erosion, and damage calculations? |
| 16:31:17 | 11 | **A.     Yes, I have.** |
| 16:31:18 | 12 |      MR. PETERSON:  Thank you.  No further questions. |
| 16:31:21 | 13 |      MR. FOSTER:  No cross, Your Honor. |
| 16:31:22 | 14 |      THE COURT:  All right.  Mr. Cragun, you may step |
| 16:31:26 | 15 | down.  Thank you very much. |
| 16:31:27 | 16 |      (Witness excused from the witness stand.) |
| 16:31:31 | 17 |      MR. WEEMS:  Now, no further witnesses, Your Honor. |
| 16:31:33 | 18 |      THE COURT:  Is there any rebuttal evidence from |
| 16:31:35 | 19 | plaintiff? |
| 16:31:39 | 20 |      MR. FOSTER:  No rebuttal evidence, Your Honor. |
| 16:31:41 | 21 |      THE COURT:  All right.  Counsel, here's what I'm |
| 16:31:42 | 22 | going to suggest.  It's 4:30.  I want to hear argument. |
| 16:31:47 | 23 | I came in this afternoon primarily expecting to hear |
| 16:31:50 | 24 | argument, not realizing that we would put on the |
| 16:31:52 | 25 | evidence.  And that's fine.  It's your case, or |

16:31:55   1   respective cases.  But I suspect that you all want more

16:32:04   2   than 15 to 20 minutes to argue your case, and because I

16:32:08   3   suspect I'm going to ask you all questions as you argue,

16:32:11   4   it's going to take more than that.  I'm going to ask you

16:32:13   5   to come back tomorrow morning at 9:30.  I'll hear

16:32:17   6   argument from counsel as to plaintiff's motion for

16:32:20   7   preliminary injunction at that point.  I have, in

16:32:22   8   interim, cleared my morning docket, although not starting

16:32:25   9   until 9:30 to accommodate this, and we will hear argument

16:32:30   10  at that point.  So we'll be in recess until tomorrow

16:32:33   11  morning at 9:30.

16:32:34   12         MR. FOSTER:  Thank you, Your Honor.

16:32:35   13         MR. WEEMS:  Thank you, Your Honor.

16:32:36   14         THE CLERK:  All rise.

16:32:38   15         (Whereupon, the proceedings were adjourned at

16:32:39   16  4:32 P.M.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;          That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 5th day of October, 2018.


                    s/ Johanna L. Wilkinson
                    Johanna L. Wilkinson, CSR, CRR, RMR
                    United States Court Reporter