1

```
1              IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF KANSAS
2

3   PARAH, LLC and
    OZONICS, LLC,
4
                  Plaintiffs,
5
         vs.                        District Court
6                                   Case Number
    MOJACK DISTRUBTORS, LLC         18-1208
7   dba SCENT CRUSHER,

8                 Defendant.

9
                   TRANSCRIPT OF PROCEEDINGS
10

11       On the 16th day of August, 2018 at 9:38 a.m. came
    on to be heard in the MOTION FOR TEMPORARY INJUNCTION in
12  the above-entitled and numbered cause before the
    HONORABLE ERIC F. MELGREN, Judge of the United States
13  District Court for the District of Kansas, Sitting in
    Wichita.
14       Proceedings recorded by mechanical stenography.
         Transcript produced by computer.
15

16
    APPEARANCES
17
         The Plaintiffs appeared by and through:
18       Mr. Patrick B. Hughes
         Adam Jones Law Firm, P.A.
19       1635 N. Waterfront Pkwy
         Suite 200
20       Wichita, Kansas 67206

21       Mr. Brett L. Foster
         Mr. Mark A. Miller
22       Dorsey & Whitney, LLP
         111 S. Main Street
23       Suite 2100
         Salt Lake City, UT 84111
24

25
```

2

```
 1        The Defendant appeared by and through:
          Mr. Douglas Weems
 2        Mr. Kyle Elliott
          Mr. Kevin Tuttle
 3        Spencer Fane Britt & Browne, LLP
          1100 Walnut
 4        Suite 1400
          Kansas City, MO 64106
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          <u>I N D E X</u>

2                                                        <u>PAGE</u>

3

CLOSING ARGUMENTS
4      By Mr. Foster                                        4
       By Mr. Miller                                       33
5      BY Mr. Weems                                         47

6

REPORTER'S CERTIFICATE                                    76
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following proceedings commenced at 9:38 a.m.

2          and were requested transcribed:)

3          THE COURT:  Mr. Foster, this was your motion, so I

4    will hear arguments from you first.

5          MR. FOSTER:  Thank you, Your Honor.

6          Okay.  Your Honor, in terms of sequence, given the

7    nature of the issues as we see it, we kind of have three

8    components:  The infringement, claim construction

9    component; the validity component; and then the

10   irreparable harm, balance of hardship, public interest

11   component and what I would propose, given --

12         THE COURT:  So your last three, I mean there are

13   really four standards --

14         MR. FOSTER:  Correct.

15         THE COURT:  -- for granting injunctive relief, and

16   invalidity and infringement probably fall within the

17   likelihood of success on the merits.

18         MR. FOSTER:  Right.

19         THE COURT:  And the other three you kind of looped

20   or grouped together.

21         MR. FOSTER:  Correct.

22         THE COURT:  All right.  Okay.

23         MR. FOSTER:  So what I would like to do, with Your

24   Honor's permission, is I will address claim construction

25   and infringement and then if you want to take their

1   argument that's fine, but then I will turn it over to

2   Mr. Miller to argue invalidity and then I will return on

3   the final three components of the preliminary injunction,

4   so if -- if that --

5           THE COURT:  I'm going to take all of your

6   arguments in total before I hear from defendants.

7           MR. FOSTER:  Okay.  Thank you.  And if it's -- I

8   will proceed with the infringement issues and then turn

9   it over to Mr. Miller and then come back to the final

10  three.

11          Okay.  The -- let's start briefly with the -- the

12  infringement issues that are really at issue.

13          And Ms. -- Sherri, could you pull up Elrod 38,

14  this is the '180 patent, and if you would pull up claim

15  one in the lower left-hand corner.

16          THE COURT:  Which patent is this?

17          MR. FOSTER:  This is the claim one of the '180

18  patent, it's Elrod Exhibit A.

19          THE COURT:  All right.

20          MR. FOSTER:  And the claim language here, you have

21  the preamble, and then it goes:  Providing a gas

22  generator, that's an element; transported into the field,

23  that's an element, or limitation; configured for mounting

24  in the field, configured for discharging a stream of

25  oxidizing gas -- you can unhighlight that one because

1   that is one I am going to get to in a minute -- and then

2   to eliminate scents associated with the hunter, that's

3   what I am going to get to in a minute; and then traveling

4   downwind of the hunter toward game animals.

5           So all of the generator in the field, mounted,

6   downwind, are all essentially conceded.  Mr. Drake

7   testified yesterday, I took him through those particular

8   points and -- and I don't believe there is any genuine

9   dispute that they have an ozone generator, we saw that on

10  the face of their operator's manual; in the field, his

11  testimony was clear on that, their operator manual and

12  pictures of them in the field are clear; mounted, it's

13  clear, they're mounted in tree stands, they're mounted in

14  ground blinds; and downwind, you have that testimony as

15  well that they are downwind and their instruction or

16  operating manuals clearly even use the word "place

17  downwind" so the concept is the wind is going to blow it

18  over, so fundamentally then, if you can delete the

19  highlighting, the only things that they've really

20  challenged in connection with this patent claim are what

21  I'll call the stream issue and the elimination issue.

22          THE COURT:  Exactly my conclusion after

23  yesterday's hearing, that with respect to infringement,

24  those are the matters at issue, stream and elimination.

25          MR. FOSTER:  Okay.  Good.  And what I -- what

1   I -- what I will do is I'll go through those issues first

2   right now, and that should -- should resolve it.

3          As for the detail, we have updated claim charts,

4   if the Court would like them, that -- the first ones were

5   submitted with our motion and these have updated from the

6   information that we've learned with its tying to exhibits

7   that are of record and on file with the Court.

8          If the Court would like updated claims charts we

9   would be happy to give those to the Court.

10          THE COURT:  All right.

11          MR. FOSTER:  Okay.  Stream.  First argument was

12   surrender of claim scope.  That was the argument in their

13   brief, that was the argument of Dr. Friis in her report,

14   and she claimed they surrendered a volume of gas and did

15   not define a stream, did not define a volume, and didn't

16   provide the standard.  There wasn't a standard in the

17   brief, there wasn't a standard in her -- her opinion, so

18   I am going to go to my -- let's go to Page 6.  Court is

19   very familiar with the standard.  If you could blow that

20   up for the Court.

21          This is from the federal circuit, *Omega* case, this

22   is the standard to show a surrender of claims scope and

23   you're balancing out the public interest, but anything

24   that's ambiguous doesn't cut it.  We have required that

25   alleged disavowing statements to be both so clear as to

1  show reasonable clarity and deliberateness and so

2  unmistakable as to be unambiguous evidence of disclaim

3  er.

4          So the standards there in bold:  It has to be both

5  clear and unmistakable.

6          And so let's walk through the file history to see

7  what we can see.

8          Let's go to the next page.  This is -- if you

9  could blow up the top part.

10          Top of this is the original claim language and it

11  says, the critical language, "By generating a volume of

12  ozone gas," and there's the disjunctive "or" a --

13  generate a gaseous stream of hydroxl -- or hydroperoxide.

14          So Dr. Friis yesterday, we cross-examined

15  Dr. Friis and asked about that in connection with the way

16  they were amended and the patent office rejected that

17  claim, on both the volume of gas elements and the gaseous

18  stream elements by applying art that Ozonics argued

19  wasn't related or applicable to hunting in the field or

20  fishing smells in the field, so there was no specific

21  attack on those -- those one versus another, the patent

22  office didn't distinguish one versus another, and so what

23  Ozonics did is cancel all 11 claims and put a host of new

24  claims in.

25          The -- the new claim, 12, that's the way you do a

1  patent prosecution, you start with claim 12, that is

2  recited here.

3        Now I have highlighted the differences here

4  because --

5        THE COURT:  Tell me again what your interpretation

6  of the PTO's problem with your original claims were.

7        MR. FOSTER:  The original claims unrelated to

8  volume or gaseous stream, by distinction was, we've got

9  ozone prior art and we believe under 102 it anticipates

10  some of the claims, and 103 it makes obvious some of the

11  claims, but it wasn't relating to those specific

12  characteristics or distinguishing one versus another

13  rejected all the claims because the prior art disclosed

14  any method or discharge of ozone and any volume to the

15  particular issues at hand which are --

16        THE COURT:  So your understanding is that

17  the -- the Patent and Trademark Office rejected those

18  claims because they were already in the -- in the field,

19  and unfortunate dual use of terms here, there was already

20  an in commerce "ozone emitting apparatus."

21        MR. FOSTER:  That's correct.

22        THE COURT:  All right.

23        MR. FOSTER:  And in response, we presented new

24  claims.  Not "we," Ozonics.

25        THE COURT:  Sure.

1          MR. FOSTER:  And here's the new claim.  The first

2  new claim is it substituted the gaseous stream of

3  descenting material for the two disjunctive, generating a

4  volume of ozone gas or gaseous stream of hydroxl or

5  hydroxy ions.

6          Dr. Friis admitted in her testimony that the

7  gaseous stream of descenting material is broader than

8  just a gaseous stream of two ions that are specifically

9  mentioned in the original claim.  And therefore it is

10  broader and she also admitted that a gaseous stream has

11  volume, so in that regard, that's -- that would be

12  commonly understood so that's -- that's what happened.

13          And then how did Ozonics respond to the office

14  action?  Ozonics responded by saying, These do not teach

15  using ozone in the field by a sportsman, hunters and

16  fishers, to eliminate scent.  Generally.  There was no

17  argument that, Now we have overcome prior art because we

18  have changed from the first way we talked about "volume"

19  and "a gaseous stream" to just broadly "a stream of

20  descenting material" so there is no argument that can be

21  made, we believe, in good faith that -- well, there can

22  be no argument made that there is a clear, unambiguous

23  disclaimer of claim scope here because it had nothing to

24  do -- this new language in -- in Ozonics' view would

25  broaden it, not narrow it, and there was no elimination

1  of volume to -- to --

2       THE COURT:  I didn't understand the thrust of

3  Dr. Friis' testimony to be surrendered as much as her

4  claim that, I mean she was saying with respect of course

5  to defendant's invention, although I think she admitted

6  that it would be true of yours as well --

7       MR. FOSTER:  Correct.

8       THE COURT:  -- that the stream, the gaseous stream

9  did not, in fact, pass over the clothing, body or

10  equipment --

11       MR. FOSTER:  Okay, and --

12       THE COURT:  -- and the defendant because the -- by

13  the time it got to them, there is no longer a stream but

14  it was a volume.

15       MR. FOSTER:  Right, right, and I'll get to that

16  issue.

17       THE COURT:  All right.

18       MR. FOSTER:  What I am focussing on is did we

19  surrender.  I didn't hear anything yesterday from

20  Dr. Friis about what her opinion relied on originally.

21  She came up and I think you've characterized it exactly

22  as we understood it as well.  So the point here is, we

23  did not surrender volume, there's no clear and

24  unmistakable.

25       Now let's go to claim construction of stream

1  before we get to her specific application to

2  infringement.  On claim construction, we first have to

3  define the ordinary skill of the art.

4        Can you go to the next slide, slide eight?

5        And this is what Dr. Friis says in her report as

6  to -- you view claim construction by reviewing the patent

7  as one of the ordinary skilled in the art and she -- she

8  says, a Bachelor's degree in mechanical engineering and

9  one to two years of related industry experience or

10 technical equivalent.

11       Okay.  And what did the -- what did the patent

12 office say in regard to the ordinary skill of the art?

13       Can you go to the second?

14       Okay.  This -- this is from the '197 patent, the

15 first part, specifically gives the field of the invention

16 and it's to provide a method of removing human scent and

17 any other scent that is not advantageous to the

18 environment.

19       And specifically during the prosecution history

20 the patent office described the relevant art as the art

21 of hunting and human scent elimination during hunting,

22 therefore, a person of ordinary skill in the art, we

23 propose, should be a person with at least two or three,

24 experiences in hunting and using scent elimination

25 products in hunting.

1        And that's consistent with the file history, we

2  don't think you need a PhD or even a -- an engineering

3  degree for this art and that's the perspective that we

4  think should be -- should be used to analyze this.

5        Now, let's -- let's -- let's talk about what does

6  "stream" mean.  That's -- again, now that we have

7  established the level of skill in the art and the

8  viewpoint, what does -- what does "stream" mean?

9        Dr. Friis in her report didn't define it at all,

10  and nor did Scent Crusher in their brief.  She did

11  concede that it was not given a specific definition in

12  the patent or in the file history, and she also said the

13  plain and ordinary meaning should apply and she testified

14  that she didn't disagree with the Merriam-Webster

15  definition of "any body of flowing gas."

16        THE COURT:  She -- I noticed though that later in

17  her testimony she sort of recharacterized --

18        MR. FOSTER:  Correct.

19        THE COURT:  -- in examination with her own counsel

20  the Webster definition to include her insertion of an

21  originating force --

22        MR. FOSTER:  Correct.

23        THE COURT:  -- which is not in the Webster

24  definition.

25        MR. FOSTER:  That's exactly right.  And that, by

1  the way, wasn't in the report anywhere, that is something

2  that originated on the stand yesterday.

3        THE COURT:  The originating force was not in her

4  original report?

5        MR. FOSTER:  She never talked about there

6  was -- there's got to be some force of, the definition is

7  "any body of flowing gas."  She says "forced body" so she

8  wants to replace "any body" with "forced."

9        THE COURT:  And I'm sorry, where did "any body"

10  come from?

11        MR. FOSTER:  Merriam-Webster dictionary.

12        THE COURT:  The Webster definition.

13        MR. FOSTER:  Correct, it's Miller Exhibit 36 I

14  believe.

15        THE COURT:  Yeah.

16        MR. FOSTER:  And so, she didn't disagree with it

17  but you're right, she wanted to insert some -- some

18  mechanical power as opposed to any body, like the plain

19  and ordinary dictionary definition.

20        So let's go to slide number one.

21        Okay.  This -- this is a basically where she's

22  coming from on -- on the -- on the definition.  "The

23  mechanical power or forced" -- that's what she is adding

24  to the dictionary definition -- and her opinion of

25  essentially the construction to what end?  To what end?

1   To get to a noninfringement position.

2        She testified if you are going to apply it in this

3   fashion it's going to leave the ozone generator and there

4   is an initial flow of it -- so there is a flow, and flow

5   is a stream, an initial stream she even testified to, but

6   then I think her testimony is, it disburses so her

7   testimony would say, okay, it's -- we've got a stream

8   when it leaves the ozone generator but somehow by the

9   time it gets to the person, it's not a stream.

10        What does she rely on?  It isn't Webster's,

11   there's no record -- intrinsic record at all and this

12   would be impossible to infringe.  It does -- the

13   testimony from Mr. Drake was basically, I asked him about

14   You've got a fan, you've got an element that produces

15   ozone and the fan blows it out, defense, defect?

16        And he said essentially, Just like Ozonics.  He

17   said essentially the same as Ozonics, that was his

18   testimony.  And so what the testimony there is, if

19   ours -- if theirs doesn't produce a flow, ours doesn't

20   either.

21        THE COURT:  You know, I think she never -- she

22   never actually said this, but I think she would

23   implicitly admit what you just said that yourself doesn't

24   do that either but nevertheless she would hold you to

25   your definition of what your art covers to say, well,

1  ours doesn't violate that because your protection is as

2  defined in the patent and whether in fact your -- your

3  invention does that precisely, she would say is probably

4  not relevant, the question is as you defined it and

5  obtained protection for it in the patent, does

6  defendant's device do that to infringe?

7       MR. FOSTER:  Right.  And so when we're looking at

8  claim construction with an end result construction to

9  reach the infringement, so you're doing it backwards,

10 okay, what do we need to avoid infringement?

11      We need to say, we've got our witnesses saying

12 it's a flow, admitting -- Mr. Drake admitted that flow.

13 As Mr. Drake admitted, that flow is over the hunter, so

14 his testimony actually contradicts hers in terms of how

15 it operates.

16      They talk about it in their materials as a blanket

17 and I'll get to that when I am proving infringement,

18 and -- and but she's result-oriented, okay, if I can stop

19 the stream or flow right out of the box, and somewhere

20 between there say it's not a stream, then somehow

21 that -- that produces a victory for me.  But --

22      THE COURT:  Does your patent language and '108

23 patent have the word "flow"?

24      MR. FOSTER:  No, "flow" is the definition we're

25 relying on any -- the flow of any -- any body of a -- any

1  flow of a body of gas, that's the Webster definition, and

2  we are relying on plain and ordinary meaning.

3        We believe a "stream" is defined as a flow -- any

4  flow.

5        THE COURT:  So "flow" does not come from your

6  patent language --

7        MR. FOSTER:  Correct.

8        THE COURT:  -- it comes from your dictionary

9  definition of "stream"?

10        MR. FOSTER:  That's correct.

11        THE COURT:  All right.

12        MR. FOSTER:  But it is the plain and ordinary

13  meaning and there is no other meaning proposed.

14        The patent doesn't define it, they admit the

15  patent doesn't define it, and a plain and ordinary and

16  common use of that word would mean a stream, in the

17  context of the gas as a flow of gas, just like the

18  dictionary indicates.  So that's the way we tie it

19  together.

20        Now here's why, when you don't have any basis for

21  your definition of "force," it's not in the file history,

22  there's nothing in there, there's -- I would say that not

23  only --

24        THE COURT:  I don't think the force issue is

25  really, at the end of the day, pertinent --

1          MR. FOSTER:  Okay.

2          THE COURT:  -- because a force issue focusses on

3  the origination of -- let me use your word for a moment.

4  The force issue focusses on the origination of the flow,

5  she says it's a stream coming out but she claims on

6  infringement because she says it ceases to become a

7  stream, it diffuses into volume and so her -- as I

8  understood it, her testimony with respect to infringement

9  focussed on the end and not the origination of this flow

10  of -- of oxidizing gas.

11          MR. FOSTER:  Correct.  I think that you have

12  correctly analyzed her position and, again, what's

13  the --

14          THE COURT:  So what I am saying is, so the force

15  that originates a stream, at the end of the day I don't

16  think is really pertinent to the infringement claim.

17          MR. FOSTER:  Okay.  Okay.  Fair enough.

18          Now when you're looking at a definition that gets

19  result oriented, I want to go to the next slide, slide

20  three, it -- no, go to slide three.

21          There we go.

22          These are -- these are, you know, red lights for a

23  district court on claim construction.  This construction,

24  any ozone generator has a fan in it and is going to

25  produce a flow or stream of ozone and in the -- in the

1  patent it talks about that -- that basically falling on

2  the hunter and his equipment, or the fisher, so you don't

3  interpret claims in a way that excludes the specification

4  or the preferred embodiment and if -- if you have a

5  construction that renders the claimed invention

6  inoperable, that's also viewed with extreme skepticism so

7  when you find no support for what you're arguing for your

8  definition in the spec, and you can't find it anywhere

9  else and they haven't proposed it anywhere else and we

10 can't find it anywhere else, that indicates that you have

11 a problem.

12       Let's pull up --

13       THE COURT:  Would you leave that up for just a

14 second, please?

15       MR. FOSTER:  Yes, yes.

16       THE COURT:  All right.  Thank you.

17       MR. FOSTER:  Now let's go to the next slide again,

18 this is the Merriam-Webster dictionaries, "Any body of

19 flowing fluid such as gas," and this is again going to be

20 widely accepted.

21       And in the field of hunting, when we're looking at

22 the ordinary skill in the art, respectfully, we're not

23 looking what -- what a PhD can theoretically think of, it

24 is what are hunters going to think of or people in the

25 scent elimination and hunting field for a few years,

1   that's the relevant inquiry and you heard it from

2   Mr. Drake, it flows and it flows over the hunter and they

3   argue that it -- it's a blanket.  Is it a blanket?  Yes,

4   because it's a flow and it's heavier than air.

5        Dr. Friis admitted that gravity will have an

6   effect on the ozone so that's what we believe the proper

7   definition is, and before I move off of claim

8   construction, and while we're here, I want to go back and

9   talk about elimination and then I'll tie it to the

10  infringement, if you will.

11       Let's go to slide two.

12       Once again, you have elimination and her

13  definition, you had once again, contrasting testimony.

14  She wants to define eliminate as 99.99 doesn't get it

15  done.

16       THE COURT:  Mm-hmm.

17       MR. FOSTER:  It's got to be 100 percent, and this

18  is where there is no ambiguity.

19       When Mr. Miller was crossing her she said, it

20  doesn't cover Scent Crusher's product because it doesn't

21  eliminate -- she said Ozonics' product won't eliminate

22  it, so the preferred embodiment under the patent isn't

23  covered, by her construction, and she even said, in fact,

24  no invention that would practice this elimination would

25  be able to, unless it's in an enclosed space, then you

1  can have 100 percent elimination.  That takes it right

2  outside of the scope and content of the prior art and

3  that's where you have a contrast with Mr. Drake.

4        THE COURT:  So she determined -- with respect to

5  elimination she interpreted the patent in my

6  understanding in a way -- and I think you just said

7  this -- in a way that would be impossible to comply and

8  since it's impossible even for you to comply with what

9  you have protected, it's impossible for them to infringe

10 it?

11       MR. FOSTER:  That's exactly what's happened here,

12 Your Honor, you have an opinion that essentially by

13 virtue of defining "eliminate" as 100 percent it means

14 they can't possibly infringe, nor can we practice it, nor

15 can we prevent anybody from practicing it.

16       Now I've got great stuff for you that we haven't

17 presented.  Slide five.

18       Part of claim construction is defined what terms

19 mean by looking into the file history and in the bottom

20 part of this you have the law from the federal circuit

21 that the intrinsic record of the patent includes all of

22 the prior art that's considered by the patent office.

23       During reexamination, and -- and *Hess*, you heard a

24 lot about *Hess*.  *Hess* was one of the three prior art

25 references that Dr. Friis relied on --

1          THE COURT:  This is the patent from *Hess*?

2          MR. FOSTER:  Correct.

3          THE COURT:  Not from Ozonics?

4          MR. FOSTER:  Yes.

5          THE COURT:  All right.

6          MR. FOSTER:  But this is in the file history, it

7  is in --

8          THE COURT:  It's in the file history for Ozonics?

9          MR. FOSTER:  Correct, yes, in fact, we overcame

10  the patent office's arguments five times or more on *Hess*.

11          THE COURT:  Right.

12          MR. FOSTER:  And so it was front and center.  And

13  in connection with that, again, this isn't something

14  that -- that was buried somewhere and that Dr. Friis or

15  the patent office didn't look at, it was the subject of

16  what we had to overcome to get our patent to the claims

17  and how do they define in *Hess* "scent elimination"?

18          "As used herein, scent elimination generally means

19  reproducing scents to an acceptable low level given the

20  application although not actually totally eliminating all

21  scents.  In particular for hunting applications, scent

22  elimination means reducing scents to a low-enough level

23  so that ambient air" -- "so that in the ambient air that

24  they do not alarm wild animals and cause them to flee."

25          THE COURT:  I'm just -- I'm just a little troubled

1    and let's -- let's state the obvious here.

2            MR. FOSTER:  Okay.

3            THE COURT:  Your patent expertise far usurps mine

4    but I'm just a little troubled by the fact that *Hess* is

5    included in the Ozonics file because you had to overcome

6    that prior art, means that you can take what's -- what's

7    really probably somewhat of an unrelated reason for

8    *Hess's* inclusion in your file, and apply it as an

9    authoritative definitional term for your patent when this

10   isn't really the reason, that is to say the elim -- the

11   description of "elimination" in the *Hess* patent isn't

12   really related to the reason that this is included in the

13   Ozonics filing.

14           MR. FOSTER:  I would respectfully disagree with

15   that analysis for two reasons:

16           Number one, the intrinsic record is what it is.

17   *Hess* is part of the intrinsic record.  You look at the

18   intrinsic record to determine what claim terms mean.

19   What is *Hess* trying to prove?  Or what -- what's

20   it -- what's its patentability?  It is to eliminate scent

21   using ozone in enclosed spaces so in that regard,

22   elimination and the problem they're solving is the same

23   problem.  Just not in the field with hunters.  It's in

24   enclosed spaces and so it -- the scent elimination

25   concept is exactly the same.

1          You want to have -- you go out in the field and

2    you take your clothes and your boots and everything and

3    you put them in that closet or that room that has the

4    *Hess* product and you -- or actually *Hess* is the blind,

5    it -- it takes it through and it is to eliminate the

6    scent.  It's the same issue.  It's exact -- it's just a

7    different environment.

8          THE COURT:  All right.  I understand your

9    argument.

10         MR. FOSTER:  All right.  Okay.  And this is how

11   the -- the point, Your Honor, too, is, again, not what a

12   PhD thinks about scent elimination, the point is what

13   does somebody in the field of scent elimination and

14   hunting for a couple of years with this experience, what

15   do they think about scent elimination?

16         And you heard it from Mr. Drake.  They advertise

17   scent elimination -- I'll get to this in my

18   infringement -- and he says, Yeah, it eliminates scent.

19   And he says, Do you have studies?

20         THE COURT:  Mr. Drake pretty much disavowed

21   everything.

22         MR. FOSTER:  Yeah, okay.  But in any event, their

23   marketing materials are very clear it is scent

24   elimination and that is what they are teaching and that's

25   what -- that's what this does.

1        So I think the definition here, this gives you

2  rock solid, instead of, again, what you don't have, you

3  know, you would eliminate the patent holder's ability to

4  even utilize the patent when it overcame for seven years

5  of prosecution the challenges of the patent office, so

6  that is the claim construction.

7        THE COURT:  Will you provide us with a copy of

8  your PowerPoint, Mr. Foster?

9        MR. FOSTER:  Yes, yes, I will.

10        THE COURT:  Thank you.

11        MR. FOSTER:    I apologize for not having an

12  extra copy, I will give it to you when I am done, and I

13  can e-mail it.

14        THE COURT:  I prefer to have it to look at the

15  screen for purposes of your argument any way, but for

16  chamber purposes, I would like a copy.

17        MR. FOSTER:  I have a PDF.

18        MR. WEEMS:  Do you have a copy for us as well?

19        THE COURT:  And by the way, and so I am now

20  exactly 30 minutes late on this, but I want to note that

21  my court reporter is not here.  We have an excellent

22  court reporter from the courthouse filling in for us who

23  does a great job but she wasn't here yesterday, so -- I

24  appreciate you filling in, Jana.

25        MR. FOSTER:  Thank you so much.

```
 1          THE COURT:  All these terms are a bit new to you

 2   but I'm sure you're doing a great job.

 3          MR. HUGHES:  Your Honor --

 4          THE COURT:  And I'm also relieved that the other

 5   person in the courtroom who spoke as quickly as I did

 6   yesterday from defense counsel is not here today.

 7          So, Jana is used to suffering with my rapid rate

 8   of speech -- I'm sorry, Jo is used to suffering with my

 9   rapid rate of speech but Jana is not, so I will try and

10   behave.

11          And, Patrick.

12          MR. FOSTER:  We appreciate you guys accommodating

13   us very much.

14          MR. HUGHES:  We have one printed copy today of

15   the -- of the -- of this -- our PowerPoint presentation

16   but I do have it available to e-mail.

17          Would the Court like it e-mailed now?

18          THE COURT:  That's fine.  Sure.  If you want to

19   e-mail it to me and to defense counsel now, that would be

20   great.

21          MR. HUGHES:  Okay, thank you.

22          THE COURT:  All right.

23          So, Mr. Miller.

24          MR. FOSTER:  So now that we have defined the

25   terms, then -- then now we're going to step through what
```

1  evidence do we have of infringement and I think we have

2  very strong evidence of -- of exactly the kind of flow,

3  again, I think it's important -- let's go to Exhibit S,

4  Page 172 of Elrod.

5       And the steps there in the middle -- yep -- using

6  the Scent Crusher.

7       This gives you the ABC's -- and we went over this

8  with Mr. Drake and his testimony -- insert the battery,

9  you turn it on, you select the button --

10      THE COURT:  Right.

11      MR. FOSTER:  -- and it runs and you've got high,

12  medium, low, and he said, Yes, that regulates the flow of

13  Ozone out of the machine, so you have -- you have a

14  stream.

15      And so I want to look at also the way it works.

16  Okay?  It -- it -- let's go to S, Exhibit 168, it's the

17  same user manual for their product.

18      And the very first, "Thank you for your purchase,"

19  that first paragraph.

20      There we go.  Thanks.

21      "Field Scent Pro is your blanket for your field

22  stand and ground blind."  That is why they characterize

23  it:  It flows out of the ozone unit over the hunter, it

24  is downwind and the animal is going to be here, it is to

25  eliminate your scent.

1          Let's show you, it's -- not only do they have a

2  product that is essentially the same as Ozonics, but they

3  also market it with the same blanket terms.

4          Let's go to 58.  This is brochure for the -- let's

5  see.

6          THE COURT:  Well, we --

7          MR. FOSTER:  I apologize.

8          THE COURT:  We focussed on the term "stream" and

9  "eliminate" because at least to my theory --

10          MR. FOSTER:  Yes.

11          THE COURT:  -- of the evidence yesterday that's

12  the gravamen of their arguments were not infringement.

13          MR. FOSTER:  Yes.

14          THE COURT:  So why don't you focus your arguments

15  more narrowly on those issues as well.

16          MR. FOSTER:  Right.  And so, essentially, again,

17  the evidence that we have is we have evidence

18  that -- that there is a flow, and we've got the

19  definition, "Any body of flowing gas."

20          They've admitted, Mr. Drake, that they have a

21  flow.  The marketing materials indicate they have a flow.

22  The marketing materials indicate that they have a

23  blanket, and we argue that we have a blanket, I'm trying

24  to find my reference to that blanket and I didn't get it

25  right.

1        Let me -- it's Page 45, Ms. Stucki.

2        And this is at least a picture so it kind of

3   illustrates -- would you blow up that picture in

4   the -- there you go.

5        This essentially -- this is the preferred

6   embodiment covered by the patent and you will note that

7   even though this is a drawing, you saw pictures in the

8   marketing materials of Scent Crusher putting their unit

9   in the tree above the hunter just like this, and you can

10  see it flowing out and covering this human scent as a

11  blanket, as it flows -- as it flows.

12       So that is exactly what we described --

13       THE COURT:  This is Scent Crusher's --

14       MR. FOSTER:  -- in exactly the same way as they

15  describe it as and that -- that helps us prove

16  infringement.

17       The -- let's see.  Now, I want to go to the -- to

18  the claim one again, Page 38, lower left-hand corner,

19  Elrod, yeah.  And go through and listen -- and analyze

20  this quickly on claim one.

21       Yep.

22       Okay.  So, if we focus on "discharging a stream of

23  oxidizing gas into the field to eliminate scents

24  associated with hunting," just focussing first on

25  "discharging a stream of oxidizing gas into the field."

```
 1          Okay.  This one is one that is not insnared by

 2  her, it's not falling on the hunter.  She admits that the

 3  ozone --

 4          THE COURT:  Which patent is this?

 5          MR. FOSTER:  The claim one of the '180.

 6          THE COURT:  This is '180.

 7          MR. FOSTER:  '180, Exhibit A, Elrod.  Yep.

 8          So this one all you need to have to infringe is

 9  discharging a stream of oxidizing gas into the field.

10  Doesn't have to cover the hunter, doesn't have to be

11  directly on the hunter, it's just discharging a stream

12  and she admitted in her testimony that the Scent Crusher

13  Field Pro and Pro Lite emit an initial flow out of the

14  unit, therefore that is a discharge of a stream of gas

15  into the field.

16          THE COURT:  So you're saying that even with her

17  hypertechnical interpretation of stream --

18          MR. FOSTER:  Correct.

19          THE COURT:  -- Scent Crusher would still infringe

20  this?

21          MR. FOSTER:  That's exactly right --

22          THE COURT:  I understand.

23          MR. FOSTER:  -- because there is a stream, there

24  is a flow, she admitted initial flow, initial flow is

25  flow, therefore, there is a discharge of --
```

1          THE COURT:  Okay, I understand.

2          MR. FOSTER:  -- oxidizing gas.

3          So let's go to the next patent, let's go to claim

4    one of the '177 patent.

5          And this is where it -- Page 42.  Lower left-hand

6    column, claim one.  Okay.

7          So here's -- here we have -- and if we go to

8    the -- to the critical stream -- "applying the stream of

9    oxidizing gas directly on to the hunter, the hunting

10   clothing, and the hunting equipment in the field to

11   deodorize" -- so stop before "deodorize."

12         That's where she's got her little -- her little

13   hypertechnical analysis, applying stream directly on to

14   the hunter, the hunting clothing and the hunting

15   equipment.

16         So that's where you can't buy her argument on flow

17   means a flow that is forced on to the hunter.  If it

18   flows out it's any flow of gas, the gas is still flowing,

19   even if it is dispersing or getting wider, as you saw in

20   that photograph, there is --

21         THE COURT:  Her argument is that it quickly ceases

22   to be a stream and becomes diffused into just a volume

23   and by the time it's covering the hunter and clothing and

24   equipment it's no longer a stream but it is more cloud of

25   volume.

1          MR. FOSTER:  But if it's a cloud of volume, to one

2  of ordinary skill in the art that's in this field they're

3  going to think of it exactly the way Dan Drake does, and

4  exactly the same way as Scott Elrod and everybody else in

5  this industry, that when you're producing that flow --

6          THE COURT:  All right, all right.

7          MR. FOSTER:  -- and it flows over the hunter and

8  creates a blanket, as both parties say you still have the

9  claimed invention and not a hypertechnical -- well,

10 there's not going to be -- it's going to have some

11 dispersion, a flow is a flow and it can't be restricted

12 to -- to something that, again, every unit out there that

13 has been non-hunting applications has the same

14 fundamental fan blowing it out.

15         THE COURT:  Right, I understand.

16         MR. FOSTER:  Okay.  All right.  So,

17 that's -- that's simply the -- that's not in claim one of

18 the '180 but it still in our view doesn't survive

19 scrutiny.

20         Now let's talk about the elimination.  I don't

21 know that we need a lot more on elimination.

22         THE COURT:  I don't think we do.

23         MR. FOSTER:  Okay.  I think, Your Honor, where

24 I've covered "stream," defining it and "eliminate,"

25 defining it, and applying both of those, I have applied

1  representative analysis to claims one of each patent,

2  we'll get you our claim charts that cover the other

3  asserted claims, and I think I'm ready to turn it over to

4  Mr. Miller.

5        THE COURT:  Very well.

6        Mr. Miller.

7        MR. MILLER:  Your Honor, I have hard copies of the

8  slides I'm going to use.

9        THE COURT:  All right.

10       MR. MILLER:  May as well hand them to you now.

11 There is a couple copies there.

12       I think I'll just start -- unless you have

13 direction of where you want me to go I'll just start by

14 talking about the prior art references briefly.

15       THE COURT:  I have direction.

16       MR. MILLER:  Okay.

17       THE COURT:  I -- I promise you that if I change my

18 mind after hearing from defendants I'll come back to

19 you --

20       MR. MILLER:  Okay.

21       THE COURT:  -- but I heard, in my opinion,

22 virtually no qualified or competent evidence yesterday

23 with respect to invalidity and so I don't think I need a

24 lot of defense from you on validity.

25       MR. MILLER:  Okay.  That is very helpful.

1          THE COURT:  It's very helpful for our time, too.

2          MR. MILLER:  Yes, it is.  If you'll allow me,

3  there is only a handful of these slides then that I would

4  like to show you --

5          THE COURT:  All right.

6          MR. MILLER:  -- because they talk about the law

7  basically that I think --

8          THE COURT:  Very well.

9          MR. MILLER:  -- that was raised in my mind from

10  her testimony.

11          Ms. Stucki, if you could go to slide

12  number -- hmm.  I'm getting there.  Man, I made a lot of

13  slides.  All right, slide number 15.

14          When you're talking about the standard of the

15  preliminary injunction stage, a lot of the case law talks

16  about substantial likelihood of invalidity, it's

17  important to recognize the context of that is you have to

18  keep in mind the burden of proof they will have at trial

19  and here's some cases that talk about likelihood of

20  success in a preliminary injunction context, you're

21  evaluating whether it's more likely than not that they'll

22  be able to prove at trial by clear and convincing

23  evidence.

24          THE COURT:  Right.

25          MR. MILLER:  If you go to the next slide, and then

1  the next one after that, Sherri, I'll skip that one.

2       This slide has some case law in it that talks

3  about how the presumption of validity is a lot harder to

4  do when -- when you don't bring anything new to the table

5  that the patent office didn't already consider.

6       And a lot of these slides show how they brought

7  nothing new to the table.  *Dawson* is not only --

8       THE COURT:  Right.

9       MR. MILLER:  -- the same thing that was previously

10  taught but the only distinction Dr. Friis made of *Dawson*

11  was, well, you place the scent particulars downwind.

12       That takes it further from our invention because

13  in the Ozonics patent you're supposed to put it upwind of

14  the hunter and some claims talk about upwind so it is

15  even less pertinent.  So this law shows how the burden is

16  even heavier on them at trial and they're not likely to

17  meet it.

18       Now, in the next slide I found a case here from

19  the District of Arizona who reaches an exact -- the exact

20  conclusion that I think is applicable here based on

21  Dr. Friis' testimony that she didn't bring anything new

22  to the table.

23       The question must be raised with an eye toward the

24  trial burden of not only clear and convincing evidence of

25  obviousness, but also the inflated burden triggered by

1  the PTO's prior examination of the patents.  And in that

2  case, they granted a preliminary injunction despite that

3  invalidity case.

4       Now, if you go to the next slide, one thing that

5  triggered, in my mind from Dr. Friis' testimony, is the

6  law about hindsight analysis.  There's a lot of case law

7  out of the federal circuit that you cannot engage in

8  hindsight analysis.  And hindsight analysis is when, you

9  know, now that everybody knows about the Ozonics patents,

10  everybody has this idea in their head now, that you can

11  actually in the open air environment, you can place this

12  ozone generator up there and just put it out continuously

13  during the hunt, now that everybody knows about it, they

14  use that, and then they look at the patents and say, What

15  could we do to these prior arts to bring them into this

16  zone?  It's pure hindsight analysis.  And hers was

17  blatant hindsight analysis.

18       Go to the next one.

19       Also she did with the Ozonics patents in mind

20  change things up.  I would encourage the Court that if,

21  because of her hindsight theories which are in these

22  slides I just presented, if you go to Slide 27, when you

23  have a case like this with hindsight theories the

24  objective evidence of nonobviousness, the secondary

25  considerations is the greatest check and safeguard

1  against a hindsight analysis.  And in this case, the

2  secondary considerations of nonobviousness are -- are

3  overwhelming.

4       This is one of those cases where the real world

5  story of the invention shows the nonobviousness.  No

6  matter how they can spin and contort the prior art and

7  that real world story, you heard from Mr. Elrod for years

8  they had to battle years of skepticism in the industry.

9  People laughed at them.  They would go to trade shows.

10  People would look at them and they would say, That can't

11  work.  It took years to educate the industry.

12       Mr. Drake testified, I wanted to partner with

13  Scott Elrod, educate the industry about ozone.  Why do

14  you need to educate the industry on something that's so

15  obvious?

16       All of those facts, you'll see in the rest of my

17  slides I identify, highlight articles from industry

18  writers and others who show how much skepticism there was

19  they were overcoming.  That by itself proves the

20  nonobviousness.

21       THE COURT:  All right.

22       MR. MILLER:  Thank you, Your Honor.

23       THE COURT:  Mr. Foster, I anticipate you were

24  expecting a longer break.

25       MR. FOSTER:  Pardon me?

1        THE COURT:  I anticipate you were expecting a

2 longer break?

3        MR. FOSTER:  I was busy outlining my irreparable

4 harm argument.

5        Okay.  All right.  On irreparable harm --

6        THE COURT:  I will tell you, Mr. Foster, that I

7 think this is the weakest part of your case so I want to

8 hear about irreparable harm.

9        MR. FOSTER:  Okay.  Thank you.

10       I think, first of all, irreparable harm, the Court

11 understands the definition, cannot be compensated for

12 with money damages.

13       THE COURT:  Exactly.

14       MR. FOSTER:  And I would start with what we have

15 from Mr. Elrod's testimony yesterday.  I think it

16 illustrates some critical points that will be a focus of

17 what type of harm that we are going to see if they're not

18 enjoined.

19       First of all, focussing on where they were before

20 entry into the market.  Before entry into the market

21 there were no substantial players selling products that

22 were in the field for ozone.

23       THE COURT:  Let's cut to the chase here, because

24 certainly your position, and it's meritorious, is that

25 this is a two-player market and that the way it has

1  evolved, Scent Crusher moving into the retail market that

2  for business reasons Ozonics vacated, but if that's true,

3  then at the end of the day it would be very simple

4  through discovery to find out what sales they had made

5  and what the financial value of their harm, if

6  infringement is ultimately found, would be and so I -- I

7  don't know how you under this financial scenario get to

8  irreparable harm.

9        MR. FOSTER:  Okay.  I think that -- that

10  the -- the issue is not for irreparable harm for us can

11  we identify all of their sales and if they take over that

12  retail space that we vacated, that that is our harm.

13        What it does do is we trained the market where to

14  go to find Ozonics over years and years of hard work

15  until we finally get to the point.  We have, I think a

16  two-supplier market, if you agree, we had testimony from

17  Mr. Cragun it was a two-supplier market; testimony from

18  Mr. Elrod it was a two-supplier market and in our view no

19  substantial evidence to the contrary.  There are some new

20  products that are out there but all defined as used in

21  enclosed spaces.

22        So the case law establishes that two-supplier

23  markets, when someone comes in, quite apart from being

24  able to possibly show lost profits and get your profits

25  in the form of damages, but that creates irreparable harm

1    in a variety of ways.  And I do think that -- that the

2    testimony of the perfect storm here, they vacated that

3    retail market that reaches the same endusers that they're

4    fighting for, relying on the patent rights and then

5    Cabela's goes to them and says, Hey, we don't have a

6    product, come in here and sell it in that market.

7         And you've seen their sales, and in the -- in the

8    first year, their orders and commitments are shocking to

9    us, to Ozonics -- Ozonics hasn't seen it because it has

10   been designated confidential but it's -- it's -- if they

11   continue on that path, you heard the testimony from

12   Mr. Elrod, and it's backed up by the data that you have,

13   it's -- is the market going to expand and have them stay

14   where they are, if there's one product in the market, the

15   patented product, and that's what the Patent Act gives

16   you is the right to exclude others.

17        They may not be as talented marketing as other

18   companies, they may not do it in a different way, they

19   made an election to go there, relying on the fact that

20   those customers that they had trained to go to Cabela's,

21   Scheels, Dick's, all these big box stores will find them

22   online and in their shows and will buy it because there's

23   one place to get it.  And where the record is clear in

24   the declaration that Ozonics has had to file multiple

25   suits against would-be infringers and they all have

41

1   stopped infringing.

2       So you -- they have policed the market to

3   eliminate competitors and if there was one, why does

4   Cabela's go to them when we decide to go direct

5   marketing, if there was something they would just say,

6   well, we'll buy those instead of making

7   something -- something new, so that is an element of

8   irreparable harm and I want to get to it, a case that

9   talks a little bit about irreparable harm.

10      THE COURT:  I would like to take this time to

11  point out, Mr. Foster, that you all have already been up

12  here 50 minutes --

13      MR. FOSTER:  Yes.

14      THE COURT:  -- and so I don't have a whole day to

15  devote to your argument --

16      MR. FOSTER:  Got it.

17      THE COURT:  -- so we need to kind of --

18      MR. FOSTER:  Cut to the chase.

19      THE COURT:  -- be a bit more efficient.

20      MR. FOSTER:  Understood.  Understood.

21      Okay.  When we have -- the other component -- so I

22  think when you look at -- look at the case, the *Veeco*

23  case is a great case, and -- could you go to -- pardon

24  me.  I do have it.  It's slide ten.

25      MS. STUCKI:  What one?

1          MR. FOSTER:  Slide ten of my opposing.

2          This is an example, if we pull this up, the *Veeco*

3 case, I like this case because, a) it is recent; and, b)

4 though it is from New York, it has got heavy citations to

5 current Federal Circuit law and quotes, So what is

6 irreparable harm?  Loss of customers, orders, market

7 share.

8          Do we have that?  We -- we have proven that, when

9 you look at --

10          THE COURT:  Item one is not irreparable harm.

11 Those can all be compensated for by financial discovery

12 and compensation.

13          MR. FOSTER:  Correct.  Correct.  I think it's

14 conjunctive there.  It's not "or" --

15          THE COURT:  No, I understand, I'm just telling you

16 how I look at this.

17          MR. FOSTER:  Right.  And then price erosion, loss

18 of business opportunities, loss of goodwill and

19 reputation.

20          Let's turn to price erosion briefly.

21          Price erosion -- do you have Slide 18?  For Cragun

22 and five?

23          There we go.

24          This is -- this -- no, take that off, please.

25          I have got the wrong slide there.

```
1        We have -- we have 50 to $100 difference per unit

2  that run from $250 --

3        THE COURT:  I saw that; they're undercutting you

4  by about $100 in the market.

5        MR. FOSTER:  Hundreds in the market.

6        THE COURT:  And your client's testimony is that he

7  will have to match that.

8        MR. FOSTER:  Yeah, exactly.  And the price erosion

9  issue creates -- creates damages and harm that you cannot

10 compensate for.

11       You know, how -- you're going to take that market

12 down, even if you got a permanent injunction, ultimately,

13 you're not going to be able to recapture -- when you're

14 at three or $400 you're not going to be able to jump back

15 up.

16       If we reset the market, we can't recover that

17 under the patent law, that is not damage -- damages that

18 we can recover.  You know, we can certainly recover some

19 price erosion but not for all of the impacts and that's

20 why the case law is very clear that price erosion is one

21 element of irreparable harm.

22       And we've got a clear case of it.  And why would a

23 customer spend $100 more for three or $400 unit buying

24 ours when they could by theirs?  It's going to kill it.

25       Although another thing that is critical, and the
```

1  cases talk about it, is the mainstream effect and I

2  would -- I would cite you to the *Metalcraft* and the *Apple*

3  case, I think those are in our briefs, and that's where

4  in the network day and age both companies are out there

5  on social media, out there on the internet, and we've

6  provided a -- an Exhibit Z-A, for instance, is a -- a

7  bunch of internet posts and comment boards.

8       The hunting community thrives in that environment,

9  pictures of people in the tree stand with their animals

10 that they've harvested, the effect of that and

11 recommending your friend, your buddy when we're doing

12 direct marketing and we have one platform, it's going to

13 ruin our ability to sell and quite apart from and to grow

14 our business.

15      THE COURT:  This is a goodwill argument?

16      MR. FOSTER:  There is a goodwill argument and

17 there's two different components of it, is it's basically

18 we have a patented product and we've submitted the

19 evidence and Mr. Elrod's declaration, we put the flag up

20 of the patent in our marketing materials.  It's on our

21 website, it's what we put in our booths, it is who we

22 are.

23      We have patented innovation; we're exclusive, it

24 takes away our entire credibility as a company, quite

25 apart from any sale that we lose, we now are looked at as

1  a fraud.  And if you'll see in the record that Scent

2  Crusher has advertisements saying, We are the

3  originators, we are the innovators, when they

4  essentially --

5          THE COURT:  Right.

6          MR. FOSTER:  -- copied the design.

7          The next issue is enforcement.  And there were a

8  couple of products that were identified that are new, not

9  yet available, including one from Scent Lock which we

10  have -- we don't -- haven't looked at it yet but it came

11  out after they announced their product.

12          One of the harms that we have is if they're

13  allowed to continue then everybody else jumps in and all

14  of a sudden we defeat our ability to defend our patent

15  and that's -- the law appreciates and respects that

16  element as an element of irreparable harm as well.

17          And reputation of an innovator, the *Celsis* case

18  that we've cited and the *Trade Techs* reputation on

19  infringement, you've even got social media, they're

20  publishing to social media, "What about Ozonics'

21  patents," somebody asks?  We found loopholes.  So now

22  everybody's seeing that there's loopholes in their

23  patents and our ability to enjoy the goodwill of the

24  exclusive right given to Ozonics through the patent

25  office is there.  The patent enforcement.

1          The *Douglas Dynamic*, federal case, 2013 case,

2    Douglas' reputation would be damaged if its sellers or

3    buyers believed it did not enforce its intellectual

4    property rights.  And, again, that's the two-player

5    market cases I'd cite to you, Robert Bosh, two-player

6    market may well serve as substantial ground for granting

7    an injunction because it creates an inference that

8    infringing sales amounts to a lost sale of the patentee,

9    loss of market share and goodwill and other ways.

10          *Hydrodynamic*, evidence of a two-player -- this is

11   District of California case, but saying --

12          THE COURT:  I'm going to give you five more

13   minutes --

14          MR. FOSTER:  I've got it.

15          THE COURT:  -- to say whatever else you want to

16   say, so...

17          MR. FOSTER:  Got it.

18          I -- the *Hydrodynamic* case, another one on

19   two-supplier market.

20          In short, Mr. Elrod and his company have worked

21   hard.  They have earned through blood, sweat and tears

22   patent rights.  They finally arrived in the marketplace

23   and at the perfectly wrong time Scent Crusher has come

24   in, we believe we've made our case on the merits, and

25   irreparable harm would be suffered if they -- if they

1   were not enjoined.

2          I will have -- answer any questions, but I'll turn

3   it over to the other side.

4          THE COURT:  I think we'll hear from defendant.

5          MR. FOSTER:  Thank you.

6          MR. WEEMS:  Thank you, Your Honor.

7          Your Honor, normally I would address the four

8   factors in the traditional order:  Substantial likelihood

9   of success on the merits; balance of harm; irreparable

10  injury; public interest, normally I would address them in

11  that way.  However, given what the Court has already said

12  I want to address them in a slightly different order.

13         THE COURT:  All right.

14         MR. WEEMS:  I want to start with irreparable

15  injury and then I will go back to likelihood of success

16  on the merits, balance of the harms, and public interest.

17         So, starting with irreparable injury, Your Honor,

18  and certainly this is a very weak part of the plaintiffs'

19  case, the plaintiffs' argument is that they can't

20  calculate the damages.  However, the plaintiffs have

21  already retained an expert witness who has made a career

22  out of calculating damages in patent cases and other

23  intellectual property cases.

24         THE COURT:  And that expert witness is part of

25  what they're relying on to say they can't calculate

1  damages here?

2       MR. WEEMS:  Right, and whether he is actually

3  qualified to give an opinion that the plaintiff will

4  suffer irreparable injury I think is -- I have never seen

5  an expert opine on irreparable injury but all of the

6  things that the plaintiff has pointed to I believe are

7  easily calculable or not compensable.

8       The -- the -- as the Court has already noted, any

9  lost sale, any sale that MoJack makes can be argued to be

10  a lost sale for Ozonics.

11       THE COURT:  How would you address price erosion?

12       MR. WEEMS:  Well, the plaintiffs' expert has

13  testified in cases on price erosion.  Right?  He has

14  testified --

15       THE COURT:  Just because, Mr. Weems, plaintiffs'

16  expert has determined that he can calculate damages in

17  other case doesn't mean that his hiring in this case

18  means that he must be able to calculate damages here.

19       MR. WEEMS:  "Must" is a strong word, it's an

20  absolute word, certainly, but he's got the ability to do

21  it and I think there are ways to calculate price erosion.

22  You have got a demonstrated history of sales and

23  increases in sales each and every year, so if Ozonics has

24  lesser sales or if they really do, in fact, have

25  to -- have to address price erosion they can take that

1  into account in their modeling.  So for -- for that

2  component of it that will show up in -- obviously in

3  their revenue if they, in fact, do have a decrease in

4  revenue.

5        And that's speculation I think, I mean I think

6  there are lots of consumers, there are lots of consumers

7  who may well want to go to Bass Pro or Cabela's or

8  whatever to see a unit on the shelf but then they go home

9  and they order something on the internet.

10       THE COURT:  Well, that has to be speculation at

11  this point because Scent Crusher has only been marketed

12  for a couple of weeks.

13       MR. WEEMS:  That's right.  Yes, yes, I agree.

14       THE COURT:  All right.

15       MR. WEEMS:  But each of the things that the

16  plaintiff points to, lost sales, lost certification, lost

17  accessories, all of those things given the two-player

18  market, they'll be able to look at --

19       THE COURT:  What about his reputation and goodwill

20  argument?

21       MR. WEEMS:  Well, and so on the reputation and

22  goodwill, so Mr. Elrod was the one who came to market

23  first with this technology.  He will always be the one

24  who came to market first with this technology.

25       Whether -- whether Scent Crusher comes in now or

1  whether Scent Crusher comes in at some point in the

2  future Mr. Elrod will always be the first.  He will

3  always have -- it's a fact:  He will always be the first.

4  And there's no -- there's no way that anyone can ever

5  take that away from him.

6          THE COURT:  All right.

7          MR. WEEMS:  Mr. Drake has actually acknowledged in

8  correspondence, Mr. Elrod is a pioneer.  That fact will

9  always remain with him.

10          THE COURT:  Mr. Drake kind of pretty much

11  disavowed everything he said.

12          MR. WEEMS:  Well, I think he certainly

13  characterized the import of his intent behind the

14  correspondence that he did send was to try to get

15  Mr. Elrod's attention.  He was trying to court, he was

16  trying to get a meeting, and so he threw out what he

17  threw out in his letter, but he acknowledges in the

18  pioneering Mr. Elrod was first and he'll always be first.

19  He will always have that reputation.

20          So, for each of those -- for each of those

21  components that the plaintiff lists for potentially

22  things that they could not calculate given the two-player

23  market, given what's going on here in this market, it's

24  going to be calculable or something that cannot be taken

25  away from plaintiff at all.

1        Let me go back, Your Honor, to the likelihood of

2   success on the merits.  Of course the plaintiff has the

3   burden to show each of these things.  The -- the

4   extraordinary remedy of an injunction is one that

5   obviously the Court is very well familiar with the

6   standard but there -- there are two issues I think on the

7   likelihood of success on the merits.

8        You've got the claim construction, the

9   infringement, whether there is infringement, and then you

10  you've got the invalidity.  I am going to start with the

11  infringement.  So, Dr. Friis is the only expert who

12  testified on this subject.  The plaintiff attacks her as

13  essentially being overqualified.  I'll come back to that

14  attack in a couple of minutes.

15       In terms of the actual infringement, what we have

16  here is the initial stream of ozone and then the

17  immediate dispersion of the ozone.  And there's been no

18  dispute by anyone that that is, in fact, what -- what is

19  going on here.

20       What's missing and what was missing from the

21  plaintiff's 50 or 55-minute presentation was the

22  plaintiff picks the words in its patent.  The plaintiff

23  is the one who picks the words in its patent.  And so

24  everything that the -- that is happening here is

25  happening in the context of the plaintiff picking the

1  words and the plaintiff having to pick those words very

2  carefully because if that patent is accepted, the

3  plaintiff is going to have a monopoly so the words that

4  the plaintiff picks are very important.

5       Now the plaintiff here happened to pick words that

6  the evidence, I think doesn't show that even the

7  plaintiffs' products are practicing.

8       THE COURT:  And that's what troubles me about your

9  argument because you define the words that are critical

10 to the infringement claim in a way that it's impossible

11 for anyone to comply with them and I think that sort of a

12 construction is disfavored if there's an ordinary and

13 reasonable meaning of these terms that would be generally

14 understood and that would cover the -- the performance of

15 the patented material as it's demonstrated, then the fact

16 that you can define those words in a way that no one can

17 mean that suggests to me that that's a -- an

18 inappropriate definition.

19      MR. WEEMS:  Well, but the plaintiff could have

20 picked a number of different words.

21      THE COURT:  My point is the plaintiff could have

22 covered what their invention does under an ordinary

23 interpretation of those terms, but Dr. Friis puts a

24 highly constrained interpretation on those terms which

25 means that no invention could cover that, and

1  that -- that alone suggests to me, given that an ordinary

2  interpretation of those terms would demonstrate what

3  plaintiffs' invention does, that alone suggests to me

4  that Dr. Friis' interpretation of those terms is perhaps

5  overly strained.

6         MR. WEEMS:  Well, I wouldn't think that no

7  invention --

8         THE COURT:  That's pretty much what she said.

9         MR. WEEMS:  Well, she's not -- she testified, as I

10 recall, that she had looked at the Scent Crusher products

11 and she had looked and she had examined -- physically

12 examined those.  I think the Court was correct when it

13 earlier today described it's really kind of implicit in

14 her testimony that she would -- would say that with

15 respect to the Ozonics products, that it's got the same

16 issue:  It's got the initial stream that then immediately

17 disperses.

18        Now it is possible that you could have a product

19 that would have enough force behind it that it would have

20 a stream to apply the ozone directly to the hunter, the

21 hunter's clothing and equipment and so forth.  Now the

22 fact that the plaintiff's product doesn't do that doesn't

23 mean that no product could do that.

24        THE COURT:  Well, it doesn't do that as she

25 defines "stream."

1          MR. WEEMS:  Yes.  But there's been no evidence by

2   anyone that the Ozonics product does that, and certainly

3   Dr. Friis' testimony is that there's -- there's no

4   evidence that the Scent Crusher product --

5          THE COURT:  The whole infringement -- the whole

6   infringement issue turns on, wouldn't you agree, the

7   definition of the terms "stream" and "eliminate"?

8          MR. WEEMS:  "Stream" --

9          THE COURT:  That's the gist of Dr. Friis'

10  testimony.

11         MR. WEEMS:  "Stream," "eliminate" and I think

12  "configured" potentially.  But "stream" and "eliminate"

13  certainly were the bulk, perhaps all of Dr. Friis'

14  testimony.

15         THE COURT:  Right.

16         MR. WEEMS:  Right.  So "stream," "eliminate," and

17  then, potentially, "configure."

18         THE COURT:  Talk to me about "configure."

19         MR. WEEMS:  Well, so the patent actually talks

20  about it's got to be configured in such a way so that the

21  stream is applied and it's the configuration language

22  that I think it's got to be -- you've got to look at the

23  claim in its entirety and the configured language it's

24  actually required to be configured in such a way that the

25  stream applies things and eliminates scent.

```
 1           THE COURT:  Okay.  And this goes to the two-scent
 2   of the application of Scent Crusher?  The 270 degree.
 3           MR. WEEMS:  Oh, the 270 degrees.  That is
 4   certainly one of the features of the Scent Crusher
 5   product that is not apparent in the ozone -- Ozonics
 6   product, excuse me.
 7           THE COURT:  All right.
 8           MR. WEEMS:  All right.  So I've talked a little
 9   bit about the stream but one thing I want to specifically
10   mention about the "stream" before I turn to the
11   "eliminate" is if you look at that patent history, it's
12   Exhibit 409 that we introduced into evidence, and it's a
13   pretty long patent history, but if you look at the
14   original claim, Page 68 of Exhibit 409, if you look at
15   the original claim it specifically talks about "volume"
16   and it talks about "stream."
17           Then, when you get to the claim that is actually
18   supported and -- and ultimately approved by the patent
19   office, that is Page 1 of Exhibit 409, the "volume"
20   language is gone.  The "volume" language was abandoned
21   and the plaintiff made that decision to abandon the
22   "volume" language in favor of the "stream solely"
23   language.  That was the plaintiffs' decision.  The
24   stream, though, also has to eliminate or deodorize and
25   those are absolutes.
```

1        Now, I -- I heard the Court's questions about the

2   hundred percent, but the plaintiffs' interpretation is,

3   really that if there's any elimination of any molecule,

4   or any bit of bacteria, that that's enough.  Again, it's

5   the plaintiffs that chooses the words here, and the

6   plaintiff picks the word "eliminate" not anyone else.

7   The plaintiffs pick that word.

8        So if the plaintiff is really going to argue that

9   any elimination of any molecule or any piece of bacteria

10  is enough to be a limitation, that potentially could

11  render the patent overly broad and something that the

12  patent and trade office would take a look at on inter

13  partes review.

14       The elimination, certainly the elimination that

15  Dr. Friis testified about, she said highly unlikely with

16  the Scent Crusher products, also potentially highly

17  unlikely with the Ozonics products, when the plaintiff

18  picks those words, it's the plaintiffs -- well, the

19  plaintiff picks those words and the plaintiffs should be

20  held to those words.

21       Now, one of the things that you heard today was

22  that if you look at the *Hess* language and the *Hess*

23  definition, the Court specifically said that it was

24  troubled by the use of the *Hess* definition for scent

25  elimination just because it happened to be found in the

1   patent file somewhere.

2          THE COURT:  Well, I -- I was troubled by its

3   applicability to its use in the Ozonics patent, right.

4          MR. WEEMS:  And I think there is good reason to be

5   troubled by it.  The plaintiff never identified an

6   instance where the plaintiff adopted that definition.

7   Right?  I mean it's there, it's in *Hess*, it's disclosed.

8          Did the plaintiff actually say, We're adopting the

9   definition of elimination that is in *Hess*?  You haven't

10  heard any evidence of that by the plaintiffs in the four

11  hours of testimony we heard yesterday, or the 50 minutes

12  of argument that we heard this morning.

13         If the plaintiff wants to adopt that definition

14  and tell the patent office that they adopt that

15  definition, they ought to be able to pinpoint and cite in

16  the record where it is that they did that.  We don't

17  believe that they did.

18         THE COURT:  All right.

19         MR. WEEMS:  In terms of the invalidity -- well,

20  before I turn to invalidity, Your Honor, I want to talk a

21  little bit about the attacks on Dr. Friis.

22         And so obviously she's a mechanical engineer,

23  she's got research, she teaches classes on ozones.  The

24  one thing you didn't hear the plaintiff talk about at all

25  was the fact that she grew up in a hunting family.

1  Right?

2         So the plaintiff wants to --

3         THE COURT:  Her hunting nexus was pretty weak.

4         MR. WEEMS:  It -- it was certainly not --

5         THE COURT:  I grew up in a hunting family, too.  I

6  would -- and I've done as much hunting as she has.  I

7  would not identify myself as a hunter and the fact that

8  she can't even bring herself to pull the trigger to make

9  a kill I think pretty much disqualifies her as a hunter,

10  so if you're -- if you're relying on her with hunting

11  expertise, that's a pretty easy loss.  She -- she did not

12  have hunting expertise.

13         She's an impressive professor, I was very

14  impressed with her --

15         MR. WEEMS:  Yes, yes.

16         THE COURT:  -- but she's not a hunter.

17         MR. WEEMS:  And I don't -- I don't think she would

18  describe herself as a hunter but did you notice when the

19  plaintiff was going -- when the plaintiffs were going

20  through their slides, they adopted a definition or they

21  proposed a definition that requires two or three years of

22  experience as a hunter in order to meet their definition?

23  That definition wasn't pulled from anywhere other than

24  the engineer of the plaintiffs' counsel.  That definition

25  didn't appear in the patent and trademark record.

1          THE COURT:  Well, the length of tenure of hunting

2   is not really pertinent to today's discussion.  Dr. Friis

3   is not a hunter.

4          MR. WEEMS:  I -- I agree.  She is not a hunter.

5          But essentially their attack is that she hasn't

6   used ozone to eliminate the scent of hunters in the

7   field, however compare and contrast what she did with

8   what the plaintiff has done.

9          Dr. Friis has actually seen and used the Scent

10  Crusher products.  She has physically examined and used

11  the Scent Crusher products.  Mr. Elrod testified he has

12  seen pictures of the Scent Crusher products.

13         THE COURT:  Well, of course as you pointed out,

14  when Mr. Elrod filed this case Scent Crusher products

15  were not commercially available.

16         MR. WEEMS:  They were not, I mean Mr. Elrod

17  testified, though, that he has one.  That he bought one.

18         THE COURT:  He has one now.

19         MR. WEEMS:  Right, and there was certainly no

20  reason he couldn't have looked at one in preparation for

21  this hearing.  Right?  So to -- attacking

22  the -- attacking Dr. Friis --

23         THE COURT:  I don't know that they attacked

24  Dr. Friis, I think they just defined her qualifications

25  in a way that is pertinent to the practice of the art.

1  So...

2       MR. WEEMS:  Okay.  The -- the other -- the other

3  argument that the plaintiffs make with respect to

4  Dr. Friis is that she didn't consider commercial success.

5       Now, the consideration of commercial success

6  really goes to the obviousness issue, and I heard the

7  Court when it -- when it said that, we've got a pretty

8  difficult road to hoe on the invalidity issue --

9       THE COURT:  Here's your problem in the invalidity

10 issue:  Dr. Friis, despite her impression, she has

11 no -- she has even less experience in patent and

12 trademark applications than she does in hunting, and so

13 Dr. Friis was presented as a witness or an expert to say

14 that notwithstanding that the patent and trademark office

15 in granting Ozonics a patent considered all these prior

16 arts, that I should accept her testimony with respect to

17 this prior art over the determination of the patent and

18 trademark office which, she has no qualifications to do

19 because it appears that her sole experience with patents

20 is that she is currently in the process of applying for

21 one.

22       So, that's why I told plaintiffs' counsel that I

23 heard no credible evidence on invalidity.  The patent and

24 trademark office addressed the very issues you're relying

25 upon here, which gives you a steep burden to achieve and

```
 1   to respond to that, you presented someone with no

 2   experience in patents, so...

 3        MR. WEEMS:  Well, we do have the option and we are

 4   certainly considering the option of asking for inter

 5   partes review before the U.S. Patent and Trademark

 6   office.

 7        THE COURT:  That is certainly an option you have

 8   but it doesn't effect my jurisdiction.

 9        MR. WEEMS:  I'm not suggesting it does.

10        THE COURT:  Right.

11        MR. WEEMS:  We can ask for that and if we do, we

12   may or may not ask you to stay this litigation.

13        THE COURT:  Right.

14        MR. WEEMS:  And you may or may not do it.

15        THE COURT:  And I have had those motions before

16   and I am familiar with that option.

17        MR. WEEMS:  Yes.

18        THE COURT:  I am assuming, by the way, that Scent

19   Crusher is not seeking patent protection for its product?

20        MR. WEEMS:  Not that I know of.

21        THE COURT:  All right.

22        MR. WEEMS:  No.  I -- I do not believe so.

23        THE COURT:  That was my assumption.

24        All right.  But before I go back to -- well, since

25   we're talking about the invalidity issue, the one thing
```

1   that I want to say about the invalidity issue, the *Dawson*

2   reference that Dr. Friis talked about and that's cited in

3   our brief at Page 15 in Footnote 5, the *Dawson* reference,

4   there is a couple of things that are significant about

5   it.

6          One is the downwind, the downstream element, which

7   certainly is taught by *Dawson*, and the other is the

8   depiction of "in the field."  Now, we believe that the

9   plaintiffs who were doing the patent prosecution, we

10  believe that they had *Dawson*, we believe that they took

11  the *Dawson* image and disclosed that to the patent office

12  but for some reason did not disclose the entire *Dawson*

13  prior art to the patent office.

14         THE COURT:  Well, the patent office had *Dawson*

15  disclosed to them it would have access to the prior art

16  itself?

17         MR. WEEMS:  Well, but we believe that the only

18  image from *Dawson* -- only an image from *Dawson* was

19  disclosed, not the entire prior art itself.  Right?  And

20  so the things that we believe that are significant about

21  *Dawson* are the downwind/downstream element and then the

22  depiction in the field.  And so those things we believe

23  are significant about *Dawson*, it's not just cumulative of

24  the other prior art because of those differences in

25  *Dawson*.

1          Turning back to the other argument that the

2     plaintiff makes with respect to Dr. Friis, the secondary

3     indicia of nonobviousness, the commercial success really

4     comes into play if you are looking at the obviousness

5     issue.  And one thing that is missing from the

6     plaintiffs' discussion is the nexus that has to be shown

7     between the commercial success and the intellectual

8     property issue.

9          We would cite to the Court the case of *Classco*

10    *versus Apple*, 8384 F.3d 1214 at 1220, and that case says,

11    and I quote, "For objective evidence of secondary

12    considerations to be imported substantial weight its

13    proponent must establish a nexus between the evidence and

14    the merits of the claimed invention."

15         That -- although certainly there was lots of

16    evidence of commercial success, what's missing from the

17    plaintiffs' presentation, what was missing from the

18    evidence, what was missing from the discussion this

19    morning is any sort of nexus between the intellectual

20    property, the patents, the claims in the patents, and the

21    commercial success.  And so although the plaintiff says,

22    Dr. Friis didn't consider that, this is obviously an

23    expedited proceeding, we haven't done discovery, we

24    didn't have any discovery that we could give her.

25              THE COURT:  Right.

1           MR. WEEMS:  And of course there's no evidence,

2   there's no nexus between that commercial success and the

3   claimed intellectual product.

4           All right.  Let me go now, Judge, and talk a

5   little bit about the balance of the harm and the public

6   interest.

7           THE COURT:  Pretty much both companies have told

8   me that if I rule against them on this motion, it will

9   destroy their company.

10          MR. WEEMS:  It is -- it is tough.

11          THE COURT:  So I mean, the harms appear to be

12  devastating on either side.

13          How do they favor one party over the other?  I

14  mean pretty much wouldn't you agree that's what both CEOs

15  testified, that if -- Ozonics said if I allow Scent

16  Crusher to continue to market, it will ruin their

17  company; Scent Crusher said if I enjoin them from

18  continuing to market, based on their lines of credit and

19  the bank loans it will ruin their company?

20          So this has become capital litigation, I guess.

21          MR. WEEMS:  I think that's -- that's a fair

22  characterization of what I heard yesterday, Your Honor,

23  and I would agree with that characterization.

24          What I would show or what I would point out,

25  though, is that it is the plaintiffs' burden to show that

1  the balance of harms weighs in their favor. So if it's

2  even, plaintiff loses.

3       THE COURT: Well, the -- there are four factors

4  that I have to consider --

5       MR. WEEMS: Yes.

6       THE COURT: -- right?

7       MR. WEEMS: Yes. And that's -- yes.

8       THE COURT: So I can still grant an injunction

9  even though I may find one of the factors neutral.

10      MR. WEEMS: I'm sorry, you're absolutely right.

11 There are obviously four factors, and I should have said

12 that: If it's even, plaintiff loses on that factor --

13      THE COURT: Right, right.

14      MR. WEEMS: -- not the whole --

15      THE COURT: I agree, plaintiff has the burden.

16      MR. WEEMS: Yeah. Yeah.

17      Lastly, the public interest. And I don't want to

18 spend a lot -- I'm not going to spend a lot of time on

19 the public interest, the plaintiff certainly talks about

20 the public interest and patent and all that kind of thing

21 but we have cited in our brief cases that deal with

22 competition as a public interest and, in fact, one of the

23 cases that we cite talks about the importance of

24 competition, imitation and refinement and certainly we

25 have, to some extent, imitation but more importantly we

1  have refinement that's gone on here.

2        The Scent Crusher products, I mean you heard the

3  testimony, what happened with Scent Crusher to develop

4  its product, what it did is it went out and talked to

5  hunters, What do you like about what's available in the

6  market?  What -- what kind of things would you like to

7  see that's not there?  And what kind of refinement can be

8  done?

9        And obviously we believe that because of the

10  refinements that we've done, the additional features and

11  benefits that Scent Crusher has on its products, the

12  public interest factor does not weigh solely in favor of

13  the plaintiff.  The competition and the refinements that

14  we have done also weigh in our favor on that point as

15  well.

16        THE COURT:  Okay.  One other question,

17  Mr. Weems --

18        MR. WEEMS:  Yes, sir.

19        THE COURT:  -- which I did not address with

20  plaintiff, there are two procedural issues that I need to

21  take up with you all.

22        If I grant an injunction -- and by the way, I

23  typically in preliminary injunction rulings or

24  preliminary injunction hearings rule from the bench.  I

25  actually came into this hearing hoping to do that.

1  I'm -- I'm not going to do that.  I think the case is

2  complicated enough and such that I am not going to be

3  able to give you a ruling here before noon today, which I

4  regret because of the nature of the injunction hearing is

5  an emergency, but I am going to have to issue an order on

6  this.

7      But if I grant an injunction, defendants are

8  entitled to a bond.

9      MR. WEEMS:  Absolutely.

10     THE COURT:  Talk to me about what you think that

11 bond should be.

12     MR. WEEMS:  So Mr. Drake's Affidavit which was

13 filed under seal I think gives the amounts that we would

14 request for the bond.  And so if the Court were to grant

15 the preliminary injunction --

16     THE COURT:  And I apologize, you all obviously

17 buried me in a blizzard of paper before this hearing,

18 which I had time to absorb only in differing amounts.

19 You're saying Mr. Drake's Affidavit actually sets forth

20 an amount of what he thinks a bond would need to be?

21     MR. WEEMS:  Yes, sir.

22     THE COURT:  Okay.  Very well.

23     MR. WEEMS:  I mean, he doesn't phrase it, Your

24 Honor, in terms of, I think the bond should be "X," but

25 he does phrase it in terms of, these are the monetary

1  harms to our company if the injunction were to be

2  granted.

3          THE COURT:  All right.

4          And my next question for both counsel is our way

5  forward, whether I grant or deny the injunction of course

6  does not resolve the case.

7          MR. WEEMS:  That's correct.

8          THE COURT:  I assume counsel are aware of the fact

9  that this Court has recently adopted patent local rules.

10         MR. WEEMS:  Yes.

11         THE COURT:  I'll tell you that -- well, I'll tell

12 you two things:  That I'm familiar with them because I

13 actually chaired the committee that reviewed and adopted

14 them.  Nevertheless, I was never an intellectual property

15 practitioner so I don't want to assert any unearned

16 expertise.  Nevertheless, those are rules that exist

17 setting forth your way forward at least in preliminary

18 matters.

19         Judge Teresa James has been assigned as a

20 magistrate in this case for those preliminary matters.

21 Is there anything -- is there any matter with respect to

22 the way forward that we need to talk about while we're

23 all here given that those local rules exist and they are

24 going to be primarily administered by the magistrate

25 judge?

```
 1          Anything that you think --

 2          MR. WEEMS:  Well, I mean the one thing that comes

 3  to mind is, you know, obviously once the defendant has

 4  filed an answer and in this case we now have, once the

 5  defendant has filed an answer, there will be a scheduling

 6  conference set being pretty short order.

 7          THE COURT:  Right, right.

 8          MR. WEEMS:  As much as we can do to -- to have

 9  that move forward quickly, I mean in the ordinary course

10  it will happen pretty quickly any way, so I don't know

11  that there is a whole --

12          THE COURT:  Part of the thing is designed in the

13  local rules is to expedite the development of the case --

14          MR. WEEMS:  Yes.

15          THE COURT:  -- because, again, irrespective of how

16  I rule on this motion, third parties are going to want a

17  rapid resolution.

18          MR. WEEMS:  I agree, I agree.

19          THE COURT:  Okay.

20          MR. WEEMS:  So to the extent you could put in a

21  good word with Judge James and say, Look, this case is

22  ready for a settlement conference, that would be

23  appreciated.

24          THE COURT:  I think you'll find her a very

25  efficient administrator of these issues.
```

1           MR. WEEMS:  She certainly has been in my

2   experience.

3           THE COURT:  All right.

4           MR. WEEMS:  So for all those reasons, we would ask

5   that the plaintiffs' motion be denied.

6           THE COURT:  Thank you Mr. Weems.

7           Let me hear from plaintiffs simply regarding the

8   bond issue --

9           MR. FOSTER:  Okay.

10          THE COURT:  -- which I neglected to raise with you

11  during your initial presentation.

12          MR. FOSTER:  Am I pressing my luck if I pull up a

13  slide with federal circuit law and balance of harms?

14          Okay, it's in my slides and you'll see it.

15          THE COURT:  All right.  We'll see your slides.

16          MR. FOSTER:  I think that helps answer your

17  question.

18          On the bond, the testimony, first of all, that was

19  provided is, there --

20          THE COURT:  And I guess I'm not certain, have you

21  seen Mr. Drake's sealed Affidavit to which Mr. Weems

22  referenced?

23          MR. FOSTER:  Yes, yes, we have.

24          THE COURT:  I wasn't sure if you had seen it if it

25  was sealed in this case --

1          MR. FOSTER:  I'm not --

2          THE COURT:  -- and because --

3          MR. FOSTER:  I'm not going to put the number.

4          THE COURT:  Okay.

5          MR. FOSTER:  But it says we have "X" number of

6   dollars in orders and/or commitments, okay?  Orders

7   and/or commitments, and we have projected "X"

8   number -- we project "X" number of sales by the end of

9   2018, and so that's what you have.

10          My -- my concern with that is two-fold:  Number

11  one, you heard the testimony from Mr. Elrod about the

12  difference between retailers' commitments and their

13  delivery, they can cancel an order at any time, you don't

14  have a contract, you don't have that what you heard from

15  their corporate representative, Mr. Drake was they have

16  inventory of 500 units each, I think if you apply the

17  math to that that would be a more appropriate bond and I

18  think you also have a relatively small company and I

19  think there might be some value in on the bond issue

20  determining exactly what they -- the real number is as

21  opposed to the orders and/or commitments because that's a

22  little -- a little -- little weak out there.

23          So I think that would define the -- his

24  declaration would define the high end of the bond, I

25  think it's -- there's -- it should be lower than that and

```
 1   I think a closer measure would be what their actual
 2   inventory is because that's what they have and they would
 3   have to get rid of it.
 4        If you stop it, that is what we believe it would
 5   be.
 6        THE COURT:  All right.
 7        MR. FOSTER:  That's it on the bond.
 8        And we have -- we have a relatively small company,
 9   and I think when you look at our revenues which are in
10   Mr. Elrod's declaration to the penny, last year, and you
11   compare those to the revenues they expect, you should
12   look at that and realize that that is a very significant
13   portion of his sales and that needs to be taken into
14   account.  The law is clear on bonding, that the -- the
15   ability of the plaintiff to pay can be a discretionary
16   factor for the Court and I think that, in combination
17   with the orders or commitments, should call the Court
18   to --
19        THE COURT:  Well, the bonding issue in my mind is
20   a subset of the dilemma that was presented yesterday
21   that -- that whoever loses this motion faces corporate
22   ruination --
23        MR. FOSTER:  Okay.
24        THE COURT:  -- I think that is a subset of that.
25        MR. FOSTER:  And I would -- I think that's -- that
```

1  maybe is the impression the Court was left with, with the

2  testimony Mr. Drake provided in declaration and indicated

3  that similar testimony, that they have a line of credit

4  and they might have -- might not be able to fulfill their

5  covenants under that line of credit.

6        This is very successful company that has done

7  business for years and has all different areas of it so I

8  don't think we heard -- we heard Mr. Elrod say, This

9  could destroy his company.

10        THE COURT:  Yeah.

11        MR. FOSTER:  We didn't hear any testimony.

12        THE COURT:  That is fair, Mr. Drake's testimony

13  was with reference more to defaulting of his line of

14  credit --

15        MR. FOSTER:  Correct.

16        MR. WEEMS:  -- than to conduct bankruptcy.

17        MR. FOSTER:  Correct.  And I will pull up -- if I

18  may, balance of hardship, although it will be Slide 19

19  when you get it --

20        THE COURT:  Very well.

21        MR. FOSTER:  -- and it talks about you take a

22  calculated risk.

23        THE COURT:  And Mr. Hughes probably already has

24  sent this to us.

25        MR. HUGHES:  You have it.

```
 1          MR. FOSTER:  Excellent.  And I think that is the
 2  calculated risk.
 3          They knew exactly what they were doing, they had
 4  the motivation from Cabela's and lots of sales in the
 5  retail space, and that's just the risk they took and
 6  that's what the case law from the federal circuit
 7  provides.
 8          Thank you, Your Honor.
 9          THE COURT:  Mr. Weems, you're standing.  I assume
10  it is not for blood flow.
11          MR. WEEMS:  I'm sorry, it's not for what?
12          THE COURT:  Not for blood flow.
13          MR. WEEMS:  You're correct, Your Honor.
14          Mr. Knight's testimony yesterday was with respect
15  to the orders, the 500, it's 500 orders that were shipped
16  so the inventory that MoJack has is a much bigger number,
17  I don't believe he testified about that number but the
18  500, that was what shipped.
19          THE COURT:  All right.
20          MR. WEEMS:  Right?  And so it would be erroneous
21  to conclude that the bond ought to be related just to
22  500 -- 500 units.
23          THE COURT:  Well, again, counsel, I regret that I
24  am not in a position to rule today as would normally be
25  my preference with respect to a motion for injunctive
```

75

1  relief but as we discussed at the outset of the hearing,

2  it is a motion for preliminary injunction so by its

3  nature it is not a temporary order that is sought.

4        I will do this as expeditiously as we can but the

5  matter is complex enough that I think also

6  because -- because as the knowing folks in Denver do

7  exist, I think it is important that I spell out clearly

8  what the Court's position is with respect to whatever

9  position I take.

10        So, thank you for your presentations.  The matter

11  is submitted and we're in recess.

12        MR. FOSTER:  Thank you.

13        MR. WEEMS:  Thank you.

14        (Proceedings conclude at 11:07 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2         I, Jana L. McKinney, United States Court Reporter

3   in and for the District of Kansas, do hereby certify:

4         That the above and foregoing proceedings were

5   taken by me at said time and place in stenotype;

6         That thereafter said proceedings were transcribed

7   under my discretion and supervision by means of

8   transcription, and that the above and foregoing

9   constitutes a full, true and correct transcript of

10   requested proceedings;

11         That I am a disinterested person to the said

12   action.

13         IN WITNESS WHEREOF, I hereto set my hand on this,

14   the 14th day of October, 2018.

15

16              s/ Jana L. McKinney
                 Jana L. McKinney, RPR, CRR, RMR
17              United States Court Reporter

18

19

20

21

22

23

24

25